1    REED R. KATHREIN (139304)
     HAGENS BERMAN SOBOL SHAPIRO LLP
2    715 Hearst Avenue, Suite 202
     Berkeley, CA 94710
3    Telephone: (510) 725-3000
     Facsimile: (510) 725-3001
4    reed@hbsslaw.com

5    LEWIS KAHN
     KAHN GAUTHIER SWICK, LLC
6    650 Poydras Street - Suite 2150
     New Orleans, LA 70130
7    Telephone: (504) 455-1400
     Facsimile: (504) 455-1498
8    lewis.kahn@kgscounsel.com

9    Attorneys for Plaintiffs

10   [Additional counsel listed on signature page]

11                      UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                                  DIVISION

14

15   BIKASH MOHAN MOHANTY, Individually      )    No.
     And On Behalf of All Others Similarly Situated, )
16                                           )    CLASS ACTION COMPLAINT FOR
                                             )    VIOLATION OF SECURITIES LAWS
17                         Plaintiff,        )
                                             )
18              vs.                          )    **JURY TRIAL DEMANDED**
                                             )
19                                           )
     AMIR BASSAN-ESKENAZI, RAN OZ,           )
20   FREDERICK BALL, GAL ISRAELY, DEAN       )
     GILBERT, KEN GOLDMAN, LLOYD             )
21   CARNEY, BRUCE SACHS, ROBERT SACHS, )
     GOEFFREY YANG, MORGAN STANLEY &         )
22   CO., INC., MERRILL LYNCH, PIERCE,       )
     FENNER & SMITH INC., JEFFERIES & CO.,   )
23   INC, COWEN & CO., INC., THINKEQUITY     )
     PARTNERS, LLC and BIGBAND               )
24   NETWORKS, INC.                          )
                                             )
25                                           )
                           Defendants.       )
26   _____)

27

28

REED R. KATHREIN (139304)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com

LEWIS KAHN
KAHN GAUTHIER SWICK, LLC
650 Poydras Street - Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
lewis.kahn@kgscounsel.com

Attorneys for Plaintiffs

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DIVISION

| | |
|---|---|
| BIKASH MOHAN MOHANTY, Individually And On Behalf of All Others Similarly Situated, ) | No. |
| ) | |
| ) | CLASS ACTION COMPLAINT FOR VIOLATION OF SECURITIES LAWS |
| Plaintiff, ) | |
| ) | |
| vs. ) | **JURY TRIAL DEMANDED** |
| ) | |
| AMIR BASSAN-ESKENAZI, RAN OZ, ) | |
| FREDERICK BALL, GAL ISRAELY, DEAN ) | |
| GILBERT, KEN GOLDMAN, LLOYD ) | |
| CARNEY, BRUCE SACHS, ROBERT SACHS, ) | |
| GOEFFREY YANG, MORGAN STANLEY & ) | |
| CO., INC., MERRILL LYNCH, PIERCE, ) | |
| FENNER & SMITH INC., JEFFERIES & CO., ) | |
| INC, COWEN & CO., INC., THINKEQUITY ) | |
| PARTNERS, LLC and BIGBAND ) | |
| NETWORKS, INC. ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## I.     NATURE OF THE ACTION

1.     This is a class action brought on behalf of the purchasers of BigBand Networks, Inc. ("BigBand" or the "Company") common stock pursuant to the March 15, 2007 Initial Public Offering ("IPO" or the "Offering") of 10.7 million shares of common stock priced at $13.00 per share. In connection with this Offering – of which 7.5 million shares were sold by the Company and 3.2 million shares of which were sold by insiders – Defendants raised gross proceeds of at least $159.965 million (including the $20.865 million BigBand shares sold by Company insiders in connection with the IPO Underwriters' oversubscription agreement). [1]

2.     BigBand, its entire Board of Directors, its Chief Financial Officer and the Underwriters involved in the Offering (including, Morgan Stanley & Co. Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., Jefferies & Co., Inc., Cowen & Co., LLC, and Thinkequity Partners, LLC), are each charged with including, or allowing the inclusion of materially false and misleading statements in the Registration Statement and Prospectus issued in connection with the IPO, in direct violation of the Securities Act of 1933. Specifically, Defendants each failed to conduct an adequate due diligence investigation into the Company prior to the IPO, and they also each failed to reveal that, at that time of the IPO, BigBand was *not* performing according to plan, it lacked significant controls and procedures and Defendants lacked any reasonable basis to forecast near-term foreseeable financial and operational results.

3.     Moreover, at the time of the IPO, Defendants also failed to reveal that the Company's financial results were already underperforming expectations and that Defendants had boosted the financial results of the quarter immediately prior to the offering, by loading its customers with more inventory than they could possibly use in the near term – such that sales in the immediate quarters would foreseeably be adversely impacted. In addition, Defendants also failed to reveal that the roll out of its new products were not proceeding according to its growth plan, and that this transition too was adversely impacting, and foreseeably would continue to impact revenues in the near-term.

---

[1]     In total, insiders sold over 4.8 million shares, including the 1.605 million shares sold by Company insiders to the IPO Underwriters pursuant to an over-subscription option.

4.     It was only on September 27, 2007, after the close of trading – and after Defendants and other Company insiders liquidated over $15.30 million of their personally held shares in or in connection with the IPO – that the truth about the Company was ultimately revealed to investors, including that the problems which existed at the time of the IPO would result in extremely disappointing results for the third quarter of 2007 – including substantially reduced revenues as the Company's largest customer was forced to "work off" excess inventory prior to being able to acquire more product from BigBand, and that problems rolling out the Company's latest products were also having a material adverse impact upon earnings, operations and results.

5.     The following trading day, on the publication of this news, BigBand stock price collapsed.   As evidence of this, shares of BigBand fell over 30% in a single trading day – plummeting from over $9.00 per share to below $6.00 per share, before closing at $6.49 per share, on September 28, 2007.   That trading day, BigBand also experienced exceptionally heavy trading volume with almost 7 million shares traded – hundreds of times the Company's recent average daily trading volume.

## II.     JURISDICTION AND VENUE

6.     The claims asserted herein arise under §§ 11 and 15 of the Securities Act of 1933 (the "Securities Act").  Jurisdiction is conferred by § 22 of the Securities Act.

7.     Venue is proper pursuant to § 22 of the Securities Act, as defendant BigBand and/or the Individual Defendants and Underwriter Defendants – Morgan Stanley, Merrill Lynch & Co., Jefferies & Co., Cowen & Co. and Thinkequity Partners  – conduct business in this District.

8.     In addition to the foregoing, BigBand maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

9.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

CLASS ACTION COMP. FOR VIOLATIONS             - 2 -
OF FEDERAL SECURITIES LAWS

### III.    THE PARTIES

**A.    Plaintiff**

10.    Plaintiff **BIKASH MOHANTY** purchased shares of BigBand common stock pursuant and/or traceable to the Company's materially false and misleading Registration Statement and Prospectus issued by Defendants in connection with the March 2007 IPO, including those shares detailed in the attached Certification, incorporated herein by reference, and was damaged thereby.

**B.    Corporate Defendant**

11.    Defendant **BIGBAND NETWORK** is a Delaware Corporation founded in 1998 and headquartered in Redwood City, California.  BigBand purports to be a leading provider of broadband multimedia infrastructure for video, voice and data. The Company's solutions are purported to be designed to process, optimize, and deliver services such as broadband Internet, VoIP, digital broadcast television, HDTV, transport of high quality video, local advertising, VOD, interactive TV and IPTV across coaxial cable, fiber or copper wire transmission and delivery systems.  The Company reports that service providers use its platforms to cost-effectively expand revenue-generating offerings of rich content and advanced interactive services. At the time of the IPO, Company customers include six of the ten largest service providers in the U.S., and leading service providers in North America, Asia, Europe and Latin America.

