# EXHIBIT 3

11 of 11 DOCUMENTS

Copyright 1998 Congressional Information Service, Inc.
Committee Reports

105th Congress , 2nd Session

Senate Report 105-182

105 S. Rpt. 182

THE SECURITIES LITIGATION UNIFORM STANDARDS ACT OF 1998

**DATE:** May , 1998. Ordered to be printed

**SPONSOR:** Mr. D Amato submitted the following report

**COMMITTEE:** from the Committee on Banking, Housing, and Urban Affairs

R E P O R T
(To accompany S. 1260)

    Introduction

**TEXT:**

    The Committee on Banking, Housing and Urban Affairs, to which was referred the bill (S. 1260), to amend the Securities Act of 1933 and the Securities Exchange Act of 1934 to limit the conduct of securities class actions under State law, having considered the same, reports favorably thereon with an amendment in the nature of a substitute, and recommends that the bill as amended do pass.

    History of the legislation

    On July 24, 1997, the Subcommittee on Securities held an oversight hearing on the operation of the Private Securities Litigation Reform Act (hereinafter referred to as either the "PSLRA" or the "1995 Act") which was passed over presidential veto during the 104th Congress (PL-104-67). At this hearing testimony was received from: Arthur Levitt, Chairman of the Securities and Exchange Commission; Keith Paul Bishop, Commissioner, California Department of Corporations; Dr. Joseph A. Grundfest, Professor, Stanford Law School and former Commissioner, Securities and Exchange Commission; Mr. Michael A. Perino Lecturer, Stanford Law School; Mr. Joseph Polizotto, Managing Director, Office of the General Counsel, Lehman Brothers (on behalf of the Securities Industry Association); Mr. Kenneth Janke, Sr., President and Chief Executive Officer, National Association of Investors Corporation; Mr. Richard Miller, General Counsel, American Institute of Certified Public Accountants; Mr. Leonard Simon, Milberg Weiss Bershad Hynes and Lerach (on behalf of the National Association of Securities and Commercial Law Attorneys); Mr. Brian Dovey, President, National Venture Capital Association and; Mr. Robert C. Hinckley, Vice President, Strategic Plans and Programs, Xilinx (on behalf of the American Electronics Association).

    As a result of the testimony received at the July 1997 hearing, Senators Gramm, Dodd, Boxer, Faircloth, Hagel and Moseley-Braun, together with seven other Senators who are not members of the Committee introduced on October 7, 1997, S. 1260, the "Securities Litigation Uniform Standards Act of 1997" (hereinafter referred to as either "Uniform Standards" or "S. 1260") Subsequently, a total of forty Senators cosponsored the legislation, including twelve from the

1998 Committee Reports, May , 1998

Committee (Senators Gramm. Dodd, Boxer, Faircloth, Hagel, Moseley-Braun, Bennett, Grams, Kerry, Mack, Allard and Enzi).

On October 29, 1997 and on February 23, 1998, the Subcommittee on Securities held legislative hearings on S. 1260. Witnesses testifying on October 29, 1997 included: U.S. Representative Rick White; U.S. Representative Anna Eshoo; Arthur Levitt, Chairman, the Securities and Exchange Commission (SEC); Isaac C. Hunt, Jr., Commissioner, Securities and Exchange Commission; Robert C. Hinckley, Vice President, Strategic Plans and Programs, Xilinx, who testified on behalf of the American Electronics Association; Harry Smith, Mayor of Greenwood, Mississippi, who testified on behalf of the National League of Cities; Herbert Milstein of Cohen, Milstein, Hausfeld & Toll, who testified on behalf of the National Association of Securities and Commercial Law Attorneys; Professor Michael Perino, Stanford Law School; Thomas E. OHara, Chairman, Board of Trustees, the National Association of Investors Corporations and Daniel Cooperman, Senior Vice President, General Counsel, and Corporate Secretary, Oracle Corporation, who testified on behalf of the Software Publishers Association.

Witnesses testifying on February 23, 1998 included: Boris Feldman, Wilson, Sonsini, Goodrich & Rosati; Professor Richard W. Painter, Cornell Law School; Michael H. Morris, Vice President and General Counsel, Sun Microsystems; Mary Rouleau, Legislative Director, Consumer Federation of America; J. Harry Weatherly, Director of Finance, Mecklenburg County, North Carolina, on behalf of the Government Finance Officers Association; and John F. Olson, Gibson, Dunn & Crutcher.

On April 29, 1998, the Committee met in Executive Session to consider and adopt an amendment in the nature of a substitute that was offered by Chairman DAmato and Senators Gramm and Dodd. The Committee also adopted an amendment, by voice vote, providing two findings to the bill. The amendment was offered by Chairman DAmato and Senators Gramm and Dodd. The amendment makes clear the Committees intention to enact this legislation in order to prevent state laws from being used to frustrate the operation and goals of the 1995 Reform Act. The legislation was ordered reported from Committee by a vote of 14-4. Senators Shelby, Sarbanes, Bryan and Johnson voted against this legislation.

Purpose and Scope of Legislation

The need for this legislation became apparent during a Securities Subcommittee hearing on July 24, 1997. This hearing was held to review the status of the implementation and impact of the "Private Securities Litigation Reform Act of 1995." During the course of that hearing one disturbing trend became apparent; namely, that there was a noticeable shift in class action litigation from federal to state courts. At this hearing, one witness pointed out the dangers of maintaining differing federal and state standards of liability for nationally-traded securities:

Pub Law No. 104-67 (Dec. 22, 1995).

Disparate, and shifting, state litigation procedures may expose issuers to the potential for significant liability that cannot easily be evaluated in advance, or assessed when a statement is made. At a time when we are increasingly experiencing and encouraging national and international securities offerings and listings, and expending great effort to rationalize and streamline our securities markets, this fragmentation of investor remedies potentially imposes costs that outweigh the benefits. Rather than permit or foster fragmentation of our national system of securities litigation, we should give due consideration to the benefits flowing to investors from a uniform national approach.

Testimony of Stephen M.H. Wallman, Commissioner, Securities and Exchange Commission; submitted to the Subcommittee on Securities "Oversight Hearing on the Private Securities Litigation reform Act of 1995" (the "Reform Act Hearing"), July 24, 1997, p. 1.

Former SEC Commissioner Joseph Grundfest summarized this post 1995 Act increase in state securities class actions in testimony co-authored with his fellow Stanford Law School faculty member Michael Perino:

The relative stability of the aggregate litigation rate masks a significant shift of activity from federal to state court * * *. There is widespread agreement that these figures represent a substantial increase in state court litigation. Two phenomena seem to explain the bulk of this shift. First, there appears to be a "substitution effect" whereby plaintiffs counsel file state court complaints when the underlying facts appear not to satisfy new, more stringent federal pleading requirements, or otherwise seek to avoid the substantive or procedural provisions of the Act. Second plaintiffs appear to be resorting to increased parallel state and federal litigation in an effort to avoid federal discovery stays or to establish alternative state court venues for settlement of federal claims.

1998 Committee Reports, May , 1998

Joint prepared statement of Joseph A. Grundfest and Michael A. Perino, "Reform Act Hearing," July 24, 1997, p. 6.

While there was some disagreement as to the exact size of the increase in state class-action filings, the overall evidence received by the Committee is compelling. As one witness testified "(t)he single fact is that state-court class actions involving nationally traded securities were virtually unknown prior to the (1995 Act); they are brought with some frequency now."

"* * * the apparent shift to state court may be the most significant development in securities litigation post-Reform Act." Securities and Exchange Commission, Report to the President and the Congress on the First Year of Practice Under the Private Securities Litigation Reform Act of 1995, p. 69 (1997); see also Statement of Senator Phil Gramm, Senate Subcommittee on Securities Hearing, February 23, 1998, entering into the record materials submitted by Price, Waterhouse, LLP documenting both the rise in state securities class action cases and the changing nature of those cases; see also Michael A. Perino, Fraud and Federalism: Preempting Private State Securities Fraud Causes of Action, Stanford Law Review (forthcoming 1998), manuscript at 31, n. 127; see also Joseph A. Grundfest and Michael A. Perino; Securities Litigation Reform: The First Years Experience (Release 97.1), Summary of Major Findings, p. ii-iii; Stanford Law School; February 27, 1997.

Written testimony of John F. Olson of Gibson, Dunn & Crutcher, "Hearing on S. 1260," February 23, 1998, p. 5.

