1  REED R. KATHREIN (139304)
   PETER E. BORKON (212596)
2  HAGENS BERMAN SOBOL SHAPIRO LLP
   715 Hearst Avenue, Suite 202
3  Berkeley, CA 94710
   Telephone: (510) 725-3000
4  Facsimile: (510) 725-3001
   reed@hbsslaw.com
5  peterb@hbsslaw.com

6  LEWIS KAHN (*Pro Hac Vice*)
   KAHN GAUTHIER SWICK, LLC
7  650 Poydras Street, Suite 2150
   New Orleans, LA  70130
8  Telephone: (504) 455-1400
   Facsimile: (504) 455-1498
9  lewis.kahn@kgscounsel.com

10 Attorneys for Lead Plaintiff and
   The Proposed Class

11 [Additional counsel listed on signature page]

12

13                 UNITED STATES DISTRICT COURT

14                NORTHERN DISTRICT OF CALIFORNIA

15                      OAKLAND DIVISION

16                                    )   Master File No. 07-cv-5101 SBA
   In re BIGBAND NETWORKS, INC.       )
17 SECURITIES LITIGATION              )   CONSOLIDATED CLASS ACTION
                                      )   COMPLAINT FOR VIOLATION OF
18                                    )   SECURITIES LAWS
                                      )
19                                    )   **JURY TRIAL DEMANDED**
   _____)
20                                    )
   This Document Relates To:  All Actions )
21                                    )
                                      )
22                                    )
                                      )
23                                    )
   _____)
24

25

26

27

28

# TABLE OF CONTENTS

I.     NATURE OF THE ACTION ................................................................. 1

II.    JURISDICTION AND VENUE ............................................................ 4

III.   THE PARTIES ..................................................................................... 5

       A.   Lead Plaintiff .............................................................................. 5

       B.   Corporate Defendant .................................................................. 5

       C.   Individual Defendants ................................................................ 5

       D.   IPO Underwriter Defendants ..................................................... 8

IV.    BACKGROUND TO THE OFFERING ............................................. 11

       A.   Company Background ............................................................... 11

       B.   Industry Background ................................................................. 13

       C.   Business Plan & IPO Pricing .................................................... 14

       D.   ADC Pre-Offering-Stock Sale .................................................. 16

V.     MATERIALLY FALSE & MISLEADING REGISTRATION STATEMENT AND
       JOINT PROXY-PROSPECTUS ISSUED IN CONNECTION WITH THE IPO ................. 17

       A.   Overview ................................................................................... 17

       B.   Materially False Statements and Omissions Regarding CMTS / Cuda ...................... 18

       C.   Materially False Statements Regarding Other Business ............................. 32

       D.   The IPO Prospectus Contained Untrue Statements Related to the Company's
            Earnings, Earnings Per Share, Assets and Stockholders' Equity .......................... 37

       E.   Customer Concentration ........................................................... 42

       F.   Insider Sales .............................................................................. 42

VI.    THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF BIGBAND
       BEGINS TO BE DISCLOSED ........................................................... 45

VII.   THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF BIGBAND IS
       BELATEDLY DISCLOSED ............................................................... 47

VIII.  CAUSATION AND ECONOMIC LOSS .......................................... 54

IX.    CLASS ACTION ALLEGATIONS ................................................... 57

X.     CLAIMS FOR RELIEF ...................................................................... 58

XI.    PRAYER ............................................................................................ 60

1

XII.    JURY TRIAL DEMANDED ..................................................................................... 60

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Court-appointed Lead Plaintiff, Gwyn Jones ("Lead Plaintiff"), brings this federal securities

2    law class action consolidated complaint ("Consolidated Complaint") individually and on behalf of all

3    other purchasers of common stock of BigBand Networks, Inc. ("BigBand" or the "Company") who

4    purchased pursuant to the Company's March 15, 2007 Initial Public Offering ("IPO" or the

5    "Offering").

## I.     NATURE OF THE ACTION

7    1.    On March 15, 2007, BigBand offered 10.7 million shares of common stock priced at

8    $13.00 per share as part of its IPO.  The Offering was pursuant to an IPO Prospectus issued that same

9    day on Securities Exchange Commission ("SEC") form 424B4 ("IPO Prospectus").   In connection

10   with this Offering – of which 7.5 million shares were sold by the Company and 3.2 million shares of

11   which were sold by insiders – Defendants raised gross proceeds of at least $159.965 million

12   (including the $20.865 million BigBand shares sold by Company insiders in connection with the IPO

13   Underwriters' oversubscription agreement). [1]

14   2.    BigBand is a technology company that stands in the middle of the war between the

15   telecommunications and cable companies.  At stake in that war is the rush to acquire the largest

16   number of "triple play" consumers possible.  Triple play refers to providing data, video and voice

17   services to consumers.  As an "arms dealer" in that war, BigBand touted itself as a company poised

18   to capitalize on the "triple play" war.  BigBand developed technologies designed to increase the

19   efficiency of transmitting all three of these services though existing infrastructures.

20   3.     In the Company's IPO Prospectus, Defendants were clear that BigBand's success

21   depended on revenues from products and services.  BigBand's product revenues depended on video

22   and data hardware and software licenses.  A key component of the Company's revenue model was

23   BigBand's Cable Modem Termination System ("CMTS") hardware.  BigBand emphasized that its

24   core business plan revolved around leveraging or upselling to customers who purchased hardware

25   and that it was successfully executing on this plan.

---

[1]    In total, insiders sold over 4.8 million shares, including the 1.605 million shares sold by Company insiders to the IPO Underwriters pursuant to an over-subscription option, available for exercise 180 days after the Offering date at the price of $13.00 per share.

CONSOL. CLASS ACTION COMPL. FOR VIOLATION OF
SECURITIES LAWS – NO. 07-cv-5101 SBA                           - 1 -
001922-12 242376 V1

4.      In contrast to Defendants' reports, at the time of the IPO, Defendants failed to reveal that BigBand had already abandoned the business plan outlined in the IPO Prospectus and that the Company was already underperforming on expectations.  As one former Senior Executive Engineer stated, at the time of the IPO "Cuda [CMTS] was failing and it was then foreseeable that the addition of any VoIP features could not produce revenues for at least 3 years."  Defendants failed to reveal that at the time of the IPO: (i) Cuda was actually already failing as a product; (ii) Cuda was a "commodity product" that had no competitive advantages; and (iii) BigBand was engaged in a completely contrary business model to the one disclosed, that was predicated upon establishing a larger footprint *at the expense of leveraging sales to preexisting customers*.  The Company's undisclosed "land-grab" plan had little or nothing in common with a calculated plan to leverage sales, revenues, gross margins and profits through sales to pre-existing customers using platforms installed by BigBand that were already operational.

5.      Internally, it was widely understood that BigBand's Cuda CMTS product was a mediocre product that "hung together poorly" and performed poorly.  Defendants knew that among the significant problems were: (i) the attempt to add features on an *ad hoc* basis was creating insurmountable engineering problems; (ii) BigBand was not capable of competing on a scale sufficient to gain entry into the mature legacy market where it was struggling to hold a 4% market share; and (iii) BigBand was not able to address problems with existing Cuda customers.

6.      Indeed, the problems were so severe that only weeks before the IPO, Defendants fired the person in charge of the CMTS division, Gilbert Kaufman, and replaced him with John Holobinko who attempted to address the widespread problems with BigBand's CMTS product by delaying roll-out of the newest Cuda CMTS product because it was so laden with "bugs."  One former BigBand employee whose title was Executive Software Engineering (CMTS) and who worked on the CMTS product called BigBand's CMTS product a "hack product with a shaky foundation."

7.      Under the weight of these product failures, Defendants knew that BigBands' CMTS business was already failing and that its market inventory value had deteriorated substantially below cost.  Under Generally Accepted Accounting Principles ("GAAP"), Defendants were obligated to account for material losses related to excess and obsolete inventory – including CMTS products.

1    With full knowledge that BigBand's CMTS product was a commodity product that provided no

2    significant technological improvement for customers, or competitive advantages to the Company,

3    Defendants failed to write down any value of the CMTS.

4           8.     The Defendants went through with the IPO without disclosing to shareholders that the

5    Defendants knew at the time of the IPO that BigBand's CMTS business was failing and that the

6    Company had already diverted from the stated business strategy of leveraging application and plug-

7    in module sales revenues from prior sales of platform products, and overextended itself in favor of

8    engaging in a customer "land-grab."    As one insider stated, Defendants instituted a "top-down" plan

9    that was different from the plan in the IPO Prospectus.  Defendants' undisclosed change in business

10    plan, failing products, and premature recognition of revenue ultimately became obvious in the third

11    and fourth quarters of 2007 when more revenue had to be deferred than BigBand was able to record.

12    Specifically, BigBand was improperly accelerating revenue in connection with its installation

13    projects, despite problems encountered with software customization and interoperability, contrary to

14    the guidance provided by GAAP.

15           9.     It was only on September 27, 2007, after the close of trading – and after Defendants

16    and other Company insiders liquidated over $41 million of their personally held shares in or in

17    connection with the IPO – that the truth about the Company was ultimately revealed to investors,

18    including that the problems which existed at the time of the IPO would result in extremely

19    disappointing results for the third quarter of 2007 – including substantially reduced revenues as the

20    Company's largest customer was forced to "work off" excess inventory prior to being able to acquire

21    more product from BigBand, and that problems rolling out the Company's latest products were also

22    having a material adverse impact upon earnings, operations and results.

23          10.    The following trading day, on the publication of this news, BigBand stock price

24    collapsed.  As evidence of this, shares of BigBand fell over 30% in a single trading day –

25    plummeting from over $9.00 per share to below $6.00 per share, before closing at $6.49 per share, on

26    September 28, 2007.  That trading day, BigBand also experienced exceptionally heavy trading

27    volume with almost 7 million shares traded – hundreds of times the Company's recent average daily

28    trading volume.

CONSOL. CLASS ACTION COMPL. FOR VIOLATION OF
SECURITIES LAWS – NO. 07-cv-5101 SBA
001922-12 242376 V1

11.     On October 30, 2008, BigBand further admitted that it would change its business model and revealed in depth its revenue failure on a conference call.  During the call, BigBand revealed that it was operating outside of the business model contained in the Registration and Prospectus and that it would close its CMTS business and fire 15% of its workforce.

12.     During that same October 30, 2008 conference call with analysts and investors hosted by the Company, Defendants finally admitted that the dramatic decline in results in the third quarter of 2007 and fourth quarter of 2007 resulted from adverse conditions that were impacting the Company prior to the IPO, including that: (i) the ***CMTS was a "commodity" business in a legacy market*** where BigBand was never more than a small player, and the Company was never able to distinguish its products based on qualitative differences, as customers made purchasing decisions based on price, and to a lesser extent legacy relationships with the Company's larger competitors; and (ii) that ***BigBand was engaged in a "land-grab" business plan that was not producing sustained revenues or supporting gross margins*** and, contrary to the Defendants' business plan outlined in the IPO Prospectus, the Company was *not* focused on leveraging established customers so as to generate concentrated higher-margins from the sale of applications and plug-in modules.

13.     Lead Plaintiff alleges that BigBand, its entire Board of Directors, its Chief Financial Officer and the Underwriters involved in the Offering (including Morgan Stanley & Co. Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., Jefferies & Co., Inc., Cowen & Co., LLC, and ThinkEquity Partners, LLC, collectively referred to as the "Underwriter Defendants"), included, or allowed the inclusion of materially false and misleading statements in the IPO Prospectus issued in connection with the IPO, in direct violation of the Securities Act of 1933.

## II.     JURISDICTION AND VENUE

14.     The claims asserted herein arise under §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act").  Jurisdiction is conferred by § 22 of the Securities Act.

15.     Venue is proper pursuant to § 22 of the Securities Act, as Defendant BigBand and/or the Individual Defendants and Underwriter Defendants – Morgan Stanley, Merrill Lynch & Co., Jefferies & Co., Cowen & Co. and Thinkequity Partners  – conduct business in this District.

16.     In addition to the foregoing, BigBand maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

17.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the securities markets.

### III.     THE PARTIES

**A.     Lead Plaintiff**

18.     Lead Plaintiff, **GWYN JONES**, designated by order of this Court dated February 14, 2008, purchased shares of BigBand common stock pursuant and/or traceable to the Company's materially false and misleading IPO Prospectus issued by Defendants in connection with the March 2007 IPO, including those shares detailed in the certification, previously filed with this Court and incorporated herein by reference, and was damaged thereby.

**B.     Corporate Defendant**

19.     Defendant **BIGBAND NETWORKS, INC.** is a Delaware Corporation founded in 1998 and headquartered in Redwood City, California.  BigBand purports to be a leading provider of broadband multimedia infrastructure for video, voice and data.  The Company's solutions are purported to be designed to process, optimize and deliver services such as broadband Internet, VoIP, digital broadcast television, HDTV, transport of high quality video, local advertising, video-on-demand ("VOD"), interactive TV and IPTV across coaxial cable, fiber or copper wire transmission and delivery systems.  The Company reports that service providers use its platforms to cost-effectively expand revenue-generating offerings of rich content and advanced interactive services. At the time of the IPO, Company customers include six of the ten largest service providers in the U.S., and leading service providers in North America, Asia, Europe and Latin America.

**C.     Individual Defendants**

20.     The individuals identified as Defendants in subparagraphs a - j below, are referred to collectively herein as the "Individual Defendants."   The Individual Defendants are each liable for the false statements contained in the materially false and misleading IPO Prospectus, as alleged herein,

as those statements were "group-published" information.  The Individual Defendants include the following:

a.   Defendant **AMIR BASSAN-ESKENAZI** ("Bassan-Eskenazi") is, and at the time of the IPO was, President, Chief Executive Officer, Chairman of the Board of Directors and Co-Founder of BigBand.  Defendant Bassan-Eskenazi signed the materially false and misleading IPO Prospectus and filed with the SEC the materially false and misleading IPO Prospectus issued in connection with the March 2007 IPO.  Also in connection with this IPO, Defendant Bassan-Eskenazi sold at least *$4.836 million* of his personally held BigBand shares.

b.   Defendant **RAN OZ** ("Oz") is, and at the time of the IPO was, Chief Technology Officer, Executive Vice President, Co-Founder of the Company and a member of the Board of Directors of BigBand.  Defendant Oz signed the materially false and misleading IPO Prospectus and filed with the SEC the materially false and misleading IPO Prospectus issued in connection with the March 2007 IPO.  Also, in connection with this IPO, Defendant Oz sold at least *$4.836 million* of his privately held Company shares.

c.   Defendant **FREDERICK BALL** ("Ball") is, and at the time of the IPO was, Chief Financial Officer and Senior Vice President and Executive Vice President of BigBand.  Defendant Ball assisted in the preparation and filing of the materially false and misleading IPO Prospectus and filed with the SEC the materially false and misleading IPO Prospectus issued in connection with the March 2007 IPO.

d.   Defendant **GAL ISRAELY** ("Israely") is, and at the time of the IPO was, a member of the Board of Directors of BigBand.  Defendant Israely signed the materially false and misleading IPO Prospectus and filed with the SEC the materially false and misleading IPO Prospectus issued in connection with the March 2007 IPO.  Also, in connection with this IPO, Defendant Israely sold at least *$5.394 million* of his privately held Company shares.  Defendant Israely is also a member of the Audit Committee of the Board.

e.   Defendant **DEAN GILBERT** ("Gilbert") is, and at the time of the IPO was, a member of the Board of Directors of BigBand.  Defendant Gilbert signed the materially false and misleading IPO Prospectus and filed with the SEC the materially false and misleading IPO

1   Prospectus issued in connection with the March 2007 IPO.  Also, in connection with this IPO,

2   Defendant Gilbert sold at least *$243,000* of his privately held BigBand shares.

3       f.    Defendant **KEN GOLDMAN** ("Goldman") is, and at the time of the IPO was, a member

4   of the Board of Directors of BigBand.  Defendant Goldman signed the materially false and

5   misleading IPO Prospectus and filed with the SEC the materially false and misleading

6   Prospectus issued in connection with the March 2007 IPO.  Defendant Goldman is also a

7   member of the Audit Committee of the Board of Directors of the Company.

