JAMES P. CUSICK (*ADMITTED PRO HAC VICE*)
ROBERT P. VARIAN (State Bar No. 107459)
REBECCA F. LUBENS (State Bar No. 240683)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    (415) 773-5700
Facsimile:    (415) 773-5759
*Emails:   jcusick@orrick.com*
         *rvarian@orrick.com*
         *rlubens@orrick.com*

MICHAEL C. TU (State Bar No. 186793)
TEODORA E. MANOLOVA (State Bar No. 233333)
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017-5855
Telephone:    (213) 629-2020
Facsimile:    (213) 612-2499
*Emails:   mtu@orrick.com*
         *tmanolova@orrick.com*

Attorneys for Defendants
Morgan Stanley & Co. Incorporated, Merrill Lynch, Pierce,
Fenner & Smith Incorporated, Jefferies & Company, Inc.,
Cowen & Company, LLC and ThinkPanmure, LLC, formerly
known as ThinkEquity Partners LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re BIGBAND NETWORKS, INC. SECURITIES LITIGATION | Master File No. 07-cv-5101-SBA |
| | CLASS ACTION |
| This Document Relates To: | **NOTICE OF MOTION AND MOTION TO DISMISS CLAIMS AGAINST UNDERWRITER DEFENDANTS IN PLAINTIFFS' CONSOLIDATED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| ALL ACTIONS. | |
| | Date:       December 9, 2008<br>Time:       1:00 p.m.<br>Judge:     Hon. Saundra B. Armstrong<br>Ctrm:      3, 3rd Floor |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................. 3

II.   THE COMPLAINT FAILS TO PLEAD AN ACTIONABLE MISSTATEMENT
      OR OMISSION ................................................................................................ 4

      A.    Key Legal Standards Governing This Motion ....................................... 4

      B.    Application Of The Controlling Standards To The Complaint Requires
            Dismissal On Multiple Grounds ............................................................ 6

      C.    Plaintiffs' Allegations That BigBand Engaged In A Contrary Business
            Model Fail To State A Claim ................................................................. 9

            1.    The Prospectus Does Not State That BigBand Would Exclusively
                  Pursue A Business Plan Based On Repeat Business............................. 10

            2.    BigBand's October 2007 Earnings Call Simply Restated The Dual-
                  Pronged Strategy Disclosed In The Prospectus ......................... 12

      D.    Plaintiffs' Allegations That The Prospectus Contained Material
            Misstatements Or Omissions Regarding CMTS Fail To State A Claim.............. 13

            1.    The Complaint, Prospectus And Earnings Call Contradict
                  Plaintiffs' Allegations ................................................................. 14

            2.    Dismissal Of The CMTS Claims Is Also Required Under The
                  "Bespeaks Caution" Doctrine ...................................................... 16

            3.    The Complaint's Puzzle-Style Pleading Fails To Allege Any Link
                  Between Statements In The Prospectus And Actual Facts ...................... 17

      E.    Plaintiffs Have Failed to Allege Material Misstatements Related To
            Purported Inaccuracies In BigBand's Financial Statements ................................. 18

            1.    Plaintiffs' CMTS Inventory Write-Down Assertions Are Baseless ......... 18

            2.    The Accounting Allegations Derived From The "Secret" Business
                  Plan Are Baseless............................................................................. 19

            3.    Plaintiffs Fail To Plead Any Corroborating Facts In Support Of
                  Their Accounting Allegations ........................................................... 21

            4.    Plaintiffs' Failure To Challenge BigBand's Independent Audits
                  And The Absence Of A Restatement Further Undercut Their
                  Allegations Of Accounting Improprieties............................................... 22

III.  PLAINTIFFS LACK STANDING TO BRING A SECTION 12(A)(2) CLAIM.............. 22

      A.    Lead Plaintiff's Certification Establishes That He Did Not Purchase Shares
            In The Initial Distribution .................................................................... 22

      B.    Plaintiffs Fail To Allege They Purchased Shares Directly From The
            Underwriter Defendants ....................................................................... 23

IV.   CONCLUSION ............................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955 (2007) ................................................... 2, 3, 5, 8

*Belodoff v. Netlist, Inc.,*
  2008 WL 2356699 (C.D. Cal. May 30, 2008) ................................................... 5, 8

*Blue Chip Stamps v. Manor Drug Stores,*
  421 U.S. 723 (1975) ................................................... 5

*Conley v. Gibson,*
  355 U.S. 41 (1957) ................................................... 5

*Dura Pharms., Inc. v. Broudo,*
  544 U.S. 336 (2005) ................................................... 5

*Gold v. Morrice,*
  2008 WL 467619 (C.D. Cal. Jan. 31, 2008) ................................................... 4

*Gustafson v. Alloyd Co., Inc.,*
  513 U.S. 561 (1995) ................................................... 23

*Hertzberg v. Dignity Partners, Inc.,*
  191 F.3d 1076 (9th Cir. 1999) ................................................... 23

*Holden v. Hagopian,*
  978 F.2d 1115 (9th Cir. 1992) ................................................... 5, 8

*In re Calpine Corp. Sec. Litig.,*
  288 F. Supp. 2d 1054 (N.D. Cal. 2003) ................................................... 5, 9, 14

*In re Connetics Corp. Sec. Litig.,*
  542 F. Supp. 2d 996 (N.D. Cal. 2008) ................................................... 17

*In re Daou Sys., Inc. Sec. Litig.,*
  411 F.3d 1006 (9th Cir. 2005) ................................................... 4

*In re Donald J. Trump Casino Sec. Litig.,*
  7 F.3d 357 (3d Cir. 1993) ................................................... 17

*In re GlenFed, Inc. Sec. Litig.,*
  42 F.3d 1541 (9th Cir. 1994) ................................................... 8

*In re iAsia Works, Inc. Sec. Litig.,*
  2002 WL 103404 (N.D. Cal May 15, 2002) ................................................... 8

# TABLE OF AUTHORITIES

**Page(s)**

*In re Infonet Servs. Sec. Litig.*,
 310 F. Supp. 2d 1080 (C.D. Cal. 2003) ............................................................ 4, 6

*In re Keegan Mgmt. Co. Sec. Litig.*,
 794 F. Supp. 939 (N.D. Cal. 1992) .................................................................. 7, 13

*In re Late Fee and Over-Limit Fee Litig.*,
 528 F. Supp. 2d 953 (N.D. Cal. 2007) ............................................................ 5, 9

*In re Leadis Tech. Sec. Litig.*,
 2006 WL 496039 (N.D. Cal. Mar. 1, 2006) ......................................................... 8

*In re Levi Strauss & Co. Sec. Litig.*,
 527 F. Supp. 2d 965 (N.D. Cal. 2007) ............................................................ 22, 23

*In re McKesson HBOC, Inc. Sec. Litig.*,
 126 F. Supp. 2d 1248 (N.D. Cal. 2000) ............................................................... 21

*In re Metropolitan Sec. Litig.*,
 532 F. Supp. 2d 1260 (E.D. Wash. 2007) ........................................................... 13

*In re Oak Tech. Sec. Litig.*,
 1997 WL 448168 (N.D. Cal. Aug. 1, 1997)......................................................... 17

*In re PEC Solutions Sec. Litig.*,
 2004 WL 1854202 (E.D. Va. May 25, 2004) ..................................................... 21

*In re Peerless Sys. Corp. Sec. Litig.*,
 182 F. Supp. 2d 982 (S.D. Cal. 2002) ................................................................ 21

*In re Silicon Storage Tech., Inc.*,
 2006 WL 648683 (N.D. Cal. Mar. 10, 2006)....................................................... 22

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
 160 F. Supp. 2d 1059 (N.D. Cal. 2001) ......................................................... 17, 18

*In re Stac Elecs. Sec. Litig.*,
 89 F.3d 1399 (9th Cir. 1996).................................................................... 4, 5, 16, 18

*In re Syntex Corp. Sec. Litig.*,
 1996 WL 518066 (9th Cir. Sept. 13, 1996) .......................................................... 4

*In re Verifone Sec. Litig.*,
 784 F. Supp. 1471 (N.D. Cal. 1992) .......................................................... 4, 7, 14