**C.    Individual Defendants**

12.    The individuals identified as Defendants in subparagraphs a - j below, are referred to collectively herein as the "Individual Defendants."   The Individual Defendants are each liable for the false statements contained in the materially false and misleading Registration Statement and joint Prospectus, as alleged herein, as those statements were "group-published" information.   The Individual Defendants include the following:

a.    Defendant **AMIR BASSAN-ESKENAZI** ("Bassan-Eskenazi") is, and at the time of the IPO was, President, Chief Executive Officer, Chairman of the Board of Directors and Co-Founder of BigBand.  Defendant Bassan-Eskenazi signed the materially false and misleading Registration Statement and filed with the SEC the materially false and

1   misleading Prospectus issued in connection with the March 2007 IPO. Also in

2   connection with this IPO, defendant Bassan-Eskenazi sold at least **$4.836 million** of his

3   personally held BigBand shares.

4      b.   Defendant **RAN OZ** ("Oz") is, and at the time of the IPO was, Chief Technology

5   Officer, Executive Vice President, Co-Founder of the Company and a member of the

6   Board of Directors of BigBand. Defendant Oz signed the materially false and

7   misleading Registration Statement and filed with the SEC the materially false and

8   misleading Prospectus issued in connection with the March 2007 IPO. Also, in

9   connection with this IPO defendant Oz sold at least **$4.836 million** of his privately held

10   Company shares.

11      c.   Defendant **FREDERICK BALL** ("Ball") is, and at the time of the IPO was, Chief

12   Financial Officer and Senior Vice President and Executive Vice President of BigBand.

13   Defendant Ball assisted in the preparation and filing of the materially false and

14   misleading Registration Statement and filed with the SEC the materially false and

15   misleading Prospectus issued in connection with the March 2007 IPO.

16      d.   Defendant **GAL ISRAELY** ("Israely") is, and at the time of the IPO was, a member of

17   the Board of Directors of BigBand. Defendant Israely signed the materially false and

18   misleading Registration Statement and filed with the SEC the materially false and

19   misleading Prospectus issued in connection with the March 2007 IPO. Also, in

20   connection with this IPO defendant Israely sold at least **$5.394 million** of his privately

21   held Company shares. Defendant Israely is also a member of the Audit Committee of

22   the Board of Directors of the Company.

23      e.   Defendant **DEAN GILBERT** ("Gilbert") is, and at the time of the IPO was, a member

24   of the Board of Directors of BigBand. Defendant Gilbert signed the materially false

25   and misleading Registration Statement and filed with the SEC the materially false and

26   misleading Prospectus issued in connection with the March 2007 IPO. Also, in

27   connection with this IPO defendant Gilbert sold at least **$243,000** of his privately held

28   Company shares.

CLASS ACTION COMP. FOR VIOLATIONS     - 4 -
OF FEDERAL SECURITIES LAWS

f.  Defendant **KEN GOLDMAN** ("Goldman") is, and at the time of the IPO was, a member of the Board of Directors of BigBand.  Defendant Goldman signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the March 2007 IPO.  Defendant Goldman is also a member of the Audit Committee of the Board of Directors of the Company.

g.  Defendant **LLOYD CARNEY** ("Carney") is, and at the time of the IPO was, a member of the Board of Directors of the Company.  Defendant Carney signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the March 2007 IPO.  Defendant Carney is also a member of the Audit Committee and the Compensation Committee of the Board of Directors of the Company.

h.  Defendant **BRUCE SACHS** ("B. Sachs") is, and at the time of the IPO was, a member of the Board of Directors of the Company.  Defendant B. Sachs signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the March 2007 IPO.  Defendant B. Sachs is also a member of the Governance Committee and the Compensation Committee of the Board of Directors.

i.  Defendant **ROBERT SACHS** ("R. Sachs") is, and at the time of the IPO was, a member of the Board of Directors of the Company.  Defendant R. Sachs signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the March 2007 IPO.  Defendant R. Sachs is also a member of the Governance Committee and the Compensation Committee of the Board of Directors.

j.  Defendant **GOEFFREY YANG** ("Yang") is, and at the time of the IPO was, a member of the Board of Directors of the Company.  Defendant Yang signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the March 2007 IPO.  Defendant Yang

1    is also a member of the Governance Committee and the Compensation Committee of

2    the Board of Directors.

3    **D.    IPO Underwriter Defendants**

4        13.    In connection with the March 2007 Initial Public Offering, Defendants **MORGAN**

5    **STANLEY & CO. INC.** ("Morgan Stanley"), **MERRILL LYNCH, PIERCE, FENNER &**

6    **SMITH INC.** ("Merrill Lynch"), **JEFFERIES & CO., INC.** ("Jefferies"), **COWEN & CO.,**

7    **LLC** ("Cowen") and **THINKEQUITY PARTNERS, LLC** ("ThinkEquity Partners") acted as

8    "Lead Underwriters" of the Offering – distributing 10.7 million shares of BigBand stock to

9    investors and initiating the first public market for BigBand shares, and also distributing an

10    additional 1.605 million shares upon exercise of the Underwriters' over-subscription allotment

11    option.  Excluding the oversubscription allotment of an additional 1.605 million shares sold

12    entirely by Company Insides, the distribution of the BigBand shares awarded Underwriters in the

13    IPO occurred, as follows:

| Name | Number of Shares |
|------|-----------------:|
| **Morgan Stanley** | **4,708,000** |
| **Merrill Lynch** | **2,782,000** |
| **Jefferies** | **1,337,500** |
| **Cowen** | **1,070,000** |
| **ThinkEquity Partners** | **802,500** |
| **Total** | **10,700,000** |

14        In connection with the March 2007 IPO, the Underwriter Defendants were paid over

$11.197 million in gross fees – paid indirectly by purchasers of the Company's shares.  The

Underwriter Defendants were paid at least $0.91 per share in connection with the sale of the 12.305

million shares, including shares sold pursuant to the exercise of the Underwriter's over-

subscription option, as follows:

| | Per Share | Total | |
|---|---|---|---|
| | | No Exercise | Full Exercise |
| Public offering price | $ 13.00 | $ 139,100,000 | $ 159,965,000 |
| Underwriting discounts and commissions payable by us | 0.91 | 6,825,000 | 6,825,000 |
| Underwriting discounts and commissions payable by the selling stockholders | 0.91 | 2,912,000 | 4,372,550 |
| **TOTAL** | | **$9,737,000** | **$11,197,550** |

15.     Shareholders were willing to, and did, pay over $11.197 million in combined fees to compensate the Underwriter Defendants for conducting a purported significant "due diligence" investigation into BigBand in connection with the IPO. The Underwriter Defendants due diligence investigation was a critical component of the Initial Public Offering, and this was supposed to provide investors with important safeguards and protections.

16.     The due diligence investigation that was required by the Underwriter Defendants included a detailed investigation into BigBand sales, accounting, controls, procedures and it also required Defendants to test the assumptions and verify the projections adopted or ratified by Defendants, to the extent a reasonable investor with access to such confidential corporate information would. A reasonable due diligence investigation would have extended well beyond a mere casual view of BigBand books and records, and its accounting, financial report and operational and financial controls. The failure of the Underwriter Defendants to conduct an adequate due diligence investigation was a substantial contributing factor leading to the harm complained of herein.

17.     In addition to the foregoing, because of the Underwriter Defendants' and Individual Defendants' positions with the Company, they each had access to the adverse undisclosed information about BigBand's business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

CLASS ACTION COMP. FOR VIOLATIONS         - 7 -
OF FEDERAL SECURITIES LAWS

18.    In addition to the Underwriting Defendants, it is also appropriate to treat the individuals named as Defendants herein as a group for pleading purposes (the "Individual Defendants") and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above.  Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Accordingly, the Individual Defendants were also involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, and approved or ratified these statements, in violation of the federal securities laws.

19.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the Nasdaq stock market exchange (the "Nasdaq"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions made in connection with the issuance of common stock in March 2007 violated these specific requirements and obligations.

20.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company at the time of the Offering.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to

prevent their issuance or cause them to be corrected. Accordingly, each of the Individual

Defendants is responsible for the accuracy of the public reports and releases detailed herein and are

therefore primarily liable for the representations contained therein.