Further, the Committee has found that this state class-action trend has had an impact beyond the number of, and dollar amounts involved in, the class actions filed. This trend has created a ripple-effect that has inhibited small, high-growth companies in their efforts to raise capital, and has damaged the overall efficiency of our capital markets. Specifically, the increased risk of state court class actions has had a chilling effect on the use of the "safe-harbor" and other important provisions of the 1995 Act. The safe harbor was intended to help get valuable financial forecasts and forward-looking information to investors, so that these investors could make decisions with as much information as possible; as Thomas OHara of the National Association of Investors Corporation ("NAIC"), testified:

Joint prepared statement of Joseph A. Grundfest and Michael A. Perino, "Reform Act Hearing," July 24, 1997, p. 6.

See, e.g., Prepared statement of Michael Morris, Vice President and General Counsel, Sun Microsystems, "Hearing on S. 1260," February 23, 1998.

The key to becoming successful with high-tech investments is a willingness to recognize and tolerate the inherent volatility of the business and access to crucial forward-looking information so an investor can make a wise decision.

Written statement of Thomas E. OHara, Chairman, NAIC, "Hearing on S. 1260," October 29, 1997.

A number of witnesses at the July 1997 hearing advocated legislation to establish uniform standards for private securities class action litigation. This legislation is an outgrowth of the July 1997 hearings and subsequent investigation and oversight by the Committee.

See, e.g., Grundfest and Perino, supra, note 2; Written statement of Robert C. Hinckely, Vice President Strategic Plans and Programs, XILINX, on behalf of The American Electronics Association, the Reform Act Hearing, July 27, 1997, p. 17.

Some critics of establishing a uniform standard of liability have attacked such legislation as being an affront on Federalism and contrary to the recent trend towards reinforcing state rights.0 Proponents of the legislation have argued that we live in an information age in which we have truly national, if not international, securities markets and that uniform standards are entirely consistent with Congresss preeminent power over the regulation of interstate and foreign commerce. The Committee, while sensitive to both these considerations, found the interest in promoting efficient national markets to be the more convincing and compelling consideration in this context.

0 written statement of Hon. Harry Smith, Mayor, Greenwood, Mississippi, on behalf of the National League of Cities, "Hearing on S. 1260," October 29, 1997, p. 8.

We do have national markets for certain securities, and fraudulent and abusive securities class action litigation distorts the efficient operation of those markets and the optimal allocation of available capital. Commissioner Keith P. Bishop, then-Californias primary state securities regulator, testified before the Subcommittee on Securities in July,

1997, that the preponderance of class action litigation in several states is irrelevant to the true national nature of the problem:

It is important to note that companies can not control where their securities are traded after an initial public offering * * *. As a result, companies with publicly-traded securities can not choose to avoid jurisdictions which present unreasonable litigation costs. Thus, a single state can impose the risks and costs of its peculiar litigation system on all national issuers.1

1 Written statement of Hon. Keith Paul Bishop, Commissioner, California Department of Corporations, "Reform Act Hearing," July 27, 1998, p. 3.

The Committee emphasizes the important role that the local "cop on the beat," i.e., the state securities regulators, plays in a complementary state-federal securities regulatory system. In recognition of this dual system, this legislation uses the approach that the National Securities Markets Improvement Act of 1996 ("NSMIA") employed.  The purpose of NSMIA was described by SEC Chairman Levitt in testimony regarding that legislation:

The current system of dual federal-state regulation is not the system that Congress or the Commission would create today if we were designing a new system * * *. An appropriate balance can be attained in the federal-state arena that better allocates responsibilities, reduces compliance costs and facilitates capital formation, while continuing to provide for the protection of investors. The bills approach to the division of responsibilities in the investment adviser and investment company areas exemplifies such a balance.

As introduced, the legislation incorporated the conceptual framework of NSMIA (with respect to interplay of federal and state regulation), while complementing, and hopefully giving full force to the 1995 Act. The Committee strongly notes that this legislation only covers precisely those securities defined in the NSMIA, principally those securities that are traded on national exchanges. During the course of the two hearings held by the Subcommittee on Securities on this legislation, the Subcommittee received a great deal of constructive advice about how best to give effect to the 1995 Act. Scienter

The Committee heard testimony from the Securities and Exchange Commission and others regarding the scienter requirement under a possible national standard of litigation for nationally traded securities. The Committee understands that this concern arises out of certain Federal district courts interpretation of the Private Securities Litigation Reform Act of 1995 (PL 104-67). In that regard, the Committee emphasizes that the clear intent in 1995 and our continuing intent in this legislation is that neither the PSLRA nor S. 1260 in any way alters the scienter standard in federal securities fraud suits. It was the intent of Congress, as was expressly stated during the legislative debate on the PSLRA, and particularly during the debate on overriding the Presidents veto, that the PSLRA establish a uniform federal standard on pleading requirements by adopting the pleading standard applied by the Second Circuit Court of Appeals. Indeed the express language of the PSLRA itself carefully provides that plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" (emphasis added). The Committee emphasizes that neither the PSLRA nor S. 1260 makes any attempt to define that state of mind.Certain exceptions

The SEC, as well as other commentators,2 also noted the need to exempt from the legislation shareholder-initiated litigation based on breach of fiduciary duty of disclosure, in connection with certain corporate actions, that is found in the law of some states, most notably Delaware.

2 See, e.g., Prepared statement of John F. Olson, "Hearings on S. 1260," Senate committee on Banking, Housing & Urban Affairs, Subcommittee on Securities, February 23, 1998, pp. 8-13.

The Committee is keenly aware of the importance of state corporate law, specifically those states that have laws that establish a fiduciary duty of disclosure. It is not the intent of the Committee in adopting this legislation to interfere with state law regarding the duties and performance of an issuers directors or officers in connection with a purchase or sale of securities by the issuer or an affiliate from current shareholders or communicating with existing shareholders with respect to voting their shares, acting in response to a tender or exchange offer, or exercising dissenters or appraisal rights.

In applying the uniform standards in this manner, the Committee expressly does not intend for suits excepted under this provision to be brought in venues other than in the issuers state of incorporation, in the case of a corporation, or state of organization, in the case of an other entity. Definition of "Class Action"

1998 Committee Reports, May , 1998

The Subcommittee on Securities heard testimony from the Securities and Exchange Commission and others that the definition of class action originally drafted as part of S. 1260 would inadvertently include cases that were beyond the intent of the legislation such as certain types of individual state private securities actions.

In response to these concerns, the Committee made several significant changes to the definition of class action. Because of the unique nature of the suits that the Committee has made subject to the legislations provisions, this definition cannot simply track the exact language of Rule 23 of the Federal Rules of Civil Procedure.

In order to ensure that individual state actions would not be included as part of the bills definitions, it was necessary for the Committee to create a standard of demarcation between individual actions appropriately brought in state court and those actions that should be subject to the bills provisions. To address this goal, and to establish objective criteria in the application of the definition, the Committee specifically included a threshold number of fifty or more persons or prospective class members as part of the definition of a class action under this legislation.

Section 2(f)(1)(A)(i)(II) of the legislation provides a definition that closely tracks the relevant provisions of Rule 23 of the Federal Rules of Civil Procedure in which a suit is brought by representative plaintiffs on behalf of themselves and other unnamed parties. Section 2(f)(1)(A)(i)(I), however, provides that any single lawsuit is treated as a class action if it seeks damages on behalf of more than fifty persons and questions of law or fact common to the prospective class predominate, without regard to questions of individualized reliance. The predominance requirement, modeled on Rule 23, is included to assure that claims that are not closely related, but that are included in a single proceeding only for the purposes of convenience are not treated as a class action. The Committee is conscious, however, of the danger that the predominance requirement could be used as a loophole to bring a single suit that names many plaintiffs. If such a suit is brought under a state law that requires proof of each individual plaintiffs reliance on a defendants alleged misstatement or omission, the necessity of proving reliance on an individual basis might mean that common questions would not predominate and the suit accordingly would not be treated as a class action.

Indeed the Supreme Court stated in Basic, Inc. . Levinson 485 U.S. 224, 242, (1988)) that "requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would * * * prevent plaintiffs from proceeding with a class action, since individual issues would * * * overwhelm the common ones." To avoid this problem, the definition provides that the predominance inquiry must be undertaken without reference to issues of individualized reliance, so that the necessity of proving reliance on an individual basis would not defeat treatment of the suit as a class action.

Section 2(f)(1)(A)(ii) is a definition of class action that is intended to prevent evasion of the bill through the use of so-called "mass actions." These kinds of actions are now brought in product liability, environmental tort and similar cases. In practice, such suits may function very much like traditional class actions and, because they involve many plaintiffs, they may have a very high settlement value. They accordingly may be abused by lawyers who seek to evade the provisions of this Act in order bring coercive strike suits.