8       g.    Defendant **LLOYD CARNEY** ("Carney") is, and at the time of the IPO was, a member

9   of the Board of Directors of the Company.  Defendant Carney signed the materially false and

10  misleading IPO Prospectus and filed with the SEC the materially false and misleading IPO

11  Prospectus issued in connection with the March 2007 IPO.  Defendant Carney is also a

12  member of the Audit Committee and the Compensation Committee.

13      h.    Defendant **BRUCE SACHS** ("B. Sachs") is, and at the time of the IPO was, a member of

14  the Board of Directors of the Company.  Defendant B. Sachs signed the materially false and

15  misleading IPO Prospectus and filed with the SEC the materially false and misleading IPO

16  Prospectus issued in connection with the March 2007 IPO.  Defendant B. Sachs is also a

17  member of the Governance Committee and the Compensation Committee.

18      i.    Defendant **ROBERT SACHS** ("R. Sachs") is, and at the time of the IPO was, a member

19  of the Board of Directors of the Company.  Defendant R. Sachs signed the materially false

20  and misleading IPO Prospectus and filed with the SEC the materially false and misleading

21  IPO Prospectus issued in connection with the IPO.  Defendant R. Sachs is also member of the

22  Governance Committee and Compensation Committee.

23      j.    Defendant **GOEFFREY YANG** ("Yang") is, and at the time of the IPO was, a member

24  of the Board of Directors of the Company.  Defendant Yang signed the materially false and

25  misleading IPO Prospectus and filed with the SEC the materially false and misleading IPO

26  Prospectus issued in connection with the March 2007 IPO.  Defendant Yang is also a member

27  of the Governance Committee and the Compensation Committee.

28

**D.    IPO Underwriter Defendants**

21.    In connection with BigBand's March 2007 IPO, Defendants **MORGAN STANLEY & CO. INC.** ("Morgan Stanley"), **MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.** ("Merrill Lynch"), **JEFFERIES & CO., INC.** ("Jefferies"), **COWEN & CO., LLC** ("Cowen") and **THINKEQUITY PARTNERS, LLC** ("ThinkEquity Partners") acted as "Lead Underwriters" of the Offering – distributing 10.7 million shares of BigBand stock to investors and initiating the first public market for BigBand shares, and also distributing an additional 1.605 million shares upon exercise of the Underwriters' over-subscription allotment option.  Excluding the oversubscription allotment of an additional 1.605 million shares sold entirely by Company Insiders, the distribution of the BigBand shares awarded the Underwriter Defendants in the IPO occurred, as follows:

| Name | Number of Shares |
|------|-----------------:|
| Morgan Stanley | 4,708,000 |
| Merrill Lynch | 2,782,000 |
| Jefferies | 1,337,500 |
| Cowen | 1,070,000 |
| ThinkEquity Partners | 802,500 |
| **Total** | 10,700,000 |

22.    In connection with the March 2007 IPO, the Underwriter Defendants were paid over $11.197 million in gross fees – paid indirectly by purchasers of the Company's shares.  The Underwriter Defendants were paid at least $0.91 per share in connection with the sale of the 12.305 million shares, including shares sold pursuant to the exercise of the Underwriter's over-subscription option, as follows:

| | Per Share | Total | |
|---|---|---|---|
| | | No Exercise | Full Exercise |
| Public offering price | $     13.00 | $  139,100,000 | $    159,965,000 |
| Underwriting discounts and commissions payable by us | 0.91 | 6,825,000 | 6,825,000 |
| Underwriting discounts and commissions payable by the selling stockholders | 0.91 | 2,912,000 | 4,372,550 |
| TOTAL | | $9,737,000 | $11,197,550 |

23.     Shareholders were willing to, and did, pay over $11.197 million in combined fees to compensate the Underwriter Defendants for conducting a purported significant "due diligence" investigation into BigBand in connection with the IPO.  The Underwriter Defendants' due diligence investigation was a critical component of the Offering, and this was supposed to provide investors with important safeguards and protections.

24.     The due diligence investigation that was required by the Underwriter Defendants included a detailed investigation into BigBand sales, accounting, controls and procedures, and it also required Defendants to test the assumptions and verify the projections adopted or ratified by Defendants, to the extent a reasonable investor with access to such confidential corporate information would.  A reasonable due diligence investigation would have extended well beyond a mere casual view of BigBand books and records, and its accounting, financial report and operational and financial controls.  The failure of the Underwriter Defendants to conduct an adequate due diligence investigation was a substantial contributing factor leading to the harm complained of herein.

25.     In addition to the foregoing, because of the Underwriter Defendants' and Individual Defendants' positions with the Company, they each had access to the adverse undisclosed information about BigBand's business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees,

attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

26.     In addition to the Underwriter Defendants, it is also appropriate to treat the individuals named as Defendants herein as a group for pleading purposes (the "Individual Defendants") and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above.  Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements and financial condition, as alleged herein.  Accordingly, the Individual Defendants were also involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, and approved or ratified these statements, in violation of the federal securities laws.

27.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the Nasdaq stock market exchange (the "Nasdaq"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions made in connection with the issuance of common stock in March 2007 violated these specific requirements and obligations.

28.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company at the time of the

1   Offering.  Each Individual Defendant was provided with copies of the documents alleged herein to

2   be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to

3   prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants

4   is responsible for the accuracy of the public reports and releases detailed herein and are therefore

5   primarily liable for the representations contained therein.

6                                   **IV.    BACKGROUND TO THE OFFERING**

7   **A.    Company Background**

8          29.     BigBand was founded in 1998, and operated as a closely held Company, financed

9   initially by a $100 million investment made primarily by venture capital funds Charles River

10  Partners, Pilot House Ventures, Redpoint Ventures, Cedar Funds, Israel's Evergreen Funds and

11  AOL.   From the Company's inception until the end of 2001, BigBand engaged in research and

12  development, producing its first marketable media processing product in 2002.   In the years that

13  followed, as the Company introduced other products and expanded its service capabilities, ultimately

14  securing hardware and software contracts from six of the ten largest telecom service providers in the

15  U.S, including: Cablevision, Comcast, Charter, Cox, Time Warner and Verizon.

16         30.     In an effort to grow its business and to purportedly allow the Company to provide an

17  "end-to-end" product solution for cable operators looking to sell data and voice transmission

18  products and services, in June 2004, the Company acquired the high-speed data equipment,

19  Broadband Access Systems division, of ADC Telecom, Inc. ("ADC").  While the terms of this

20  transaction were not announced at the time of the acquisition, at the time of the IPO the Company

21  reported that the total purchase price of these assets was slightly over $25.1 million, paid for almost

22  entirely in both non-voting and preferred BigBand shares.[2]

23         31.     The acquisition of ADC's high-speed data equipment division was purported to give

24  BigBand a portfolio of patented products, including the "Cuda" CMTS product line, as well as a

25  software provisioning product line, named Fastflow.  According to analysts familiar with these

26  technologies, the ADC acquisition allowed BigBand to move beyond video routing and VOD

27  _____

28  [2]       This was essentially the same business that ADC had purchased from Broadband Access Devices for
    $2.25 billion less than four years earlier, in September 2000.

1  functions, to products that also allowed cable operators to offer voice and high-speed data transfer

2  over their *existing* transmission systems.

3       32.    BigBand's acquisition of ADC also had the effect of making BigBand a significantly

4  less attractive acquisition target.  By acquiring the CMTS assets, BigBand immediately increased its

5  size and it also acquired products that were already offered by cable giants Motorola, Cisco, Arris

6  Group and even Terayon Communications.   Thus, in addition to helping the Company remain

7  autonomous, the ADC asset acquisition also placed BigBand into the mature CMTS "legacy" market,

8  where larger competitors already had well established leadership positions and installed systems

9  platform products. According to CIBC analysts, Cisco, Motorola and Arris Group held 95% of the

10  market share for CMTS products.

11       33.    It was also substantially a result of the ADC acquisition in early-2004, that BigBand

12  refrained from selling stock to the public earlier.  At the time of the ADC asset acquisition, BigBand

13  assured the market that it would *not sell any stock to the public until the newly acquired CMTS assets*

14  *were fully integrated into operations*.  In fact, immediately after the ADC asset acquisition closed, on

15  May 28, 2004, spokesman and Vice President of Corporate Development, Seth Kenvin, was quoted

16  in a trade press interview, published on a website named *Lightreading.com*, as stating that, *"[w]e're*

17  *not going to go public this year.  Maybe next year, once we can show we can achieve this*

18  *integration" of the ADC operations*.

19       34.    While the ADC asset acquisition did serve to boost revenues in 2005, by the time

20  BigBand completed the CMTS acquisition it had already benefited significantly from cable

21  operators' demand for its video platforms and systems efficiency products.  From 2002 to 2005,

22  BigBand's revenues increased significantly, as evidenced by the chart below:

|  |  | Years Ended December 31, |  |  |
|---|---|---|---|---|
|  | 2002 | 2003 | 2004 | 2005 |
|  | (in thousands, except per share data) | | | |
| Consolidated Statements of Operations Data: | | | | |
| Net revenues | | | | |
|     Products | $   9,203 | $   20,014 | $   31,536 | $   85,966 |
|     Services | 371 | 1,566 | 3,936 | 12,013 |
| Total Net Revenues | 9,574 | 21,580 | 35,472 | 97,979 |

1

**B.    Industry Background**

2       35.    During the time leading up to BigBand's IPO, several pivotal developments occurred

3   in the telecommunications markets that were vital to BigBand's success.  First, telephone service

4   providers and cable companies that traditionally did not compete with one another all began to

5   upgrade or rebuild their networks to become "triple-play" providers of voice, data and video

6   services.

7       36.    Competition among cable and telephone service providers was further driven by

8   consumer demand for high-bandwidth services such as high-speed Internet services, VOD and high

9   definition video ("HD") services.  Competition was also being driven by satellite television service

10  providers, who faced fewer bandwidth limitations, and which by the end of 3Q:05 had captured an

11  estimated *28% of all paid television subscribers in the U.S.* (according to IDC, an independent

12  research firm), primarily by offering more HD channels and additional VOD services.  To compete

13  with satellite television service providers, at least one telephone service provider, Verizon, had

14  already embarked on a plan to spend up to $18 billion by 2010 building a complete end-to-end fiber

15  optic system ("FiOS") designed to supply high-speed data, voice and interactive video services.

16      37.    These new systems and services were also designed to compete with advertising

17  innovations that were being developed for the Internet.  Thus, in addition to offering very low-cost,

18  or even free, voice transmission services directly to consumers over the Internet, online media

19  companies like Google and Yahoo were aggregating and facilitating access to content that

20  significantly increased the relevance, interactivity and measurability of their clients' advertising.

21  Program customization and information capture and analysis capabilities were very important to

22  advertising, and resulted in a significant migration of ad spending to the Internet.

23      38.    Thus, to compete for advertisers' spending, triple-play service providers were

24  therefore, required to: (i) deliver relevant advertisements; and (ii) provide products that allow

25  advertisers to quantify or measure the effectiveness of their marketing campaigns.  Video networks

26  service providers, however, have struggled to capture and supply the intelligence necessary for the

27  relevancy, interactivity and measurability required to meet advertisers' expanding demands.  As a

28

result, in recent years, more and more advertisers have migrated their ad spending to the Internet, thereby, taking advantage of its enhanced features.

**C.      Business Plan & IPO Pricing**

39.      The Company's IPO pricing was based on its ability to produce the unique combination of proprietary platform technology, applications and modular plug-ins, that allegedly gave BigBand its competitive market advantage.  The Company's professed business model was predicated, first, upon the supposed success of its legacy Cuda CMTS business and, second, upon its emerging switched digital products.  At the time of the IPO, BigBand attributed its success to its CMTS operations, and to its ability to install systems platforms and then "leverage" this installed base.

40.      BigBand touted this business plan as having several important benefits, including that it provided a stable and more reliable source of revenues.  For example, in addition to purportedly stable and growing CMTS Cuda sales, each switched digital platform sale completed was also supposed to provide BigBand the immediate opportunity to test-market additional modules and applications, and then to sell these additional higher-margin products within the estimated sales cycle (reported in the IPO Prospectus as between 9 and 18 months).[3]

41.      As evidence of the effectiveness of the Company's reliance upon CMTS sales as well as this install and leverage model, by the end of 3Q:06 BigBand reported sales for the first three quarters of the year of almost $113 million – an alleged increase of 60% over the corresponding period in 2005.   In addition, by the end of FY:2006, BigBand reported revenues of 176.6 million, 80% higher than FY:2005, and in 4Q:06 the Company posted $63 million in revenue, 136% over

---

[3]      In addition to supporting gross margins, leveraging sales to customers with existing installed BigBand platforms also lowered the risk of revenue disruption and impacted revenue recognition. In fact, the risk of interoperability was lowered when the Company regulated the rate of its product roll out and footprint expansion, because if BigBand sought to leverage its platform bases, it would be forced to complete its original platform installation and to solve interoperability issues earlier in the sales cycle and before they could be compounded by more problems with other contracts.  The Company's install and leverage revenue model would force BigBand to resolve interoperability more rapidly, and it would help reduce the foreseeable risk that interoperability issues could entirely undermine revenues.  Had the Company not adopted this plan, BigBand would have been subject to a significantly greater risk that unresolved interoperability issues could spread as more and more projects were being started but not completed, as Company resources were spread thinner and thinner, and as revenues became deferred but not recognized.

4Q:05. Also in 4Q:06, BigBand posted a net profit of $8.9 million, up from $1.6 million in the preceding quarter and a loss of $5.8 million in 4Q:05. The Company's IPO was perfectly timed to take advantage of BigBand achieving profitability in the 3Q:06, the quarter ending September 30, 2006.

42.     Attaining profitability immediately prior to the IPO was also a critical and prominent feature used by the Underwriter Defendants' in presentations to analysts and investors and in the "road-show" presentations and one-on-one conversations with institutional investors that occurred prior to the Offering. As evidence of this, at or about the time of the IPO, analysts were quoted in the financial press also stating that BigBand was then poised for continuous foreseeable near-term growth, in part, as follows:

- "*Based on the company's current growth trajectory, the valuation appears attractive* relative to other high growth networking companies as well as recent buyout multiples in the sector." (Renaissance Capital report 3/15/07.)

- "*Triple-play companies that help enable the transmission of video, voice and data have been among the most desirable* in the initial public offering market over the past six months, and BigBand Networks took advantage of that demand . . . ." (*Daily Deal* 3/16/07.)

- "*It's very much what we expected, and we think it can hold the premium because its not a speculative play*. They're profitable, and their growth is pretty impressive." (Quoting Ben Holmes, publisher Morningnotes.com LLC, a Boulder Colorado IPO Research firm).

43.     In addition to the foregoing, the Company's performance was also critical to the pricing of BigBand's IPO by the Underwriter Defendants, as evidenced by the IPO Prospectus which states, in part, the following:

**Pricing of the Offering**

Prior to this Offering, there has been no public market for our common stock. *The initial public Offering price was determined by negotiations among us and the representatives of the underwriters. Among the factors considered* in determining the initial public offering price *were our future prospects* and those of our industry in general, *our sales, earnings and certain other financial and operating information in recent periods, and the price earnings ratios, price sales ratios and market prices of securities and certain financial and operating information of companies engaged in activities similar to ours*. An active trading market for the shares may not develop. It is

also possible that after the Offering the shares will not trade in the public market at or above the initial public offering.[4]

BigBand Networks Inc., Registration Statement (form 424B4), at 108 (March 15, 2007).