OHS West:260481344.1

iii

UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS; MP&A IN SUPPORT THEREOF
(MASTER FILE NO. 07-CV-5101-SBA)

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

*In re Worlds of Wonder Sec. Litig.*,
4      35 F.3d 1407 (9th Cir. 1994) ..................................................................... 6, 16

5

*Kaplan v. Rose*,
      49 F.3d 1363 (9th Cir. 1995) ............................................................... 4, 7, 13

6

*May v. Borick*,
7      1997 WL 314166 (C.D. Cal. Mar. 3, 1997) ................................................ 17

8

*Moore v. Kayport Package Express, Inc.*,
      885 F.2d 531 (9th Cir. 1989) ...................................................................... 23

9

*O'Sullivan v. Trident Microsystems, Inc.*
10      1994 WL 124453 (N.D. Cal. 1994) .............................................................. 4

11

*Osher v. JNI Corp.*,
12      256 F. Supp. 2d 1144 (S.D. Cal. 2003) ....................................................... 21

13

*Pinter v. Dahl*,
      486 U.S. 622 (1988) .................................................................................... 23

14

*Provenz v. Miller*,
15      102 F.3d 1478 (9th Cir. 1996) ..................................................................... 16

16

*Rubinstein v. Collins*,
17      20 F.3d 160 (5th Cir. 1994) ......................................................................... 16

18

*Smith v. Circuit City Stores, Inc.*,
      286 F. Supp. 2d 707 (E.D. Va. 2003) .......................................................... 22

19

*Sprewell v. Golden State Warriors*,
20      266 F.3d 979 (9th Cir. 2001) ..................................................................... 5, 8

21

*Steckman v. Hart Brewing, Inc.*,
22      143 F.3d 1293 (9th Cir. 1998) ..................................................................... 4, 7

23

*Vess v. Ciba-Geigy Corp.*,
      317 F.3d 1097 (9th Cir. 2003) ....................................................................... 8

24

*Warren v. Fox Family Worldwide, Inc.*,
25      328 F.3d 1136 (9th Cir. 2003) ....................................................................... 4

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## STATUTES

15 U.S.C.
    Section 77k(a) ................................................................................................ 4
    Section 77l(a)(2) ........................................................................................ 4, 23

## RULES

Federal Rules of Civil Procedure
    Rule 8 ................................................................................................... passim
    Rule 9(b) .............................................................................................. passim
    Rule 12(b)(6) .............................................................................................. 1

## TREATISES

Wright & Miller, *Federal Practice and Procedure* (3d ed. 2004)
    Section 1216 .............................................................................................. 5

1

## NOTICE OF MOTION AND MOTION

2  TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3          PLEASE TAKE NOTICE THAT on December 9, 2008 at 1:00 p.m., or as soon thereafter

4  as counsel may be heard, in the courtroom of the Honorable Saundra B. Armstrong, United States

5  District Judge, at 1301 Clay Street, Oakland, California, 94612, defendants Morgan Stanley & Co.

6  Incorporated ("Morgan Stanley"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill

7  Lynch"), Jefferies & Company, Inc. ("Jefferies"), Cowen & Company, LLC ("Cowen") and

8  ThinkPanmure, LLC (formerly known as ThinkEquity Partners LLC) ("ThinkEquity")

9  (collectively, the "Underwriter Defendants"), will and hereby do move this Court for an order

10  granting their motion to dismiss plaintiffs' Consolidated Class Action Complaint for Violation of

11  Securities Laws (the "Complaint").  The Underwriter Defendants' motion seeks dismissal of all

12  claims against them and is brought pursuant to Rules 8, 9(b) and 12(b)(6) of the Federal Rules of

13  Civil Procedure ("FRCP").

14          This motion is based upon this Notice and the accompanying Memorandum of Points and

15  Authorities; the Request for Judicial Notice in Support of the BigBand Defendants' Motion to

16  Dismiss Plaintiffs' Consolidated Complaint; the Declaration of Joni L. Ostler in Support of the

17  BigBand Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint; the

18  papers on file in the action; the argument of counsel at the hearing; and other such matters as may

19  be considered by the Court.  This motion is made following the conference of counsel for the

20  respective parties pursuant to the Standing Order of the Hon. Saundra B. Armstrong, which took

21  place on July 28, 2008.

22  ### ISSUES TO BE DECIDED (Civil Local Rule 7-4(a)(3))

23  1.      Whether plaintiffs' claims under Section 11 and Section 12(a)(2) of the Securities Act of

24          1933 (The "Securities Act") should be dismissed because:

25          a.      The Complaint fails to plead facts sufficient to establish that the Prospectus

26                  contained statements that were materially false or misleading.

27          b.      Plaintiffs' allegations mischaracterize, and are directly contradicted by, the

28                  Prospectus and other documents upon which the Complaint purports to be based.

c.      The Complaint's attempt to plead material misstatements is based on subsequent events and hindsight, not alleged facts that existed at the time the registration statement became effective.

d.      The charging allegations of the Complaint fail to satisfy the heightened requirements of Rule 9(b), which is controlling because plaintiffs' claims sound in fraud.

e.      Irrespective of the application of Rule 9(b), the Complaint's allegations are legally insufficient both under the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955 (2007), and under controlling Ninth Circuit standards, because they are based on conclusions and deductions that are unsupported, unreasonable and contradicted by the underlying documents.

f.      The alleged forward-looking misstatements are rendered nonactionable by the cautionary language and risk factors set forth in the Prospectus, and application of the "bespeaks caution" doctrine.

2.      Whether plaintiffs' Section 12(a)(2) claim should be dismissed because:

a.      The Lead Plaintiff did not purchase any shares in the initial distribution of stock.

b.      Plaintiffs have failed to plead they purchased shares directly from any of the Underwriter Defendants.

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.     INTRODUCTION**

3        Plaintiffs' claims arise out of the March 15, 2007 initial public offering ("IPO") of shares

4   of BigBand Networks, Inc. ("BigBand" or "Company") common stock.  Morgan Stanley, Merrill

5   Lynch, Jefferies, Cowen and ThinkEquity were the underwriters for the IPO.  Additional

6   background facts relevant to this motion are set forth in the motion to dismiss filed by BigBand,

7   Amir Bassan-Eskenazi, Ran Oz, Frederick A. Ball, Gal Israely, Dean Gilbert, Kenneth E.

8   Goldman, Lloyd Carney, Bruce I. Sachs, Robert J. Sachs, and Geoffrey Y. Yang (collectively, the

9   "BigBand Defendants"), in which the Underwriter Defendants hereby join and incorporate by

10  reference.

11       The core defect in the Complaint is that it is founded on (i) mischaracterizations of the IPO

12  Prospectus, (ii) litigation "spin" on documents that contradict the Complaint's pivotal allegations,

13  and (iii) conclusions that do not pass muster under the controlling legal standards.  Plaintiffs'

14  claims are legally deficient under the heightened pleading standards imposed by Rule (b).  They

15  further fail under the rules articulated by the Supreme Court in *Bell Atlantic Corp. v. Twombly* and

16  Ninth Circuit principles as applied by this Court.  These fatal defects are dispositive of all claims

17  asserted against the Underwriter Defendants, who appear to have been targeted as proverbial "deep

18  pockets."

19       All claims based on forward-looking statements -- which account for a majority of the

20  allegations in the Complaint -- fail for the additional reason that the Prospectus cautioned investors

21  against the very risks that resulted in BigBand's subsequent business setback.  Those warnings are

22  decisive under the "bespeaks caution" doctrine as applied by the Ninth Circuit.

23       The Section 12 claim should be dismissed at the threshold because, beyond other

24  shortcomings, the Complaint fails to plead facts that would confer standing on the Lead Plaintiff.

25  Moreover, the certification filed pursuant to the Private Securities Litigation Reform Act of 1995

26  conclusively demonstrates the absence of standing under Section 12.