## IV.   MATERIALLY FALSE & MISLEADING STATEMENTS IN THE REGISTRATION STATEMENT AND PROSPECTUS

**A.   Background to the Offering**

21.    Founded in 1998, BigBand initially operated as a closely held company, financed

initially by approximately $100 million raised in five venture funding rounds with investors such

as, Charles River Partners, Pilot House Ventures, Redpoint Ventures, Cedar Funds, Israel's

Evergreen Funds and AOL. By the fall of 2006, however, as demand for video, voice over the

internet and high-speed data increased the market for companies that provide products and services

to cable operators and telephone companies that allow them to increase the capacity on their

customer lines were in vogue. Accordingly, at that time, Defendants decided to sell at least 10

million shares of Company stock to the public in the open market.

22.    In addition to taking advantage of the market demand for "triple-play" telecom

companies (companies that provide voice, cable and internet consumer products), at the time of the

IPO, Defendants portrayed BigBand as a significant "growth" company – as distinguished from a

"speculative" technology investment. In fact, after having reached purported break-even

performance by the end of the third quarter of 2006, by the end of that quarter and at the time

Defendants first reported that they were planning the IPO, BigBand reported sales of $113 million

– a purported increase of 60% over the corresponding period in 2005. In addition, by the end of

FY:2006, BigBand reported revenues of 176.6 million, 80% higher than FY:2005, and in 4Q:06 it

posted $63 million in revenue, 136% over 4Q:05. Also in 4Q:06, BigBand posted a purported net

profit of $8.9 million, up from $1.6 million in the preceding quarter and a loss of $5.8 million for

the corresponding quarter.

23.    This Company's then recent stellar performance was a critical feature in

Defendants' presentations to analysts and investors in the "road-show" presentations and one-on-

one conversations with institutional investors that occurred prior to the offering. As evidence of

this, at or about the time of the IPO analysts were quoted in the financial press also stating that

BigBand was then poised for continuous foreseeable near-term growth, in part, as follows:

- *"Based on the company's current growth trajectory, the valuation appears attractive* relative to other high growth networking companies as well as recent buyout multiples in the sector. (Renaissance Capital report 3/15/07.)

- *"Triple-play companies that help enable the transmission of video, voice and data have been among the most desirable* in the initial public offering market over the past six months, and bigband networks took advantage of that demand. (*Daily Deal* 3/16/07.)

- *"It's very much what we expected, and we think it can hold the premium because its not a speculative play.* They're profitable, and their growth is pretty impressive." (Quoting Ben Holmes, publisher Morningnotes.com LLC, a Boulder Colorado IPO Research firm).

24.    Regardless of this stellar performance and despite the guidance that Defendants were providing to analysts and investors during the "road-show" presentations and one-on-one conversations with Company management, on February 1, 2007 – only weeks before the Company's IPO occurred – ADC announced that it would sell its stake in the Company for approximately $59 million.   In June 2004, when the Company acquired its cable television business from ADC, it granted ADC an approximate 10% equity interest in the Company. Reportedly, the ADC shares were sold to Redpoint Ventures, already one of the Company's largest shareholders both prior to, and after this acquisition.

25.    While it appears that ADC received approximately $10.00 per share for its BigBand shares in early-February 2007, on March 14, 2007, Defendants published a release announcing that BigBand had priced the Initial Public Offering of its common stock at $13.00 per share – above the $10.00 to $12.00 range originally set by Underwriters.   The Company's release announcing the pricing of the BigBand IPO stated, in part, the following:

> REDWOOD CITY, Calif., March 14, 2007 – BigBand Networks, Inc. (NASDAQ: BBND) today announced an initial public offering of 10,700,000 shares of its common stock at a price of $13.00 per share (before underwriting discounts and commissions). Of those shares, BigBand Networks will sell 7,500,000 shares and selling stockholders will sell 3,200,000 shares. Several of its stockholders have granted the underwriters the right to purchase an additional 1,605,000 shares of common stock to cover over-allotments. BigBand's common stock will be listed on the Nasdaq Global Market

CLASS ACTION COMP. FOR VIOLATIONS          - 10 -
OF FEDERAL SECURITIES LAWS

1    under the symbol "BBND" and will begin trading on March 15,
2    2007.

3    Morgan Stanley and Merrill Lynch & Co. acted as joint book-
     running managers for the offering, with Jefferies & Company,
     Cowen and Company, and ThinkEquity Partners LLC serving as co-
4    managers. A copy of the final prospectus relating to the offering may
     be obtained by contacting Morgan Stanley, 180 Varick Street, New
5    York, NY 10014, Attention: Prospectus Department, by telephone at
     212-761-6775 or by e-mail at prospectus@morganstanley.com, or by
6    contacting Merrill Lynch & Co., 4 World Financial Center, North
     Tower, New York, NY 10080 or by telephone at 212-449-1000.

7
**V.    MATERIALLY FALSE & MISLEADING REGISTRATION STATEMENT AND
8        JOINT PROXY-PROSPECTUS ISSUED IN CONNECTION WITH THE IPO**

9        26.    In connection with the March 15, 2007 Initial Public Offering of 10.7 million shares

10   priced at $13.00 per share, Defendants filed with the SEC, that day, pursuant to Form 424B4, a

11   Registration Statement and joint Proxy-Prospectus. Unbeknownst to investors, however, the

12   Registration Statement and Prospectus issued in connection with the BigBand IPO was materially

13   false and misleading and misstated or omitted to disclose material adverse facts about the

14   Company. For example, rather than disclosing the problems that existed within the Company, at

15   the time of the Offering the Prospectus described BigBand as a growth company that maintained

16   adequate controls and procedures that was executing according to plan, and capitalizing on the roll

17   out of its new products.

18       27.    Moreover, rather than disclose the problems that existed within the Company at the

19   time of the IPO, Defendants represented to investors that BigBand was well-suited to provide

20   reasonable earnings and revenue forecasts because the unique nature of the Company's business

21   allowed the Individual Defendants to work with Company customers on a *nine to eighteen month*

22   *sales cycle*. The Company's purported early entry into BigBand's customers' product development

23   and sales process was reported in the IPO Prospectus, in part, as follows:

24                   Our sales cycle for an initial customer purchase typically ranges from
                     nine to eighteen months, but can be longer. This process generally
25                   involves several stages before we can recognize revenues on the sale
                     of our products. As a provider of advanced technologies, we seek to
26                   actively participate with our existing and potential customers in the
                     evaluation of their technology needs and network architectures,
27                   including the development of initial designs and prototypes.
                     Following these activities, we typically respond to a service
28                   provider's request for proposal, configure our products to work

CLASS ACTION COMP. FOR VIOLATIONS         - 11 -
OF FEDERAL SECURITIES LAWS

within our customer's network architecture, and test our products first in laboratory testing and then in field environments to ensure interoperability with existing products in the service provider's network.… *After initial deployment of our products, subsequent purchases of our products typically have a more compressed sales cycle.* [Emphasis added.]

28.    While concentration of the Company's customer base may have provided additional risks for investors, this also should have provided more clarity and transparency when reporting sales results and guidance.  Foreseeably, therefore, the Company's significantly consolidated client base, that existed at BigBand at the time of the IPO, should also have facilitated foreseeable earnings and revenue forecasts.  Accordingly, the IPO Prospectus stated, in part, the following:

*Due to the nature of the cable and telecommunications industries, we sell our products to a limited number of large customers, which have varied over time. For the quarter ended December 31, 2006 and the years ended December 31, 2006, 2005 and 2004, we derived approximately 90%, 79%, 69% and 61% of our net revenues from our top five customers, respectively.* In 2006, Comcast, Cox, Time Warner Cable and Verizon each represented 10% or more of our net revenues. In 2005, Adelphia, Cox and Time Warner Cable each represented 10% or more of our net revenues. In 2004, Adelphia, Comcast, Cox and Time Warner Cable each represented 10% or more of our net revenues. *We believe that for the foreseeable future our net revenues will be highly concentrated in a relatively small number of large customers*.… [Emphasis added.]

29.    That the Company maintained an internal sales force at the time of the IPO also provided Defendants additional oversight and control over BigBand sales.  Accordingly, as a result of Defendants' sales oversight, at all relevant times Defendants also purported to maintain consistent oversight over sales, earnings and revenues forecasts.  As evidence of this, the foregoing, the Prospectus also stated, in part, the following:

*We sell our products and services to customers in the United States through our direct sales force. We sell to customers internationally through a combination of direct sales and resellers. In the year ended December 31, 2006, approximately 89% of our sales were to customers in the United States* and 11% were to customers outside the United States. Domestic sales for 2005 and 2004 accounted for 83% and 80% of our total sales, respectively, while sales to customers outside of the United States accounted for 17%, and 20% of our total sales, respectively. [Emphasis added.]