Subpart (A)(ii) addresses the Committees concern by including in the definition of class action any group of lawsuits that are filed or pending in the same court, that in the aggregate seek damages on behalf of more than fifty persons, that involve common questions of law or fact, and which are joined, consolidated, or otherwise proceed as a single action for any purpose.  The Committee does not intend for the bill to prevent plaintiffs from bringing bona fide individual actions simply because more than fifty persons commence the actions in the same state court against a single defendant.

However, the provisions of the bill would apply where the court orders that the suits be joined, consolidated, or otherwise proceed as a single action at the state level. The Committee also notes that when such suits proceed as a single action in state court, it is frequently at the request of the plaintiffs.

The class action definition has been changed from the original text of S. 1260 to ensure that the legislation does not cover instances in which a person or entity is duly authorized by law, other than a provision of state or federal law governing class action procedures, to seek damages on behalf of another person or entity. Thus, a trustee in bankruptcy, a guardian, a receiver, and other persons or entities duly authorized by law (other than by a provision of state or federal law governing class action procedures) to seek damages on behalf of another person or entity would not be covered by this provision.

Finally, while the Committee believes that it has effectively reached those actions that could be used to circumvent the reforms enacted by Congress in 1995 as part of the Private Securities Litigation Reform Act, it remains the

1998 Committee Reports, May , 1998

Committees intent that the bill be interpreted broadly to reach mass actions and all other procedural devices that might be used to circumvent the class action definition.

section-by-section analysis

Section 1. Short title

The short title of the bill is the Securities Litigation Uniform Standards Act of 1998.

Section 2. Findings

Congress finds that in order to avoid the thwarting of the purpose of the Private Securities Litigation Reform Act of 1995, national standards for nationally traded securities must be enacted, while preserving the appropriate enforcement powers of state regulators, and the right of individuals to bring suit.

Section 3. Limitation on remedies

Subsection 3(a) amends Section 16 of the Securities Act of 1933 as follows:

Subsection 16(a) is a savings clause.

Subsection 16(b) provides that no class action based on State law alleging fraud in connection with the purchase or sale of covered securities may be maintained in State or Federal court.

Subsection 16(c) provides that any class action described in Subsection (b) that is brought in a State court shall be removable to a Federal district court, and may be dismissed pursuant to the provisions of subsection (b).

Subsection 16(d) of the new section 16 provides for the preservation of certain law suits brought under State law affecting conduct of corporate officers with respect to certain corporate actions, including tender offers, exchange offers or the exercise of dissenters or appraisal rights.

Subsection 16(e) of the new section 16 reemphasizes that State securities commissions retain their jurisdiction to investigate and bring enforcement actions.

Subsection 16(f) of the new section 16 provides for definitions under the section, including definitions of "class action," "covered security," and "affiliate of the issuer." "Class action" is defined so as to capture mass actions, but to exclude shareholder derivative actions and actions by a group of less than 50 individuals or entities. "Covered securities" includes securities satisfy the definition of that term given in subsection 18(b)(1) and 18(b)(2) of the Securities Act of 1933.

Subsection 3(b) amends Section 28 of the Securities Exchange Act of 1934 so as to effect the changes to that section substantially similar to, and consistent with, the amendments that subsection 3(a) makes to the Securities Act of 1933.

Section 4. Applicability

The changes in law made by the bill do not affect any court action commenced before and pending on the date of enactment of the legislation.

regulatory impact statement

This legislation is designed to address and unforeseen "loophole" in the 1995 Private Securities Litigation Act, that has blocked that law from accomplishing its stated goal of reforming private securities litigation. Because S.1260 seeks to achieve further reforms in the private securities litigation system, the Committee believes that this legislation will have little or no regulatory impact.

cost of legislation 1U.S. Congress, Congressional Budget Office, Washington, DC, May 1, 1998. Hon. Alfonse M. DAmato, Chairman, Committee on Banking, Housing and Urban Affairs, U.S. Senate, Washington, DC.

Dear Mr. Chairman: he Congressional Budget Office has prepared the enclosed cost estimate for S. 1260, the Securities Litigation Uniform Standards Act of 1998.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contacts are Kathleen Gramp (for federal costs), and Pepper Santalucia (for the state and local impact).

Sincerely, June E. ONeill, Director.

Enclosure.

congressional budget office cost estimateS. 1260 Securities Litigation Uniform Standards Act of 1998

S. 1260 would amend existing law related to class actions involving certain types of securities fraud. Under this bill, certain class actions could not be based on state law and could only be maintained in federal courts.

CBO estimates that implementing S. 1260 would have no significant impact on the federal budget. Recent data on the number of securities-related class actions brought under state law suggest that fewer than 100 cases per year might shift to federal courts as a result of this bill. Although class actions often involve complex and time-consuming issues, CBO estimates that the federal court system would not incur significant costs to process that number of new cases. Because S. 1260 would not affect direct spending or receipts, pay-as-you-go procedures would not apply.

S. 1260 contains an intergovernmental mandate as defined in the Unfunded Mandates Reform Act of 1995 (UMRA) because it would preempt state securities laws. However, CBO estimates that the impact on state budgets would not be significant. The bill contains no private-sector mandates as defined in UMRA.

The CBO staff contacts for this estimate are Kathleen Gramp (for federal costs), who can be reached at 226-2860, and Pepper Santalucia (for the state and local impact), who can be reached at 225-3220. This estimate was approved by Robert A. Sunshine, Deputy Assistant Director for Budget Analysis.

changes in existing law

In the opinion of the Committee, it is necessary to dispense with the requirements of paragraph or subsection 12 of rule XXVI of the Standing Rules of the Senate in order to expedite the business of the Senate.

## ADDITIONAL VIEWS OF SENATORS SARBANES, BRYAN AND JOHNSON

i. introduction

In reporting the Securities Litigation Uniform Standards Act ("Uniform Standards Bill), the Senate Banking Committee once again sends to the Senate floor a solution in search of a problem. The Committee majority seeks to stem a supposed epidemic of frivolous securities fraud suits being filed in State court. The majority operates on the assumption that securities fraud class actions filed in State court are being used to evade the provisions of the Private Securities Litigation Reform Act of 1995 ("Litigation Reform Act"). This assumption is supported neither by empirical studies of State court litigation nor by the record pace of securities offerings. Undeterred by the evidence, the majority would preempt securities fraud causes of action under State law. The Uniform Standards Bill would establish the provisions of the Litigation Reform Act as a uniform standard for litigation involving securities traded on the national stock exchanges.

In so doing, the majority turns a blind eye both to the shortcomings of the Litigation Reform Act and to the flaws of the Uniform Standards Bill. We opposed the Litigation Reform Act because we were concerned that it was not sufficiently protective of investors. Developments since its enactment heighten rather than lessen that concern. We oppose the Uniform Standards Bill both because of its overly broad reach and because its sponsors fail to take this opportunity to correct the flaws of the Litigation Reform Act. Should the Uniform Standards Bill be enacted, investors will find their State court remedies eliminated. We fear that in too many cases, investors will be left without any effective remedies at all. Such a result can only harm innocent investors, undermine public confidence in the securities markets, and ultimately raise the cost of capital for deserving American businesses. For these reasons, a broad coalition of groups representing investors, public officials, workers and pension funds, including AARP, AFSCME, Consumer Federation of America, the Government Finance Officers Association, the National Association of State Retirement Administrators, the National League of Cities, the New York State Bar Association, the U.S. Conference of Mayors, and the United Mine Workers, opposes this Bill. Over two dozen law professors have expressed their opposition as well.

11See January 23, 1998 Letter to Senators and Members of Congress from Professors Ian Ayres, Stephen M. Bainbridge, Douglas M. Branson, William W. Bratton, John C. Coffee, Jr., James D. Cox, Charles M. Elson, Merritt B. Fox, Tamar Frankel, Theresa A. Gabaldon, Nicholas L. Georgakopoulos, James J. Hanks, Jr., Kimberly D. Krawiec, Fred S. McChesney, Lawrence E. Mitchell, Donna M. Nagy, Jennifer OHare, Richard W. Painter, William H. Painter, Margaret V. Sachs, Joel Seligman, D. Gordon Smith, Marc I. Steinberg, Celia R. Taylor, Robert B. Thompson, Manning G. Warren III, and Cynthia A. Williams.

1998 Committee Reports, May , 1998

ii. myth of state court loophole

The rationale for this legislation rests on a misconception of the facts. The sponsors of the Bill assert that securities fraud class actions have migrated from Federal court to State court in order to evade the provisions of the Litigation Reform Act. In particular, the Bills supporters maintain that class actions are being brought in State court to avoid the Acts stay of discovery and safe harbor for forward looking statements. In fact, every empirical study of securities fraud class action filings reaches the same conclusion: while State court securities filings may have increased in 1996, they decreased in 1997.