**D.    ADC Pre-Offering-Stock Sale**

44.    Faced with BigBand's reports of stellar performance immediately prior to the March 2007 IPO and the guidance by Defendants to analysts and investors during the "road-show" presentations and on-on-one conversations with Company management, and seemingly ignoring the fact that a public market would soon exist for its shares, on February 1, 2007 – only weeks before the Company's IPO occurred – ADC announced that it would sell its stake in the Company for approximately $59 million.  In June 2004, when the Company acquired its cable television business from ADC, it granted ADC approximately 10% equity interest in BigBand.  Reportedly, the ADC shares were sold to Redpoint Ventures, one of BigBand's largest shareholders both prior to and after this acquisition.[5]

45.    While it appears that ADC received approximately $10.00 per share for its BigBand shares in early February 2007, on March 14, 2007, Defendants published a release announcing that BigBand had priced the IPO of its common stock at $13.00 per share – above the $10.00 to $12.00 range originally set by the Underwriter Defendants.  The Company's release announcing the pricing of the BigBand IPO stated, in part, the following:

> REDWOOD CITY, Calif., March 14, 2007 – BigBand Networks, Inc. (NASDAQ: BBND) today announced an initial public offering of 10,700,000 shares of its common stock at a price of $13.00 per share (before underwriting discounts and commissions). Of those shares, BigBand Networks will sell 7,500,000 shares and selling stockholders will sell 3,200,000 shares. Several of its stockholders have granted the underwriters the right to purchase an additional 1,605,000 shares of common stock to cover over-allotments. BigBand's common stock will be listed on the Nasdaq Global Market under the symbol "BBND" and will begin trading on March 15, 2007.
>
> Morgan Stanley and Merrill Lynch & Co. acted as joint book-running managers for the offering, with Jefferies & Company, Cowen and Company, and ThinkEquity Partners LLC serving as co-managers. A

---

[4]    All emphasis added and all internal quotations and citations removed, unless otherwise stated.

[5]    Remarkably, within days of the IPO, as shares of the Company traded above the Offering prices and BigBand's enterprise value ballooned to over $1.0 billion, this 10% stake in the Company could have been worth over $100 million – almost twice the pre-IPO sales price.

1
2
3
4

> copy of the final prospectus relating to the offering may be obtained by contacting Morgan Stanley, 180 Varick Street, New York, NY 10014, Attention: Prospectus Department, by telephone at 212-761-6775 or by e-mail at prospectus@morganstanley.com, or by contacting Merrill Lynch & Co., 4 World Financial Center, North Tower, New York, NY 10080 or by telephone at 212-449-1000.

5

## V.    MATERIALLY FALSE & MISLEADING REGISTRATION STATEMENT AND JOINT PROXY-PROSPECTUS ISSUED IN CONNECTION WITH THE IPO

6

### A.    Overview

7
8
9
10
11

46.    In connection with the March 15, 2007 IPO of 10.7 million shares of BigBand common stock, priced at $13.00 per share, Defendants filed with the SEC, pursuant to form 424B4, a Registration Statement and Prospectus ("IPO Prospectus").  Unbeknownst to investors, however, the IPO Prospectus issued in connection with the BigBand IPO was materially false and misleading and misstated or omitted or failed to disclose material adverse facts about BigBand.

12
13
14
15
16
17
18
19

47.    For example, rather than disclose the problems that existed within the Company's CMTS business, at the time of the March 2007 Offering, or that the Company had abandoned its strategy of leveraging application revenues and had over-extended itself in an effort to "grab" product footprint, the IPO Prospectus described BigBand as a Company that was successfully executing on its strategy of controlled and measured growth, focused on leveraging existing customers and, in the process, generating higher and more consistent revenues, profits and gross margins.  Moreover, at the time of the IPO, Defendants also described the Cuda CMTS business as operating according to plan and failed to disclose any problems related to its CMTS business.

20
21
22
23
24
25
26

48.    In fact, however, as investors could not know at the time of the IPO, so many problems existed with BigBand's CMTS Cuda product that the Company had secretly attempted to reorganize this entire division and was on the verge of canceling the roll-out of its latest Cuda product, because of its inability to produce a commercially viable version that did not consistently fail and that did not harm customers' systems.  Moreover, by the time of the IPO, Defendants had also secretly changed the Company's business model, and BigBand was attempting to "grab" market territory in a manner that far outstripped the Company's resources.[6]

27
28

---

[6]    Specifically, at the time of the IPO, it was no longer true that BigBand was selling its lower margin platform products to service providers, installing those products to generate service revenues and then

49.    As investors ultimately learned from statements made by Defendant Bassan-Eskenazi and from conducting interviews with several former senior managers of the Company, however, at the time of the IPO: (i) Cuda was actually already failing as a product; (ii) Cuda was a "commodity product" that had no competitive advantages; and (iii) BigBand was engaged in a completely contrary business model to the one disclosed, that was predicated upon establishing a larger footprint *at the expense of leveraging sales to preexisting customers*.  The Company's undisclosed "land-grab" plan had little or nothing in common with a calculated plan to leverage sales, revenues, gross margins and profits through sales to pre-existing customers using platforms installed by BigBand that were already operational.

50.    Although Bassan-Eskenazi's admissions came months after the IPO, little or nothing had changed in the CMTS market from the time of the IPO until Defendants belatedly admitted that Cuda was a commodity product, that Cuda was failing in the market and that BigBand would discontinue Cuda completely.

**B.    Materially False Statements and Omissions Regarding CMTS / Cuda**

51.    The Company's inability to effectively integrate its CMTS business and failure of the Cuda product served as a catalyst for the Company's decision to abandon this business in the months immediately following the IPO.  However, by the time of the March 2007 IPO, the assets acquired by BigBand from ADC in 2004 for little over $25 million in stock (which assets were previously acquired by ADC in 2000 at a cost of over $2.5 billion), were essentially commodity products in a legacy market.  Simply put, there was little or no competitive advantage in adopting the Company's CMTS products, when potential customers could buy similar products, for the same price or less, from the same companies that had previously sold them their basic architecture and platform products.  Moreover, not only did the potential customers in the CMTS market already have pre-existing relationships with their original platform vendors, but these competitors were the nation's largest technology vendors who held more than 95% of the CMTS market.

---

immediately test-marketing other higher margin application products and plug-in modules that were foreseeably expected to provide the Company with a consistent flow of relatively predictable revenues and higher blended gross margins.

52.     Worse still, according to the Company's former executive engineers, and its senior sales, support and account managers, interviewed by Lead Plaintiff and reported herein *infra*, ¶¶ 47 – 66,  by the time of the IPO, Cuda also had many undisclosed problems, including but not limited to: (i) the Company's *ad hoc* attempt to add features, in a failing effort to stay abreast of competitors' product innovations, was exacerbating problems that *already* existed in the Cuda products; (ii) that BigBand was unable to resolve problems in its Cuda products, such that the addition of new features was rapidly creating new problems; (iii) that Defendants had attempted to restructure the entire Cuda CMTS division weeks before the IPO, because of the problems that existed with the Cuda products, and as part of this restructuring, the new head of Cuda operations sought to delay or even halt the introduction of its newest product introduction; and (iv) it was impossible for Cuda to compete effectively, or generate sufficient revenues to fund operations based on its market position at that time.

53.     However, rather than disclose either that BigBand's CMTS products were commodities – competing on price alone – or that the Company was at a significant disadvantage in the high-speed data transmission business, and that BigBand could not effectively compete with Motorola or Cisco Systems, or others, the IPO Prospectus highlighted the purported product uniqueness of BigBand's CMTS product, and its purported continued sales success.  As evidence of this, the IPO Prospectus stated, in part, the following:

> **High-Speed Data and Voice-over-IP**.  Our High-Speed Data product application enables cable operators to offer real-time services, such as VoIP and streaming video content over the Internet. Using our High-Speed Data product application, cable operators can offer different levels of data speeds, which can be tiered based on the level of subscriber fees or on real-time bandwidth needs. ***Our High-Speed Data product application offers redundancy characteristics and a distributed switch fabric with routing and forwarding capabilities across multiple application modules, instead of in a central core where switching latency can be exacerbated. As a result, those cable operators that are deploying voice services can leverage the ability of our high-speed data product application to reduce dropped packets and latency to deliver high-quality and reliable voice services.***

BigBand, Registration Statement (form 424B4), at 57.

*        *        *

**Cuda Cable Modem Termination System (CMTS).**  Our Cuda CMTS is a DOCIS 2.0-qualified hardware platform dedicated to the delivery of our data applications for cable operators. Instead of locating all routing and forwarding in a central switching core, our Cuda hardware system architecture distributes these capabilities across multiple application modules to offer carrier-class reliability. It has a total switching capacity of 204 Gbps and provides the superior RF performance critical for real-time services, such as VoIP and streaming video, that require very low packet error rates. Our CMTS platform supports QAM RF modulation for both downstream and upstream digital traffic. ***Because of its high-density design, this platform allows our customers to scale their services with reduced space and power consumption. Moreover, like the BMR and BME, the Cuda is field-upgradeable to support new services and network architectures.***

*Id.,* at 58.

\*        \*        \*

***The markets in which we operate are intensely competitive, and many of our competitors are larger, more established and better capitalized than we are.***

The markets for selling network-based hardware and software products to service providers are extremely competitive and have been characterized by rapid technological change.  In the ***CMTS market,*** we compete principally with Cisco Systems, Motorola and Arris. In the video market, we compete broadly with system suppliers including Harmonic, Motorola, Scientific Atlanta (a division of Cisco systems), Seachange International, Tandberg Television (which recently announced that it will be acquired by Arris), Terayon Communication Systems and a number of smaller companies. We may not be able to compete successfully in the future, which may harm our business.

Many of our competitors are substantially larger and have greater financial, technical, marketing and other resources than us. Given their capital resources, many of these large organizations are in a better position to withstand any significant reduction in capital spending by customers in these markets. They often have broader product lines and market focus and are not as susceptible to downturns in a particular market. In addition, many of our competitors have been in operation much longer than we have and therefore have more long-standing and established relationships with domestic and foreign service providers. If any of our competitors' products or technologies were to become the industry standard, our business would also be seriously harmed. If our competitors are successful in bringing their products to market earlier, or if their products are more technologically capable than ours, then our sales could be materially adversely affected.

*Id.,* at 12-13.

54.    By not disclosing that, at the time of the March 2007 IPO, the Company was already having significant problems integrating the CMTS assets into BigBand's sales platform, that these

1    products were rife with severe problems impacting operability, that Defendants had re-aligned this

2    entire business as a result of its failure, and that these products were essentially commodities

3    competing on price alone and not succeeding, the IPO Prospectus risk disclosures were also

4    materially false and misleading.  Accordingly, as a result of the problems related to the Cuda CMTS

5    products at the time of the BigBand IPO, it was not true that the risk of Cuda's failure was a mere

6    contingency or an unforeseeable possibility.  At the time of the BigBand IPO, the failure of the

7    Company's CMTS business was entirely foreseeable given the problems that existed within these

8    products, BigBand's inability to solve these problems over a long period of time, and the then

9    existent market conditions – conditions which continued to persist virtually unchanged, until early-

10   August 2007 when the Company first began to shutter this business.

11         55.    **Undisclosed Adverse Facts Related to CMTS.**  Based on statements compiled

12   through interviews of former managers, directors and employees of BigBand's now-defunct Cuda

13   CMTS division, the problems that resulted in the ultimate failure of this division *already* existed at

14   the time of BigBand's IPO, but the Defendants failed to disclose them.  These former senior

15   managers and high-level employees describe BigBand's CMTS product as a product riddled with

16   performance and operational problems.  Those problems only increased as BigBand attempted to add

17   additional features in a failed effort to catch up with competitors.  They also describe a product that

18   could not be sold profitably, that was not finding acceptance in the marketplace and that was being

19   sold by a recently reorganized division that did not even want to roll-out the newest product because

20   of known severe problems that prevented it from performing properly.

21         56.    For example, a former Senior Executive: Engineering (CMTS), who was hired

22   directly by Defendant Bassan-Eskenazi in the fall of 2004, after BigBand acquired the ADC assets,

23   and who reported to Gilbert Kaufman (former Executive Vice President World-Wide R&D) and later

24   to John Holobinko (Vice President and General Manager of Cable Edge Business Unit), stated that:

25         •    It was evident as early as 2004, that there was no viable
                strategy to increase Cuda market share.  In part, because Cuda
26              did not have features compatible with Cisco in CMTS, because
                ***the Cuda product was "mediocre*****,**" and because the Company
27              was constantly playing "catch-up" in an effort to add new
                features to remain even marginally competitive.

28

1

- The patchwork of software upgrades that was resulting from BigBand's efforts to piece together its *ad hoc* upgraded system resulted in very poor performance and system problems. According to this Senior Executive Engineer, the **_system "hung together poorly" and had poor performance_**, in part, because useless and unnecessary code from prior system versions was never eliminated.

2

3

4

5

- Prior to leaving BigBand following the IPO in 2007, this former Senior Executive Engineer advocated for an entire new release of Cuda because, **_"there was never a sense that we had solved the underlying problems,"_** and because the then most recent version of Cuda, released in 2006, "lacked stability" and resulted in repeated and frequent system failures, or "crashes," that resulted in unacceptable customer-service loss and system failures. Such failures were so severe that, the fail-safe operations and built-in recovery safety features were also rendered non-functional.

6

7

8

9

10

- That, larger and more well-established competitors such as Cisco, Motorola and ARRIS dominated the market, and left little or no ability for BigBand to compete with its Cuda products prior to the IPO or thereafter.

11

12

13    57.    In addition to the foregoing, this Senior Executive Engineer was so concerned that

14    Cuda did "not fit in" with the Company's other products or marketing, that Cuda had never been

15    profitable for BigBand, and that the market dynamics were so disfavorable to Cuda that, prior to the

16    IPO, this Senior Executive Engineer spoke directly to Defendant Bassan-Eskenazi, Gilbert Kaufman

17    (former Ex. Vice President World-Wide R&D) ("Kaufman"), and John Connelly (currently

18    Executive Vice President Marketing) ("Connelly"), and told them all that *Cuda was failing and it*

19    *was then foreseeable that the addition of any VoIP features could not produce revenues for at least 3*

20    *years*. According to this Senior Executive Engineer, immediately prior to the IPO, he held a series of

21    discussions with Bassan-Eskenazi, Kaufman and Connelly, where the problems related to the

22    CMTS/Cuda business were discussed and where it was further discussed whether these problems

23    were so severe that the Company should discontinue the product, and whether Cuda could even

24    survive in the market.

25    58.    In fact, when asked about any discussions that were held immediately prior to the

26    IPO, concerning whether the Cuda would survive or die, this Senior Executive Engineer stated that

27    there were so many discussions in different locations with different people about the viability of

28    Cuda, that it made it hard to isolate any specific discussion. However, this Senior Executive

Engineer did recall one specific discussion that took place in September of 2006, about 6 months prior to the IPO.  When this conversation took place, Kaufman was in charge of engineering. Defendant Bassan-Eskenazi traveled from California to Massachusetts where Defendant Bassan-Eskenazi spoke directly with this Senior Executive Engineer and with Kaufman, regarding the viability of Cuda given BigBand's inability to add to meager 4% share of the CMTS market.