27

28

1    **II.    THE COMPLAINT FAILS TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION**

2

3        **A.    Key Legal Standards Governing This Motion**

4        To state a claim under Sections 11 or 12(a)(2) of the Securities Act plaintiffs must plead

5    facts establishing that the Prospectus contained a statement that was either materially false, or

6    rendered materially misleading by virtue of an omission.  *See, e.g.*, 15 U.S.C. §§ 77k(a) &

7    77l(a)(2); *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1027 (9th Cir. 2005).  The statement

8    must be materially false or misleading at the time the registration statement becomes effective, and

9    in the context of the Prospectus read as a whole.  *See, e.g.*, *In re Stac Elecs. Sec. Litig.*, 89 F.3d

10   1399, 1409 (9th Cir. 1996); *In re Syntex Corp. Sec. Litig.*, 1996 WL 518066, at *5 (9th Cir. Sept.

11   13, 1996).  Plaintiffs cannot plead a claim in hindsight or by relying on statements that are taken

12   out of context or examined in isolation.  *See, e.g., Kaplan v. Rose*, 49 F.3d 1363, 1373 (9th Cir.

13   1995); *O'Sullivan v. Trident Microsystems, Inc.* 1994 WL 124453, at *4 (N.D. Cal. 1994).

14       Nor can plaintiffs fall back on block quotes or undifferentiated allegations that suggest the

15   Prospectus was inadequate.  To state a claim under Sections 11 or 12(a)(2), plaintiffs must "clearly

16   identify" specific statements alleged to be actionable, and "which of the factual allegations support

17   an inference that particular statements are false or misleading."  *Gold v. Morrice*, 2008 WL

18   467619, at *2 (C.D. Cal. Jan. 31, 2008).  The complaint must also "establish a link between a

19   misleading statement or implication in the prospectus and an actual fact, not a speculation about

20   the future, omitted from the document."  *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1484 (N.D.

21   Cal. 1992).

22       Perhaps most importantly, plaintiffs may not evade dismissal by mischaracterizing the

23   Prospectus or other documents cited in the complaint.  It is the documents -- not the complaint's

24   characterization of them -- that control.  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96

25   (9th Cir. 1998); *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003); *In re

26   Infonet Servs. Sec. Litig.*, 310 F. Supp. 2d 1080, 1087-88 (C.D. Cal. 2003).  Allegations that

27   conflict with the Prospectus are disregarded, and the Court may consider the full text of the

28   documents in evaluating plaintiffs' claims.  *Id.*; *In re Stac*, 89 F.3d at 1405.

1    As this Court has emphasized in the context of motions to dismiss Securities Act claims,

2  the absence of a scienter requirement does not permit plaintiffs to rely on unsubstantiated

3  conclusions or implausible assertions.  The Court may disregard "unreasonable inferences or

4  conclusory legal allegations cast in the form of factual allegations." *In re Calpine Corp. Sec.*

5  *Litig.*, 288 F. Supp. 2d 1054, 1074 (N.D. Cal. 2003) (Armstrong, J.); *see also In re Late Fee and*

6  *Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 957 (N.D. Cal. 2007) (Armstrong, J.) ("[C]onclusory

7  allegations of law, unwarranted deductions of fact or unreasonable inferences are insufficient to

8  defeat a motion to dismiss."); *accord Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th

9  Cir. 2001); *Holden v. Hagopian*, 978 F.2d 1115, 1121 (9th Cir. 1992).

10    These bedrock rules are amplified by the Supreme Court's landmark decision in *Twombly*,

11  127 S. Ct. at 1965, which abolished the "no set of facts" standard enunciated in *Conley v. Gibson*,

12  355 U.S. 41 (1957).  In complex cases such as this one, Rule 8's requirement of allegations

13  showing that the pleader "is entitled to relief" requires plaintiffs to plead plausible facts that "raise

14  a right to relief above the speculative level." *Id.*  Overreaching assertions or unsupported

15  conclusions are not sufficient.[1]  Courts applying *Twombly* to dismiss Section 11 and 12 claims

16  have held that, absent cogent allegations, plaintiffs' right to relief "cannot rise above the

17  speculative." *Belodoff v. Netlist, Inc.*, 2008 WL 2356699, at *12 (C.D. Cal. May 30, 2008).

18    Moreover, when -- as in this case -- claims alleged under Sections 11 and 12 "sound in

19  fraud," plaintiffs must also comply with the heightened requirements of Rule 9(b).  If the gravamen

20  of a complaint pleading violations of Sections 11 and 12(a)(2) is that defendants engaged in

21  intentional or fraudulent conduct, plaintiffs must provide detailed support for all such accusations.

22  *See*, *e.g.*, *In re Stac*, 89 F.3d at 1405-5.

23    Finally, under the "bespeaks caution" doctrine, detailed risk factors in a prospectus render

24

25    [1] As the Court emphasized, these rules are necessary to ensure that plaintiffs with "largely groundless claims" are not permitted to "take up the time of a number of other people, with the right to do so representing an *in terrorem* increment in settlement value," and to avoid unnecessary

26  "expenditure of time and money by the parties and the court."  *Id.* (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741

27  (1975); 5 Wright & Miller, *Federal Practice and Procedure* § 1216, at 233-34 (3d ed. 2004)) (internal quotation omitted).

28

1   forward-looking statements nonactionable as a matter of law. *See, e.g.*, *In re Worlds of Wonder*

2   *Sec. Litig.*, 35 F.3d 1407, 1414 (9th Cir. 1994) ("The bespeaks caution doctrine provides a

3   mechanism by which a court can rule as a matter of law (typically in a motion to dismiss for failure

4   to state a cause of action or a motion for summary judgment) that defendants' forward-looking

5   representations contained enough cautionary language or risk disclosure to protect the defendant

6   against claims of securities fraud."); *In re Infonet*, 310 F. Supp. 2d at 1092.

7
        **B.    Application Of The Controlling Standards To The Complaint**
8
              **Requires Dismissal On Multiple Grounds**

9        As discussed in more detail in the sections that follow, the Complaint does not survive the

10   application of these legal standards.  Under controlling law, plaintiffs have failed to allege that the

11   Prospectus contained a statement that was either false or materially misleading by virtue of an

12   omission.  That is true across the board, including with respect to (i) claims based on the purported

13   concealment of BigBand's "true" business plan, (ii) alleged misrepresentations regarding the Cable

14   Modem Termination System ("CMTS") technology, and (iii) accounting claims predicated on

15   plaintiffs' business plan allegations and the inventory write-down they claim should have been

16   taken in connection with CMTS.

17        The Complaint is fatally defective because plaintiffs' core allegations are conclusively

18   refuted by the documents upon which they are purported to be based.  The assertion that BigBand

19   disclosed a business plan focused exclusively on additional sales to pre-existing customers is flatly

20   contradicted by the Prospectus.  The concomitant claim that BigBand admitted seven and one-half

21   months later that it had secretly been pursuing a "land grab" strategy based on sales to new

22   customers cannot be reconciled with the earnings-call transcript from which it is supposedly

23   derived.  Likewise, plaintiffs' allegations regarding the Prospectus' portrayal of the role and

24   prospects of the CMTS technology bear little resemblance to what the Prospectus actually said and

25   are contradicted by the Company's subsequent statements regarding its decision to discontinue the

26   CMTS product.  Finally, the Complaint's assertions regarding an inventory write-down that

27   allegedly should have been taken prior to the March 15, 2007 offering are based on a misportrayal

28   of a restructuring charge that BigBand took in connection with an October 30, 2007 decision to

1    retool BigBand's operations.

2            Nor does the Complaint comply with the legal requirement that Section 11 and 12 claims

3    identify specific statements in the Prospectus and allege facts showing that the statements were

4    materially false and/or misleading at the time they were made. *See, e.g.*, *In re Verifone*, 784 F.

5    Supp. at 1484; *Kaplan*, 49 F.3d at 1373. Instead, plaintiffs impermissibly rely on hindsight,

6    seeking to project mischaracterized "facts" derived from statements made in an earnings call on

7    October 30, 2007 all the way back to the March 15, 2007 date on which the Prospectus became

8    effective. ¶¶[2] 130-38; *see, e.g., In re Keegan Mgmt. Co. Sec. Litig.*, 794 F. Supp. 939, 942 (N.D.