30.    In connection with this IPO, Company insiders – including certain of the Defendants named herein – sold material amounts of their privately owned BigBand shares to reap

gross proceeds of over $62.465 million, including exercise of the Underwriters oversubscription option, as follows:

| Name of Beneficial Owner | Shares Beneficially Owned Prior to this Offering | | Number of Shares Being Offered [31] | Shares Beneficially Owned After this Offering [32] | |
|---|---|---|---|---|---|
| | Number | Percentage | | Number | % |
| **5% Stockholders :** | | | | | |
| Funds affiliated with Redpoint Ventures, L.P. | 12,999,757 | 25.8% | — | 12,999,757 | 22.5% |
|    3000 Sand Hill Road, Bldg. 2, Suite 290 | | | | | |
|    Menlo Park, CA 94025 | | | | | |
| Funds affiliated with Charles River Partners, L.P. | 10,983,170 | 21.8 | — | 10,983,170 | 19.0 |
|    1000 Winter Street, Suite 3300 | | | | | |
|    Waltham, MA 02451 | | | | | |
| Funds affiliated with Meritech Capital | 4,915,556 | 9.8 | — | 4,915,506 | 8.5 |
|    245 Lytton Avenue, Suite 350 | | | | | |
|    Palo Alto, CA 94301 | | | | | |
| Funds affiliated with Evergreen Partners U.S. Direct Fund III, L.P. | 4,169,320 | 8.3 | 734,231 | 3,435,089 | 5.9 |
|    96 Rothschild Blvd. | | | | | |
|    Tel Aviv, Israel 65224 | | | | | |
| Funds affiliated with Pilot House Ventures | 3,920,117 | 7.8 | 690,347 | 3,229,770 | 5.6 |
|    Lewis Wharf | | | | | |
|    Boston, MA 02110 | | | | | |
| Funds affiliated with Cedar Funds | 2,997,603 | 6.0 | 446,229 | 2,551,374 | 4.4 |
|    1050 Winter Street, Suite 2700 | | | | | |
|    Waltham, MA 02451 | | | | | |

| Name of Beneficial Owner | Shares Beneficially Owned Prior to this Offering | | Number of Shares Being Offered [31] | Shares Beneficially Owned After this Offering [32] | |
|---|---|---|---|---|---|
| | Number | Percentage | | Number | Percentage |
| **Directors and Executive Officers:** | | | | | |
| Amir Bassan-Eskenazi | 2,673,508 | 5.2% | 220,024 | 2,453,484 | 4.1% |
| Frederick Ball | 343,905 | * | — | 343,905 | * |
| Ran Oz | 2,652,767 | 5.2 | 361,131 | 2,291,636 | 3.9 |
| Robert Horton | 82,396 | * | — | 82,396 | * |
| John Connelly | 277,605 | * | — | 277,605 | * |
| Lloyd Carney | 13,437 | * | — | 13,437 | * |
| Dean Gilbert | 219,645 | * | 11,007 | 208,638 | * |
| Ken Goldman | 13,750 | * | — | 13,750 | * |
| Gal Israely | 2,997,603 | 6.0 | 446,229 | 2,551,374 | 4.4 |
| Bruce Sachs | 10,983,170 | 21.8 | — | 10,983,170 | 19.0 |
| Robert Sachs | 15,937 | * | — | 15,937 | * |
| Geoffrey Yang | 12,999,757 | 25.8 | — | 12,999,757 | 22.5 |
| All executive officers and directors as a group (12 persons) | 33,273,480 | 62.7% | 1,038,391 | 32,235,089 | 53.2% |
| **Other Selling Stockholders:** | | | | | |
| Time Warner, Inc. | 2,045,042 | 4.1 | 360,140 | 1,684,902 | 2.9 |
| Gary Lauder | 1,116,072 | 2.2 | 125,000 | 991,072 | 1.7 |
| Funds affiliated with Star Ventures | 916,172 | 1.8 | 159,324 | 756,848 | 1.3 |

CLASS ACTION COMP. FOR VIOLATIONS
OF FEDERAL SECURITIES LAWS

| | | | | | |
|---|---|---|---|---|---|
| Oro Sociedad Anonima | 200,000 | * | 8,805 | 191,195 | * |
| Seth Kenvin | 167,584 | * | 29,864 | 137,720 | * |
| Paul Kagan | 100,000 | * | 17,610 | 82,390 | * |
| Barry Kaplan | 100,000 | * | 17,610 | 82,390 | * |
| High Street Investors | 32,198 | * | 5,670 | 26,528 | * |
| Bernd Girod | 32,198 | * | 5,670 | 26,528 | * |
| Robert Clark Fowler, Jr. [2] | 15,286 | * | 1,930 | 13,356 | * |
| Stephanie Jean Fowler [3] | 13,674 | * | 1,647 | 12,027 | * |
| Haim Bassan-Eskenazi [4] | 7,823 | * | 375 | 7,448 | * |
| Ruth Bassan-Eskenazi [5] | 7,823 | * | 375 | 7,448 | * |
| Sarit Yaffe [6] | 7,823 | * | 616 | 7,207 | * |
| Nir Yaffe [6] | 7,823 | * | 616 | 7,207 | * |
| Freda Family Trust [7] | 3,220 | * | 567 | 2,653 | * |
| Dror Amir [8] | 1,876 | * | 330 | 1,546 | * |
| Eli Borochov | 1,668 | * | 294 | 1,374 | * |
| Zohar Eliezri | 1,668 | * | 294 | 1,374 | * |
| Eliav Korakh | 1,668 | * | 294 | 1,374 | * |

Pursuant to the Underwriters' over-allotment option, additional BigBand shares were also sold by Company Insiders and Selling Stockholders, as follows:

| Selling Stockholders | Shares Subject to the Overallotment Option |
|---|---|
| Funds affiliated with Pilot House Ventures | 570,894 |
| Funds affiliated with Evergreen Partners U.S. Direct Fund III, L.P. | 315,769 |
| Time Warner, Inc. | 297,824 |
| NBT Ltd. (affiliated with Amir Bassan-Eskenazi) | 179,976 |
| Funds affiliated with Star Ventures | 131,756 |
| Oz Holdings Ltd. (affiliated with Ran Oz) | 38,869 |
| Seth Kenvin | 24,696 |
| Barry Kaplan | 14,563 |
| Sandalwood Investments II, L.P. (affiliated with Dean Gilbert) | 9,102 |

31.     As a result of the statements made by Defendants at the time of the IPO, demand for BigBand IPO stock far outstripped supply, and shares of the Company immediately traded up over

---

[2]     Mr. Fowler is the brother-in-law of Amir Bassan-Eskenazi, our President and Chief Executive Officer.
[3]     Ms. Fowler is the sister-in-law of Amir Bassan-Eskenazi, our President and Chief Executive Officer.
[4]     Haim Bassan-Eskenazi is the father of Amir Bassan-Eskenazi, our President and Chief Executive Officer.
[5]     Ruth Bassan-Eskenazi is the mother of Amir Bassan-Eskenazi, our President and Chief Executive Officer.
[6]     Ms. Yaffe is the sister of Amir Bassan-Eskenazi, our President and Chief Executive Officer, and Nir Yaffe is Ms. Yaffe's husband.
[7]     Julia Freda-Eskenazi, the wife of Amir Bassan-Eskenazi, our President and Chief Executive Officer, is the beneficiary of the Freda Family Trust. Ms. Freda-Eskenazi has no voting or investment power over these shares and disclaims beneficial ownership of the shares beneficially owned by the trust.
[8]     Dror Amir is the cousin of Ran Oz, our Executive Vice President and Chief Technology Officer.

33% in the first day of trading. Accordingly, after being priced at $13.00 per share, BigBand shares opened trading at $15.25 and traded up over $4.00 each to close the first day of trading at $17.31 per share. With a total of 57 million shares outstanding, BigBand closed its first day of trading with a market capitalization of almost $1 billion.