For example, a study done by the National Economic Research Associates (NERA), a consulting firm, found that the number of securities class action suits filed in State courts during the first 10 months of 1996 increased to 79 from 48 filed during the same period in 1995. In an update released in the summer of 1997, however, NERA found that the number of securities class actions filed in State courts during the first four months of 1997 declined to 19, down from 40 filed in the same period in 1996. In July 1997, Professor Joseph Grundfest and Michael Perino of Stanford Law School testified that the number of issuers sued only in State class actions declined from 33 in 1996 to an annualized rate of 18 in 1997. A "Price Waterhouse Securities Litigation Study" posted by that accounting firm on its Internet site corroborated NERAs findings. Using data compiled by Securities Class Action Alert based on the number of defendants sued, Price Waterhouse reported that the number of State court securities class actions increased from 52 in 1995 to 66 in 1996, but then declined to 44 in 1997. That was lower than the number of such actions in 1991 or 1993. The Study found "the total number of cases filed in 1997 shows little to no change from the average number of lawsuits filed in the period 1991 through 1995." Data provided to the Committee by Price Waterhouse on February 20, 1998 also demonstrate that State court filings declined in 1997. Measured by the number of cases filed, the number of State securities class actions declined from 71 in 1996 to 39 in 1997. As the SEC testified in October 1997, "recent data * * * tends to show that the migration of securities class actions from federal to state court may have been a transient phenomenon."

See CRS Report for Congress, "Securities Litigation Reform: Unfinished Business?," April 4, 1998, at 2.

Id. at 6.

Joint Written Testimony of Joseph A. Grundfest and Michael A. Perino before the Subcommittee on Securities, July 24, 1997, at Figure 1.

Not only do the Bills supporters fail to address the decline in State court securities actions in 1997, they fail to recognize the geographic concentration of such actions. Many securities class actions are brought under the "fraud on the market" theory. Under this theory, each investor need not prove his or her individual reliance on the fraudulent statement. Appellate courts in just four States have recognized the "fraud on the market" theory in securities actions. The General Counsel of the SEC has suggested "eliminating the requirement of reliance makes possible a class action for securities suits." Securities fraud class actions therefore may not be possible in the great majority of States. California is one of the few States that recognizes the "fraud on the market" theory. Not surprisingly, the great majority of securities fraud class actions filed in State court are filed in California. According to the SEC, roughly 60% of State securities class actions brought since enactment of the 1995 Act were brought in California. While we do not believe that any one State should set a "pro-plaintiff" national standard for securities fraud, we also do not believe that Congress need second-guess the judgments of California at balancing the interests of its local businesses versus those of its local investors. If California law makes it too easy to sue California businesses, then the California legislature should change the law.

See Basic, Inc. . Levinson, 85 U.S. 224 (1988), adopting the "fraud on the market" theory for Federal securities fraud actions.

Richard H. Walker, "The New Securities Class Action: Federal Obstacles, State Detours," 39 Ariz. L. Rev. 641, 678 & n.272 (Summer 1997).

Id. at 678.

Mirkin . Wasserman, 58 P.2d 568, 580 (Cal. 1993).

Testimony of U.S. Securities and Exchange Commission before the Subcommittee on Securities, October 29, 1997, at 12.

The record volume of securities offerings is further evidence that investors feel they are receiving adequate information on which to base investment decisions. The $39 billion raised by initial public offerings in 1997 is a record second only to the nearly $50 billion raised in 1996.0 Total underwriting of corporate equities and bonds in 1997 hit a record $1.3 trillion.1 Market capitalization and trading volume on the national securities exchanges are also at record highs. By every measure, the nations securities markets remain preeminent in the world. Whatever the cost of securities litigation, at either the Federal or State level, it does not interfere with the functioning of Americas securities markets.

0 "IPO Market Shows its Muscle for a Second-Straight Year," Wall Street Journal, January 2, 1998.

1 "An Overview of the Capital Markets and Securities Industry in 1997," Securities Industry Association, January 23, 1998, at 4.

Unable to demonstrate a need for this legislation, supporters of preemption next argue that the mere threat of State litigation is a problem. In particular, they argue that the threat of State litigation is deterring companies from making the kind of "forward-looking statements" that would be protected from Federal litigation under the "safe harbor" contained in the 1995 Act. We were concerned that the safe harbor went too far and might very well protect fraudulent statements from liability. Regardless of ones views of the safe harbor, the evidence is that companies are in fact using it. A study of 547 high-tech firms by Professors at the University of Michigan and Stanford Business Schools found "a significant increase in both the frequency of firms issuing forecasts and the number of forecasts issued following enactment of the Reform Act."2

2 Marilyn Johnson, Ron Kasznik and Karen K. Nelson, "The Impact of Securities Litigation Reform on the Disclosure of Forward-Looking Information by High Technology Firms, January 5, 1998.

Proponents of preemption also cite the possibility that State actions may be used to circumvent the stay on discovery pending a motion to dismiss that was enacted by the Litigation Reform Act. We agree that State court filings should not be used by plaintiffs to "game the system," to enjoy the best of both the State and Federal securities laws. Discovery is an extensive, expensive proposition and should not be used to drive up the settlement value of weak cases. In fact, some State courts have voluntarily imposed stays on discovery in circumstances where the Federal courts would do so.3 There is certainly no need to preempt State law causes of action generally in order to effectuate the discovery stay provisions of the Act.

3 See, e.g., Milano . Auhll, o. SB 213 476 (Cal. Super. Court, Santa Barbara County, Oct. 2, 1996; Sperber . Bixby No. 699812 (Cal. Super. Court, San Diego County, Oct. 25, 1996)

A range of experts has concluded that the need for this legislation has not been demonstrated. SEC Commissioner Norman Johnson wrote on March 24, 1998:

Consistent with the opinion the Commission and its staff have repeatedly taken, I believe there has been inadequate time to determine the overall effects of the Private Securities Litigation Reform Act of 1995, and that the proponents of further litigation reform have not demonstrated the need for preemption of state remedies or causes of action at this time.

Perhaps the most telling debunking of the myth of an explosion in State court actions was provided by Boris Feldman, a partner in the Silicon Valley defendants firm Wilson, Sonsini, Goodrich & Rosati. In a report on "Securities Litigation Recent Developments" posted on his firms Internet site, Mr. Feldman stated:

In my opinion, plaintiffs state court gambit has been a failure and is over. Others may disagree. I base that conclusion on three factors. First, plaintiffs attempts to broaden dramatically state laws that have been on the books for years have not worked. Courts have consistently rejected plaintiffs attempts to apply to shareholder disputes statutes that impose lower burdens, or greater penalties, than do the securities laws.

Second, I believe that plaintiffs have come to realize that they will not be permitted to use courts in a particular state (i.e., California) to litigate the claims of shareholders around the country * * *

Finally, plaintiffs have not had much success milking the state cases for discovery that they can then use to file a federal complaint.

III. SHORTCOMINGS OF THE LITIGATION REFORM ACT

The Uniform Standards Bill would preempt State law securities actions in favor of the provisions of the Litigation Reform Act. As we considered the provisions of the Litigation Reform Act insufficiently protective of investors to be an

appropriate Federal securities antifraud standard, we cannot support establishing that Act as the sole, "uniform" standard for nationally traded securities. At this juncture, it is necessary briefly to review the shortcomings of the Litigation Reform Act. Safe harbor protects fraudulent statements

The Litigation Reform Act created a "safe harbor" for forward looking statements, immunizing them from antifraud liability. Forward looking statements are broadly defined under the Act to include projections of financial items such as revenues, income and dividends as well as statements of future economic performance. Forward looking statements are thus precisely the sort of information of most interest to investors deciding whether to purchase or sell securities. Given this broad definition, it is crucial that such statements not be immunized when made with fraudulent intent. To do so is to provide fraud artists with an incentive to tailor their frauds to fit the statutory safe harbor and thereby defraud investors with impunity.

Prominent legal scholars have warned that the Litigation Reform Acts safe harbor did precisely that. A body of expert opinion suggests that the language of the safe harbor indeed protects deliberate falsehoods. Professor John Coffee of Columbia Law School wrote, "even if a knowingly false tatement is made, the defendant escapes liability if meaningful cautionary statements are added to the forward-looking statement."4 (emphasis added) The Association of the Bar of the City of New York stated the safe harbor "could immunize artfully packaged and intentional misstatements and omissions of known facts."5 (emphasis added)

December 6, 1995 Letter to President Clinton.

November 15, 1995 Letter to President Clinton.