59.     This Senior Executive Engineer also stated that the same questions regarding the viability of Cuda was raised every time budgets were discussed.  Specifically, in December 2006, this issue was again raised when the subject of funding for Cuda was debated at a meeting of managers attended by the Senior Executive Engineer in Israel.  It was reported that, at this meeting, Tal Weiss, the Senior Director of Planning in Israel, who was actually working on Video products along with Romi Sulton, met with this Senior Executive Engineer and argued that Cuda was not making a profit, and that it should be killed to provide more funding for digital switching based video and VoIP products in particular.

60.     Following this Senior Executive Engineer's return to the United States, he also engaged in informal discussions with Kaufman and later Defendant Bassan-Eskenazi, and briefed them on the conversations held with Sulton and Weiss.  At or about the same time, this Senior Executive Engineer also had informal discussions with Paul Crann (GM Telco Business Unit) who also wanted to halt any additional work on Cuda.  Crann's position reflected the widely held belief within BigBand that Cuda was disproportionally funded at the expense of BigBand making money in other areas.[7]

61.     This Senior Executive Engineer also said that he told Gil Kaufman and Defendant Bassan-Eskenazi, around August 2006, that any CMTS based VoIP product would have no revenue (sales) for three years.  While this former employee did not attend the senior executive meeting where the final numbers were worked out, he did sate that he told his boss Gil Kaufman and Defendant Amir-Eskenazi that no sales could be expected from VoIP.  Despite this reasonable

---

[7]     This opinion was slightly at odds with the belief of those who worked in the Cuda CMTS division who argued that Cuda was underperforming because engineers lacked the funding necessary to fix bugs and sustain customers.

1    forecast, this Senior Executive Engineer stated that his estimates were disregarded and that the plan

2    of record showed some sales occurring as early as 2008.

3        62.    Another former Executive: Software Engineering (CMTS), who was hired in 2002

4    and who worked at ADC prior to the acquisition of its CMTS business, and who reported to the

5    senior executive identified above, and who also reported to Gilbert Kaufman (former Executive Vice

6    President World-Wide R&D), and later to John Holobinko (Vice President and General Manager of

7    Cable Edge Business Unit), who both in turn reported to Defendant Bassan-Eskenazi, also confirmed

8    that:

- At the time of the IPO, CMTS was already severely underperforming to expectations, and it could not compete or take market share from major manufacturers such as Cisco and Motorola.

- At the then current growth rates, the Cuda products could not attain profitability, as product problems and rising engineering costs exceeded expectations, and further reduced profitability. As such, at the time of the IPO, this former Executive Software Engineer concluded that CMTS was not growing at a rate sufficient to support operations.

- At the time of the IPO, quality problems in the original Cuda CMTS products acquired from ADC were exacerbated as BigBand prematurely added a patch-work of features to attempt to win customer accounts. This executive software engineer described ***the Cuda product as a "hack" product with a "shaky foundation."***

- By the time of the IPO, Cuda quality had deteriorated to unsatisfactory levels as each released version grew worse and more problems occurred, as BigBand attempted to add more features.

21        63.    According to both the Executive: Software Engineering (CMTS) and the Senior

22    Executive Engineer, immediately prior to IPO, both the number and the severity of field problems

23    *were high and increasing*, and that these problems were being reported to Bassan-Eskenazi and the

24    other senior-most Company managers on weekly reports created using field test evaluation reports.

25    These field test evaluation reports were created using software called "Clear Quest." In fact,

26    according to both of these executive level software engineers, it was substantially as a result of the

27    undisclosed problems related to the Cuda products that, immediately prior to the IPO in February

28    2007, the Company engaged in a complete reorganization of its CMTS operations.

CONSOL. CLASS ACTION COMPL. FOR VIOLATION OF
SECURITIES LAWS – NO. 07-cv-5101 SBA
001922-12 242376 V1

64.     According to both of these engineers, Defendants knew that the Cuda product was failing and therefore attempted to reorganize this division immediately prior to the IPO.  Specifically, Defendants fired Gilbert Kaufman, the Executive Vice President responsible for World Wide Engineering, Research & Development.  Kaufman was responsible for heading the CMTS operations.  Kaufman was replaced by John Holobinko, who had previously served as Vice President of Product Management.  Holobinko became the Vice President and General Manager of Cable Edge Business Unit.  In fact, according to both of these engineers, the problems related to Cuda were so severe that Holobinko immediately delayed the roll-out of the newest Cuda version until the known "bugs" could be cured.  Holobinko even considered canceling this version until a new "stabilized release" could be developed to fix known material defects.  By May 2007, the Company ultimately began work on an entirely new version of Cuda.

65.     Similarly, on the customer support side of the CMTS operations, a former Senior Network Support Engineer who worked at the Company from the fall of 2005 until the employee purge of October 2007, and who reported to Per Cederbom (West Coast Manager of Customer Support), and later to Greg Hauck (Manager of Customer Support), who in turn reported to Alex Derecho (Senior Support Director), who in turn reported to Jeff Lindholm (Senior Vice President of Marketing and Sales), has also revealed that:

- Prior to the IPO, BigBand had "oversold" CMTS products, such that it was already known to the Company that customers would not be re-ordering products in the foreseeable near term.

- In October 2006, this Senior Network Support Engineer personally visited one major customer in Northern Virginia.  The customer informed him that it had very high inventory and could not be expected to reorder new CMTS products for at least several quarters.  At or about the same time, Verizon also informed BigBand that it had excess inventory.

- In fact, as early as June 2006, this Senior Network Support Engineer personally visited another customer, Sudden Link (the Cox spin off), who also complained of excess inventory.

- As early as June 2006, this Senior Network Support Engineer also stated that customers had informed BigBand that they would not purchase DOCSIS 2.0 standard compliant technology, when new equipment that supported the upgraded DOCSIS 3.0 standard, was expected by 2008.

66.     As a Senior Network Support Engineer responsible for CMTS and Cuda, this former employee was well acquainted with the material, unresolved product quality problems related to Cuda that existed at the time of the IPO – including the myriad of problems caused by the continued addition of new features onto a system with pre-existing unresolved problems.  In fact, this network support engineer was able to witness the close causal relationship between the Company's attempt to adopt new features and the emergence of new system problems prior to the IPO, and concluded that *the constant addition of new features was "Killing Cuda."*

67.     The former Senior Network Support Engineer reported that by the time of the IPO software problems had become so severe that Return Material Authorizations (RMAs) "overwhelmed" the Company's supply of replacement parts.   Accordingly, by that time, the Company was seeing as many as 6 returned products per day – which was far outstripping the 15-20 unit planned refurbished parts supply – and which even caused BigBand to replace non-functioning products with new products or parts, directly from new inventory.  Although widely known internally, none of this was disclosed to the public.

68.     Also according to this Senior Network Support Engineer, the problems driving these returns were so severe that, in some cases, customers' systems were becoming inoperable or, in several instances, had caught fire as a result of the use of BigBand CMTS Cuda products.  This former Senior Network Support Engineer recalled at least two catastrophic customer system failures – one several months prior to the IPO, and one within several months after – where customers' systems burst in flames and produced sparks.  While the melted BigBand CMTS Cuda boards were ultimately replaced, the first report that was filed related to the incident that occurred prior to the IPO was changed by more senior management from having an incident titled, "Sparks & Flames" to one styled, "high thermal event."

69.     The first system to catch fire occurred in December 2006, at Cox facilities in Kansas. The second system to burn was at Time Warner, Santa Monica in July 2007.   As reported, the cause of these fires had to do with the radial connectors on the backplate.  Apparently, if boards were not put in correctly, connectors could be crushed and shorts could occur.  This shorting also prevented the board from "failing over" to another board.  Despite the fact that this design defect affected every

chassis, Defendants instructed field operatives to replace the defective parts. However, because tolerances in these units were very tight, additional errors only resulted in further damage to the unit. In the end, field operations were abandoned and additional units were shipped back to the factory.

70.     This Senior Network Support Engineer confirmed that Kaufman was fired, and replaced by Holobinko, immediately prior to the IPO in response to BigBand's inability to cure material quality control problems. According to this former Senior Network Support Engineer, upon taking control over this division, Holobinko immediately delayed the sale and marketing of BigBand's latest version of Cuda because of its many problems and overall system instability, and immediately suggested work on an entirely new version, styled the "stabilization release" – which would not be released until all major operability problems were resolved.

71.     The information gathered from these three engineers is further supported by the statements of another former long-term employee who worked as an account manager from 2000, until BigBand's employee purge in October 2007. This Cuda CMTS Account Manager, who handled the Cox account, reported to Scott Loveland (Program Director), who also reported to David Heard (current COO), who in turn reported to Defendant Bassan-Eskenazi, also stated that:

- Despite the fact that Multiple System Operators ("Moss") constantly required new features, by the time of the IPO, BigBand "lacked resources" necessary to allow the engineering group to successfully add features and, instead, BigBand was "chasing features," unsuccessfully, in an effort to achieve product parity with the major product suppliers, such as Cisco and Motorola.

- Immediately prior to the IPO, upon joining the Company, Holobinko determined that so many problems existed in BigBand's then most recent version of Cuda, that he stopped release of this product and immediately attempted to resolve all "Priority 1" and "Priority 2" operability problems, or "bugs." In fact, upon taking control over the CMTS operations immediately prior to the IPO, it was also reported that Holobinko even demanded that a stabilized version immediately be created to resolve these problems.

- Prior to the IPO and thereafter, faulty software imbedded in the Cuda CMTS product was resulting in very high returns – well above plan. Also, prior to the IPO, BigBand was well aware that customers were awaiting the introduction of new DOCSIS 3.0 compliant products, and that too was causing them to delay purchase of the Company's DOCSIS 2.0 compliant products.

72.    Another former long-term Sales Director who was responsible for world-wide sales of Cuda CMTS products, who worked at BigBand from late 2004 until October 2007, and who reported to John Collins (Sr. Director of World-Wide Operations), who in turn reported to Jeff Lind Holm (current, Vice President of Sales), who in turn reported to David Heard (Chief Operating Officer), who in turn reported to Defendant Bassan-Eskenazi, also confirmed that:

- At the time of the IPO, BigBand was having problems meeting customers' requirements for CMTS, and were unable to provide features they demanded, or keep pace with innovations offered by larger, better capitalized and more well-established competitors.

- At the time of the IPO, in addition to attempting to play catch-up by unsuccessfully adding new features to a system that was already fraught with operability problems, BigBand could not win any new markets because the ***Cuda CMTS products were "commodities."***

- At the time of the IPO, because of the problems inherent in the Cuda CMTS products, ***BigBand was "not counting on CMTS volume to grow***," it was focused only on retaining existing customers, and any growth in this product segment was wholly dependent upon the growth in its customers' client base to increase its own product and sales volume.

73.    This former Sales Director also prepared sales forecast "roll-up" reports, on a monthly basis.  These reports indicated whether the sale was from CMTS or switched digital, the amount of the sale, when it would book, and the specific customer's name.  This report was regularly presented to John Collins.  In addition to the monthly reports, this former Sales Director also provided quarterly reports that incorporated similar sales forecasts and reported closings.  These quarterly reports were presented in planning sessions attended by David Heard, Jeff Lindholm and Ralph Rondinone (current Sr. Vice President Manufacturing), where another document referred to as the "Plan of Record" was created and then provided to Defendant Bassan-Eskenazi.

74.    In addition to the interview provided by this former Sales Director, a former Senior Business Analyst, who was hired by BigBand immediately after the IPO and who continued working at the Company until May 2008, and who formerly reported to this aforementioned former Sales Director, stated that after the October 2007 lay-offs, he explained *there had been a "top-down" plan that didn't support the "top down" plan which was in the prospectus for the IPO*.  This is fully

1   consistent with what is now known about BigBand – that Defendants had secretly changed the

2   Company's business plan, and had adopted a "bottoms-up" expansion that extended BigBand well

3   beyond its resources or abilities.

4       75.    **Excess and Obsolete CMTS Inventory.**  At the time of the IPO, pursuant to the

5   Generally Accepted Accounting Principles ("GAAP"), it was necessary for BigBand to account for

6   material losses related to excess and obsolete inventory held in its CMTS subsidiary.  However, had

7   Defendants properly reported CMTS inventory impairments prior to the IPO, as required by GAAP,

8   this would have resulted in a material adverse impact on BigBand's earnings – of at least

9   approximately $5 million.

10      76.    The materiality of this $5 million inventory impairment, prior to the IPO, cannot be

11  understated.   During 4Q:06, the last reported quarter immediately prior to the IPO, Defendants

12  reported inventory of $7.153 million, with finished goods inventory of $5.190 million, an amount

13  equal to 12.6% and 9.2% of total product revenues, respectively.  Despite the fact that the inventory

14  impairment at the time of the IPO was equal to the entire amount of the Company's finished goods

15  inventory, and accounted for almost 10% of total product revenues, at the time of the IPO the

16  Company's financial statements failed to reflect this impairment, or risk of excess or obsolete

17  inventory, through reserves or charges against income – as required by GAAP and BigBand's own

18  internal accounting policies.

19      77.    At the time of the IPO, BigBand's CMTS business was already failing, the market

20  value of inventory had deteriorated substantially below cost, and Defendants violated GAAP for

21  inventories by failing to take a charge against earnings.  In fact, by the time of the IPO, as

22  Defendants ultimately admitted, the Company's CMTS products presented no significant

23  technological improvements for customers, or competitive advantages to the Company.  Indeed,

24  BigBand's CMTS products these were merely "commodity" products that competed on the basis of

25  price alone.  Furthermore, because potential customers could, and did, buy similar products for the

26  same price or less, from the companies that had previously sold them their basic architecture and

27  platform products, they were not buying similar products from BigBand.

28

CONSOL. CLASS ACTION COMPL. FOR VIOLATION OF
SECURITIES LAWS – NO. 07-cv-5101 SBA            - 29 -
001922-12 242376 V1

78.    At the time of the IPO, all of the foregoing factors existed and their adverse impact on the Company's inventory also existed.  None of these factors suddenly emerged in the first three quarters of 2007.  Despite the impaired condition of the Company's inventory at the time of the IPO, Defendants continued to carry BigBand's inventory on its financial statements at inflated values – the effect of which was to overstate inventory, margins, earnings and net income.

79.    Pursuant to GAAP section Accounting Research Bulletin No. 43 ("ARB 43"), Defendants were required to write down the impaired value of the Company's CMTS inventory prior to the IPO, for the following reasons, among others:

> A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as its cost.  Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period.  This is generally accomplished by stating such goods at a lower level commonly designated as market.

ARB 43, Chapter 4, Statement 5.

80.    Similarly, the charge to earnings was also required prior to the IPO because, as stated in the IPO Prospectus, BigBand disclosed that it purported to have in place the following policy regarding its inventory:

> Inventories are stated at the lower of cost or market.  Cost is determined on the first-in, first-out method.  We provide for excess and obsolete inventories after evaluation of historical sales and usage, current economic trends, market conditions, product rationalization, forecasted sales, product lifecycle and current inventory levels.  Provisions for excess and obsolete inventory are recorded as cost of net product revenues.  This evaluation requires us to make estimates regarding future events in an industry where rapid technological changes are prevalent.  It is possible that increases in inventory write-downs may be required in the future if there is a decline in market conditions or if changes in expected product lifecycles occur.

BigBand, Registration Statement (form 424B4), at 35.

81.    GAAP also requires that an estimated loss from a contingency – such as the utility of inventory – "shall be accrued by a charge to income," if: (i) information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (ii) the amount of the loss can be reasonably

1    estimated.  Statement of Financial Accounting Standards ("SFAS") No. 5 Accounting for

2    Contingencies, ¶ 8 (Mar. 1975).  SFAS No. 5 also requires that financial statements disclose

3    contingencies when it is at least reasonably possible (e.g., a greater than slight chance) that a loss

4    may have been incurred.  The disclosure shall indicate the nature of the contingency and give an

5    estimate of the possible loss, a range of loss or state such an estimate cannot be made.