9    Cal. 1992) (where information becomes available shortly after the effective date suggesting that

10   the prospectus is misleading, it is "tempting to assume" that "[d]efendants must have had an

11   inkling of it before the [public offering]," yet that information is "irrelevant to the determination of

12   what should have been stated in the prospectus."). Thus, even if the Complaint had accurately

13   portrayed the various statements that BigBand made on the October 30, 2007 call, plaintiffs'

14   attempts to equate the situation that developed **more than seven months** after the IPO with facts

15   that purportedly existed on March 15, 2007, would fail because they are based on "speculation

16   made in hindsight." *Steckman,* 143 F.3d at 1299. Plaintiffs' efforts at reverse-engineering an

17   allegation that BigBand failed to write down impaired inventory based on the fact that it took a

18   restructuring charge long after the IPO suffer from the same defect.

19           Although pled under the Securities Act, the Complaint is subject to Rule 9(b) because it

20   alleges intentional wrongdoing, and hence sounds in fraud. In addition to explicitly pleading

21   "[d]efendants' fraudulent conduct" (¶ 144), plaintiffs repeatedly allege that BigBand deliberately

22   concealed its "true" business plan and efforts to restructure one of its business divisions,[3] and that

---

[2] Unless otherwise noted, all "¶ __" and "¶¶ __" citations reference paragraphs from plaintiffs'
Complaint and all "Ex. __" citations reference exhibits appended to the Declaration of Joni L.
Ostler in Support of the BigBand Defendants' Motion to Dismiss Plaintiffs' Consolidated Class
Action Complaint ("Ostler Decl. "). The Underwriter Defendants hereby join in the Request for
Judicial Notice in Support of the BigBand Defendants' Motion to Dismiss Plaintiffs' Consolidated
Complaint.

[3] *See, e.g.*, ¶¶ 48 (defendants "secretly attempted to reorganize [the CMTS] division" and
"secretly changed the Company's business model"); 92 (defendants "secretly adopted a hidden
plan"); & 93 (defendants were "concealing their change in plans"); *see also* ¶¶ 74, 86, 124 & 136

---

1  defendants' purported concealment was ultimately "revealed" when the Company "admitted" that

2  it was "operating outside of the business plan contained in the Registration [sic] and Prospectus."[4]

3  The Complaint further claims that defendants knowingly misrepresented failures of the CMTS

4  product line, improperly accelerated revenues, and misrepresented the Company's financial

5  performance in order to bolster the IPO.  *See, e.g.*, ¶¶ 53-74, 94-106 & 130-35.

6      These pointed accusations cannot be recast as negligence in order to evade the strictures of

7  Rule 9(b).  Allegations of "[f]ailing to state known facts and attempting to create an inaccurate

8  impression of future business are prototypical forms of intentional fraud," and therefore subject to

9  the heightened requirements of Rule 9(b).  *Belodoff*, 2008 WL 2356699, at *6.[5]  Plaintiffs make no

10 pretense of complying with those requirements.

11     To satisfy Rule 9(b), plaintiffs must set forth the "time, place, and nature of the alleged

12 fraudulent activities," as well as "an explanation as to why the statement or omission complained

13 of was false or misleading."  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994).

14 As a review of its key allegations quickly demonstrates, the Complaint does not attempt to allege

15 even the barest details (who, when, where or how) about the purported secret business plan,

16 BigBand's restructuring efforts or the supposed inaccuracies of its financial statements.

17     If Rule 9(b) did not apply, the Complaint would still fail.  It is readily apparent that the

18 Complaint could not pass muster under *Twombly* or controlling Ninth Circuit law.  127 S. Ct.

19 1955; *Sprewell*, 266 F.3d 979; *Holden*, 978 F.2d 1115.  Allegations founded on hindsight and

20 mischaracterizations of the documents upon which they purport to be based cannot provide a

21 plausible showing that plaintiffs are entitled to relief under *Twombly*.  Inferences, conclusions and

22 deductions drawn from such assertions are not reasonable, and must also be disregarded under the

23

24 (similar).

   [4] ¶ 11; *see also* ¶¶ 50, 105, 125, 130, 132 & 135 (similar).

25    [5] *See also In re iAsia Works, Inc. Sec. Litig.*, 2002 WL 103404, at *5 (N.D. Cal. May 15, 2002)
   (where "gravamen of plaintiffs' complaint is that defendants deliberately concealed facts known to
26 them," including the fact that "contrary to statements contained in the prospectus, iAsia was
   proceeding with its 'true business plan' which it kept hidden from investors," complaint held to
27 FRCP 9(b) heightened pleading standard); *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1103 (9th
   Cir. 2003); *In re Leadis Tech. Sec. Litig.*, 2006 WL 496039, *4 (N.D. Cal. Mar. 1, 2006).

28

1    Ninth Circuit rules applied by this Court.  *Id*.; *In re Calpine*, 288 F. Supp. 2d at 1074; *In re Late*

2    *Fee*, 528 F. Supp. 2d at 957.

3        Because the risk factors and cautionary language included in the Prospectus address the

4    very same problems plaintiffs seek to exploit, the "bespeaks caution" doctrine provides another

5    independent ground for dismissal based on forward-looking statements.  The Prospectus repeatedly

6    emphasized that plaintiffs' CMTS technology remained in development at the time of the IPO, that

7    there were risks that customers would not adopt the technology, and that BigBand might not be

8    able to compete successfully in the crowded CMTS market.  *See, e.g.*, Ex. A at 12-13, 55 & 57.  It

9    further explicitly cautioned that integration and interoperability problems -- which BigBand had

10   experienced in the past -- could cause longer sales cycles, delays in revenue recognition and lower

11   than expected revenue in any particular quarter.  *See, e.g.*, Ex. A at  9-10 & 15.

12       **C.    Plaintiffs' Allegations That BigBand Engaged In A Contrary**
          **Business Model Fail To State A Claim**
13

14       The Complaint alleges that at the time of the IPO, BigBand "touted" (¶ 40) a business plan

15   of leveraging "sales, revenues, gross margins and profits through sales [of applications and plug-in

16   modules] to pre-existing customers using platforms installed by BigBand that were already

17   operational" (¶ 47), but "secretly" pursued a contrary plan of "establishing a larger footprint at the

18   expense of leveraging sales to preexisting customers."  ¶ 4; *see also* ¶¶ 48, 74, 86, 92, 93, 124 &

19   136.  Plaintiffs also assert that BigBand's management later confessed that the Company was

20   pursuing a "secret" business plan that diverged radically from the Prospectus, and they attempt to

21   use this supposed departure as a springboard for asserting that, prior to the IPO, BigBand exploited

22   the alleged concealment to accelerate revenue and inflate its financial performance.  *See, e.g.*,

23   ¶¶ 11, 50, 97, 98, 105, 106, 125, 130, 132 & 135.

24       These various allegations fail because they are directly contradicted by the documents on

25   which they purport to be based.  A review of the Prospectus reveals that the Complaint

26   fundamentally mischaracterizes the business strategy that was **actually** disclosed.  Plaintiffs

27   selectively excise key components of the Company's strategy and studiously ignore a multitude of

28   statements that are inconsistent with the strawman version that serves as the linchpin of their

1    claims.  The supposed "admission" that BigBand had been pursuing a strategy that was not

2    disclosed in the Prospectus is based on a similar mischaracterization of the earnings call in which

3    the admission purportedly was made.  As the transcript itself makes clear, the strategy discussed on

4    the call was the same as the one described in the Prospectus.

5

6    **1.    The Prospectus Does Not State That BigBand Would
         Exclusively Pursue A Business Plan Based On Repeat Business**

7        Plaintiffs' treatment of a long block quotation from the "Strategy" section of the Prospectus

8    that serves as the centerpiece of their "business plan" claims is a blatant example of their

9    mischaracterization of the document.  ¶ 87 (quoting Ex. A at 55).  Plaintiffs proclaim that the

10   Prospectus stated that BigBand intended to focus on existing customers (¶ 87), but they

11   disingenuously omit the following paragraph, which directly contradicts and refutes their core

12   assertions, substituting an ellipsis instead:

13       ***Expand Customer Base*** *Regardless of Access Technology.* … We
         intend to leverage our media processing expertise **to penetrate new**
14       **customers worldwide**, regardless of the type of access networks
         they have.

15

16   Ex. A at 55 (emphasis added).  Thus, despite plaintiffs' contention that the passage stated that

17   BigBand was pursuing a plan consisting exclusively of marketing and selling to existing

18   customers, the Prospectus says no such thing.  ¶ 87.  Plaintiffs' selective editing speaks volumes.