32.    **2Q:07 Results Below Analysts Estimates**.  Despite the controls and procedures that were purported to be in place at the time of the Offering and regardless of Defendants' claims that BigBand was operating according to its growth plan, on May 3, 2007 – within only six weeks of the IPO – Defendants revealed that the Company then expected results for the second quarter to be below analysts' consensus estimates.   That day, the *Associated Press* reported, in part, the following:

> **BigBand Networks sees 2nd-quarter sales below analysts estimates**
>
> Digital video networking company BigBand Networks Inc. on Thursday gave second-quarter and full-year revenue estimates whose *low end was beneath Wall Street expectations.*
>
> *        *        *
>
> BigBand expects *second-quarter revenue to range from $52 million* to $56 million and *full-year revenue to range from $225 million* to $230 million.
>
> Analysts surveyed by Thomson Financial are expecting *second-quarter revenue of $55.7 million and full-year revenue of $230.3 million.*
>
> *        *        *
>
> Shares of BigBand fell $3.03, or 14 percent, to $18.40 in aftermarket electronic trading after closing at $21.43, up $1.13. The company's shares have traded between $16.30 and $21.63 since they began trading in mid-March

33.    Despite these lower then expected results, however, that day when BigBand published a release announcing results for 1Q:07, this release quoted defendant Bassan-Eskenazi, who reiterated many of the same statements as had been made at or prior to the IPO in road-show presentations and in one-on-one conversations with analysts and investors. These statements included, in part, the following:

> "During the quarter, *we continued to see an expansion of our installed base of solutions and of the capacity of our existing footprint*, which favorably benefited our gross margin," commented Amir Bassan-Eskenazi, chairman, president and CEO of BigBand Networks.

"*We are delighted to report strong financial results for the first quarter of 2007*, our first quarter as a public company," continued Bassan-Eskenazi. "Some of the world's largest cable and telecommunications carriers continue to demonstrate interest in our media services platforms, built upon a unique combination of networking, video processing and bandwidth management capabilities.

"*We believe that our financial achievements to date demonstrate the increasing consumer demand for more and better video services*, including high-definition programming. *Our growth continues to be a function of the broader adoption of our switched broadcast solution by major cable operators* and the increasing deployment of television services by telecommunications carriers, among many other initiatives.

"Looking ahead, we are optimistic about our business and long-term market opportunity. We expect to further leverage our platform and gain footprint with new customers in new geographies. BigBand Networks continues to innovate, and we believe our technology will remain a key point of differentiation in the future," concluded Bassan-Eskenazi. [Emphasis added.]

34.     In addition to the foregoing, Defendants also used this release to condition investors to expect that the Company was continuing to operate according to its growth plan, and provided the following Business Outlook for the third quarter and full year 2007 – reiterating many of the same statements as had been made at or prior to the IPO in road-show presentations and in one-on-one conversations with analysts. This Outlook included the following:

**Business Outlook**

Based on current expectations, management provided the following outlook for its business in 2007:

**Quarter Ending June 30, 2007**

* Net revenues are anticipated to be in the range of approximately $52 to $56 million.

* GAAP gross margins are anticipated to be in the range of 54% to 56%, which includes approximately $0.3 million in stock-based compensation.

* GAAP operating expenses are anticipated to be in the range of $28.5 to $29.5 million which includes approximately $2.7 million in stock-based compensation and amortization of intangibles.

* Provision for income tax is anticipated to be in the range of approximately $0.5 to $0.6 million.

* Fully diluted weighted average shares are anticipated to be in the range of 70 to 71 million shares.

* This equates to GAAP earnings per share in the range of $0.02 to $0.06.

**Fiscal Year Ending December 31, 2007**

\*    Net revenues are anticipated to be in the range of approximately $225 to $230 million.

\*    GAAP gross margins are anticipated to be in the range of 54% to 56%, which includes approximately $1.4 million in stock-based compensation.

\*    GAAP operating expenses are anticipated to be in the range of $115.0 to $120.0 million, which includes stock-based compensation of approximately $10.0 million and amortization of intangibles of $0.6 million.

\*    Provision for income tax is anticipated to be in the range of approximately $2.0 to $2.5 million.

\*    Fully diluted weighted average shares are anticipated to be in the range of 69 to 70 million shares.

\*    This equates to GAAP earnings per share in the range of $0.06 to $0.11.

35.    Later on May 3, 2007, when BigBand hosted a conference call for analysts and investors, and after they opened up the call to questions, Defendants explained that the lowered revenue guidance for 2Q:07 was *not* the result of any fundamental problems facing the Company, but were rather related to simple revenue deferral issues, and that such sales would be recovered in the following quarter.   In this regard, defendant Bell stated, "Yes. It's the timing of revenue recognition and the full release of the product.... I wouldn't read into it as being dramatic. But it is, clearly, trending in the right direction."

36.    On May 9, 2007, BigBand filed with the SEC its report of financial results for 1Q:07, pursuant to Form 10-Q.  The Company's 1Q:07 Form 10-Q reiterated many of the same or similar statements as had been made by Defendants prior to or at the time of the IPO, concerning the Company's controls and procedures.  Accordingly, the 1Q:07 Form 10-Q stated that BigBand's Basis of Presentation and Use of Estimates were in compliance with SEC accounting rules as well as Generally Accepted Accounting Principles ("GAAP"), in part, as follows:

**Basis of Presentation**

The condensed consolidated financial statements include accounts of the Company and its wholly owned subsidiaries. All significant intercompany balances and transactions have been eliminated. The accompanying condensed consolidated balance sheet as of March 31, 2007, the condensed consolidated statements of operations for the three months ended March 31, 2007 and 2006, and the condensed consolidated statements of cash flows for the three months ended March 31, 2007

and 2006, are unaudited. The condensed consolidated balance sheet as of December 31, 2006, is derived from the audited consolidated financial statements included in the Company's final Prospectus, related to the Company's initial public offering (IPO) of common stock. The accompanying consolidated financial statements should be read in conjunction with the audited consolidated financial statements and related notes contained in the final Prospectus dated March 14, 2007.

*The accompanying condensed financial statements have been prepared in accordance with U.S. generally accepted accounting principles (GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission (SEC).* Not all financial information and footnotes required for complete financial statements have been presented. *Management believes the unaudited condensed consolidated financial statements have been prepared on a basis consistent with the audited financial statements and include all adjustments necessary of a normal and recurring nature for fair presentation of the Company's condensed consolidated balance sheet as of March 31, 2007*, the condensed consolidated statement of operations for the three months ended March 31, 2007 and 2006, and the condensed consolidated statements of cash flows for the three months ended March 31, 2007 and 2006. [Emphasis added.]

Use of Estimates

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts reported in the condensed consolidated financial statements and accompanying notes. Management uses estimates and judgments in determining recognition of revenues, provision for inventory write-downs, valuation of stock options and preferred stock warrant liabilities, provision for warranty claims, allowance for doubtful accounts, valuation of goodwill and other purchased intangible assets, and long-lived assets. *Management bases its estimates and assumptions on methodologies it believes to be reasonable*…. [Emphasis added.]

37.     In combination these statements also led investors to reasonably believe that

BigBand maintained at least *the minimum* controls and procedures necessary to operate the

Company in a safe and efficient manner.   This was also reflected in BigBand's 1Q:07 Form 10-Q,

which also stated, in part, the following:

**CONTROLS AND PROCEDURES**
Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures

*We maintain disclosure controls and procedures, as such term is defined in SEC Rule 13a-15(e), that are designed to ensure that information required to be disclosed in our reports under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for timely decisions regarding required disclosure*. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required

to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As required by SEC Rule 13a-15(b), we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of March 31, 2007. Based on the foregoing, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level.

**Changes in Internal Control over Financial Reporting**

*There have been no other changes in our internal controls over financial reporting that occurred during the period covered by this Form 10-Q that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.* [Emphasis added.]