To date, no Federal circuit court has had an opportunity to address the Litigation Reform Acts safe harbor. The danger that the statutory language immunizes deliberate fraud remains strong. Proportionate liability penalizes innocent investors

The Litigation Reform Act eliminated the rule of "joint and several" liability that has been applied in fraud cases for hundreds of years and that had been applied in Federal securities fraud cases. The Act substituted a system of "proportionate liability," which transferred responsibility for bearing the results of a fraud from participants in the fraud to innocent victims of the fraud. This change was opposed and continues to be opposed by a host of consumer groups, labor unions, and government officials.6

May 23, 1995 Letter to Senate Banking Committee Members from American Council on Education, California Labor Federation AFL-CIO, Congress of California Seniors LA County, Consumer Federation of America, Consumers for Civil Justice, International Brotherhood of Teamsters, Government Finance Officers Association, Gray Panthers, National League of Cities, New York State Council of Senior Citizens, North American Securities Administrators Association, and U.S. PIRG; May 24, 1995 Letter to Members from Citizen Action, Consumer Federation of America, Consumers Union, Public Citizen, U.S. PIRG, and Violence Policy Center.

Under joint and several liability, each person who participates in a fraud is liable for the entire amount of the victims damages. Mark Griffin, Securities Commissioner for the State of Utah, testified before the Securities Subcommittee on March 22, 1995 on behalf of the 50 State securities commissioners. He explained why the law held all parties who participate in a securities fraud jointly and severally liable:

"Under current law, each defendant who conspires to commit a violation of the securities law is jointly and severally liable for all he damages resulting from the violation. The underlying rationale of this concept is that a fraud will fail if one of the participants reveals its existence and, as a result, all wrongdoers are held equally culpable if the fraud achieves its aims." (emphasis in original)

In practice, defendants bear the burden of proving their relative fault. Through a contribution action, a defendant in a securities fraud action can seek reimbursement from another party that he believes to be more at fault.

The Litigation Reform Act transferred this burden to investors. The Act limited joint and several liability under the Federal securities laws to persons who commit "knowing securities fraud." All other violators generally are liable only for their proportionate share of the fraud victims losses. "Knowing securities fraud" is defined in the Act specifically to exclude reckless conduct. The Litigation Reform Act thus reduced the liability for reckless violators from joint and several liability to proportionate liability.

When investors damages can be paid by a violator who is jointly and severally liable, this change will not affect the recovery available to investors. In many cases, though, the architect of the fraud is bankrupt, has fled, or otherwise

cannot pay the investors damages. In those cases, this change will harm investors: innocent victims of fraud will be denied full recovery of their damages. In a February 23, 1995 letter to House Commerce Committee Chairman Thomas J. Bliley, Jr., Chairman Levitt wrote, "(t)he Commission has consistently opposed proportionate liability." Testifying before the Securities Subcommittee on April 6, 1995, Chairman Levitt said

"Proportionate liability would inevitably have the greatest effect on investors in the most serious cases (e.g., where an issuer becomes bankrupt after a fraud is exposed)."

The Litigation Reform Act thus transferred responsibility for bearing the results of a fraud from participants in the fraud to innocent victims of the fraud. It provided that those who commit fraud are no longer responsible for the results of their conduct. Instead, innocent investors must bear the losses if a portion of their damages are uncollectible. In so doing, the Litigation Reform Act seriously undermined the effectiveness of the Federal securities laws as a remedy for defrauded investors. No extension of statute of limitations

We were concerned about the provisions of the Litigation Reform Act described above, which harm investors bringing meritorious fraud suits. We were also disappointed that the Act did not contain provisions necessary to aid investors bringing meritorious suits. The first omission was the Acts failure to extend the statute of limitations for private rights of action under Section 10(b) of the Securities Exchange Act of 1934, the principal antifraud provision of the Federal securities laws.

In Lampf . Gilbertson, 01 U.S. 350 (1991), the Supreme Court significantly shortened the period of time in which investors may bring such securities fraud actions. By a five to four vote, the Court held that the applicable statute of limitations is one year after the plaintiff knew of the violation and in no event more than three years after the violation occurred. This is shorter than the statute of limitations for private securities actions under the law of 33 of the 50 States.7

7 Testimony of the U.S. Securities and Exchange Commission before the Subcommittee on Securities, October 29, 1997, at 20.

Testifying before the Banking Committee in 1991, SEC Chairman Richard Breeden stated "the timeframes set forth in the (Supreme) Courts decision is unrealistically short and will do undue damage to the ability of private litigants to sue." Chairman Breeden pointed out that in many cases, "events only come to light years after the original distribution of securities and the Lampf cases could well mean that by the time investors discover they have a case, they are already barred from the courthouse."

The FDIC and the State securities regulators joined the SEC in 1991 in favor of overturning the Lampf ecision. Chairman Levitt testified before the Securities Subcommittee in April 1995, "(e)xtending the statute of limitations is warranted because many securities frauds are inherently complex, and the law should not reward the perpetrator of a fraud who successfully conceals its existence for more than three years." Chairman Levitt reaffirmed his support for a longer statute of limitations before the Committee as recently as March 25, 1998.

Senate Banking Committee Hearing, March 25, 1998, Transcript at 30.

This shorter period does not allow individual investors adequate time to discover and pursue violations of securities laws. Ignoring these recommendations, the Litigation Reform Act left intact the shorter statute of limitations adopted by Lampf.
No restoration of aiding and abetting

A final major shortcoming of the Litigation Reform Act was its failure to restore liability in private actions under the Federal securities laws for aiders and abettors of securities fraud. Prior to 1994, courts in every circuit in the country had recognized the ability of investors to sue aiders and abettors of securities frauds. The courts derived aiding and abetting liability from traditional principles of common law and criminal law. To be held liable, most courts required that an investor show that a securities fraud was committed, that the aider and abettor gave substantial assistance to the fraud, and that the aider and abettor had the intent to deceive or behaved recklessly.

See, e.g., IITv. Cornfeld, 19 f.2d 909, 992 (2nd Cir. 1980).

In Central Bank of Denverv. First Interstate Bank of Denver, 11 U.S. 164 (1994), again by a five to four vote, the Supreme Court eliminated the right of investors to sue aiders and abettors of securities fraud. Testifying at a May 12, 1994 Securities Subcommittee hearing, Chairman Levitt stressed the importance of restoring aiding and abetting liability for private investors:

1998 Committee Reports, May , 1998

"persons who knowingly or recklessly assist the perpetration of a fraud may be insulated from liability to private parties if they act behind the scenes and do not themselves make statements, directly or indirectly, that are relied upon by investors. Because this is conduct that should be deterred, Congress should enact legislation to restore aiding and abetting liability in private actions."

The North American Securities Administrators Association and the Association of the Bar of the City of New York also endorsed restoration of aiding and abetting liability in private actions. Chairman Levitt recently testified that he continues to support restoration of aiding and abetting liability.

Senate Banking Committee Hearing, March 25, 1998, Transcript at 30.

The Litigation Reform Act ignored the recommendation of the SEC, the State securities regulators and the bar association that aiding and abetting liability be restored for private litigants. The deterrent effect of the Federal securities laws thus remains weakened. Pleading standard may have eliminated liability for reckless conduct

In addition to the concerns we identified at the time the Litigation Reform Act was passed, another concern has developed since its enactment: a number of Federal District Courts have interpreted the pleading standards enacted by the Act as eliminating liability for reckless conduct under the Federal securities antifraud provision. No Circuit Court has yet ruled on the issue and the majority of District Courts have ruled that the Act did not eliminate recklessness as a state of mind sufficient to satisfy the requirements for fraud. If, however, the view of the minority of District Courts should prevail, the effectiveness of the Federal securities laws as a deterrent to and remedy for fraud will be compromised.

The Litigation Reform Act enacted a strict pleading standards for Federal securities fraud suits. Following a standard applied by the U.S. Court of Appeals for the Second Circuit, the Act requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Federal District Courts have disagreed on how to interpret this provision, based primarily on different readings of the Acts legislative history. According to the SEC, 14 District Courts have interpreted this provision to allow plaintiffs to plead facts giving rise to a strong inference that the defendants acted either knowingly or recklessly, or that the defendants had a motive and opportunity to commit the fraud. However, a minority of District Courts have held that the Act eliminated recklessness as conduct sufficient to constitute fraud.

See Testimony of the U.S. Securities and Exchange Commission before the Senate Securities Subcommittee, October 29, 1997, at 13.

See, e.g., "In re Silicon Graphics, Inc. Securities Litigation," C 96-0393, 1997 WL 337580 (N.D. Cal. June 5, 1997).

This issue is currently pending in the Courts of Appeal for the Sixth and Ninth Circuits. The Securities and Exchange Commission has filed an amicus brief in the Ninth Circuit case, urging the view that the Litigation Reform Act did not eliminate recklessness as the standard for antifraud liability. The Commission warned the Securities Subcommittee that elimination of liability for reckless conduct "would jeopardize the integrity of the securities markets, and would deal a crippling blow to defrauded investors with meritorious claims." The Litigation Reform Act has thus unintentionally placed the effectiveness of the Federal securities laws at risk.