6         82.    The SEC considers the disclosure of loss contingencies to be so important to an

7    informed investment decision that it promulgated Regulation S-X, which provides that disclosures in

8    interim period financial statements may be abbreviated and need not duplicate the disclosure

9    contained in the most recent audited financial statements, except that, "where material contingencies

10   exist, disclosure of such matters shall be provided even though a significant change since year end

11   may not have occurred." 17 C.F.R. § 210.10-01.  In addition, Concepts Statement No. 5 states, "[a]n

12   expense or loss is recognized if it becomes evident that previously recognized future economic

13   benefits of an asset have been reduced or eliminated . . . ."

14        83.    Here, it is undisputed that the utility of the Company's CMTS inventory was no

15   longer as great as its cost, and that its value had deteriorated materially as a result of the

16   obsolescence of this product.  In fact, Defendants have admitted this already by forcing BigBand to

17   record a $5 million impairment charge in 3Q:07.  It is also indisputable that the failure to record a

18   charge to inventories on a timely basis violated the IPO Prospectus disclosure stating that Defendants

19   had already evaluated the value of all inventory and that necessary charges for obsolete inventory

20   had already been taken.

21        84.    As further evidence that Defendants were required to write down the value of

22   impaired inventory prior to the IPO, at the time they belatedly announced the write-off of $5 million

23   of impaired inventory, in the 3Q:07, Defendants blamed a series of factors that all existed prior to the

24   IPO, including that: (i) BigBand could not convince customers to abandon their existing relationships

25   with the Company's bigger competitors and purchase CMTS products from BigBand; (ii) the

26   Company's CMTS products presented no significant technological improvements for customers or

27   competitive advantages to the Company; and (iii) Cable operators had been absorbing the large 2006

28   purchases and thus were not making new purchases in 2007.

85.     As a result of the foregoing, at the time of the IPO, it was clear that information was available indicating that the CMTS inventory was, or probably would be, impaired and the amount of the impairment was readily estimated – at least $5 million.  Accordingly, disclosure should have been made to indicate the nature of the inventory impairment contingency, and an estimate of even the "possible loss," and at least a "range of loss" should have been provided – or if such an estimate could not be provided, Defendants were obligated to explain why.   Here, there was no question that, at the time of the IPO, it had already become evident that previously recognized future economic benefits of the CMTS inventory had been reduced, or eliminated.

**C.      Materially False Statements Regarding Other Business**

86.     In addition to the undisclosed failure of the Company's CMTS Cuda business – or possibly as a result of it – also prior to the IPO, BigBand had secretly changed its business plan from controlled and measured growth built upon leveraging sales, to the execution of a "*land-grab*" business plan, where the Company was attempting to extend itself well beyond its resources or abilities.  Thus, in addition to omitting to reveal this over-leveraged business strategy, the description of BigBand's sales strategy provided in the IPO Prospectus was not true or accurate.  In fact, the IPO Prospectus created the false impression that BigBand was committed to a strategy that would attempt to leverage its platform installations by accelerating new product introductions to existing customers.[8]

87.     Rather than disclose that the Company had adopted a "land-grab" deployment strategy, the IPO Prospectus states in a section that purported to explain the "key elements" of BigBand's business strategy, that BigBand was engaged in establishing foothold locations and then immediately leveraging these customers by test-marketing other applications and modules that could be deployed quickly, and that were custom tailored to accommodate the Company's basic platform architecture.  As evidence of this, the IPO Prospectus stated, in part, the following:

---

[8]     One advantage of the leveraged plan was that it foreseeably would have allowed BigBand to generate more consistent revenues over a shorter period of time.  Also, as compared to a "land-grab," where no follow-on revenues would reasonably be expected for an extended period of time, the leveraged model also presented a lower risk of interoperability and higher gross margins.

CONSOL. CLASS ACTION COMPL. FOR VIOLATION OF
SECURITIES LAWS – NO. 07-cv-5101 SBA
001922-12 242376 V1

- 32 -

- • ***Leverage Modular Architecture to Accelerate New Product Introduction.*** **We have created a series of media processing software modules that, when combined with our programmable hardware and switching fabric, serve as the foundation for a range of network-based product applications.** The competition between cable operators and telephone companies is accelerating the rate of change in their networks, and **we believe our software modules will serve as the foundation for rapidly delivering solutions that address our customers' bandwidth and service delivery needs.**

- • ***Expand Footprint Within Existing Customer Base.*** We are intensely customer focused. we have customer relationships with a number of service providers both in the United States and internationally, including six of the ten largest service providers in the United States. We believe these customer relationships give us a strong advantage in understanding our customers' network challenges and delivering timely solutions, as we did with our Switched Broadcast product application. ***We will continue to work closely with our customers on the designs of their network architectures and emerging services, expand our relationships with these customers to deploy more of our existing applications, and develop and deliver new applications to address their network challenges.***

  *      *      *

- • ***Broaden Addressable Advertising Capabilities.*** We currently enable service providers to insert video advertisements targeted to subscribers in specific geographic zones. ***We intend to collaborate with our customers to continue developing and deploying next-generation advertising solutions*** and are currently in field trials with a leading cable operator for the delivery of ads tailored down to the individual subscriber level.

BigBand, Registration Statement (form 424B4), at 55.

88.     The false statements regarding BigBand's strategy were further reflected in the IPO Prospectus, where BigBand described its purported competitive strengths and the purported advantages provided by its platforms and technologies. In this regard, the IPO Prospectus also stated, in part, the following:

### Competitive Strengths Of BigBand

We have core expertise in media processing, communications networking and bandwidth management. We hold 26 U.S. patents, 16 of which relate to our video products and ten of which relate to our data products. ***Our expertise in emerging technologies, such as switched broadcast, and*** our customer relationships with large service providers are key strengths *that enable us to gain greater insight into the network requirements of our customers.* ***Leveraging this***

> ***expertise, we combine our fully programmable hardware and modular software architecture to deliver product applications designed to meet service provider needs for intelligent, high-bandwidth networks.*** Our products are interoperable with a broad range of content and services in various parts of a service provider's network. Further, we believe our product applications decrease our customers' total cost of ownership, reduce their time-to-market with new services and improve their ability to achieve more efficient bandwidth utilization.

BigBand, Registration Statement (form 424B4), at 3.

*     *     *

### Platforms And Technologies

> Our intelligent, Network-based product applications are built on an architecture that combines modular software with extensible video and data hardware platforms. ***Our modular software architecture enables us to more quickly and cost effectively develop new features and products. Our hardware platforms offer field-upgradeable hardware, high-speed switching and routing with general-purpose processing capabilities in a chassis-based design. This hardware and software approach provides our customers with rich media processing capabilities in a carrier-class hardware configuration that can be extended across multiple network locations and, as needed, to accommodate more services and more subscribers***.

*Id.,* at 57.

89.     The statements regarding BigBand's purported business strategy can not be read alone, without taking account of the statements in the IPO Prospectus that addressed its sales operations.  Accordingly, the statements regarding BigBand's purported "sales cycle" make it very clear to investors that the Company had adopted a dually focused approach to its business, whereby it would create, install and inaugurate its systems platforms, *and then* continue to sell those customers additional higher margin advanced applications and plug-in module products.

90.     Based on the representations in the IPO Prospectus, that Defendants would immediately seek to leverage its revenues by marketing, testing and selling additional products to existing customers, the IPO Prospectus conditioned investors to expect a sales cycle that extended from about *9 to 18 months – including the test-market and up-sell period*.  Moreover, revenue was

1    also recognized and/or recorded as "Deferred Revenues" based, in substantial part, on estimates,

2    assumptions and disclosures related to this 9 to 18 month cycle.[9]

3        91.    It is clear from the description of the Company's purported 9 to 18 month sales cycle

4    that the IPO Prospectus did not disclose the existence of any "land-grab" plan, but instead, the

5    ordered and progressive roll-out of its products and services, first to new customers and then in

6    significant part to existing customers.  As evidence of this, the IPO Prospectus further stated, in part,

7    the following:

> ***Our sales cycle for an initial customer purchase typically ranges from nine to eighteen months, but can be longer. This process generally involves several stages before we can recognize revenues*** on the sale of our products. As a provider of advanced technologies, [1] We seek to actively participate with our existing and potential customers in the evaluation of their technology needs and network architectures, including the development of initial designs and prototypes. [2] Following these activities, we typically respond to a service provider's request for proposal, configure our products to work within our customer's network architecture, and test our products first in laboratory testing and then in field environments to ensure interoperability with existing products in the service provider's network. [3] Following testing, our revenue recognition depends on satisfying complex customer acceptance criteria specified in our contract with the customer and our customer's schedule for roll-out of the product. Completion of several of these stages is substantially outside of our control, which causes our revenue patterns from a given customer to vary widely from period to period. [4] ***After initial deployment of our products, subsequent purchases of our products typically have a more compressed sales cycle***.

BigBand, Registration Statement (form 424B4), at 32.

*        *        *

> **The sales cycles of our products…usually involve:**
>
> •    a significant technical evaluation period;
>
> •    a significant commitment of capital and other resources by service providers;

---

[9]    Moreover, these assumptions and disclosures were also very important to investors given that the sales of applications and plug-in modules were higher margin products and were reasonably expected to result in higher blended gross margins along a more fluid and consistent revenue stream. Very significantly, the IPO Prospectus stated explicitly that, "[a]fter initial deployment of [BigBand's] products, subsequent purchases of … products typically have a more compressed sales cycle." BigBand, Registration Statement (form 424B4), at 32. It was the compressed sales cycle of the higher-margin, follow-on application and plug-in module sales that were expected to help BigBand drive revenues and profits, and sustain a high level of blended margins.

    •   substantial time required to engineer the deployment of new technologies or new video, voice and data services;

    •   substantial testing and acceptance of new technologies that affect key operations; and

    •   ***substantial test marketing of new services with subscribers***.

***For these and other reasons, our sales cycles generally have been between nine and eighteen months***, but can last longer. if orders forecasted for a specific customer for a particular quarter do not occur in that quarter, our operating results for that quarter could be substantially lower than anticipated . . . .

*Id.,* at 10.

92.    In addition to the foregoing, because Defendants had secretly adopted a hidden plan to focus exclusively upon expanding its foot-print, at the expense of cultivating the high margin revenue business from its existing client base and while over-extending the Company, other statements contained in the IPO Prospectus were also false and materially misleading.  Thus, while Defendants included risk disclosures in the IPO Prospectus that warned of possible revenue fluctuations, Defendants falsely characterized the reasons for such revenue "lumpiness" on conditions outside the Company's control – and not as a natural consequence of its changed business strategy.

93.    As stated above, another consequence of Defendants' undisclosed change of business plan was that it also created additional undisclosed risks regarding the foreseeable likelihood that BigBand would run into systems integrations problems that would further delay the recognition of Company revenues.  By engaging in its "*land-grab*" strategy, BigBand was entering into more development deals at an earlier stage in its overall business cycle, with more customers who had more diverse service delivery systems, and these actions were exposing BigBand to a greater risk that interoperability problems would result.  By concealing their change in plans, and that this change would foreseeably extend the Company's sales cycles well beyond the 9 to 18 months disclosed in the IPO Prospectus, Defendants were also able to – and did – prematurely recognize millions of dollars in revenue at the time of the IPO.

**D.     The IPO Prospectus Contained Untrue Statements Related to the Company's Earnings, Earnings Per Share, Assets and Stockholders' Equity**

94.     By concealing the changes in the Company's business model, Defendants also inflated BigBand's reported revenues, earnings, net income, gross margins and profits, that were presented in the IPO Prospectus.  In fact, Defendants were able to accelerate the recognition of millions of dollars of revenue, prior to the IPO, by adopting unreasonably short product cycle assumptions and disclosures, and by failing to model for the additional foreseeable interoperability issues and customization problems inherent in attempting to establish its much wider footprint.

95.     Generally Accepted Accounting Principles, or GAAP, are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Those principles are the official standards adopted by the American Institute of Certified Public Accountants ("AICPA"), a private professional association, through three successor groups it established:  the Committee on Accounting Procedure, the Accounting Principles Board ("APB"), and the Financial Accounting Standards Board ("FASB").

96.     As set forth in SEC 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).  Throughout the Class Period, Defendants knew that they were responsible for preparing financial statements that conform to GAAP.  As noted by AICPA professional standards:

> Financial statements are management's responsibility  .  .  .  . [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.  The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management . . . .   Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

AICPA Statements on Auditing Standards, AU §110.03, D*istinction Between Responsibilities of Auditor and Management*.

1      97.    **The IPO Prospectus Contained Untrue Statements Related to the Company's**

2  **Revenue Recognition Practices.**  Rather than comply with GAAP or the Company's own revenue

3  recognition policies, in connection with the IPO, Defendants improperly accelerated millions of

4  dollars of revenue in connection with BigBand's installation projects, and overstated earnings,

5  earnings per share and stockholders' equity.  Thus, in the face of longer sales cycles driven by its

6  undisclosed change in business strategy (and understanding that it was foreseeable that extending the

7  Company to the edge of its resources, and beyond, in an effort to too rapidly grow its footprint, was

8  and would continue to result in more software customization and interoperability problems), at the

9  time of the IPO, it was improper for Defendants to report millions of dollars in revenue that could not

10  reasonably be recognized for months or even years.

11      98.    Thus, for example, as early as in 2Q:07, the first full quarter reported immediately

12  after the IPO, the impact of Defendants' prior revenue recognition could first be seen, as estimated

13  billings plummeted by approximately $10.3 million, compared to 1Q:07 (never to return to the high

14  of $58.8 million).[10]  Indeed, in each of the subsequent quarters BigBand's estimated billings

15  continued to decrease.  As reflected in the table below, the decrease in billings in the 2Q:07 and

16  beyond, evidenced Defendants' prior improper acceleration of billings, and corresponding revenues,

17  at the time of the IPO, as follows:

|  | Mar 31, 2007 | Jun 30, 2007 | Sep 30, 2007 | Dec 31, 2007 |
|---|---|---|---|---|
| Net revenues |  |  |  |  |
| Products | $  45,656 | $  46,261 | $  29,942 | $  22,857 |
| Services | 7,178 | 8,202 | 8,608 | 7,807 |
| **Total net revenues** | 52,834 | 54,463 | 38,550 | 30,664 |
| Beginning deferred revenue | 50,602 | 56,583 | 48,477 | 58,224 |
| Less: |  |  |  |  |
| Ending deferred revenues | 56,583 | 48,477 | 58,224 | 67,288 |
| Increase (decrease) in deferred revenues | 5,981 | (8,106) | 9,747 | 9,064 |
| Estimated billings for the quarter | $  58,815 | $  48,477 | $  48,297 | $  39,728 |

[10]    This was also in spite of the fact that these dismal 2Q:07 results were also masked in part, by the $8.1 million reversal of deferred revenue, allowing the Company to show revenues consistent with the prior quarter.