19       The other two passages[6] plaintiffs muster as "support" for their unwarranted assertions

20   regarding the Company's business strategy say nothing about BigBand's strategic direction, long-

21   term objectives, or business plan.  They merely describe customer relationships with key service

22   providers and technological features of modular software architecture.  ¶ 88 (company leverages

23   "customer relationships" and "expertise in emerging technologies" to "deliver product applications

24   designed to meet service provider needs for intelligent, high-bandwidth networks") (quoting Ex. A

25   at 3); ¶ 88 (software architecture allows the company "to more quickly and cost effectively develop

26   ────────────────

27   [6] Plaintiffs allege that two passages from the Prospectus reflected "false statements regarding
     BigBand's strategy."  ¶ 88 (citing Ex. A at 3 ("Competitive Strengths of BigBand") & 57
     ("Platforms and Technologies")).

28

1   new features and products.") (quoting Ex. A at 57). As the Complaint itself acknowledges, the

2   cited passages are descriptions of BigBand's "purported competitive strengths and the purported

3   advantages provided by its platforms and technologies" (¶ 88) -- not an articulation of a business

4   plan.

5        Moreover, plaintiffs fail to allege that these statements were false when made. There is no

6   allegation that BigBand did not enjoy these stated competitive strengths or technological

7   advantages. Nor does the Complaint claim that BigBand was not attempting to sell to existing

8   customers at the time of the IPO.

9        None of the passages quoted by plaintiffs suggests that BigBand would pursue one strategy

10  to the exclusion of another. Most importantly, numerous statements (in addition to the one excised

11  from the block quote in paragraph 87) make clear that BigBand intended to pursue a strategy of

12  broadening its customer base -- not sell exclusively to existing customers as alleged in the

13  Complaint:

14
15              Although we intend to establish strategic relationships with leading
                distributors worldwide **in an attempt to reach new customers**, we
16              may not succeed in establishing those relationships. Ex. A at 14
                (emphasis added).

17              In addition, **as we expand our operations internationally**, our
                support organizations will face additional challenges . . . . Ex. A at
18              17 (emphasis added).

19              We **intend to continue expanding into international markets**.
                We are currently expanding our indirect sales channels in Europe
20              and Asia through distributor and reseller arrangements with third
                parties. Ex. A at 17-18 (emphasis added).

21
                [W]e are attempting to **broaden our customer base** by penetrating
22              new markets and expanding internationally . . . . Ex. A at 60
                (emphasis added).

23
                We have many programs in place to **heighten industry awareness**
24              of our company and our products . . . . Ex. A at 61 (emphasis
                added).

25

26       References to BigBand's "potential" customers appear throughout the Prospectus. For

27  instance, the Prospectus specifically noted that BigBand would focus on expanding its switched

28  digital video business to telephone companies as new customers and that its growth plan depended

1    on its success in reaching those customers.  Ex. A at 8 ("Our continued growth will depend

2    significantly on our ability to deliver products that help enable telephone companies to provide

3    video services … we have limited experience with sales and marketing efforts designed to reach

4    these **potential customers**.") (emphasis added).[7]

5                    **2.    BigBand's October 2007 Earnings Call Simply Restated
                          The Dual-Pronged Strategy Disclosed In The Prospectus**
6

7           Plaintiffs allege that in an October 30, 2007 earnings call BigBand "finally admitted" and

8    "confessed" that it was engaged in a "land-grab" business plan focused on new customers, not

9    leveraging sales to existing customers as purportedly represented in the Prospectus.  *See* ¶¶ 11, 12,

10   105, 125, 130, 131, 135 & 136.  A review of the transcript quoted in the Complaint shows that

11   plaintiffs have again mischaracterized the document that provides the "basis" of their claim.  The

12   relevant portion of the discussion at the end of the earnings call was:

13               On the SDV business it's very much a footprint and expansion
                 business like your question pointed out.  At this point a lot of the
14               attention is to winning new footprint because once we win new
                 footprint with more customers it provides the continued expansion
15               that you related to.

16               The expansion at this point is modest and in our '07 business was
                 modest and was expected to be modest.  What's driving
17               **incremental expansion** to deploy switched business is the addition
                 of more channels and more high definition, specifically, all of
18               which are clearly, we believe, going to happen in the short and mid-
                 term but did not happen meaningfully in '08.

19               And we're focused on **growing more incremental systems** and
20               grabbing footprint.  Part of our problem in Q3, as we discussed,
                 relates exactly to that as we grab more footprint in more systems
21               with more types of clients and what have you.  Under different
                 customers it actually creates delay in our ability to recognize
22               revenue from any one of those systems.

23   Ex. I at 8 (emphasis added).

24   ───────────────────
       [7] *See also* Ex. A at 7 (referring to "the capital spending patterns of our existing and **potential
     customers**" and the "strategic focus of our customers and **potential customers**") (emphasis
25   added); 13 (referring to risk that "our existing and **potential customers** may decide against using
     our product in their networks . . . ."; referring to investment of resources in network design by
26   BigBand's "existing and **potential customers**"; referring to possibility that "existing or **potential
     customers**" are reluctant to add network infrastructure from new vendors) (emphasis added); & 17
27   (referring to potential that BigBand's reputation with "**potential customers**" would be harmed if it
     does not provide effective ongoing support to existing customers) (emphasis added).
28

1    Plaintiffs attempt to exploit the reference to "winning new footprint" in switched digital

2   video, but BigBand's CEO made clear that the Company was focused on "**growing more**

3   **incremental systems and** grabbing footprint" -- not exclusively on "grabbing footprint." *Id.*

4   (emphasis added). He also referred to "incremental expansion" through the "addition of more

5   channels and more high definition," i.e., sales to existing customers, its "second order" from

6   Motorola Environment, and BigBand's selection as a switched digital video vendor for Comcast,

7   one of BigBand's largest existing customers. *Id.* at 3 & 8; Ex. A at 60.

8    It is thus clear both that the Prospectus did not describe a business strategy based

9   exclusively on sales to existing customers, and that the October 30 call discussed incrementally

10   growing sales to existing customers -- not only "grabbing footprint" with new customers.

11   Moreover, the statements on the October 2007 call say nothing about the circumstances on March

12   15, 2007, more than seven months earlier. *See, e.g., In re Metropolitan Sec. Litig.*, 532 F. Supp. 2d

13   1260, 1294 (E.D. Wash. 2007); *Kaplan*, 49 F.3d at 1373; *In re Keegan*, 794 F. Supp. at 946.

14        **D.    Plaintiffs' Allegations That The Prospectus Contained Material**
15        **Misstatements Or Omissions Regarding CMTS Fail To State A Claim**

16    The allegations regarding BigBand's CMTS technology are, again, contradicted by the

17   documents cited in the Complaint. Plaintiffs mischaracterize and ignore the Prospectus's

18   disclosures regarding the role of CMTS in BigBand's business, and the risks it faced in its efforts

19   to develop and exploit the technology. They take similar liberties with the Company's October 30,

20   2007 explanation of its decision to discontinue those efforts.

21    Plaintiffs allege that, although the Prospectus described "the Cuda CMTS business as

22   operating according to plan," internally it was widely known that there were significant problems

23   with the product. ¶ 47; *see also* ¶¶ 51-74. They attempt to portray CMTS as the key to BigBand's

24   success, and allege that the Company was "at a significant disadvantage in the high-speed data

25   transmission business, and that BigBand could not effectively compete with Motorola and Cisco

26   Systems or others" because "potential customers could, and did, buy similar products for the same

27   price or less, from the companies that had previously sold them their basic architecture and

28   platform products." ¶¶ 3, 5-6, 53 & 77. These assertions fall far short of the mark.

1    The Prospectus did not state that BigBand's success hinged on CMTS alone. Moreover, it

2    disclosed the facts that were allegedly omitted and fairly addressed the matters plaintiffs claim

3    were misrepresented. The contradictions between plaintiffs' allegations and the underlying

4    documents, and the absence of facts supporting a reasonable inference that particular statements

5    were false or misleading, are fatal. *See*, *e.g.*, *In re Calpine*, 288 F. Supp. 2d at 1076; *In re*

6    *Verifone*, 784 F. Supp. at 1484.