38.     Similarly, the 1Q:07 Form 10-Q also contained Certifications by Defendants Bassan-Eskenazi and Ball that also purported to attest to the accuracy and completeness of the Company's financial reports and disclosures. Again, no material changes had occurred in the Company's financial reporting, the Certification included in the 1Q:07 Form 10-Q reflected the procedures purported to be in place at BigBand prior to, and at the time of, the March 2007 IPO, as follows:

### CERTIFICATION

1.     I have reviewed this quarterly report on Form 10-Q of BigBand Networks, Inc. (the "Registrant");

2.     *Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

3.     *Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;*

4.     The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Registrant and have:

(a)     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

CLASS ACTION COMP. FOR VIOLATIONS               - 19 -
OF FEDERAL SECURITIES LAWS

1

2     (b)  *evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*; and

3

4     (c)  *disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting*; and

5

6

7   5.  The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

8

9     (a)  *all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information*; and

10

11

12     (b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

13

14    Date: May 8, 2007

15   /s/ **AMIR BASSAN-ESKENAZI**
Amir Bassan-Eskenazi
Chief Executive Officer

16   ( Principal Executive Officer )

17            *   *   *

18   Date: May 9, 2007

19   /s/ **FREDERICK BALL**
Frederick Ball

20   Chief Financial Officer
( Principal Financial Officer )

21

22

23

24   **CERTIFICATION OF CHIEF EXECUTIVE OFFICER**

25   **Pursuant to18 U.S.C. Section 1350,
As Adopted pursuant to**

26   **Section 906 of the Sarbanes-Oxley Act of 2002**

27   I, **Amir Bassan-Eskenazi,** certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the quarterly report

28   of BigBand Networks, Inc. on Form 10-Q for the quarterly period ended March 31,

2007, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that *information contained in such quarterly report on Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of BigBand Networks, Inc.*

Date: May 8, 2007

/s/ **AMIR BASSAN-ESKENAZI**
Amir Bassan-Eskenazi
Chief Executive Officer
( Principal Executive Officer )

### CERTIFICATION OF CHIEF FINANCIAL OFFICER

**Pursuant to18 U.S.C. Section 1350,
As Adopted pursuant to
Section 906 of the Sarbanes-Oxley Act of 2002**

I, **Frederick Ball**, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the quarterly report of BigBand Networks, Inc. on Form 10-Q for the quarterly period ended March 31, 2007, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that *information contained in such quarterly report on Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of BigBand Networks, Inc*.

Date: May 9, 2007

/s/ **FREDERICK BALL**
Frederick Ball
Chief Financial Officer
( Principal Financial Officer )                                        [Emphasis added.]

39.     Similar statements were also reiterated by Defendants at the Deutsche Bank Securities 2007 Technology Conference held on May 16, 2007, at the Westin St. Francis Hotel in San Francisco, CA, and at the Sixth Annual JMP Securities Research Conference on May 21, 2007, at the Ritz-Carlton Hotel also in San Francisco, CA.  On May 31, 2007, the Company also presented at the Cowen and Company 35th Annual Mid-Cap Technology Conference at the New York Palace Hotel in New York City, NY, where Defendants again reiterated these same or substantially similar statements.

40.     **Disappointing 2Q:07 Results**.  On August 2, 2007, shares of the Company declined 30% – falling approximately $4.00 per share to approximately $10.10 per share – after BigBand posted revenue and earnings below consensus estimates.   According to a report by the

CLASS ACTION COMP. FOR VIOLATIONS                - 21 -
OF FEDERAL SECURITIES LAWS

*Associated Press,* "higher operating expenses, product and service costs and stock compensation weighed down results."

41.    Despite the fact that the Company reported earnings of $0.02 per share, significantly less than analysts consensus estimates of $0.07 per share, at that time BigBand published a release that again quoted defendant Bassan-Eskenazi, who reiterated the following positive statements about the Company, as follows:

> *"We are pleased with our improvements in both revenues and earnings results in the second quarter,"* commented Amir Bassan-Eskenazi, president and CEO of BigBand Networks. *"We continued to drive significant expansion of the footprint of our media services platforms. We continue to work closely with customers in supporting their efforts to enhance their existing networks for advanced video services. We believe that BigBand's solutions for switched broadcast and TelcoTV will continue to gain traction with major customers both in the U.S. and internationally.*
>
> *    *    *
>
> "Video continues to be a major driver of capital expenditures in service provider networks. *We believe that our technology innovation and time-to-market leadership are key competitive differentiators in our video and data markets.* Our product roadmap calls for more innovation as the industry moves to addressable advertising and personalized video services. *We continue to be well-positioned for additional growth over the long-term and are optimistic about our business,"* concluded Bassan-Eskenazi. [Emphasis added.]

42.    In addition to the foregoing, Defendants again used the Company's release to condition investors to expect that BigBand was operating to its growth plan, and provided the following Business Outlook for 3Q:07 and FY:2007, that reiterated many of the same statements that had been made at or prior to the IPO in road-show presentations and in one-on-one conversations with analysts and investors and that were repeated throughout the relevant period. This guidance included the following:

**Business Outlook**

Based on current expectations, management provided the following outlook for its business in the third quarter of 2007:

**Quarter Ending September 30, 2007**

*    Net revenues are anticipated to be in the range of approximately $54 to $58 million.

1

2      *    GAAP gross margins are anticipated to be in the range of 53% to 55%, which includes approximately $0.4 million in stock-based compensation.

3      *    GAAP operating expenses are anticipated to be in the range of $30 to $31 million,which includes approximately $3.0 million in stock-based compensation and amortization of intangibles.

4

5      *    Provision for income tax is anticipated to be in the range of approximately $0.5 to $0.6 million.

6      *    Fully diluted weighted average shares are anticipated to be in the range of 71 to 72 million shares.

7

8      *    This equates to GAAP earnings (loss) per share in the range of ($0.01) to $0.03, and a non-GAAP earnings per share in the range of $0.03 to $0.07.

9      **Fiscal Year Ending December 31, 2007**

10     *    Net revenues are anticipated to be in the range of approximately $225 to $230 million.

11

12     *    GAAP gross margins are anticipated to be in the range of 54% to 56%, which includes approximately $1.5 million in stock-based compensation.

13     *    GAAP operating expenses are anticipated to be in the range of $116 to $121 million, which includes stock-based compensation of approximately $10.5 million and amortization of intangibles of $0.6 million.

14

15     *    Provision for income tax is anticipated to be in the range of approximately $2.0 to $2.5 million.

16

17     *    Fully diluted weighted average shares are anticipated to be in the range of 69 to 70 million shares.

18     *    This equates to GAAP earnings per share in the range of $0.03 to $0.08, and a non-GAAP earnings per share in the range of $0.28 to $0.33.

19

20     43.    Later the same day, in a conference call for analysts and investors, Defendants

21     reiterated this guidance, in part, as follows:

22         *Let me recap our guidance for Q3 and fiscal year 2007. For Q3 we currently expect net revenues to be in the range of $54 to 58 million.* Gross margins are anticipated in the range of 53% to 55%. Operating expenses are expected to be approximately $30 to $31 million on a GAAP basis, and approximately $27 to $28 million on a non-GAAP basis. This excludes approximately $3 million in stock-based compensation and amortization of intangibles. Fully diluted weighted average shares are expected to be 71 to 72 million shares.

23

24

25

26

27     Our provision for income taxes in Q3 is expected to be between 500,000 and 600,000, reflecting a pro-rata portion of our expected full-year tax provision of $2 to $2.5 million. *This equates to GAAP*

28

CLASS ACTION COMP. FOR VIOLATIONS          - 23 -
OF FEDERAL SECURITIES LAWS

*EPS of $(0.01) to +$0.03 per share, and non-GAAP EPS of $0.03 to $0.07 per share.*

*For the full year 2007, we continue to expect full-year revenues of between $225 and $230 million.* That said, our current visibility indicates that we are more likely to be in the low-end of that range due to the impact of timing of receipt of customer acceptance on in-process Switched Broadcast deployments.

Gross margins are expected to be between 54% and 56% for the full year. Full-year operating expenses are expected to be between $116 million and $121 million on a GAAP basis, and approximately $104 to $109 million on a non-GAAP basis, excluding full-year stock-based compensation of approximately $10.5 and amortization of intangibles of $600,000.