Hoffman . Comshare, Inc., o. 97-2098 (6th Cir.); Zeid . Kimberly, o. 97-16070 (9th Cir.).

Testimony of the U.S. Securities and Exchange Commission before the Senate Securities Subcommittee, October 29, 1997, at 13.

IV. FLAWS OF THE UNIFORM STANDARDS BILL

We oppose the Uniform Standards Bill firstly because of the shortcomings of the Litigation Reform Act described above. The Uniform Standards Bill would preempt securities fraud class actions brought under State law. Investors seeking to file class action lawsuits would be forced to file under the Federal securities laws. They would have to endure the objectionable provisions we have cited: the safe harbor and proportionate liability provisions enacted by the Litigation Reform Act and the shorter statute of limitations and the elimination of aiding and abetting liability left intact by the Litigation Reform Act. Because these provisions prevent investors from bringing meritorious securities fraud class actions, we cannot support the preemption of all State law provisions without which investors might have no remedies at all.

But the Uniform Standards Bill contains shortcomings of its own, apart from those already present in the Federal securities laws. These include a definition of "class action" that is overly broad; an unfair application of the statute of limitations; and a failure to codify liability for reckless conduct. Definition of class action is too broad

Although narrowed by the Substitute Amendment adopted by the Committee, the Bills definition of "class action" is still too broad. It may include State court actions brought by separate individual investors, or by groups of public investors such as school districts or local governments. They risk being dragged into Federal court against their will, potentially depriving them of more favorable State statutes of limitations, pleading standards, joint and several liability, and so on.

The term "class action" is commonly understood to refer to cases brought by one plaintiff on behalf of all other unnamed plaintiffs similarly situated. Under Rule 23 of the Federal Rules of Civil Procedure, common questions of law and fact must predominate before a judge can certify a case as a class action. This is the type of case about which the proponents of the legislation complain: a case brought by an attorney with just one actual investor as lead plaintiff, in order to force a company to pay a large settlement.

The Bill, however, contains a definition of "class action" broad enough to pick up individual investors against their will. The Bill would amend Section 16 of the Securities Act of 1933 and 28 of the Securities Exchange Act of 1934 to define class action. New Sections 16(f)(1)(A)(ii) and 28(f)(5)(A)(ii) include as a class action any group of lawsuits in which damages are sought on behalf of more than 50 persons, if those lawsuits are pending in the same court, involve common questions of law or fact, and have been consolidated as a single action for any purpose. Even if the lawsuits are brought by separate lawyers, without coordination, and common questions do not predominate, they may qualify as a class action and thus be preempted. So, if an individual investor chooses to bring his own lawsuit in State court, to bear the expenses of litigation himself in order to avoid the provisions of the Litigation Reform Act, he can be forced into Federal court and made to abide by the Federal rules if 50 other investors each make the same decision. Indeed, the Bill provides an incentive for defendants to collude with parties to ensure that the preemption threshold is reached. Such a result does not merely end abuses associated with class action lawsuits, it deprives individual investors of their remedies.

The definition of "class action" in the Bill would preempt other types of lawsuits as well. New Sections 16(f)(1)(A)(i)(I) and 28(f)(5)(A)(i)(I) include as a class action any lawsuit in which damages are sought on behalf of more than 50 persons and common questions of law or fact predominate. The Bill specifies that the predomination inquiry be made "without reference to issues of individualized reliance on an alleged misstatement or omission * * *" This ensures that investors receive the worst of both worlds. While the investors could not bring a class action under State law because each investor must prove his or her reliance, they nonetheless constitute a "class action" under the Bill and their suit is preempted.

Suits brought by local government investors, such as cities or school districts, are likely to be preempted under this provision. For example, Mayor Harry Smith of Greenwood, Mississippi testified last October, "(i)n August, we learned that at least 22 cities and 12 counties might have been misled with regard to a series of investments."

25 Should 16 more cities and counties be found to have been victimized, these Mississippi local governments could not bring a suit under Mississippi law. There is no reason for such a suit to be shut out of State court. Such suits are not the vague, open-ended class actions about which the supporters of the Bill complain. Whatever the merits of preempting those cases, individual investors who forego filing such class actions should retain the right to bring a case in either Federal or State court.

Testimony of Harry Smith, Mayor, City of Greenwood, Mississippi, on behalf of the National League of Cities before the Senate Securities Subcommittee, October 29, 1997, at 3.
Application of statute of limitations is unfair

The overly broad definition of "class action" leads directly to another of the bills flaws. The Federal statute of limitations, which the SEC considers unduly short, will now apply in an unfair manner to State cases as well. Cases that were timely filed under State statutes of limitations may now be removed to Federal court and dismissed under the shorter Federal statute of limitations.

As described above, actions brought by individual investors in State court could constitute a "group" and be removable to Federal court. Similarly, an action brought by more than 50 identified investors, such as school districts or municipalities, could fall within the definition. The bill provides that in such instances the suits may be removed to

Federal court. Once there, no action based upon State statutory or common law may be maintained. The investors must be able to maintain a suit under Federal law, including the Federal statute of limitations. Since most States have a statute of limitations longer than the Federal time period, it is likely that most investors will have to satisfy a shorter statute of limitations. In other words, investors who filed timely lawsuits under State law may find their lawsuits dismissed for failure to meet a shorter time requirement that they could not have known would be applied to them. Such a result goes far beyond discouraging frivolous suits. It can deprive defrauded investors of any opportunity to seek a remedy. Failure to codify liability for recklessness

A final shortcoming of this Bill is its failure to codify liability under the Federal antifraud provisions for reckless conduct. Liability for reckless conduct is crucial to ensure that professionals such as accountants and underwriters perform the responsibilities assigned to them by the Federal securities laws. The SEC has stated, "a uniform standard for securities fraud class actions that did not permit investors to recover losses attributable to reckless misconduct would jeopardize the integrity of the securities markets"

      26 (emphasis added)

Letter from Chairman Levitt and Commissioners Hunt and Unger to Senators DAmato, Gramm and Dodd, March 24, 1998.

As described above, a minority of Federal district courts have interpreted the Litigation Reform Act and its legislative history as eliminating such liability. We recognize and support the statements made in the Committee Report that Congress did not and does not intend to eliminate such liability. We hope these statements are sufficient to preserve recklessness as the substantive standard for liability under the Federal antifraud provisions.

While such legislative history is helpful, however, is not a substitute for legislative language. Federal courts do not uniformly consider legislative history when deciding questions of statutory interpretation. Even those courts that do may not consider legislative history prepared in a succeeding Congress when interpreting a statute enacted in a preceding Congress. Chairman Levitt testified that he would prefer legislative language that explicitly codified liability for reckless conduct. Nonetheless, the Uniform Standards Bill fails to include such language. The Bill therefore would preempt State class actions in favor of a uniform Federal standard potentially containing a disastrous flaw, namely no imposition of liability for reckless conduct.

Senate Banking Committee Hearing, March 25, 1998, Transcript at 34.

V. CONCLUSION

Requiring true class actions regarding securities traded on national exchanges to conform to an appropriate uniform standard is not without some intellectual appeal. But this bill fails on both counts. First, it would reach beyond true class actions to rob investors of their opportunity to bring individual actions in State court. Second, it would impose the current Federal standard as the uniform standard without rectifying its shortcomings.

The SEC testified before the Securities Subcommittee on October 29, 1997 that "the bill would deprive investors of important protections, such as aiding-and-abetting liability and longer statutes of limitations, that are only available under state law." This concern remains valid. Thirty-three of 50 States provide longer statutes of limitations for securities fraud actions than do the Federal securities. Forty-nine of 50 States provide liability for aiders and abetters of such fraud. In too many instances, these provisions would no longer be available under the Uniform Standards Bill, leaving investors without remedies.

Testimony of U.S. Securities and Exchange Commission before the Senate Securities Subcommittee, October 29, 1997, at 20.

Id. at 19.

For these reasons, State and local government officials, unions, senior citizens, academics, consumer groups and others oppose the Uniform Standards Bill. The New York State Bar Association concluded in January 1998, "the proposed solution far exceeds any appropriate level of remedy for the perceived problem." We urge the Senate carefully to consider the Bills impact on individual investors before approving it in its current form.

Paul S. Sarbanes.

Richard H. Bryan.

1998 Committee Reports, May , 1998

Tim Johnson.