CONSOL. CLASS ACTION COMPL. FOR VIOLATION OF
SECURITIES LAWS – NO. 07-cv-5101 SBA
001922-12  242376 V1

99.     GAAP permits the recognition of revenue from the sale of software products only if the following criteria are met: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred; (iii) the vendor's fee is fixed or determinable; and (iv) collectability of revenue is probable. Statement of Position 97-2 ("SOP 97-2"), *Software Revenue Recognition.*

100.     Moreover, in order for revenue to be recognized, it must be earned and realized or realizable. Concepts Statement No. 5*, Recognition and Measurement in Financial Statements of Business Enterprises*, ¶ 83. Revenues are earned when the reporting entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. Revenues are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash. Concepts Statement No. 5 ¶ 83. If collectability is not reasonably assured, then revenues should be recognized on the basis of cash received. Concepts Statement No. 5 ¶ 84g; *see also* Accounting Research Bulletin ("ARB") No. 43, (June 1943) Ch. 1A ¶ 1; Accounting Principles Board Opinion No. 10, *Omnibus Opinion-1966* (Dec. 1966) ¶ 12. If payment is subject to a significant contingency, then revenue recognition is improper. Statement of Financial Accounting Standards ("SFAS") No. 5, *Accounting for Contingencies* (Mar. 1975).

101.     Similarly, the SEC's Staff Accounting Bulletin ("SAB") No. 104, which sets forth the SEC Staff's views in applying GAAP to revenue recognition in financial statements, imposes the same prerequisites to the recognition of revenue as does SOP 97-2.

102.     Additionally, SOP 97-2 contains specific guidance on whether a company may recognize revenue from a software license sale at the time of the sale (that is, "immediately" or "upfront") or whether revenue must be deferred. Typically, arrangements with software companies consist of a number of elements, only one of which is the delivery of the actual software. Upgrades and enhancements of the software or Post Contract Support ("PCS") to customers' satisfaction are common additional elements of such arrangements. The guidance in SOP 97-2 is based on a fundamental accounting concept that, until the customer receives the essential value purchased, the vendor has not completed the earnings process.

103.    The IPO Prospectus represented to the investors, in pertinent part, the following related to revenue recognition:

> We derive net revenues from sales of our products and services. Product revenues consists of sales of our hardware and software products. Shipping charges, which have been insignificant to date, are included in product revenues, and the related shipping costs are included in cost of product revenue. Service revenues consists of customer support and maintenance, product installation and training activities.
>
> Software is essential to the functionality of our products. We provide software updates that we choose to develop, which we refer to as unspecified software updates, and enhancements related to our products through support service contracts. As a result, we account for revenue in accordance with Statement of Position, or SOP 97-2, Software Revenue Recognition as amended by SOP 98-9, Modification of SOP 97-2, Software Revenue Recognition, With Respect to Certain Transactions, for all transactions involving the sale of software.
>
> We recognize product revenue when all of the following have occurred: (1) we have entered into an arrangement with a customer; (2) delivery has occurred; (3) customer payment is deemed fixed or determinable and free of contingencies and significant uncertainties; and (4) collection is probable. Pricing is considered fixed or determinable at the execution of a customer arrangement, based on specific products and quantities to be delivered at specified prices.

BigBand, Registration Statement (form 424B4), at 34.

*       *       *

> Most of our products are sold in combination with customer support and maintenance services, which consist of software updates and product support. Software updates provide customers with rights to unspecified software updates that we choose to develop and to maintenance releases and patches released during the term of the support period. Product support services include telephone support, access to on-site technical support personnel and repair or replacement of hardware in the event of damage or failure during the term of the support period. Net revenues for support services are recognized on a straight-line basis over the service contract term, which is generally one year. ***Installation services and training services, when provided, are also recognized in service revenues when performed.***

*       *       *

> Revenue recognition requirements under SOP 97-2 are very complex. In applying our revenue recognition policy, we must determine which portions of our revenue are recognized currently and which portions must be deferred.

*Id.,* at 35.

104.    Additionally, the IPO Prospectus falsely represented that:

> We derive a significant portion of our net revenues from sales that include the network design, installation and integration of equipment, including equipment acquired from third parties to be integrated with our products to the specifications of our customers. **We base our revenue forecasts on the estimated timing to complete the network design, installation and integration of our customer projects and customer acceptance of those products.**

BigBand, Registration Statement (form 424B4), at 9.

105.    The IPO Prospectus contained untrue statements related to the Company's earnings, earnings per share and stockholders' equity, as a result of the Company improperly accelerating revenue in connection with its installation projects, despite problems encountered with software customization and interoperability, contrary to the guidance provided by GAAP.  In fact, Defendants ultimately admitted that: (i) the Company was not leveraging its installations, but was rather engaged in an accelerated expansion that pushed BigBand well beyond its resources and abilities and which was resulting in interoperability problems and customization delays; (ii) these interoperability problems and customization delays were having a huge, material adverse impact on revenues, earnings and profits; (iii) the inability to generate revenues and earnings as a result of the undisclosed change in BigBand's business plan would not allow the Company to achieve profitability or pre-IPO, normalized revenue growth, for at least three quarters or longer.

106.    Defendants' undisclosed change in business plan, along with its premature recognition of revenues, became obvious by the third and fourth quarter of 2007, when more revenue had to be deferred than could be recorded.  Thus, as a result of the inability of the Company to complete its projects (the natural result of its over-extending itself well beyond its resources or abilities), by 4Q:07, the current portion of deferred revenues, amounted to over 157.4% of actual revenues.  By that time, overall revenues had also fallen to only $22.875 million, less than 50% of any quarter reported since 4Q:06, with the exception of the preceding quarter.  By 3Q:07, receivables as a percentage of revenues also increased to over 101%, and this trend continued into the following quarter – further evidence that Defendants had accelerated the recognition of revenue previously, and that it was paying for that following the IPO.

**E.    Customer Concentration**

107.    The concentrated nature of BigBand's customer base made it impossible for Defendants not to be aware of the significant problems related to its CMTS Cuda business, and the challenges facing the Company's switched digital operations.  Demonstrating the extreme concentration of the Company's customer base, the IPO Prospectus stated, in part, the following:

> Due to the nature of the cable and telecommunications industries, *we sell our products to a limited number of large customers, which have varied over time. for the quarter ended December 31, 2006 and the years ended December 31, 2006, 2005 and 2004, we derived approximately 90%, 79%, 69% and 61% of our net revenues from our top five customers, respectively*. In 2006, Comcast, Cox, Time Warner Cable and Verizon each represented 10% or more of our net revenues. In 2005, Adelphia, Cox and Time Warner Cable each represented 10% or more of our net revenues. In 2004, Adelphia, Comcast, Cox and Time Warner Cable each represented 10% or more of our net revenues. We believe that for the foreseeable future our net revenues will be highly concentrated in a relatively small number of large customers . . . .

BigBand, Registration Statement (form 424B4), at 32.

*        *        *

> Customers with trade receivables balances of 10% or greater of the total trade receivables balances as of December 31, 2005 and 2006, and customers with net revenues of 10% or greater of net revenues for the years ended December 31, 2004, 2005, and 2006 are as follows:

| Customers | Percentage Of Total Trade Receivables As Of December 31, | | Percentage Of Net Revenues For The Periods Ended December 31, | | |
|---|---|---|---|---|---|
| | 2005 | 2006 | 2004 | 2005 | 2006 |
| A | *  % | *  % | 13  % | 37  % | *  % |
| B | * | 11 | 18 | 20 | 13 |
| C | * | * | 18 | * | 10 |
| D | 25 | 36 | 12 | 10 | 19 |
| E | 12 | 37 | * | * | 32 |
| F | 11 | * | * | * | * |

*   represents less than 10%

*Id.,* at F-11.

**F.    Insider Sales**

108.    Despite the fact that, by the time of the IPO, the Company's CMTS business was already failing, and Defendants had also already embarked on a course of business inconsistent with

the disclosures made in the IPO Prospectus, in connection with the March 2007 Offering, Company insiders – including certain of the Defendants named herein – sold material amounts of their privately owned BigBand shares to reap gross proceeds of over $62.465 million – including exercise of the Underwriters oversubscription option.  These insider share sales included, in substantial part, the following:

| Name of Beneficial Owner | Shares Beneficially Owned Prior to this Offering | | Number of Shares Being Offered [31] | Shares Beneficially Owned After this Offering [32] | |
| --- | --- | --- | --- | --- | --- |
| | Number | Percentage | | Number | % |
| **5% Stockholders**: | | | | | |
| Funds affiliated with Redpoint Ventures, L.P. 3000 Sand Hill Road, Bldg. 2, Suite 290 Menlo Park, CA 94025 | 12,999,757 | 25.8% | — | 12,999,757 | 22.5% |
| Funds affiliated with Charles River Partners, L.P. 1000 Winter Street, Suite 3300 Waltham, MA 02451 | 10,983,170 | 21.8 | — | 10,983,170 | 19.0 |
| Funds affiliated with Meritech Capital 245 Lytton Avenue, Suite 350 Palo Alto, CA 94301 | 4,915,556 | 9.8 | — | 4,915,506 | 8.5 |
| Funds affiliated with Evergreen Partners U.S. Direct Fund III, L.P. 96 Rothschild Blvd. Tel Aviv, Israel 65224 | 4,169,320 | 8.3 | 734,231 | 3,435,089 | 5.9 |
| Funds affiliated with Pilot House Ventures Lewis Wharf Boston, MA 02110 | 3,920,117 | 7.8 | 690,347 | 3,229,770 | 5.6 |
| Funds affiliated with Cedar Funds 1050 Winter Street, Suite 2700 Waltham, MA 02451 | 2,997,603 | 6.0 | 446,229 | 2,551,374 | 4.4 |

| Name of Beneficial Owner | Shares Beneficially Owned Prior to this Offering | | Number of Shares Being Offered [31] | Shares Beneficially Owned After this Offering [32] | |
| --- | --- | --- | --- | --- | --- |
| | Number | Percentage | | Number | Percentage |
| **Directors and Executive Officers:** | | | | | |
| Amir Bassan-Eskenazi | 2,673,508 | 5.2% | 220,024 | 2,453,484 | 4.1% |
| Frederick Ball | 343,905 | * | — | 343,905 | * |
| Ran Oz | 2,652,767 | 5.2 | 361,131 | 2,291,636 | 3.9 |
| Robert Horton | 82,396 | * | — | 82,396 | * |
| John Connelly | 277,605 | * | — | 277,605 | * |
| Lloyd Carney | 13,437 | * | — | 13,437 | * |
| Dean Gilbert | 219,645 | * | 11,007 | 208,638 | * |
| Ken Goldman | 13,750 | * | — | 13,750 | * |
| Gal Israely | 2,997,603 | 6.0 | 446,229 | 2,551,374 | 4.4 |
| Bruce Sachs | 10,983,170 | 21.8 | — | 10,983,170 | 19.0 |
| Robert Sachs | 15,937 | * | — | 15,937 | * |
| Geoffrey Yang | 12,999,757 | 25.8 | — | 12,999,757 | 22.5 |
| All executive officers and directors as a group | 33,273,480 | 62.7% | 1,038,391 | 32,235,089 | 53.2% |

(12 persons)

| Other Selling Stockholders: | | | | | |
|---|---|---|---|---|---|
| Time Warner, Inc. | 2,045,042 | 4.1 | 360,140 | 1,684,902 | 2.9 |
| Gary Lauder | 1,116,072 | 2.2 | 125,000 | 991,072 | 1.7 |
| Funds affiliated with Star Ventures | 916,172 | 1.8 | 159,324 | 756,848 | 1.3 |
| Oro Sociedad Anonima | 200,000 | * | 8,805 | 191,195 | * |
| Seth Kenvin | 167,584 | * | 29,864 | 137,720 | * |
| Paul Kagan | 100,000 | * | 17,610 | 82,390 | * |
| Barry Kaplan | 100,000 | * | 17,610 | 82,390 | * |
| High Street Investors | 32,198 | * | 5,670 | 26,528 | * |
| Bernd Girod | 32,198 | * | 5,670 | 26,528 | * |
| Robert Clark Fowler, Jr. [11] | 15,286 | * | 1,930 | 13,356 | * |
| Stephanie Jean Fowler [12] | 13,674 | * | 1,647 | 12,027 | * |
| Haim Bassan-Eskenazi [13] | 7,823 | * | 375 | 7,448 | * |
| Ruth Bassan-Eskenazi [14] | 7,823 | * | 375 | 7,448 | * |
| Sarit Yaffe [15] | 7,823 | * | 616 | 7,207 | * |
| Nir Yaffe [6] | 7,823 | * | 616 | 7,207 | * |
| Freda Family Trust [16] | 3,220 | * | 567 | 2,653 | * |
| Dror Amir [17] | 1,876 | * | 330 | 1,546 | * |
| Eli Borochov | 1,668 | * | 294 | 1,374 | * |
| Zohar Eliezri | 1,668 | * | 294 | 1,374 | * |
| Eliav Korakh | 1,668 | * | 294 | 1,374 | * |

BigBand, Registration Statement (form 424B4), at 91-92.

109.    Pursuant to the Underwriters' over-allotment option, additional BigBand shares were also sold by Company Insiders and Selling Stockholders, as follows:

| Selling Stockholders | Shares Subject to the Overallotment Option |
|---|---|
| Funds affiliated with Pilot House Ventures | 570,894 |
| Funds affiliated with Evergreen Partners U.S. Direct Fund III, L.P. | 315,769 |
| Time Warner, Inc. | 297,824 |
| NBT Ltd. (affiliated with Amir Bassan-Eskenazi) | 179,976 |
| Funds affiliated with Star Ventures | 131,756 |
| Oz Holdings Ltd. (affiliated with Ran Oz) | 38,869 |
| Seth Kenvin | 24,696 |
| Barry Kaplan | 14,563 |
| Sandalwood Investments II, L.P. (affiliated with Dean Gilbert) | 9,102 |

---

[11]    Mr. Fowler is the brother-in-law of Defendant Bassan-Eskenazi.

[12]    Ms. Fowler is the sister-in-law of Defendant Amir Bassan-Eskenazi.

[13]    Haim Bassan-Eskenazi is the father of Defendant Bassan-Eskenazi.

[14]    Ruth Bassan-Eskenazi is the mother of Defendant Amir Bassan-Eskenazi.

[15]    Ms. Yaffe is the sister of Defendant Bassan-Eskenazi, and Nir Yaffe is Ms. Yaffe's husband.

[16]    Julia Freda-Eskenazi, the wife of Defendant Amir Bassan-Eskenazi, is also the beneficiary of the Freda Family Trust.

[17]    Dror Amir is the cousin of Ran Oz, Executive Vice President and Chief Technology Officer.

*Id.,* at 94.

110.   **The Offering.**  As a result of the statements and omissions made by Defendants at the time of the IPO, demand for BigBand IPO stock far outstripped supply – and shares of the Company immediately traded up over 33% in the first day of trading.  Accordingly, after being priced at $13.00 per share, BigBand shares opened trading at $15.25, and traded up over $4.00 each to close the first day of trading at $17.31 per share.  With a total of 57 million shares outstanding, *BigBand closed its first trading day with a market capitalization of almost $1 billion.*

111.   Only one week after the BigBand IPO, as shares of the Company climbed over 35% higher than their Offering price, underwriters exercised their over-subscription option and purchased 1.605 million additional shares of common stock priced at $13.00 per share, for additional gross proceeds of $20.9 million.  Following this sale, in total, Company Insiders sold over $62.5 million of BigBand shares, and the Company sold over $97.5 million, for gross IPO proceeds of just under $160 million.

112.   Including shares sold pursuant to the underwriters' over-subscription agreement, Company insiders and selling stockholders sold BigBand shares, as follows: (i) Evergreen Partners $9,545,003; (ii) Pilot House Ventures $8,974,511; (iii) Cedar Funds $5,800,977; (iv) Time Warner, Inc. $4,681,820; (v) Amir Bassan-Eskenazi $2,860,312; (vi) Ran Oz $4,694,703; (vii) Dean Gilbert $143,091; and (viii) Gal Israely $5,800,977.