7
              **1.    The Complaint, Prospectus And Earnings Call Contradict**
8                   **Plaintiffs' Allegations**

9    Plaintiffs' claims are based on the Prospectus and the transcript of the October 30, 2007

10   earnings call. A review of those documents -- in their entirety, rather than the selectively edited

11   and incomplete versions mischaracterized in the Complaint -- eviscerates those conclusory

12   assertions.

13   First, plaintiffs' premise that CMTS was a "key component" (¶ 3) of BigBand's revenue

14   stream, and that BigBand's "professed business model was predicated, first, upon the supposed

15   success" of its CMTS product (¶ 39) is patently false. In fact, data products, including CMTS,

16   were a relatively small component of BigBand's revenue model. In 2006, video accounted for

17   $121,937,000 of BigBand's $154,013,000 in product revenues while data revenues amounted to

18   only $32,076,000. Ex. A at F-14. Revenue for the three months ended September 30, 2007 was

19   split between video, $24.3 million, and data, $5.7 million.[8] Ex. I at 4. Moreover, the Prospectus

20   emphasizes that increased sales of video products to telephone companies, not data products such

21   as CMTS, were expected to drive the Company's growth. *See, e.g.*, Ex. A at 8.

22   Second, despite plaintiffs' attempts to depict CMTS as a stagnant product that was failing

23   at the time of the IPO, judicially-noticeable documents make clear that BigBand continued to work

24   diligently on CMTS after the IPO, expending money and resources on its development and

25   _____

26   [8] Data comprised an usually high portion of product revenues in 2005, a fact that was disclosed
     in the Prospectus. Ex. A at 45 ("[D]uring the second quarter of 2005, we experienced an unusual
     increase in product net revenues from data products primarily due to $18.8 million of revenues
27   recognized in 2005 following satisfaction of customer acceptance criteria for product shipped to a
     single customer in 2004.").
28

1   improvement.  At the time of the IPO, BigBand was "in the process" of developing a modular

2   cable modem termination system ("M-CMTS").  Ex. A at 12.  M-CMTS was the "focus" of

3   BigBand's "development efforts."  *Id.* at 55.  As the Complaint itself acknowledges, immediately

4   prior to the IPO BigBand reorganized its CMTS operations, appointing a new manager for the

5   business line.  ¶¶ 63, 64 & 70.  "By May 2007," months after the IPO, the company had begun

6   work on a new version of CMTS.  ¶ 64.  These allegations undermine plaintiffs' assertions that the

7   Company "knew" CMTS was a dead-end at the time of the IPO.  ¶¶ 5, 7, 8 & 64.  Similarly,

8   although plaintiffs claim that there was no market for CMTS, the Complaint alleges that BigBand

9   had made large sales of CMTS products at the time of the IPO.  ¶ 65.

10          Third, the October 30, 2007 earnings-call transcript shows that the decision to discontinue

11  CMTS was made long after the March 15, 2007 offering, because innovation offered by the

12  development of M-CMTS after the IPO proved insufficient to overcome price resistance from

13  customers.  Moreover, the Prospectus disclosed that development of M-CMTS was critical to the

14  success of CMTS and that success was far from assured.  Ex. A at 12 & 55.[9]  The Complaint's

15  selective quotation of a portion of the October 30 call -- which omits the key part of the CMTS

16  discussion -- makes clear that BigBand's realization that CMTS would not succeed came at the end

17  of a process:

18              All of our customers have incumbent vendors because of the point
            you brought up, the maturity of the market.  And it would cause
19          decisions to get delayed.  In a way **at the end** we realized that this
            is a mature market that is more driven by pricing and keeping the
20          system and securing the existing system to replacing them to create

21      [9]  Ex. A at 12-13 ("If we fail to deliver our M-CMTS product to market in a timely and cost-
    effective manner, or if our M-CMTS product fails to operate with all the functionality our
22  customers expect, our future operating results would be harmed . . . .  The markets in which we
    operate are intensely competitive, and many of our competitors are larger, more established and
23  better capitalized than we are."); 13 ("[M]any of our competitors have been in operation much
    longer than we have and therefore have more long-standing and established relationships with
24  domestic and foreign service providers," and "may offer more compelling product offerings, and
    be able to offer greater pricing flexibility, making it more difficult for us to compete while
25  sustaining acceptable gross margins."); 55 ("[O]ur development efforts have focused on combining
    networking with real-time processing of video.  Our M-CMTS is the first step in our plan to meet
26  and market demand for video over IP . . . ."); & 57 ("Modular CMTS is the next generation of our
    High-Speed Data product application, which is currently in multiple customer trials on three
27  continents . . . .  We expect to begin commercial deployment of our M-CMTS product in the first
    half of 2007.").

28

a path at this point for video over IP.

¶ 133 (quoting Ex. I at 14) (emphasis added).  When the discussion from the call that plaintiffs omitted is included, it is even clearer that the shortcomings of CMTS only became apparent over time, and were not obvious at the time of the IPO:

> It was definitely not a shortcoming in the sense that we went into what was described at the time, flawless trials of carrying MCMTS, creating new bandwidth, exceeding the 50 megabits per second barrier and going to 100 megabites a second to off the shelf channel boded cable modem.  **And we felt pretty good about that.  What we did find out though at the end of the day with all the innovation**, the path to video over IP and all the other unique propositions we offered it was as easy as cutting the price from the incumbent vendors.

*Id.* (emphasis added).

As the statements that plaintiffs omitted from their Complaint reveal, BigBand was optimistic about the prospects for M-CMTS at the time of the IPO.  It went through a process of developing and introducing M-CMTS in the months following the IPO, and only after that process realized that the CMTS market was not willing to pay incremental pricing for the innovation that had been developed.  Moreover, the Prospectus had explicitly warned that the success of CMTS depended on the development of M-CMTS.

### 2.    Dismissal Of The CMTS Claims Is Also Required Under The "Bespeaks Caution" Doctrine

The Prospectus' cautionary language regarding BigBand's CMTS technology requires dismissal under the "bespeaks caution" doctrine.  *See, e.g., In re Stac*, 89 F.3d at 1408 ("We have recognized that the 'bespeaks caution' doctrine provides a mechanism by which a court can rule as a matter of law that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendants against claims of securities fraud.").  Under the doctrine, affirmative forward-looking statements are not actionable if they are accompanied by sufficient cautionary language that they would not mislead a reasonable investor.  *See, e.g., Rubinstein v. Collins*, 20 F.3d 160, 167 (5th Cir. 1994) ("[T]he 'bespeaks caution' doctrine reflects the unremarkable proposition that statements must be analyzed in context."); *Worlds of Wonder*, 35 F.3d. at 1414; *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996).

1    Here, the Prospectus disclosed that the success of BigBand's CMTS product was largely

2   dependent on development efforts that were in progress at the time of the IPO, and that BigBand

3   had larger competitors in the CMTS market who already had well-established leadership positions

4   and installed systems.  *See, e.g.*, Ex. A at 12-13, 55 & 57.  The Prospectus used cautionary

5   language "directly address[ing] the substance of the statement[s] the plaintiffs challenge."  *In re*

6   *Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 372-3 (3d Cir. 1993).  At most, the passages

7   plaintiffs cite regarding CMTS were "nonactionable expressions of corporate optimism."  *See In re*

8   *Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1008 (N.D. Cal. 2008) (internal quotation

9   omitted).

### 3.    The Complaint's Puzzle-Style Pleading Fails To Allege Any Link Between Statements In The Prospectus And Actual Facts

12   Plaintiffs quote three excerpts from the Prospectus in support of their CMTS allegations.

13  The first two passages are forward-looking statements regarding the technical features and

14  innovations of BigBand's high-speed data product application and its Cuda hardware platform.

15  ¶ 53 (quoting Ex. A at 57-58).  The third is a block quotation from the "Risk Factor" section of the

16  Prospectus disclosing, in great detail, the potential harm to BigBand's business if it could not

17  compete effectively with other players in the space that are "substantially larger and have greater

18  financial, technical, marketing and other resources than [BigBand]."  ¶ 53.