Note that full-year stock-based compensation has increased slightly from our previous estimate due to equity grants during the quarter. Full-year estimates assume a full-year tax provision of between $2 and $2.5 million. Fully diluted weighted average shares for the full year are expected to be in the range of 69 to 71 million shares. *This equates to GAAP EPS of $(0.03) to $0.08 per share, and non-GAAP EPS of $0.28 to $0.33.*

*In summary, the business continued to track against our expectations as we demonstrated solid year-over-year growth in gross margin expansion. We continue to drive operating profitability and cash flow, and we continue to grab footprint* and expand our presence in the markets surrounding Switched Broadcast, TelcoTV, and IPTV. [Emphasis added.]

44.     On August 10, 2007, BigBand filed with the SEC its report of financial results for 2Q:07, pursuant to Form 10-Q. The Company's 2Q:07 Form 10-Q reiterated many of the same or similar statements as were contained in the Company's August 2, 2007 release and during its regularly scheduled conference call, and as had been made by Defendants prior to or at the time of the IPO, concerning the Company's controls and procedures and its compliance with GAAP. As evidence of this, the 2Q:07 Form 10-Q stated that BigBand's Basis of Presentation, Use of Estimates and Controls and Procedures were purported to be in compliance with GAAP and SEC reporting rules. These statements were the same as or substantially similar to those statements contained and certified in the Company's 1Q:07 Form 10-Q, filed with the SEC on or about May 9, 2007, and reproduced herein, in ¶ 36, *supra*.

## VI.    THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF BIGBAND IS BELATEDLY DISCLOSED

45.    Following the publication of a release on September 27, 2007, in which Defendants announced results far below guidance, shares of the Company traded to below $6.00 – more than 50% less than the price at which BigBand shares were offered to the public only months before in the March 2007 IPO.  At that time, Defendants revealed that quarterly revenue was expected to be as low as $35 million, compared to analyst mean estimate of $56 million, and that the Company would post an operating loss, compared to consensus estimates of a profit of at least ($0.06) per share.

46.    At that time, Defendants also published a release which admitted, for the first time, in part, the following:

> BigBand Networks, Inc., (NASDAQ:BBND) today revised its revenue outlook for the third quarter ending September 30, 2007. *The Company now expects to report revenue for the third quarter in the range of $35 to $39 million, which is below the Company's previous guidance of $54 to $58 million.*
>
> The lower revenue outlook is due to several coincident factors. BigBand has been *deploying switched digital video across an expanding number of customers and configurations. Some of these ongoing deployments have required more software customization and integration than originally expected*. This impacted the Company's ability to recognize switched digital revenue for some deployments in the third quarter. The Company *also experienced slowdown in Telco-TV revenue*, as its *major customer worked through some previously purchased inventory*. Finally, the Company experienced *continued softness in its data business. As a result of lower revenue expectations, BigBand expects to report an operating loss for the third quarter of fiscal year 2007*. [Emphasis added.]

47.    As investors realized after the publication of these shocking and belated adverse admissions, the true but undisclosed negative conditions that existed at the time of the March 2007 IPO, and that continued to adversely impact the Company after that time include, in part, the following:

a.    At the time of the IPO, development of switched digital video products were not proceeding according to plan, and Defendants were behind schedule on this roll out because the migration to these new products required significant customization and software integration that was not disclosed to investors and that was not factored into BigBand's purported growth plan;

b.  At the time of the IPO, as a result of Defendants' inability to successfully roll out the Company's switched digital video products, Defendants had helped to create the appearance of robust sales growth by stuffing its customer sales channels and warehouses with more inventory they could foreseeably use in the near term – effectively prematurely recognizing revenues by draining them from consecutive periods;

c.  At the time of the IPO, control deficiencies existed within the Company, and it is now obvious that BigBand did maintain the minimum standards of good Corporate Governance or controls and procedures, as is required by the SEC and the Company's own internal guidelines and standards of business conduct;

d.  As a result of the foregoing undisclosed problems that existed at the time of the IPO and thereafter throughout the relevant period, guidance sponsored and/or endorsed by Defendants was not reasonable or based on the true facts that existed at that time; and

e.  At the time of the March 2007 IPO, Defendants had *not* conducted an adequate due diligence investigation into BigBand, that would have revealed many of the issues, and that would most likely have prevented the sale of this Company to shareholders through the public equity markets at that time, or at the inflated price at which these shares were originally sold.

48.     BigBand share price declined 30% on September 27, 2007, as an immediate reaction to the publication of these belated disclosures.  Moreover, almost 7 million shares traded that day, many times the Company's near-term average trading volume.   The chart below evidences the artificial inflation in the price of BigBand stock at the time of the IPO and thereafter throughout the relevant period, and the dramatic decline in the price of these shares following Defendants' belated disclosures, as follows:



## VII.    CAUSATION AND ECONOMIC LOSS

49.    In connection with the March 2007 BigBand IPO, Defendants signed a materially false and misleading Registration Statement and filed with the SEC and made available to shareholders a materially false and misleading Prospectus.  These filings were essential in allowing Defendants to complete the Initial Public Offering of 10.7 million BigBand shares  plus an additional 1.605 million over-subscription shares priced at $13.00 each, and raise over $159 million, and to create a public market for trading in Company stock, immediately thereafter.

50.    On September 28, 2007, however, after Defendants' prior misrepresentations and illegal and improper conduct came to be revealed and was apparent to investors, shares of BigBand declined to below $6.00 per share – evidence that the prior artificial inflation in the price of Company shares was eradicated.   As a result of their purchases of BigBand stock in connection with the IPO, including those who purchase shares traceable to the Offering in the public markets immediately thereafter, Plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

51.    By improperly characterizing the Company's financial results and misrepresenting its prospects, the Defendants presented a misleading image of BigBand's business and future growth prospects.  At the time of the IPO and thereafter during the relevant period, Defendants repeatedly emphasized the ability of the Company to introduce its new products and maintain its "growth trajectory," and to accelerate this plan once Defendants raised these additional funds

through the public equity markets. These claims caused and maintained the artificial inflation in BigBand's stock at the time of the March 2007 IPO, and thereafter until the truth about the Company was ultimately revealed to investors in the final trading days of September 2007.

52.     Defendants' false and materially misleading statements caused BigBand shares to trade at artificially inflated levels from the time of the March 2007 IPO, when they were offered at $13.00 per share, until such shares reached an all-time record trading high of over $21.00 per share in late-April 2007.

53.     On September 28, 2007, however, after investors learned the truth about the Company, and learned that Defendants could not operate the Company according to its growth plan, and was not successfully introducing its new products, such that 2007 results were *already* adversely impacted *prior* to the Offering, shares of the Company collapsed. Defendants' belated disclosures had an immediate, adverse impact on the price of BigBand shares.

54.     The decline in BigBand stock price following the revelation of Defendants' belated disclosures on September 27, 2007, was a direct result that the nature and extent of Defendants' misrepresentations and omissions contained in the IPO Prospectus became known to investors, and to the market. The timing and magnitude of BigBand's stock price decline the following day, when trading resumed, negates any inference that the losses suffered by Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to Defendants' fraudulent conduct.

55.     The economic loss, *i.e.* damages suffered by Plaintiff and other members of the Class, was a direct result of Defendants' misrepresentations and omissions being revealed to investors, and the subsequent significant decline in the value of the Company's shares was also the direct result of Defendants' prior misstatements and omissions being revealed.

## VIII.   CLASS ACTION ALLEGATIONS

56.     This is a class action on behalf of all persons who purchased BigBand shares, or traceable stock, pursuant to the March 2007 Registration Statement and Prospectus (the "Class"), excluding Defendants. Class members are so numerous that joinder of them all is impracticable.

57.    Common questions of law and fact predominate and include whether Defendants: (i) violated the Securities Act; (ii) whether the BigBand IPO Registration Statement and Prospectus misrepresented material facts; and (iii) the extent of and appropriate measure of damages.