## ADDITIONAL VIEWS OF SENATOR JACK REED

S. 1260 Securities Litigation Uniform Standards Act

Introduction

As a supporter of the Private Securities Litigation Reform Act of 1995 (hereafter "PSLRA" or "1995 Act") , I am pleased to support S.1260, the Securities Litigation Uniform Standards Act of 1998 (hereafter "1998 Act"). This legislation will create a uniform standard for securities class action lawsuits against corporations listed on the three largest national exchanges. While class action suits are frequently the only financially feasible means for small investors to recover damages, such lawsuits have also been subject to abuse, draining resources from corporations while inadequately representing the interests of investor plaintiffs.

In 1995, I voted for the PSLRA in order to curtail this abusive litigation. At that time it was obvious that some class action suits were being filed after a precipitous drop in the value of a corporations stock, without citing specific evidence of fraud. Such lawsuits frequently inflict substantial legal costs upon corporations, harming both the business and its shareholders. Unfortunately, since passage of federal litigation procedures protecting corporations from such suits there has been some attempt by class action plaintiffs to circumvent these safeguards by filing similar lawsuits in state courts.

The 1998 Act will preempt this circumvention, creating a national standard for class action suits involving nationally traded securities. I favor this legislation because it recognizes the national nature of our securities markets, provides for more efficient capital formation, and protects investors.

New Responsibilities of Congress

Preemption marks a significant change concerning the obligations of Congress. When federal legislation was enacted to combat securities fraud (the Securities Act of 1933 and the Securities Exchange Act (SEA) of 1934, which included section 10(b), the antifraud provision upon which private actions are now based), the federal law augmented existing state statutes. States were still free to provide greater protections to their citizens from fraud. Indeed, in 1995, the Chairman of the Securities and Exchange Commission provided testimony concerning the multifaceted system by which securities were regulated: through both public and private lawsuits in both state and federal courts. Many of my colleagues voted for the 1995 legislation knowing that if federal standards failed to provide adequate investor protections, state suits would provide a necessary backup.

15 U.S.C. 77(l).

See estimony of Securities and Exchange Commission, Hearings on Securities Litigation Uniform Standards Act. Subcommittee on Securities, United States Senate Committee on Banking, Housing and Urban Affairs, October 29, 1997. ("* * * the benefits of our dual system of federal and state law, which has served investors well for over 60 years.)

See estimony of Professor Richard W. Painter, Hearings on Securities Litigation Uniform Standards Act. Subcommittee on Securities, United States Senate Committee on Banking, Housing and Urban Affairs, February 23, 1998, citing colloquy of Representative Christopher Cox with Professor Daniel Fischel, Hearings Concerning the Common Sense Legal Reform Act. Subcommittee on Telecommunications and Finance, House Committee on Commerce, January 19, 1995, at 110 (Mr. Cox. "So if you were a plaintiff, who like any plaintiff has a choice of forum, and if you were one of the investors who were defrauded in Orange County, for example, you might file your suit in State court or in Federal Court, depending on how you saw your advantage * * * " Mr. Fischel. "Yes, you would still have the same choice of forums.).

With passage of this legislation, my colleagues and I have now accepted full and sole responsibility for securities traded on the three national exchanges to ensure that standards concerning fraud allow victimized, small investors to recoup lost funds through class action suits. A meaningful right of action against those that defraud guarantees the average investor confidence in our national markets. A uniform national standard concerning fraud provides no benefit to markets if issuers having listed securities can, with impunity, fail to ensure that consumers receive truthful, complete information on which to base investment decisions.

1998 Committee Reports, May , 1998

My support for this legislation rests on the presumption that the scienter standard was not altered by either the 1995 Act or this legislation. I strongly endorse the Report which accompanies this legislation, which states clearly that nothing in the 1995 legislation changed the scienter standard or the previous case law, established by the Second Circuit, concerning the means to successfully plead that state of mind. The reason such standards were not changed in 1995 is that they are essential to providing adequate investor protection from fraud.

See Time Warner, Inc. . Ross, F3d 259, 268-69 (2d Cir. 1993).

A plaintiff can plead scienter, without direct knowledge of the plaintiffs state of mind, in two ways: "The first approach is to allege facts establishing a motive to commit fraud and an opportunity to do so. The second approach is to allege facts constituting circumstantial evidence of either reckless or conscious behavior." Id.

I have been deeply troubled by the ruling of several federal district courts which, ignoring the clear legislative history of the 1995 Act, have invalidated the proper pleading standard for a 10b-5 action. With regard to 10(b) class action lawsuits, the PSLRA mandated stiffer pleading requirements concerning the defenddant(s)s state of mind. See 15 U.S.C. 77z-1, 78u-4. The PSLRA requires plaintiffs to plead specific facts "giving rise to a strong inference" hat the defendants acted with the required state of mind. See 5 U.S.C. 78u-4(b)(2). In contrast, some circuits allowed scienter to be averred generally prior to adoption of the PSLRA. (See In re Glenfed, Inc., 42 F.3d 1541, 1545-47 (9th Cir. 1994). However, the PSLRAs heightened standard was specifically linked to the most stringent pleading standard at the time, that of the Second Circuit. See The Conference Committee Report (Report), 141 Cong. Rec. H13702 (daily ed. Nov. 28, 1995).

See attached list of recent judicial adjudications of this standard, prepared at my request, by the staff of the Securities and Exchange Commission. The analysis indicates that of the thirty-two (32) federal district courts which have ruled on the issue, eighteen (18) have correctly upheld the previous Second Circuit Standard, whereas fourteen (14) have not.

pre-1995 standards

In Ernst & Ernstv. Hochfelder, he Court held that to establish liability under Section 10(b) and Rule 10b-5, a plaintiff must "establish scienter on the part of a defendant." 425 U.S. 185, 193 & n. 12 (1976). While in Hochfelder he Court failed to address whether recklessness satisfied the scienter requirement, subsequent decisions by virtually all the courts of appeals held that recklessness did meet the scienter requirement. Time Warner, supra. Sundstrandv. Sun Chemical Corp., 53 F.2d 1033, 1045 (7th Cir. 1977) (defining reckless conduct as "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.") (No Circuit Court has held otherwise.)

With regard to the standards necessary to establish scienter in a pleading, the Second Circuit developed the most stringent requirement. That court required plaintiffs to allege in the complaint "facts that give rise to a strong inference of fraudulent intent." Shieldsv. Citytrust Bancorp. Inc., 5 F.3d 1124, 1128 (2d Cir. 1994). Such a "strong inference" could be established in two ways: by "alleging facts to show that defendants had both the motive and opportunity to commit fraud, or by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Id. See also Beckv. Manufacturers Hanover Trust Company, 20 F.2d 46 at (2d Cir. 1987), and Rossv. A.H. Robins Co., 07 F.2d 545 (2nd Cir. 1979).

the need to preserve the recklessness standard

The courts reason for allowing a plaintiff to establish scienter through a pleading of motive and opportunity or recklessness is clear: "a plaintiff realistically cannot be expected to plead a defendants actual state of mind." Cohenv. Koenig, 5 F.3d 1168, 1173 (2d Cir. 1994) (quoting Connecticut Natl. Bankv. Fluor Corp., 08 F.2d 957, 962 (2d Cir. 1987) (quoting Goldmanv. Belden, 54 F.2d 1059, 1070 (2d Cir. 1985)). Since the 1995 Act allows for a stay of discovery pending a defendants motion to dismiss, requiring a plaintiff to establish actual knowledge of fraud or an intent to defraud in a complaint raises the bar far higher than most legitimately defrauded investors can meet. The SEC has been clear on this point and it has been well recognized by the supporters of both the 1995 and 1998 Acts that neither changed the preexisting scienter standard. Indeed, proponents of the 1995 Act were clear that the bill included recklessness. William H. Kuehnle, Comment, "On Scienter, Knowledge, and Recklessness Under the Federal Securities" Laws, 34 House. L. Rev. 121, n. 93, citing 141 Cong. Rec. S17934 (daily ed. Dec. 5, 1995) (statement of Senator DAmato) ("The legislation creates a uniform standard for complaints that allege securities fraud. This standard is already the law in New York."). Even after passage of the Conference Report of the 1995 Act and the Presidents veto

and message were complete, proponents of the legislation described the bill as retaining recklessness. See, e.g., 141 Cong. Rec. S19150 (daily ed. Dec. 22, 1995) (statement of Senator Domenici) ("(I)t is the Second Circuits pleading standard."); 141 Cong. Rec. S19067 (Dec. 21, 1995) (statement of Sen. Dodd) ("(P)leading standard is faithful to the Second Circuits test."); and 141 Cong. Rec. H15219 (daily ed. Dec. 20, 1995) (statement of Rep. Lofgren) ("The President says he supports the Second Circuit standard for pleading * * *. That is * * * included in this bill.")