113.   Including shares sold pursuant to the underwriters' over-subscription agreement, the IPO Underwriter Defendants sold BigBand shares, as follows: (i) Morgan Stanley, $61,204,000; (ii) Merrill Lynch, $36,166,000; (iii) Jeffries & Co., $17,387,500; (iv) Cowen & Co., $13,910,000; and (v) ThinkEquity Partners, $10,432,500.

### VI.   THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF BIGBAND BEGINS TO BE DISCLOSED

114.   **Revised 2Q/07 Results Expected Below Estimates**.  Despite the controls and procedures that were purported to be in place at the time of the Offering and regardless of Defendants' claims that BigBand was operating according to its growth plan, on May 3, 2007 – within only six weeks of the IPO – Defendants revealed that the Company then expected results for

the second quarter to be below analysts' consensus estimates.   That day, the *Associated Press* reported, in part, the following:

> **BigBand Networks sees 2nd-quarter sales below analysts estimates**
>
> Digital video networking company BigBand Networks Inc. on Thursday gave second-quarter and full-year revenue estimates whose *low end was beneath Wall Street expectations.*
>
> *       *       *
>
> BigBand expects *second-quarter revenue to range from $52 million* to $56 million and *full-year revenue to range from $225 million* to $230 million.
>
> Analysts surveyed by Thomson Financial are expecting *second-quarter revenue of $55.7 million and full-year revenue of $230.3 million.*
>
> *       *       *
>
> Shares of BigBand fell $3.03, or 14 percent, to $18.40 in aftermarket electronic trading after closing at $21.43, up $1.13. The company's shares have traded between $16.30 and $21.63 since they began trading in mid-March.

115.    Later on May 3, 2007, when BigBand hosted a conference call for analysts and investors, and after they opened up the call to questions, Defendants explained that the lowered revenue guidance for 2Q:07 was *not* the result of any fundamental problems facing the Company, but were rather related to simple revenue deferral issues, and that such sales would be recovered in the following quarter.   In this regard, Defendant Bell stated, "Yes. It's the timing of revenue recognition and the full release of the product . . . I wouldn't read into it as being dramatic.  But it is, clearly, trending in the right direction."

116.    Following the publication of the Company's release on May 3, 2007, and in response to its conference call hosted that day, shares of BigBand immediately declined, from a close of almost $21.50 per share that day, on trading volume of just over 800,000 shares, to a close of $18.85 the following trading day, May 4, 2007, on much greater volume, of over 1.875 million shares traded.

117.    **Disappointing 2Q:07 Results**. On August 2, 2007, shares of the Company declined 30% – falling approximately $4.00 per share to approximately $10.10 per share – after BigBand

posted revenue and earnings below consensus estimates.   According to a report by the *Associated Press*, "higher operating expenses, product and service costs and stock compensation weighed down results."  At that time, the Company reported earnings of $0.02 per share, significantly less than analysts' consensus estimates of $0.07 per share.

## VII.   THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF BIGBAND IS BELATEDLY DISCLOSED

118.   Following the publication of a release on September 27, 2007, in which Defendants announced results far below guidance, shares of the Company traded to below $6.00 – more than 50% less than the price at which BigBand shares were offered to the public only months before in the March 2007 IPO.  At that time, Defendants revealed that quarterly revenue was expected to be as low as $35 million, compared to analyst mean estimate of $56 million, and that the Company would post an operating loss, compared to consensus estimates of a profit of ($0.06) per share.

119.   At that time, Defendants also published a release which admitted, for the first time, in part, the following:

> BigBand Networks, Inc., (NASDAQ:BBND) today revised its revenue outlook for the third quarter ending September 30, 2007. ***The Company now expects to report revenue for the third quarter in the range of $35 to $39 million, which is below the Company's previous guidance of $54 to $58 million.***

> The lower revenue outlook is due to several coincident factors. BigBand has been ***deploying switched digital video across an expanding number of customers and configurations. Some of these ongoing deployments have required more software customization and integration than originally expected***. This impacted the Company's ability to recognize switched digital revenue for some deployments in the third quarter. The Company ***also experienced slowdown in Telco-TV revenue***, as its ***major customer worked through some previously purchased inventory***. Finally, the Company experienced ***continued softness in its data business. As a result of lower revenue expectations, BigBand expects to report an operating loss for the third quarter of fiscal year 2007***.

120.   Following the publication of this release, shares of BigBand immediately collapsed to below $6.00 each, the stock finally closed at $6.40 per share, a one day decline of $2.67, or almost 30 % per share, or more than 50% less than the price at which BigBand shares were offered to the public only months before in the March 2007 IPO.  This also represented a decline of over 70 %, from the Class Period high of over $21.00 per share reached in May 2007.

121.    During the conference call later that day, Defendants Bassan-Eskenazi and Ball

provided additional insight into the issues surrounding the weakness at BigBand, as follows:

> BASSAN-ESKENAZI: Hello and thank you for joining us on short
> notice. As you know from our press release earlier today, we revised
> our outlook for the third quarter to reflect weakness in certain parts of
> our business. ***For the third quarter, we now expect to report revenue
> in the range of $35 million to $39 million, which is below our
> original guidance of $54 million to $58 million***. Our revised guidance
> for the third quarter of '07 reflects two primary issues, which are
> impacting our business -- transition issues with our video business and
> softness in our data business. I will now discuss both.
>
> *    *    *
>
> ***On the switched digital video side, we are experiencing longer sales
> in deployment cycle than we previously expected, resulting in slower
> revenue growth in Q3***. As the pioneer and leader and in switched
> digital video, we continue and break new grounds with an expanding
> number of customers and configurations. ***This deployment brings new
> integration challenges, resulting in more software customization and
> interoperability testing than originally anticipated. This caused delay
> in customer acceptance in Q3. We expect these integration
> challenges to persist for a few quarters.***
>
> ***Number two -- softness in our data business. We are disappointed in
> the performance of our data business, which consists primarily of
> our Cuda CMTS and Modular CMTS products***. Our data revenues
> will fall short of our previous expectations. Despite our proven
> innovation, product accolades and what we believe is a better roadmap,
> ***we've so far failed to these translate these into revenue and footprint.
> In Q3, we lost a number of deals that we previously expected to win***,
> based on what we believe were mostly pricing-driven customer
> decisions.

Fair Disclosure Wire, *Q3 2007 BigBand Networks Preliminary Earnings Conference
Call,* Transcript 092707ar.750, Sept. 27, 2007.

122.    Later on this call, Defendants Ball and Bassan-Eskenazi provided additional insight

into the revenue shortfall at the Company, which appeared to be driven in material part by the

unexpected number of interoperability problems.  During the conference call, Defendants Bassan-

Eskenazi and Ball added, in part, the following:

> FRED BALL, CFO, BIGBAND NETWORKS, INC. The challenge is -
> - this is Fred ***-- the challenge we're having with some of the rev rec
> items is they're dependent on some interoperabilities, some
> configuration and we just haven't -- we're struggling with the timing
> of that. And I know, in one case, we had one system slip all the way
> into '08***. Not that we're not deploying it. We're just -- there's some
> interoperability, some configuration requirements that is causing us to

see that now in '08.  And so, it creates real challenges around predicting visibility when we're just trying to get Q3 buttoned up.

*Id.*

123.    The irony of the fact that Defendants' explanations raised almost as many questions as they answered was not lost on the analysts who participated on this call, or the investors that listened. Accordingly, upon hearing this explanation, Morgan Keegan & Co. analyst, Simon Leopold, stated, "Sure.  Now, this begs the classic question that somebody eventually is going to ask of sort of when did you know about this, given we are at the very end of the quarter and this is a pretty sizable miss. Why were you unable to provide an updated guidance maybe a little earlier?"

124.    In fact, regardless of Defendants' feigned surprise, the significant rise in interoperability problems in 3Q:07 was the natural result of attempting to start too many installations at the same time 9 to 12 months earlier, and it was the result of then embarking on a much higher risk business plan that did not seek to balance the interoperability installation risks against the security of revenue generation that could have been cultivated if BigBand had focused its limited resources, in substantial part, on sales of application and plug-in modules.  By secretly adopting a "land-grab" model, however, the higher margin shorter cycle revenue that could have been generated by cultivating existing customers was abandoned in favor of expanding the Company's footprint and, as a result, by 3Q:07 revenues had stalled and margins began to show evidence of erosion as inter-operability problems escalated – thereby undermining BigBand's ability to generate revenues and profits, or sustain favorable gross margins or receivables.

125.    While the negative effects of BigBand's secret change in business plan began to become obvious in 3Q:07, at the time of the September 27, 2007 conference call, Defendants had still not fully or adequately disclosed that they had switched to a "land-grab" business model.   On the call, however, Defendant Bassan-Eskenazi did reveal that the negative effects seen in 3Q:07 were expected to continue "cascading" into subsequent quarters.

126.    Following the pre-announcement of results for 3Q:07, uncertainty surrounded BigBand.  As further evidence of this, on October 18, 2007, Defendant Ball, then Chief Financial Officer of the Company announced his resignation – purportedly to "pursue personal interests."

127.    On October 30, 2007, Defendants reported results for 3Q:07, with a loss of $12.2 million, or $0.21 per share, down from a year-earlier profit of $1.58 million, or $0.03 per share. 3Q:07 revenues fell to $38.6 million, compared to $43.1 million reported in the year-ago period.  At that time, Defendants also revealed that, for 4Q:07, BigBand also expected to report a loss of at least $0.22 to $0.31 per share on revenues of only $27 to $33 million.  For 4Q:07, Defendants also announced that GAAP gross margins were anticipated to be in the range of 45% to 48%.

128.    In addition to lagging sales and eroding margins, at that time BigBand also announced purported "restructuring" charges of up to $5.0 million.  In connection with this purported restructuring, Defendants also announced that they would discontinue BigBand's Cuda high-speed data transmission product line, cut 15% of the Company's work-force, and abandon the CMTS platform in an effort to focus on digital video.

129.    That day, Defendants also published a release that summarized BigBand's "Business Outlook," in part, as follows:

Business Outlook

Based on current expectations, management provided the following outlook for its business in the fourth quarter of 2007:

• Net revenues are anticipated to be in the range of approximately $27 to $33 million.

• which includes approximately $0.4 million in stock-based compensation.

• GAAP operating expenses are anticipated to be in the range of $25.5 to 26.5 million, which includes approximately $2.5 million in stock-based compensation, $143,000 in amortization of intangibles and approximately $0.8 million in litigation-related expenses.

• Additionally, we expect to incur one-time charges associated with the restructuring of our business in the range of $3 to 5 million, which includes employee severance and lease termination costs.

*        *        *

• This equates to GAAP loss per share in the range of $0.31 to $0.22 and a non-GAAP loss per share in the range of $0.18 to $0.12.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

130.    It was in the conference call for analysts and investors hosted by the Company later the same day, October 30, 2007, that Defendants finally admitted that: (i) the CMTS was a "commodity" business in a legacy market where BigBand was never more than a small player, and the Company was never able to distinguish its products based on qualitative differences, as customers made purchasing decisions based on price, and to a lesser extent legacy relationships with the Company's larger competitors; and (ii) that BigBand was engaged in a "land-grab" business plan that was not producing sustained revenues or supporting gross margins and, contrary to Defendants' repeated statements, the Company was not focused on leveraging established customers so as to generate concentrated higher-margins from the sale of applications and modules.

131.    At that time, investors also first learned that the additional interoperability problems that BigBand had encountered beginning in 3Q:07, as BigBand was unable to complete system installations on schedule (and that impacted revenues and gross margins), was the direct consequence of this "land-grab" – where BigBand was racing to start installation projects, regardless of the fact that the Company was experiencing problems at projects already started, and regardless of the fact that BigBand lacked the resources to solve existing problems and complete existing systems, prior to seeking additional new business.  Similarly, at that time investors also learned that the change in BigBand's business was actually resulting in significantly longer sales cycles and that this was having an effect on revenue generation.

132.    In addition to the foregoing, despite the fact that little or nothing had changed in the mature CMTS market since the time of the BigBand IPO only months before, and also regardless of the statements that Defendants had made previously to the contrary, during the 3Q:07 conference call Defendant Bassan-Eskenazi first admitted BigBand's inability to increase market share in its CMTS business was the result of customers not viewing this technology as a triple-play or "convergence platform," but only a high speed data and voice transmission "commodity product."  Thus, while BigBand was selling CMTS assets, acquired from ADC in early-2004 (which assets were acquired previously by ADC in 2000), and while no significant changes had occurred in this "mature" legacy market since the time of the BigBand IPO, investors were surprised to learn that price alone was

CONSOL. CLASS ACTION COMPL. FOR VIOLATION OF
SECURITIES LAWS – NO. 07-cv-5101 SBA
001922-12  242376 V1

- 51 -

1    driving sales in this market, and that BigBand could not compete successfully with large competitor

2    suppliers who already had customer relationships that it did not possess.

3        133.    As evidence of the foregoing, during this conference call Defendant Bassan-Eskenazi

4    also stated, in part, the following:

5            All of our [CMTS Cuda] customers have incumbent vendors because
             of the point you brought up, the maturity of the market. And it would
6            cause decisions to get delayed. In a way at the end we realized that this
             is a mature market that is more driven by pricing and keeping the
7            system and securing the existing system to replacing them to create a
             path at this point for video over IP.
8
     Fair Disclosure Wire, *Q3 2007 BigBand Networks Earnings Conference Call – Final,*
9    Transcript 103007aw.727, Oct. 30, 2007.

10       134.    During the course of the 3Q:07 conference call Defendant Bassan-Eskenazi referred

11   to CMTS as "commodity product" not once, but at least twice.   First, in explaining customers'

12   reaction to the Company's decision to exit the CMTS platform space, Defendant Bassan-Eskenazi

13   admitted that, "we got out of the commodity portion of the CMTS stand alone [business]."   At that

14   time, Defendant Bassan-Eskenazi also admitted that a stand-alone CMTS product was virtually

15   superfluous, and that BigBand was already able to "leapfrog" over this product and enable the path to

16   video through other available products.

17       135.    Defendant Bassan-Eskenazi's confession – that BigBand was engaged in the high-risk

18   gamble of executing a "land-grab" business plan (and not fairing well) – came about only after an

19   astute analyst from Merrill Lynch, named Tal Liani, grilled Defendants Bassan-Eskenazi and Ball

20   over why the Company's prior sales to customers were not generating revenue in the quarters

21   following the initial delivery of the initial platform products, after BigBand booked large blocks of

22   revenue in 4Q:06 and 1Q:07 and, in the quarters following systems operability, were expected to

23   produce a stream of high-margin application and plug-in module sales revenue as this sales cycle

24   concluded.

25       136.    Ultimately, it was in response to this question, that Defendant Bassan-Eskenazi first

26   revealed the secret key to understanding the Company's operations – the adoption of the "land-grab"

27   strategy.  Accordingly, during this call Defendant Bassan-Eskenazi stated, in part, that:

28

CONSOL. CLASS ACTION COMPL. FOR VIOLATION OF
SECURITIES LAWS – NO. 07-cv-5101 SBA                 - 52 -
001922-12 242376 V1

AMIR BASSAN-ESKENAZI: Okay. There's a lot there. So let's organize this a little bit. On the SDV business *it's very much a footprint and expansion business* like your question pointed out. *At this point a lot of the attention is to winning new footprint* because once we win new footprint with more customers it provides the continued expansion that you related to.

\*        \*        \*

*And we're focused on growing more incremental systems and grabbing footprint. Part of our problem in Q3, as we discussed, relates exactly to that as we grab more footprint in more systems with more types of clients and what have you. Under different customers it actually creates delay in our ability to recognize revenue from any one of those systems.*

Fair Disclosure Wire, *Q3 2007 BigBand Networks Earnings Conference Call – Final,* Transcript 103007aw.727, Oct. 30, 2007.