19    The Complaint makes no attempt to specify which statements are alleged to be false and

20  misleading, or the reason or reasons why any particular statement is actionable.  As this Court has

21  held, puzzle-style pleading that places the burden "'on the reader to sort out the statements and

22  match them with the corresponding adverse facts to solve the 'puzzle' of interpreting plaintiffs'

23  claims'" is an "'unwelcome and wholly unnecessary strain on defendants and the court system'"

24  and, therefore, grounds for dismissal for failure to state a claim.  *In re Splash Tech. Holdings, Inc.*

25  *Sec. Litig.*, 160 F. Supp. 2d 1059, 1075 (N.D. Cal. 2001) (Armstrong, J.) (quoting *In re Oak Tech.*

26  *Sec. Litig.*, 1997 WL 448168, at *5 (N.D. Cal. Aug. 1, 1997); *May v. Borick*, 1997 WL 314166, at

27  *8 (C.D. Cal. Mar. 3, 1997)).  As this Court further emphasized:  "The fact that certain sections of

28  the report have been highlighted is not a reliable guide to determining which statements are alleged

1    to be false as bold statements sometimes do not turn out to be actionable . . .". *Id.*

2
      **E.     Plaintiffs Have Failed to Allege Material Misstatements Related To Purported**
3              **Inaccuracies In BigBand's Financial Statements**

4        Plaintiffs' attempt to bootstrap their defective allegations regarding CMTS and a

5    purportedly "secret" business plan into a claim for accounting fraud is similarly unavailing. As

6    demonstrated above, the underlying allegations are inadequate, rendering the accounting claim

7    deficient as well. The fact that plaintiffs have not sued Ernst & Young, the accounting firm that

8    audited and issued an unqualified audit opinion on the financial statements of BigBand that are at

9    issue, underscores these decisive shortcomings.

10        In a classic attempt at pleading by hindsight, plaintiffs use BigBand's $5 million

11    restructuring charge announced on October 30, 2007 as the basis for claiming that the CMTS

12    inventory should have been written down by $5 million prior to the March 15, 2007 IPO. *See* ¶¶

13    75-85. The Complaint further attempts to link the misconceived business plan allegations to the

14    financial statements included in the Prospectus by conclusorily asserting that BigBand improperly

15    accelerated revenue by using the business plan supposedly described in the Prospectus instead of

16    the "secret" plan actually being pursued as the basis for recognizing revenue. *See, e.g.*, ¶¶ 93-98.

17             **1.     Plaintiffs' CMTS Inventory Write-Down Assertions Are Baseless**

18        Plaintiffs proclaim that it is "undisputed" that CMTS inventory should have been written

19    down at the time of the IPO, and that BigBand admitted this "fact" by recording a $5 million

20    impairment charge in the third quarter of 2007. ¶ 83. The Complaint alleges no facts to support

21    that assertion, which is based on hindsight and a misportrayal of a restructuring charge -- not an

22    inventory write-down -- taken seven and one-half months after the IPO.

23        As the October 30, 2007 earnings call and other allegations in the Complaint explicitly

24    make clear, the restructuring charge was taken after BigBand decided to discontinue the CMTS

25    product line, initiate a reduction in force, and incur various expenses as part of a broader effort to

26    restructure its business **after** the IPO -- not when plaintiffs claim the CMTS inventory should have

27    been written down. As noted at pages 15-16 above, the Prospectus disclosed that the M-CMTS

28    technology that was critical to successfully marketing CMTS products was **still in development** at

1   the time of the IPO, and the decision to discontinue the CMTS line was made only **after** the

2   introduction of M-CMTS was met with pricing resistance.  *See ¶* 128; Ex. I at 2 & 6.  Thus, even if

3   the restructuring charge could be equated with an inventory write-down (and it cannot be), there

4   could not possibly be any basis for taking the write-down prior to the IPO.  *See, e.g.,* Committee on

5   Accounting Procedure, American Institute of Certified Public Accountants, Accounting Research

6   Bulletin No. 43, Ch. 4, ¶ 9 ("no loss should be recognized unless the **evidence indicates clearly**

7   that a **loss has been sustained**") (emphasis added).[10]

8          Moreover, the documents cited in the Complaint make clear that the $5 million charge that

9   plaintiffs seek to project backwards to the time of the IPO was less than $5 million, and consisted

10  largely of employee severance and lease termination expenses.  *See* October 30, 2007 Press

11  Release (quoted at ¶ 129) ("[W]e expect to incur one-time charges associated with the restructuring

12  of our business in the range of $3 to 5 million, which includes employee severance and lease

13  termination costs."); Ex. I at 5 (Oct. 30, 2007 Conference Call) ("[W]e expect to have one time

14  charges in Q4 in the range of $3 million to $5 million related to severance, lease termination, and

15  other restructuring items.").

16              **2.     The Accounting Allegations Derived From The "Secret" Business
                        Plan Are Baseless**

17

18          Plaintiffs allege that the financial statements included in the Prospectus were false because

19  BigBand improperly accelerated millions of dollars in revenue based on estimations of sales cycles

20  predicated on a business strategy of sales to existing customers, rather than the "secret" strategy of

21  selling to new customers.  *See, e.g., ¶¶* 93-98.  More specifically, the Complaint claims that sales

22  cycles were shorter for existing customers than for new ones, and that revenue could be recognized

23  more quickly because the Company encountered fewer interoperability issues on sales to existing

24  customers.  *See ¶¶* 90, 91 & 93.  In their unsupported attempt to allege an accounting claim,

25  plaintiffs assert that, prior to the IPO, BigBand recognized revenue based on short sales cycles for

26  existing customers rather than the supposed longer sales cycles associated with the "secret" plan of

27

---

28  [10] A copy of ARB No. 43 is attached to the Ostler Decl. as Exhibit L.

1    selling to new customers.  *See* ¶¶ 89-90.

2         These assertions suffer from layers of dispositive defects.  As demonstrated at pages 9-13

3    above, the claim that BigBand was pursuing a "secret" business plan is based on a gross

4    mischaracterization of the underlying documents.  If the business plan assertions were viable, the

5    accounting claims would fail because they are based on rank conclusions -- not factual allegations.

6    Among other things, the Complaint makes no attempt to allege how, when or where revenue was

7    accelerated.

8         Moreover, contrary to plaintiffs' allegations, the Prospectus contains ample disclosure

9    regarding interoperability issues, the length of sales cycles, and the fact that neither is linked to

10   whether a customer is existing or new.  Indeed, three of the five summary risk factors at the

11   beginning of the Prospectus contain the specific cautionary language related to BigBand's sales

12   cycle and related interoperability challenges.[11]  The Prospectus goes on to disclose in more detail

13   that "the timing of [BigBand's] revenue related to the implementation of [its] product applications

14   in [its customers'] complex networks is difficult to predict and could result in lower than expected

15   revenue…"  Ex. A at 10.  It also states that BigBand's sales cycles "can last longer" than eighteen

16   months, and that BigBand had "in the past" experienced interoperability complications requiring it

17   to modify its software or hardware, which "could cause longer installation times for [its] products

18   and could cause order cancellations, either of which would adversely affect [BigBand's] business,

19   operating results and financial conditions."  *Id.* at 15.

20        None of the multiple specific warnings about the unpredictable nature of BigBand's sales

21   cycle draws a distinction between the pursuit of existing versus new customers.  *See, e.g.*, Ex. A at

22   9, 10 & 15.  They obviously apply to all customers, new and old.  Indeed, the passage offered by

23   plaintiffs in support of their assertion that BigBand's sales cycles were longer due to a purportedly

24   undisclosed plan to sell to new customers refers to both strategies:

25

26   [11] Ex. A at 3 ("the timing of a significant portion of our revenue is dependent on complex
     systems integration"; "our operating results are likely to fluctuate significantly for a variety of
27   reasons"; "our operating results in a particular period can be impacted by our lengthy sales
     cycle.").
28

1
2
3
4
5

> Our sales cycle for an initial customer purchase typically ranges from nine to eighteen months, but can be longer. This process generally involves several stages before we can recognize revenues on the sale of our products. As a provider of advanced technologies, we seek to actively participate with our **existing and potential customers** in the evaluation of their technology needs and network architectures, including the development of initial designs and prototypes.