58.    Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX.    CLAIM FOR RELIEF

### For Violations of §11 of the Securities Act Against All Defendants and §15 of the Securities Act Against Defendants

59.    Plaintiff incorporates each and every allegation above as if stated herein.

60.    The Individual Defendants each signed BigBand's IPO Registration Statement and/or filed that Prospectus with the SEC and distributed it to investors.  The Underwriter Defendants each permitted their names to be included on the cover of the Prospectus as the Underwriters.

61.    On or about March 15, 2007, the Defendants named in this Claim for Relief completed an IPO of 10.7 million shares of BigBand stock − in addition to 1.605 million shares allotted to Underwriters in an over-subscription option − at $13 per share, for total proceeds of at least $159 million.

62.    Each of the statements alleged herein relating to BigBand's prospects and financial results made in the  March 2007 Prospectus and Registration Statement were false or misleading when issued.  The true but concealed facts were that BigBand was not able to effectively introduce its new products, and Defendants concealed this fact by stuffing its customers with excess BigBand product supply, and that the Company was already operating below its growth plan prior to the Offering which undisclosed conditions would, foreseeable, continue to hinder the Company in the near-term. These omissions were a violation of SEC Regulation S-K, Item 303(a), which requires that trends which will have a material effect on a registrant's results be disclosed.

63.     All Defendants named in this Claim for Relief, with the exception of BigBand, the issuer (whose liability for the misstatements is absolute), owed to the purchasers of the stock, including Plaintiff and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time it became effective, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

64.     The officers and directors of BigBand who were signatories to the Registration Statement and the Underwriter Defendants were responsible for the preparation of the Prospectus and the Registration Statement.  By virtue of the material misrepresentations contained in the Registration Statement and Prospectus, Plaintiff and the Class have been damaged.

65.     By reason of the conduct herein alleged, each defendant named in this Claim for Relief violated §11 of the Securities Act.  Defendants Bassan-Eskenazi and Oz, as well as certain of the other Individual Defendants named herein, by reason of their stock ownership and positions with BigBand, were controlling persons of BigBand and are liable under §15 of the Securities Act.

## X.     PRAYER

WHEREFORE, Plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; and such other relief as the Court may deem proper.

## XI.     JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October _2_ , 2007

HAGENS BERMAN SOBOL SHAPIRO, LLP

By: _____
        REED KATHREIN

715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001

1
2
3
4

Steve Berman
HAGENS BERMAN SOBOL SHAPIRO, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

5
6
7
8

Lewis Kahn
KAHN GAUTHIER SWICK, LLC
650 Poydras Street - Suite 2150
New Orleans, LA  70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

9
10
11

Kim E. Miller
KAHN GAUTHIER SWICK, LLC
12 East 41th Street – 12 Floor
New York, NY  10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

12
13
14
15

Eric J. O'Bell
LAW OFFICES OF ERIC J. O'BELL, LLC
3500 North Hullen Street
Metairie, LA 70002
Telephone: (504) 456-8677
Facsimile: (504) 456-8624

16
17

Attorneys for Plaintiff and the Class

18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATION IN SUPPORT OF APPLICATION FOR LEAD PLAINTIFF

Bikash Mohan Mohanty (name) ("plaintiff") declares, as to the claims asserted under the federal securities law, that:

1.    Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws and plaintiff is willing to serve as a lead plaintiff in this case and all other related cases that may be consolidated with it.

2.    Plaintiff did not purchase securities of BigBand Networks, Inc. at the direction of counsel or in order to participate in a private action under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    During the Class Period, plaintiff has executed transactions in the securities of BigBand Networks, Inc. as follows. See Attached Schedule.

5.    In the last three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

6.    Plaintiff will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  10 / 02 , 2007

_Bikash Mohan Mohanty_
Plaintiff

Name of plaintiff: Prakash Mohan Mohanty
Schedule of plaintiff's Transaction(s) in
BigBand Networks, Inc.

Purchase(s):

| Date | Units | Price | Total |
|------|-------|-------|-------|
| 09/26/07 | 4219 | 9.02 | 38,055.38 |
| 09/27/07 | 3496 | 9.01 | 31,498.96 |
| | | | $69,554.34 |

Sale(s):

| Date | Units | Price | |
|------|-------|-------|---|
| 09/28/07 | 7515 | 6 | 45090 |
| 09/28/07 | 200 | 6.01 | 1202 |
| | | | $46292 |

Net loss                                    $23262

| Status | Order Number | Action | Quantity | Symbol | Symbol Description | Type | Price | Reported | Entered Time | Entered Date |
|---|---|---|---|---|---|---|---|---|---|---|
| Filled | 3232043731 | Sell | 3940 | BBND | Bigband Networks Inc Com | Limit | 6 | 09:54:51 09/28/07 | 9:54:38 | 9/28/2007 |
| Filled | 3232043731 | Sell | 1200 | BBND | Bigband Networks Inc Com | Limit | 6 | 09:54:51 09/28/07 | 9:54:38 | 9/28/2007 |
| Filled | 3232043731 | Sell | 200 | BBND | Bigband Networks Inc Com | Limit | 6 | 09:54:51 09/28/07 | 9:54:38 | 9/28/2007 |
| Filled | 3232043731 | Sell | 200 | BBND | Bigband Networks Inc Com | Limit | 6 | 09:54:51 09/28/07 | 9:54:38 | 9/28/2007 |
| Filled | 3232043731 | Sell | 300 | BBND | Bigband Networks Inc Com | Limit | 6 | 09:54:51 09/28/07 | 9:54:38 | 9/28/2007 |
| Filled | 3232043731 | Sell | 400 | BBND | Bigband Networks Inc Com | Limit | 6 | 09:54:51 09/28/07 | 9:54:38 | 9/28/2007 |
| Filled | 3232043731 | Sell | 975 | BBND | Bigband Networks Inc Com | Limit | 6 | 09:54:51 09/28/07 | 9:54:38 | 9/28/2007 |
| Filled | 3232043731 | Sell | 200 | BBND | Bigband Networks Inc Com | Limit | 6 | 09:54:51 09/28/07 | 9:54:38 | 9/28/2007 |
| Filled | 3232043731 | Sell | 200 | BBND | Bigband Networks Inc Com | Limit | 6 | 09:54:51 09/28/07 | 9:54:38 | 9/28/2007 |
| Filled | 3232043731 | Sell | 100 | BBND | Bigband Networks Inc Com | Limit | 6.01 | 09:54:51 09/28/07 | 9:54:38 | 9/28/2007 |
| Filled | 3229459386 | Buy | 1696 | BBND | Bigband Networks Inc Com | Limit | 6 | 09:54:51 09/28/07 | 9:54:38 | 9/28/2007 |
| Filled | 3229459386 | Buy | 200 | BBND | Bigband Networks Inc Com | Limit | 9.01 | 13:49:33 09/27/07 | 13:40:35 | 9/27/2007 |
| Filled | 3229459386 | Buy | 600 | BBND | Bigband Networks Inc Com | Limit | 9.01 | 13:46:48 09/27/07 | 13:40:35 | 9/27/2007 |
| Filled | 3229459386 | Buy | 600 | BBND | Bigband Networks Inc Com | Limit | 9.01 | 13:45:35 09/27/07 | 13:40:35 | 9/27/2007 |
| Filled | 3229459386 | Buy | 300 | BBND | Bigband Networks Inc Com | Limit | 9.01 | 13:44:08 09/27/07 | 13:40:35 | 9/27/2007 |
| Filled | 3229459386 | Buy | 400 | BBND | Bigband Networks Inc Com | Limit | 9.01 | 13:43:49 09/27/07 | 13:40:35 | 9/27/2007 |
| Filled | 3229459386 | Buy | 300 | BBND | Bigband Networks Inc Com | Limit | 9.01 | 13:42:33 09/27/07 | 13:40:35 | 9/27/2007 |
| Filled | 3224775060 | Buy | 4219 | BBND | Bigband Networks Inc Com | Limit | 9.02 | 11:23:11 09/26/07 | 11:07:23 | 9/26/2007 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Buy | | | 7715 | BBND | Bigband Networks Inc Com | | 69554 | | | |
| Total Sell | | | 7715 | BBND | Bigband Networks Inc Com | | 46292 | | | |
| Net Loss | | | 7715 | BBND | Bigband Networks Inc Com | | 23262 | | | |