See Testimony of Securities and Exchange Commission, Hearings on Securities Litigation Uniform Standards Act. Subcommittee on Securities, United States Senate Committee on Banking, Housing and Urban Affairs, October 29, 1997. ("The Commission strongly believe that recklessness must be preserved as the standard for liability because it is essential to investor protection.)

Thus, the legislative history well establishes that the 1995 Act retained the standards, as established by the Second Circuit Court of Appeals, associated with pleading and establishing scienter in a 10(b) action. Not only are the standards clear, but it is clear that a weakening of such standards threatens the security of investors and the stability of our markets.

The views of the Majority, as outlined in this Report, make clear that interpretations which eviscerate a plaintiffs ability to plead motive and opportunity or recklessness, as defined by the Second Circuit prior to the 1995 Act, are both incorrect and a threat to the security of our markets. Such standards are under attack by both those who both misinterpret the standards of the 1995 Act and those who argue that recklessness fails to satisfy the scienter standard as established in the 1933 and 1934 Acts. This later interpretation is particulary dangerous in that it could eliminate liability for recklessness in both private actions as well as regulatory enforcement actions by the SEC.

SeeAmicus Curiae brief of American Institute of Certified Public Accountants in the matter of Zeidv. Kimberely, 9th Cir. 1998)(No. 97-16070).

Four years after Hochfelder, n Aaronv. SEC, he Court, held that the SEC must meet the same scienter standards as private litigants, since the 1933 and 1934 Acts contained no distinctions in the standards of proof that either private or public litigants must meet. 446 U.S. 680 at 701 (1980).

conclusion

With assurances of the Chair and sponsors of S. 1260 that proper protections for investors will remain in place, I supported the 1998 Act, thus moving toward an efficient, national, uniform standard for securities class action lawsuits. I trust that higher courts will adhere to current principles of legislative history and case law to rule that the pleading and scienter standards continue to protect investors. Additionally, as expressed in votes during the mark-up of this legislation, I am concerned that the definition of class action, as currently included in the bill, is too broad. Specifically, by defining a class as those whose claims have been consolidated by a state court judge, the bill infringes upon the rights of individual investors to bring suit; a situation sponsors have sought to avoid. I hope that this issue can be resolved before the bill reaches the Senate floor. Finally, I have appreciated the expert analysis that the Chairman, Commissioners, and staff of the Securities and Exchange Commission have provided on this issue. I thank them for their assistance. Jack Reed.

Office of the General Counsel, U.S. Securities and Exchange Commission, Washington, DC, April 20, 1998. Ted Long, Legislative Counsel, Offices of Senator Jack Reed, Hart Senate Office Building, Washington, DC.

Dear Mr. Long:The attached responds to your request for staff technical assistance with respect to S. 1260, the "Securities Litigation Uniform Standards Act of 1997." This technical assistance is the work of the staff of the Securities and Exchange Commission; the Securities and Exchange Commission itself expresses no views on this assistance.

I hope the attached is responsive to your request.

Sincerely, Richard H. Walker, General Counsel.

Attachment.

Pleading Standard Scorecard

i. cases applying the second circuit pleading standard

1. City of Painesvillev. First Montauk Financial Corp.,1998 WL 59358 (N.D. Ohio Feb. 8, 1998).

1998 Committee Reports, May , 1998

2. Epsteinv. Itron, Inc.,No. CS-97-214 (RHW), 1998 WL 54944 (E.D. Wash. Jan. 22, 1998).

3. In re Wellcare Mgmt. Group, Inc. Sec. Lit., 964 F. Supp. 632 (N.D.N.Y. 1997).

4. In re FAC Realty Sec. Lit., 1997 WL 810511 (E.D.N.C. Nov. 5, 1997).

5. Pagev. Derrickson,No. 96-842-CIV-T-17C, 1997 U.S. Dist. LEXIS 3673 (M.D. Fla. Mar. 25, 1997).

6. Weikelv. Tower Semiconductor Ltd.,No. 96-3711 (D.N.J. Oct. 2, 1997).

7. Gilford Ptnrs. L.P.v. Sensormatic Elec. Corp.,1997 WL 757495 (N.D. Ill. Nov. 24, 1997).

8. Galaxy Inv. Fund, Ltd.v. Fenchurch Capital Management, Ltd.,1997 U.S. Dist. LEXIS 13207 (N.D. Ill. Aug. 29, 1997).

9. Pilarczykv. Morrison Knudsen Corp.,965 F. Supp. 311, 320 (N.D.N.Y. 1997).

10. OnBank & Trust Co.v. FDIC,967 F. Supp. 81, 88 & n.4 (W.D.N.Y. 1997).

11. Fugmanv. Aprogenex, Inc.,961 F. Supp. 1190, 1195 (N.D. Ill. 1997).

12. Shahzadv. H.J. Meyers & Co., Inc.,No. 95 Civ. 6196 (DAB), 1997 U.S. Dist. LEXIS 1128 (S.D.N.Y. Feb. 6, 1997).

13. Rehmv. Eagle Fin. Corp.,954 F. Supp. 1246, 1252 (N.D. Ill. 1997).

14. In re Health Management Inc., 970 F. Supp. 192, 201 (E.D.N.Y. 1997).

15. Marksman Partners, L.P.v. Chantal Pharmaceutical Corp.,927 F. Supp. 1297, 1309-10, 1309 n.9 (C.D. Cal. 1996).

16. Fischlerv. AmSouth Bancorporation,1996 U.S. Dist. LEXIS 17670 (M.D. Fla. Nov. 14, 1996).

17. STI Classic Fundv. Bollinger Industries, Inc.,No. CA 3:96-CV-0823-R, 1996 WL 866699 (N.D. Tex. Nov. 12, 1996).

18. Zeidv. Kimberley,930 F. Supp. 431 (N.D. Cal. 1996).

ii. cases applying a stricter pleading standard than the second circuit A. Cases holding that motive and opportunity and recklessness do not meet pleading standard

1. Markv. Fleming Cos., Inc.,No. CIV-96-0506-M (W.D. Okla. Mar. 27, 1998).

2. In re Silicon Graphics Sec. Lit., 970 F. Supp. 746 (N.D. Cal. 1997).

3. In re Comshare, Inc. Sec. Litig., Case No. 96-73711-DT, 1997 U.S. Dist. LEXIS 17262 (E.D. Mich. Sept. 18, 1997).

4. Voitv. Wonderware Corp.,No. 96-CV. 7883, 1997 U.S. Dist. LEXIS 13856 (E.D. Pa. Sept. 8, 1997).

5. Powersv. Eichen,NO. 96-1431-B (AJB), 1997 U.S. Dist. LEXIS 11074 (S.D. Cal. Mar. 13, 1997).

6. Norwood Venture Corp.v. Converse Inc.,959 F. Supp. 205, 208 (S.D.N.Y. 1997).

7. Friedbergv. Discreet Logic, Inc.,959 F. Supp. 42, 48-49 (D. Mass. 1997).

8. In re Glenayre Technologies, Inc., 1997 WL 691425 (S.D.N.Y. Nov. 5, 1997).

9. Havenickv. Network Express, Inc.,1997 WL 626539 (E.D. Mich. Sep. 30, 1997).

10. Chanv. Orthologic Corp., et al.,No. CIV-96-1514-PHX-RCB (D. Ariz. Feb. 5, 1998) (dicta). B. Cases holding only that motive and opportunity do not meet Reform Acts pleading standard

1. Novakv. Kasaks,No. 96 Civ. 3073 (AGS), 1998 WL 107033 (S.D.N.Y. Mar. 10, 1998).

2. Mylesv. MidCom Communications, Inc.,No. C96-614D (W.D. Wash. Nov. 19, 1996).

3. In re Baesa Securities Litig., 969 F. Supp. 238 (S.D.N.Y. 1997).

1998 Committee Reports, May , 1998

4. Pressv. Quick & Reilly Group, Inc.,No. 96 Civ. 4278 (RPP), 1997 U.S. Dist. LEXIS 11609, at *5 (S.D.N.Y. Aug. 8, 1997).

iii. examples of cases with language questioning recklessness as a basis of liability (all cases previously listed above)

1. In re Silicon Graphics Sec. Lit., 970 F. Supp. 746 (N.D. Cal. 1997).

2. Friedbergv. Discreet Logic, Inc.,959 F. Supp. 42, 49 n.2 (D. Mass. 1997).

3. Norwood Venture Corp.v. Converse Inc.,959 F. Supp. 205, 208 (S.D.N.Y. 1997).

**SUBJECT:** LAWYERS (92%); LEGISLATION (91%); VOTERS & VOTING (90%); TESTIMONY (90%); WITNESSES (90%); CLASS ACTIONS (78%);

**LOAD-DATE:** May 07, 1998