137.    As a result of comments made by Defendant Bassan-Eskenazi during the October 30, 2007 conference call, investors also first learned that application and plug-in module product revenues would probably not even begin to make any material contribution to the Company's revenues until the second half of 2008, if not after.  As evidence of this, during this call Defendant Bassan-Eskenazi also stated, in part, the following:

So a big part of our differentiation is this ability to originally offer more application. The timing of which is hard to predict, and at this point we do not incorporate this in our short-term view. All our customers show great interest in advertising as a core part of their business model, and over time moving to addressable advertising using the two way network and what our platform enable them to do. Both on telco TV and on the cable side we think it's going to be a very important application but one that if it drives '08 revenues it's going to be in the second half and at this point is difficult to forecast.

Fair Disclosure Wire, *Q3 2007 BigBand Networks Earnings Conference Call – Final,* Transcript 103007aw.727, Oct. 30, 2007.

138.    As investors realized after the publication of these shocking and belated adverse admissions, the true but undisclosed negative conditions that existed at the time of the March 2007 IPO, and that continued to adversely impact the Company after that time include, in part, the following:

a.    At the time of the IPO, the Company had already recognized that it would not be able to successfully compete in the mature CMTS market because it could not gain market share,

1   it could not achieve profitability, it could not keep pace with innovations by competitors,

2   and it could not sell product that met customers' demands or expectations;

3   b.   Development of switched digital video products were not proceeding according to plan,

4   and Defendants were behind schedule on this roll-out because problems related to

5   necessary significant customization and software integration, were being compounded by

6   the Company's over-extended land-grab business approach;

7   c.   At the time of the IPO, delays related to Defendants' inability to successfully roll-out the

8   Company's switched digital video products, and undisclosed longer sales cycles also

9   caused or allowed Defendants to prematurely recognize revenues in violation of GAAP

10   and the Company's own revenue recognition policies and procedures.  Moreover, at the

11   same time, Defendants failure to properly write-down the value of its impaired CMTS

12   inventory on a timely basis, also had the effect of artificially inflating BigBand's net

13   income and earnings at the time of the IPO, also in violation of GAAP;

14   d.   At the time of the IPO, control deficiencies existed within the Company, and it is now

15   obvious that BigBand did not maintain the minimum standards of good Corporate

16   Governance or controls and procedures, as is required by the SEC and the Company's

17   own internal guidelines and standards of business conduct;

18   e.   As a result of the foregoing undisclosed problems that existed at the time of the IPO and

19   thereafter throughout the relevant period, guidance sponsored and/or endorsed by

20   Defendants was not reasonable or based on the true facts that existed at that time; and

21   f.   At the time of the March 2007 IPO, Defendants had *not* conducted an adequate due

22   diligence investigation into BigBand, that would have revealed many of the issues, and

23   that would most likely have prevented the sale of this Company to shareholders through

24   the public equity markets at that time, or at the inflated price at which these shares were

25   originally sold.

26   ## VIII.   CAUSATION AND ECONOMIC LOSS

27   139.   In connection with the March 2007 BigBand IPO, Defendants signed a materially

28   false and misleading IPO Prospectus and filed with the SEC and made available to shareholders a

materially false and misleading IPO Prospectus.  These filings were essential in allowing Defendants to complete the Offering of 10.7 million BigBand shares plus an additional 1.605 million over-subscription shares priced at $13.00 each, and raise over $159 million, and to create a public market for trading in Company stock, immediately thereafter.

140.    On September 28, 2007, however, after Defendants' prior misrepresentations and illegal and improper conduct came to be revealed and was apparent to investors, shares of BigBand declined to below $6.00 per share – evidence that the prior artificial inflation in the price of Company shares was eradicated.   As a result of their purchases of BigBand stock in connection with the IPO, including those who purchase shares traceable to the Offering in the public markets immediately thereafter, Lead Plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

141.    By improperly characterizing the Company's financial results and misrepresenting its prospects, Defendants presented a misleading image of BigBand's business and future growth prospects.  At the time of the IPO and thereafter during the relevant period, Defendants repeatedly emphasized the ability of the Company to introduce its new products and maintain its "growth trajectory," and to accelerate this plan once Defendants raised these additional funds through the public equity markets.  These claims caused and maintained the artificial inflation in BigBand's stock at the time of the March 2007 IPO, and thereafter until the truth about the Company was ultimately revealed to investors in the final trading days of September 2007.

142.    Defendants' false and materially misleading statements caused BigBand shares to trade at artificially inflated levels from the time of the March 2007 IPO, when they were offered at $13.00 per share, until such shares reached an all-time record trading high of over $21.00 per share in late-April 2007.

143.    On September 28, 2007, however, after investors learned the truth about the Company, and learned that Defendants could not operate the Company according to its growth plan, and was not successfully introducing its new products, such that 2007 results were *already* adversely impacted *prior* to the Offering, shares of the Company collapsed.  Defendants' belated disclosures had an immediate, adverse impact on the price of BigBand shares.

144.    The decline in BigBand stock price following the revelation of Defendants' belated disclosures on September 27, 2007, was a direct result that the nature and extent of Defendants' misrepresentations and omissions contained in the IPO Prospectus became known to investors, and to the market.  The timing and magnitude of BigBand's stock price decline the following day, when trading resumed, negates any inference that the losses suffered by Lead Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to Defendants' fraudulent conduct.

145.    With BigBand's shares continuing to trade at below $5.00 each, on October 30, 2007, Defendants also revealed that the effects of BigBand's change in business plan was continuing to adversely impact results of operations.  At that time, in addition to reporting a loss of $0.03 per share in 3Q:07, the Company also revealed that BigBand expected to report a loss of as much as $0.31 per share, on revenues of only $27 to $33 million for 4Q:07.  At that time, Defendants also reported that gross margins had declined precipitously, and that BigBand would close its CMTS business and fire 15% of its workforce.

146.    It was in the conference call for analysts and investors hosted by the Company later the same day, October 30, 2007, that Defendants finally admitted that the dramatic decline in results in 3Q:07 and 4Q:07 were the results of the adverse conditions that were impacting the Company prior to the IPO.  Defendant Bassan-Eskenazi admitted twice during that call that BigBand's CMTS products were "commodity products."

147.    BigBand share price declined 30% on September 28, 2007, as an immediate reaction to the publication of these belated disclosures.  Moreover, almost 7 million shares traded that day, many times the Company's near-term average trading volume.   The chart below evidences the artificial inflation in the price of BigBand stock at the time of the IPO, and the dramatic decline in the price of these shares following Defendants' belated disclosures, as follows:



148.    The economic loss, *i.e.* damages suffered by Lead Plaintiff and other members of the Class, was a direct result of Defendants' misrepresentations and omissions being revealed to investors, and the subsequent significant decline in the value of the Company's shares was also the direct result of Defendants' prior misstatements and omissions being revealed.

## IX.    CLASS ACTION ALLEGATIONS

149.    This is a class action on behalf of all persons who purchased BigBand shares, or traceable stock, pursuant to the March 2007 IPO Prospectus (the "Class"), excluding Defendants. Class members are so numerous that joinder of them all is impracticable.

150.    Common questions of law and fact predominate and include whether Defendants: (i) violated the Securities Act; (ii) whether the BigBand IPO Prospectus misrepresented material facts; and (iii) the extent of and appropriate measure of damages.

151.    Lead Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Lead Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

# X.     CLAIMS FOR RELIEF

## COUNT I

### For Violations of § 11 of the Securities Act Against All Defendants and § 15 of the Securities Act Against Defendants

152.     Lead Plaintiff incorporates each and every allegation above as if stated herein.

153.     The Individual Defendants each signed BigBand's IPO Prospectus and/or filed that IPO Prospectus with the SEC and distributed it to investors.  The Underwriter Defendants each permitted their names to be included on the cover of the IPO Prospectus as the Underwriters.

154.     On or about March 15, 2007, the Defendants named in this Claim for Relief completed an IPO of 10.7 million shares of BigBand stock – in addition to 1.605 million shares allotted to Underwriters in an over-subscription option – at $13.00 per share, for total proceeds of at least $159 million.

155.     Each of the statements alleged herein relating to BigBand's prospects and financial results made in the March 2007 IPO Prospectus were false or misleading when issued.  The true but concealed facts were that BigBand was not able to effectively introduce its new products, and Defendants concealed this fact by stuffing its customers with excess BigBand product supply, and that the Company was already operating below its growth plan prior to the Offering which undisclosed conditions would, foreseeably, continue to hinder the Company in the near-term.  These omissions were a violation of SEC Regulation S-K, Item 303(a), which requires that trends which will have a material effect on a registrant's results be disclosed.

156.     All Defendants named in this Claim for Relief, with the exception of BigBand, the issuer (whose liability for the misstatements is absolute), owed to the purchasers of the stock, including Lead Plaintiff and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the IPO Prospectus at the time it became effective, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

157.     The officers and directors of BigBand who were signatories to the IPO Prospectus and the Underwriter Defendants were responsible for the preparation of the IPO Prospectus.  By virtue of

1    the material misrepresentations contained in the IPO Prospectus, Lead Plaintiff and the Class have

2    been damaged.

3        158.    By reason of the conduct herein alleged, each Defendant named in this Claim for

4    Relief violated § 11 of the Securities Act.  Defendants Bassan-Eskenazi and Oz, as well as certain of

5    the other Individual Defendants named herein, by reason of their stock ownership and positions with

6    BigBand, were controlling persons of BigBand and are liable under § 15 of the Securities Act.

7                                    **COUNT II**

8              **For Violations of § 12(A)(2) of the Securities Act Against All Defendants**

9        159.    Lead Plaintiff incorporates each and every allegation above as if set forth herein.

10       160.    For purposes of this cause of action, Lead Plaintiff expressly disclaims and excludes

11   any allegation that could be construed as alleging fraud or intentional or reckless misconduct as this

12   Cause of Action is based solely on claims of strict liability and/or negligence under the 1933 Act.

13       161.    Defendants were sellers, offerors, underwriters and/or solicitors of sales of the

14   BigBand shares offered pursuant to the March 2007 IPO Prospectus.

15       162.    The BigBand IPO Prospectus contained untrue statements of material facts, omitted to

16   state other facts necessary to make the statements made not misleading, and concealed and failed to

17   disclose material facts.  Defendants' actions of solicitation included participating in the preparation

18   of the false and misleading IPO Prospectus.

19       163.    Defendants owed to the purchasers of BigBand shares which were sold in the March

20   2007 BigBand Offering the duty to make a reasonable and diligent investigation of the statements

21   contained in the IPO Prospectus, to insure that such statements were true and that there was no

22   omission to state a material fact required to be stated in order to make the statements contained

23   therein not misleading.  These Defendants knew of, or in the exercise of reasonable care should have

24   known of, the misstatements and omissions contained in the Offering materials as set forth above.

25       164.    Lead Plaintiff and other members of the Class purchased or otherwise acquired

26   BigBand shares pursuant to and traceable to the defective IPO Prospectus.  Lead Plaintiff did not

27   know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions

28   contained in the IPO Prospectus.

CONSOL. CLASS ACTION COMPL. FOR VIOLATION OF                      - 59 -
SECURITIES LAWS – NO. 07-cv-5101 SBA
001922-12  242376 V1

1    165.    Lead Plaintiff, individually and representatively, hereby offers to tender to Defendants

2    those securities which Lead Plaintiff and other Class members continue to own, on behalf of all

3    members of the Class who continue to own such securities, in return for the consideration paid for

4    those securities together with interest thereon.

5    166.    By reason of the conduct alleged herein, these Defendants violated, and/or controlled

6    a person who violated, § 12(a)(2) of the Securities Act.  Accordingly, Lead Plaintiff and members of

7    the Class who hold BigBand shares purchased in the March 2007 Offering have the right to rescind

8    and recover the consideration paid for their BigBand shares and, hereby elect to rescind and tender

9    their BigBand shares to the Defendants sued herein.  Lead Plaintiff and Class members who have

10   sold their BigBand shares are entitled to rescissory damages.

11   167.    Less than three years elapsed from the time that the securities upon which this Count

12   is brought were sold to the public to the time of the filing of this action.  Less than one year elapsed

13   from the time when Lead Plaintiff discovered or reasonably could have discovered the facts upon

14   which this Count is based to the time of the filing of this action.

15                                    **XI.    PRAYER**

16   Wherefore, Lead Plaintiff prays for judgment as follows: declaring this action to be a proper

17   class action; awarding damages, including interest; and such other relief as the court may deem

18   proper.

19                              **XII.    JURY TRIAL DEMANDED**

20   Lead Plaintiff hereby demands a trial by jury.

21

22   Dated: May 30, 2008                    HAGENS BERMAN SOBOL SHAPIRO LLP

23
                                           By _____/s/ Reed R. Kathrein_____
24                                                    REED R. KATHREIN

25                                         Peter E. Borkon (212596)
                                           715 Hearst Avenue, Suite 202
26                                         Berkeley, CA 94710
                                           Telephone: (510) 725-3000
27                                         Facsimile: (510) 725-3001
                                           reed@hbsslaw.com
28                                         peterb@hbsslaw.com

CONSOL. CLASS ACTION COMPL. FOR VIOLATION OF
SECURITIES LAWS – NO. 07-cv-5101 SBA                    - 60 -
001922-12 242376 V1

1

2
Steve Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
3
Seattle, WA 98101
Telephone: (206) 623-7292
4
Facsimile: (206) 623-0594
steve@hbsslaw.com
5

6
Lewis Kahn (*Pro Hac Vice*)
KAHN GAUTHIER SWICK, LLC
650 Poydras Street, Suite 2150
7
New Orleans, LA 70130
Telephone: (504) 455-1400
8
Facsimile: (504) 455-1498
lewis.kahn@kgscounsel.com
9

10
Kim E. Miller
KAHN GAUTHIER SWICK, LLC
12 East 41st Street, 12 Floor
11
New York, NY 10017
Telephone: (212) 696-3730
12
Facsimile: (504) 455-1498
kim.miller@kgscounsel.com
13

14
Attorneys for Lead Plaintiff and the Proposed Class

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on May 30, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

/s/ Reed R. Kathrein

REED R. KATHREIN

# Mailing Information for a Case 4:07-cv-05101-SBA

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Keith E. Eggleton**
  keggleton@wsgr.com

- **Michael M. Goldberg**
  info@glancylaw.com

- **Lewis S. Kahn**
  lewis.kahn@kgscounsel.com

- **Lewis Stephen Kahn**
  lewis.kahn@kglg.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com,sf_filings@hbsslaw.com

- **Jeffrey W. Lawrence**
  jeffreyl@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com,GDarwish@csgrr.com

- **Freeda Yllana Lugo**
  flugo@wsgr.com,jjohnstone@wsgr.com

- **Joni L. Ostler**
  jostler@wsgr.com,rstrickland@wsgr.com,pbaird@wsgr.com,flugo@wsgr.com,keggleton@wsgr.com

- **Alan Roth Plutzik**
  aplutzik@bramsonplutzik.com

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

- **Rodney Grant Strickland , Jr**
  rstrickland@wsgr.com

- **Michael Carl Tu**
  mtu@orrick.com

## Manual Notice List

The following is the list of attorneys who are **not**
on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use
your mouse to select and copy this list into your word processing program in order to create notices or labels for
these recipients.

**James P. Cusick**
Orrick Herrington & Sutcliffe, LLP
666 Fifth Avenue
New York, NY 10103-001

**Gwyn Jones**
,

**Meredith K. Kotler**
Wilson Sonsini Goodrich & Rosati, P.C.
1301 Avenue of the America
40th Floor
New York, NY 10019