6  ¶ 91 (citing Ex. A at 32) (emphasis added). Similarly, the transcript from the September 2007

7  earnings call that plaintiffs cite as evidence of BigBand's alleged "revelation" that it had been

8  pursuing new customers also plainly links the "longer sales cycles" the company had experienced

9  to "an expanding number of customers and configurations" -- indicating that the problem was not

10  confined to new customers, but also included new configurations for existing customers. Ex. J

11  at 2.

12              **3.    Plaintiffs Fail To Plead Any Corroborating Facts In Support Of Their Accounting Allegations**

13

14          The Complaint's accounting claims also run afoul of the rule that accounting manipulation

15  allegations must be pled with "sufficient corroborating facts." *Osher v. JNI Corp.*, 256 F. Supp. 2d

16  1144, 1163 (S.D. Cal. 2003); *see also In re PEC Solutions Sec. Litig.*, 2004 WL 1854202, at *12

17  (E.D. Va. May 25, 2004). With respect to the write-down allegations, the Complaint does not

18  allege even "basic details," such as the amount of impaired inventory, the CMTS components that

19  were impaired or the nature of the impairments, the dates of any transactions affected, or the

20  identities of any of the customers or employees involved in those transactions. *In re Peerless Sys.*

21  *Corp. Sec. Litig.*, 182 F. Supp. 2d 982, 991 (S.D. Cal. 2002); *see also In re McKesson HBOC, Inc.*

22  *Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) (plaintiffs alleging accounting fraud must

23  "allege enough information so that a court can discern whether the alleged GAAP violations were

24  minor or technical in nature, or whether they constituted widespread and significant inflation of

25  revenue").

26          Plaintiffs' revenue-recognition allegations fare no better. The Complaint relies almost

27  entirely on the business plan assertions and does not even allege what BigBand's revenue-

28  recognition policies or practices were -- much less why or how they might have violated GAAP or

1    the amount of revenue purportedly overstated.  The only "detail" plaintiffs offer in support of their

2    conclusory accusations is a chart supposedly depicting a fall-off in estimated billings between the

3    first and fourth quarters of 2007.  ¶ 98.  Billings and revenues can fluctuate for a host of reasons,

4    and the chart does nothing to support plaintiffs' conclusory assertions.  In fact, it depicts total

5    revenues increasing immediately after the IPO, from the first quarter to the second quarter.

6          **4.    Plaintiffs' Failure To Challenge BigBand's Independent Audits**
            **And The Absence Of A Restatement Further Undercut Their**
7          **Allegations Of Accounting Improprieties**

8          The fundamental inadequacies in plaintiffs' attempt to allege accounting irregularities are

9    amplified by their failure to sue BigBand's outside auditors with respect to BigBand's inventory

10   write-downs, revenue recognition, or any other aspect of the Company's accounting.  "A failure to

11   challenge the independent auditors' opinions weakens an allegation that a defendant violated

12   GAAP."  *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 719 (E.D. Va. 2003); *see also In*

13   *re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 991 (N.D. Cal. 2007) (dismissing securities

14   fraud claim where plaintiffs "alleged no facts suggesting that KPMG did not perform its audit of

15   Levi's 2003 financial statements properly or issued an unqualified opinion in error."); *In re Silicon*

16   *Storage Tech., Inc.*, 2006 WL 648683, at *8 (N.D. Cal. Mar. 10, 2006) (holding that plaintiffs had

17   not adequately alleged falsity of statements regarding inventory write-downs, in part because

18   company's outside auditors had issued clean audit opinions and did not require restatement of

19   certain quarters).  Ernst & Young audited and issued unqualified audit opinions on the financial

20   statements included in the Prospectus.  Ex. A at F-2.  The implausibility of the Complaint's

21   conclusory claims is highlighted by the fact that the auditors did not take issue with accounts

22   plaintiffs assert were fraudulent.

23   **III.    PLAINTIFFS LACK STANDING TO BRING A SECTION 12(a)(2) CLAIM**

24          **A.    Lead Plaintiff's Certification Establishes That He Did Not**
                 **Purchase Shares In The Initial Distribution**
25

26          The Complaint alleges that "Lead Plaintiff and other members of the Class purchased or

27   otherwise acquired BigBand shares pursuant to and/or traceable to the IPO Prospectus."  ¶ 18.  As

28   a matter of law, however, the purchase of shares that are merely traceable to the initial public

1   offering is insufficient to allege standing under Section 12.  A plaintiff must have purchased shares

2   **directly** from a defendant in the initial distribution of the securities at issue.  *See, e.g., Gustafson v.*

3   *Alloyd Co., Inc.*, 513 U.S. 561, 577-78 (1995) (only investors who purchased shares in an offering

4   have standing to sue under Section 12(a)(2)); *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076,

5   1081 (9th Cir. 1999).  Allegations that shares were traceable to the IPO do not plead standing.  *See,*

6   *e.g.*, *In re Levi Strauss*, 527 F. Supp. 2d at 983.

7        Lead Plaintiff's Certification affirmatively establishes that he cannot meet the standing

8   requirement because **none** of his purchases could have been made from a defendant pursuant to the

9   IPO.  The IPO price was $13 per share.  *See* Ex. A.  Lead Plaintiff's first purchase occurred on

10  March 26, 2007 at $17.89 per share.  *See* Ex. K (Lead Plaintiff Certification filed in connection

11  with Lead Plaintiff Motions).  All of Lead Plaintiff's purchases were therefore made in the

12  secondary market after the IPO was completed, at prices other than the IPO price.

13  **B.    Plaintiffs Fail To Allege They Purchased Shares Directly**
14  **From The Underwriter Defendants**

15       Section 12(a)(2) provides that any person who "offers or sells a security" by means of a

16  materially misleading prospectus shall be liable "to the person purchasing such security from him."

17  See 15 U.S.C. § 77l(a)(2).  The Supreme Court has held that the phrase "purchase . . . from him"

18  "narrows the field of potential sellers" because:

19       [an] important consequence of this provision is that § 12[a] imposes
         liability on only the buyer's immediate seller; **remote** purchasers
20       are precluded from bringing actions against remove sellers.  **Thus,**
         **a buyer cannot recover against his seller's seller.**
21

22  *Pinter v. Dahl*, 486 U.S. 622, 643, n.21 (1988) (citations omitted) (emphasis added).[12]

23       Following *Pinter*, the Ninth Circuit has squarely held that liability under Section 12(a)(2)

24  extends only to those defendants who sell directly to a plaintiff.  *Hertzberg*, 191 F.3d at 1081

25  ("section 12 . . . permits suit against a seller of security by prospectus only by 'the person

26  _____

27  [12] In *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531 (9th Cir. 1989), the Ninth Circuit
     held that the Supreme Court's reasoning in *Pinter* applies equally to 12(a)(1) and 12(a)(2) and that
     *Pinter* sets the liability standard for both sections.  *Id.* at 536.
28

1  purchasing such security from him,' thus specifying that a plaintiff must have purchased the

2  security directly from the issuer of the prospectus.").

3       Here, because plaintiffs fail to allege that the Underwriter Defendants either passed title to

4  them or solicited their immediate sale -- and the Lead Plaintiff's certification affirmatively

5  establishes that the Underwriter Defendants did **not** do so as to him -- the Section 12 claim against

6  the Underwriter Defendants fails as a matter of law.

7

8  **IV.     CONCLUSION**

9       Although claims under the Securities Act do not require scienter, the rules governing such

10  claims do not countenance the pleading excesses that permeate the Complaint.  For all of the

11  foregoing reasons, the Underwriter Defendants respectfully request that the Court dismiss with

12  prejudice the Section 11 and 12(a)(2) claims filed against them.

13

14  Dated:   August 8, 2008                    Respectfully submitted,

15                                             ORRICK, HERRINGTON & SUTCLIFFE LLP

16                                             By: _____ */s/ Robert P. Varian*
17                                                             Robert P. Varian

18                                             Attorneys for Defendants
                                               Morgan Stanley & Co. Incorporated, Merrill Lynch,
19                                             Pierce, Fenner & Smith Incorporated,
                                               Jefferies & Company, Inc., Cowen & Company, LLC
20                                             and ThinkPanmure, LLC, formerly known as
                                               ThinkEquity Partners LLC

21

22

23

24

25

26

27

28