KEITH E. EGGLETON, State Bar No. 159842
RODNEY G. STRICKLAND, State Bar No. 161934
JONI OSTLER, State Bar No. 230009
L. DAVID NEFOUSE, State Bar No. 243417
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: keggleton@wsgr.com
Email: rstrickland@wsgr.com
Email: jostler@wsgr.com
Email: dnefouse@wsgr.com

Attorneys for Defendants
BIGBAND NETWORKS, INC., AMIR BASSAN-
ESKENAZI, FREDERICK A. BALL, RAN OZ,
LLOYD CARNEY, DEAN GILBERT, KENNETH
A. GOLDMAN, GAL ISRAELY, BRUCE I.
SACHS, ROBERT J. SACHS and GEOFFREY Y.
YANG

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| In re BIGBAND NETWORKS, INC. SECURITIES LITIGATION | Master File No. 07-cv-05101-SBA |
| | CLASS ACTION |
| | BIGBAND DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT |
| This Document Relates to: | |
| ALL ACTIONS. | DATE: Dec. 9, 2008 TIME: 1:00 p.m. COURTROOM: 3 JUDGE: Hon. Saundra Brown Armstrong |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ...........................................................................v

SUMMARY OF ARGUMENT .........................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ..............................................................................2

    A.    The BigBand Defendants .................................................................................2

    B.    BigBand's IPO ...............................................................................................3

    C.    BigBand's Disclosures After the IPO...............................................................4

    D.    Plaintiff's Allegations .....................................................................................6

ARGUMENT ...............................................................................................................................7

    I.    Plaintiff's Section 11 Claim Should Be Dismissed.............................................7

        A.    Applicable Standards .................................................................................7

        B.    Plaintiff's Allegations Regarding Cuda Are Fatally Deficient ......................9

            1.    There Was No Duty to Disclose Alleged Cuda Product Problems ...........................................................................................9

                a.    Disclosure of Product Problems Was Not Necessary to Make Any Affirmative Statements in the Prospectus Not Misleading ........................................................................9

                b.    Disclosure of Product Problems Was Not Required by SEC Rule............................................................................16

            2.    Further Disclosure Regarding Cuda Was Not Required.................17

        C.    Plaintiff's Remaining Allegations Are Baseless...........................................18

        D.    Plaintiff's Allegations Separately Fail Under Rule 9(b).............................22

    II.    Plaintiff's Section 12(a)(2) Claim Should Be Dismissed .......................................23

        A.    Plaintiff Lacks Standing to Assert a Section 12(a)(2) Claim ......................23

        B.    The BigBand Defendants Are Not Alleged to Have Offered or Sold Stock Pursuant to Section 12(a)(2)...............................................................24

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Balistreri v. Pacifica Police Dep't,*
    901 F.2d 696 (9th Cir. 1990) .................................................................................. 8

*Bell Atl. Corp. v. Twombly,*
    127 S. Ct. 1955 (2007) .................................................................................... *passim*

*Belodoff v. Netlist, Inc.,*
    2008 WL 2356699 (C.D. Cal. May 30, 2008) ............................................... *passim*

*Brody v. Homestore,*
    2003 WL 22127108 (C.D. Cal. Aug. 8, 2003) ................................................... 24

*Brody v. Transitional Hosps. Corp.,*
    280 F.3d 997 (9th Cir. 2002) .............................................................................. 7

*Cent. Laborers Pension Fund v. Merix Corp.,*
    2005 WL 2244072 (D. Or. Sept. 15, 2005) ...................................................... 25

*DeMaria v. Andersen,*
    318 F.3d 170 (2d Cir. 2003) ............................................................................. 24

*DiLeo v. Ernst & Young,*
    901 F.2d 624 (7th Cir. 1990) ............................................................................ 20

*Falkowski v. Imation Corp.,*
    309 F.3d 1123 (9th Cir. 2002) .......................................................................... 23

*Garber v. Legg Mason,*
    537 F. Supp. 2d 597 (S.D.N.Y. 2008) .............................................................. 15

*Gustafson v. Alloyd Co.,*
    513 U.S. 561 (1995) .......................................................................................... 23

*Hertzberg v. Dignity Partners, Inc.,*
    191 F.3d 1076 (9th Cir. 1999) .......................................................................... 24

*Howard v. Everex Sys., Inc.,*
    228 F.3d 1057 (9th Cir. 2000) .......................................................................... 25

*In re Allscripts, Inc. Sec. Litig.,*
    2001 WL 743411 (N.D. Ill. June 29, 2001) ...................................................... 13

*In re Business Objects S.A. Sec. Litig.,*
    2005 WL 1787860 (N.D. Cal. July 27, 2005) ................................................... 14

*In re Convergent Techs. Secs. Litig.,*
    948 F.2d 507 (9th Cir. 1991) .................................................................. 12, 13, 15

*In re DDi Corp. Sec. Litig.*,
        2005 U.S. Dist. LEXIS 1056 (C.D. Cal. Jan. 7, 2005) ........................................ 22

*In re DSP Group, Inc. Sec. Litig.*,
        1997 WL 678151 (N.D. Cal. Mar. 5, 1997) ......................................................... 17

*In re Daou Sys., Inc.*,
        411 F.3d 1006 (9th Cir. 2005) ............................................................................. 8

*In re Dreamworks Animation SKG, Inc., Sec. Litig.*,
        2006 U.S. Dist. LEXIS 24456 (C.D. Cal. Apr. 12, 2006) ............................... 17, 21

*In re Guidant Corp. Sec. Litig.*,
        536 F. Supp. 2d 913 (S.D. Ind. 2008) ................................................................. 10

*In re iAsia Works, Inc., Sec. Litig.*,
        2002 WL 1034041 (N.D. Cal. May 15, 2002) ............................................. 9, 10, 22

*In re ICN Pharms. Inc. Sec. Litig.*,
        299 F. Supp. 2d 1055 (C.D. Cal. 2004) ............................................................... 21

*In re Leadis Tech., Inc. Sec. Litig.*,
        2006 WL 496039 (N.D. Cal. Mar. 1, 2006) ......................................................... 22

*In re Leapfrog Enter. Sec. Litig.*,
        2006 WL 2192116 (N.D. Cal. Aug. 1, 2006) ....................................................... 14

*In re Levi Strauss & Co. Sec. Litig.*,
        527 F. Supp. 2d 965 (N.D. Cal. 2007) ................................................................. 23

*In re Lyondell Petrochemical Co. Sec. Litig.*,
        984 F.2d 1050 (9th Cir. 1993) ............................................................................. 18

*In re Metawave Comms. Corp. Sec. Litig.*,
        298 F. Supp. 2d 1056 (W.D. Wash. 2004) ........................................................... 14

*In re OPUS360 Corp. Sec. Litig.*,
        2002 WL 31190157 (S.D.N.Y. Oct. 2, 2002) ............................................. 10, 13, 16

*In re PETsMART, Inc. Sec. Litig.*,
        61 F. Supp. 2d 982 (D. Ariz. 1999) ..................................................................... 21

*In re Portal Software, Inc. Sec. Litig.*,
        2005 WL 1910923 (N.D. Cal. Aug. 10, 2005) ..................................................... 23

*In re Silicon Graphics Inc. Sec. Litig.*,
        183 F.3d 970 (9th Cir. 1999) ............................................................................... 19

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
        160 F. Supp. 2d 1059 (N.D. Cal. 2001) ................................................................. 6

*In re Stac Elecs. Sec. Litig.*,
        89 F.3d 1399 (9th Cir. 1996) ......................................................................... *passim*

*In re Syntex Corp. Sec. Litig.*,
        1993 WL 476646 (N.D. Cal. Sept. 1, 1993) ........................................................ 17

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ................................................................. 14

*In re VeriFone Sec. Litig.*,
    784 F. Supp. 1471 (N.D. Cal. 1992) ........................................................... 7

*In re VeriFone Sec. Litig.*,
    11 F.3d 865 (9th Cir. 1993) ............................................................ 7, 8, 9, 18

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996) ..................................................................... 25

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) .................................................................. 11

*In re Wyse Tech. Sec. Litig.*,
    1990 WL 169149 (N.D. Cal. Sept. 13, 1990) ............................................. 17

*Limantour v. Cray Inc.*,
    432 F. Supp. 2d 1129 (W.D. Wash. 2006) ................................................ 14

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
    238 F.3d 363 (5th Cir. 2001) .................................................................. 25

*Maher v. Durango Metals, Inc.*,
    144 F.3d 1302 (10th Cir. 1998) ............................................................... 25

*May v. Borik*,
    1997 WL 314166 (C.D. Cal. Mar. 3, 1997) .............................................. 18

*Murphy v. Hollywood Entm't Corp.*,
    1996 WL 393662 (D. Or. May 9, 1996) ................................................... 24

*North Star Int'l v. Ariz. Corp. Comm'n*,
    720 F.2d 578 (9th Cir. 1983) .................................................................... 8

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
    297 F.3d 1182 (11th Cir. 2002) ................................................................ 7

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008) ................................................. 15, 21

*Pinter v. Dahl*,
    486 U.S. 622 (1988) .............................................................................. 24

*Plevy v. Haggerty*,
    38 F. Supp. 2d 816 (C.D. Cal. 1998) .......................................... 13, 20, 21

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) .................................................................. 23

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996) .......................................................................................... 25

*Shuster v. Symmetricon, Inc.*,
    1997 WL 269490 (N.D. Cal. Feb. 25, 1997) ....................................................... 13

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998)................................................................. 8, 17, 21

*Weinstein v. Jain*,
    1995 WL 787549 (N.D. Cal. Oct. 23, 1995) ............................................... 23, 24

*Wietschner v. Monterey Pasta Co.*,
    294 F. Supp. 2d 1102 (N.D. Cal. 2003) ............................................................. 19

*Yourish v. Cal. Amplifier*,
    191 F.3d 983 (9th Cir. 1999)................................................................................. 9

## STATUTES AND REGULATIONS

15 U.S.C. § 77k(a) .................................................................................................... 7, 15, 16

15 U.S.C. § 77l(a)(2) ...................................................................................................... 23

15 U.S.C. § 77o .............................................................................................................. 25

17 C.F.R. § 229.303(a) ................................................................................................... 16

## RULES

Fed. R. Civ. P. 8(a) ............................................................................................... *passim*

Fed. R. Civ. P. 9(b) ............................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ................................................................................................... 8

### NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on December 9, 2008, at 1:00 p.m., or as soon thereafter as counsel may be heard, in the Courtroom of the Honorable Saundra Brown Armstrong, United States District Court, 1301 Clay Street, Oakland, California, defendants BigBand Networks, Inc. ("BigBand" or the "Company"), and Amir Bassan-Eskenazi, Ran Oz, Frederick A. Ball, Gal Israely, Dean Gilbert, Kenneth E. Goldman, Lloyd Carney, Bruce I. Sachs, Robert J. Sachs, and Geoffrey Y. Yang (collectively, the "Individual Defendants" and collectively with BigBand, the "BigBand Defendants"), will and hereby do move to dismiss all claims asserted against them by Lead Plaintiff Gwyn Jones ("Plaintiff") in the Consolidated Class Action Complaint for Violations of Securities Laws (the "Complaint").

The BigBand Defendants move to dismiss Plaintiff's claims for failure to state a claim under Fed. R. Civ. P. 12(b)(6), and for failure to plead fraud with the particularity required by Fed. R. Civ. P. 9(b). This motion is supported by the following memorandum, the Declaration of Joni Ostler, executed Aug. 8, 2008 ("Ostler Dec.") and all exhibits appended thereto, the BigBand Defendants' Request for Judicial Notice, the argument of counsel, and any other matters properly before the Court. The BigBand Defendants also join in the motion to dismiss filed by the Underwriter Defendants.

### ISSUES TO BE DECIDED

1. Whether Plaintiff has stated claims under Section 11 ("Section 11") and Section 12(a)(2) ("Section 12(a)(2)") of the Securities Act of 1933 (the "Securities Act"), given the absence of a duty to disclose the purportedly omitted information and the absence of any untrue statement of fact in the Prospectus.

2. Whether Plaintiff has stated a claim under Section 15 ("Section 15") of the Securities Act, given the absence of a requisite underlying violation of the Sections Act.

## MEMORANDUM OF POINTS AND AUTHORITIES

### SUMMARY OF ARGUMENT

This lawsuit is based on classic, but impermissible, hindsight pleading. More than seven months after BigBand's March 2007 initial public offering ("IPO"), BigBand disclosed disappointing results for the third quarter of 2007 and that it was retiring one of its several products, the Cuda Cable Modem Termination System ("Cuda"). Plaintiff claims that the Prospectus for the IPO was false and misleading, primarily because it failed to disclose problems with Cuda that allegedly existed in March 2007. Because BigBand retired Cuda in October 2007, Plaintiff speculates that the BigBand Defendants knew of fatal defects in March 2007.

Alleged omissions are not actionable under the securities laws absent a duty to disclose. There is no general duty to disclose all information that may be relevant to an IPO, even if the information is material. Sections 11 and 12 require disclosure only if an omitted fact (i) was necessary to make the affirmative statements in the prospectus not misleading, or (ii) had to be disclosed by SEC rule. The facts allegedly omitted from the Prospectus do not pass either test.

Most fundamentally, disclosure of the allegedly omitted facts regarding Cuda was not required to make any affirmative statements actually contained in the Prospectus not misleading. The Prospectus made only limited statements about Cuda, and included no representations that the product was problem-free or would be profitable. To the contrary, the Prospectus expressly warned that all of BigBand's products can "frequently" contain defects, that BigBand faced intense competition from competitors that were larger and had better resources, and that there was no guarantee that the Company would be profitable. Courts have made clear that there is no duty to disclose every problem that a product may have – particularly where, as here, a company does not affirmatively tout engineering or commercial viability.

Plaintiff's claims based on Cuda separately fail because they lack an adequate factual basis. While Plaintiff asserts that problems with Cuda existed and were known at the time of the IPO, he alleges no facts – beyond a purely speculative level – in support of his claims. Plaintiff proffers the purported statements of five confidential witnesses ("CWs"), but all they provide are conclusory opinions that Cuda was not a strong or commercially successful product. The Prospectus does not

say otherwise.  As for facts, only one CW identifies a single incident at one of BigBand's many customers' facilities.  The dearth of factual allegations easily fails to meet the pleading standard under Fed. R. Civ. P. 8(a) ("Rule 8(a)") and *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007).

Plaintiff's remaining challenges to the Prospectus are baseless.  Plaintiff's cavil that the Prospectus concealed a "landgrab" business strategy of obtaining new customers (rather than leveraging sales to existing customers) makes no sense.  Investors *expect* companies to seek new customers.  Plaintiff fares no better with his unsupported allegation that the Prospectus contained false financial statements because BigBand improperly accelerated revenue recognition and failed to take a necessary $5 million write-down for obsolete Cuda inventory.  Plaintiff does not, because he cannot, allege that BigBand ever restated its financial reporting from the Prospectus.  To the contrary, BigBand's financial statements were audited by independent accountants and declared to present fairly BigBand's financial position.  Plaintiff pleads no facts to support his financial statement claims, much less facts to raise his claims above the purely speculative level.  The inventory-based claim is particularly specious, as it is premised on the fact that BigBand recorded a $5 million impairment six months *after* the IPO.  Plaintiff's reasoning that the charge must have been required earlier is hindsight pleading.

Plaintiff's claims also fail to satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b) ("Rule 9(b)").  The claims are subject to this burden because they "sound in fraud."  Plaintiff alleges that Defendants "concealed" known facts, accelerated revenue recognition to inflate revenues, and engaged in "channel stuffing."  Courts have routinely held that such claims sound in fraud and are subject to Rule 9(b).  Because Plaintiff fails to satisfy even Rule 8(a), his allegations necessarily fail to satisfy the heightened pleading requirements of Rule 9(b).

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    The BigBand Defendants

BigBand is a Delaware corporation headquartered in Redwood City.  ¶ 19.[1]  At the time of

---

[1] "¶ __" refers to paragraphs of the Consolidated Complaint. "Ex. __" refers to the Ostler Declaration.  *See* BigBand Defendants' Request for Judicial Notice, filed Aug. 8, 2008.

its IPO, the Company employed approximately 560 employees. Ex. A at 3, 64. The Individual

Defendants are or were officers or directors of BigBand. ¶ 20.

BigBand develops, markets, and sells hardware and software platforms that enable cable

operators and telephone companies to offer video, voice, and data services to their customers. Ex.

A at 50. BigBand's customers number more than 200 globally, and include six of the ten largest

cable and telephone service providers in the United States (including Cablevision, Comcast, Time

Warner Cable, and Verizon). *Id.*; Ex. B at 4.

BigBand offers a number of products for each of video and data services. BigBand's video

product applications include digital simulcast, TelcoTV, and switched broadcast. Ex. A at 56-58.

At the time of its IPO, BigBand's data services product applications included high-speed data and

voice-over-IP. *Id.* at 57. Cuda was the platform that delivered high-speed data applications for

cable operators. *Id.* at 58. BigBand originally focused solely on video-related products, but formed

its data services division in 2004 through an asset purchase agreement with ADC

Telecommunications, Inc. *Id.* at 3; ¶ 30.

Prior to its IPO, BigBand had an impressive track record of year-over-year growth from

2004 through 2006. Net revenues increased by a factor of five, and gross profit increased by a

factor of almost eight. Ex. A at 5. BigBand has never restated its financial reporting.

**B.     BigBand's IPO**

On March 15, 2007, BigBand's common stock was offered to the public through an IPO, at

a price of $13 per share. ¶ 1. Although the Prospectus was over 100 pages, Cuda was mentioned

only briefly, and only a handful of times. *See* Ex. A at 8, 12, 14, 53-55, 57-59, F-20, F-41. That is

not surprising, given that Cuda was one of several offerings for data-related services, and that

BigBand separately offers a much larger number of video-related products. *Id.* at 56-57. For 2006,

data products (including Cuda) comprised less than 21% of BigBand's net revenue. *Id.* at F-14. In

addition, the Prospectus expressly noted that BigBand's data products, which include Cuda,

"generally have lower margins" and were "lower margin products" than its video products. *Id.* at 8,

33, 41.

The Prospectus also described six key elements of BigBand's business strategy, one of

1   which was to expand its footprint within its existing customer base.  *Id.* at 55.  A second key

2   element was to "expand customer base regardless of access technology."  *Id.*  BigBand stated that it

3   intended to leverage its expertise "to penetrate new customers worldwide."  *Id.*

4        The Prospectus contained extensive risk disclosures.  *See id.* at 3, 7-24.  BigBand

5   specifically warned that its products can "frequently" contain defects and bugs.  Addendum

6   A; Ex. A at 16-17.  BigBand further warned that customers' existing networks did and could

7   have errors, which could create interoperability issues.  Addendum B; Ex. A at 15.

8   Likewise, BigBand provided extensive warnings regarding the intense competition that the

9   Company faced, including for Cuda.  Addenda C-D; Ex. A at 12-13, 63-64.  BigBand

10  specifically named its competitors in the data services market – significant competitors,

11  including Cisco Systems and Motorola – and warned that competitors were "substantially

12  larger and have greater financial, technical, marketing and other resources than us."

13  Addenda C-D; Ex. A at 13, 63-64.  BigBand further warned that it faced additional risk

14  arising from competitors' efforts to integrate products performing similar functions to

15  BigBand's products.  Addendum E; Ex. A at 13.

16       Importantly, BigBand provided no formal guidance in its Prospectus for future results.

17  BigBand did, however, specifically state that it expected revenues for the first quarter of 2007 (to

18  end March 31, 2007) to decrease compared to revenues in the fourth quarter of 2006, in light of

19  certain purchases made during the fourth quarter.  *Id.* at 45.  BigBand provided extensive warnings

20  about its future financial performance, noting that operating results "are likely to fluctuate

21  significantly" and "may fail to meet or exceed the expectations" of analysts.  Addendum F; Ex. A at

22  3, 7-8.  BigBand also warned that results "can be impacted by our lengthy sales cycle," which

23  "lengthy, complex, and unpredictable" cycles typically ranged from 9 to 18 months but "can last

24  longer." *Id.* at 3, 8, 10, 32.  The Company further warned that it had only recently become

25  profitable, and that it may not be able to sustain profitability.  *Id.* at 10.

26  **C.     BigBand's Disclosures After the IPO**

27       On May 3, 2007, BigBand announced its first quarter results for 2007, which showed year-

28  over-year growth in net revenues, and year-over-year reduction in net loss.  Ex. C.  Plaintiff does

1   not, and cannot, allege that BigBand failed to meet guidance for this quarter, because the Company

2   never gave any – except to warn that it expected net revenue in the first quarter of 2007 to *decrease*.

3   Ex. A at 45.  BigBand provided guidance for the second quarter, indicating net revenues in the

4   range of $52 to $56 million, and GAAP earnings per share of $.02 to $.06.  *Id.*  Plaintiff

5   misleadingly alleges that BigBand provided "*lowered* revenue guidance" for the second quarter.  ¶

6   115 (emphasis added).  In fact, BigBand never previously gave guidance for the second quarter, and

7   it never subsequently changed the May 3 guidance.  Rather, BigBand's predictions were merely

8   different from the predictions that certain analysts – those "surveyed by Thomson Financial" – had

9   made.  ¶ 114.  Less than a week after the May 3 announcement, BigBand filed its quarterly report

10  on Form 10-Q, repeating its risk disclosures.  Ex. D at 28-40.

11      On August 2, 2007, BigBand announced its second quarter results.  Plaintiff misleadingly

12  emphasizes that BigBand's performance fell below *analysts'* predictions.  ¶ 117.  Putting aside that

13  the Prospectus specifically warned that results might not meet analysts' expectations, in fact

14  BigBand's results were *in line with its own public guidance from May 3*.  *See* Exs. C, E.  BigBand

15  also provided guidance for its upcoming third quarter.  Ex. D.  Again, eight days later, BigBand

16  filed its quarterly report on Form 10-Q, repeating its risk disclosures.  Ex. F at 29-41.

17      On September 27, 2007, BigBand announced that it was revising downward its revenue

18  projection for the third quarter.  Ex. G.  BigBand attributed the revision to three factors:  (i) the

19  inability to recognize in the third quarter certain video-related revenues, due to unexpected software

20  customization and integration needs in that area; (ii) slowdown in other video-related revenues, as

21  one major customer worked through some previously purchased inventory; and (iii) continued

22  softness in the data (Cuda) business.  *Id*.

23      On October 30, 2007, BigBand announced disappointing results for the third quarter.  Ex.

24  H.  The Company described a new restructuring plan, which focused on video services and retiring

25  the Cuda platform for data services.  *Id.*  Defendant Bassan-Eskenazi explained that, after

26  BigBand's August 2 announcement, the Company reevaluated its business and conferred with its

27  customers; as a result of what it learned, BigBand decided to refocus on video services, which were

28  the Company's "unique core competency," as opposed to data services (e.g., Cuda) that were

acquired in mid-2004.  *Id.*  During a conference call later that day, Bassan-Eskenazi reiterated that, after recently consulting with customers, a "key takeaway[]" was "to focus on our unique core competency, innovative video solutions."  Ex. I at 2.  Consistent with the Prospectus, Bassan-Eskenazi described data services products as "lower level, lower margin" and "commodity" products.  *Id.* at 2, 6.  BigBand also described that it took a $5 million impairment charge for obsolete Cuda inventory.  Ex. H; Ex. I at 3.

**D.      Plaintiff's Allegations**

BigBand's stock price dropped following the Company's announcements on September 27 and October 30, 2007.  Within days of the first announcement, the first of several lawsuits was filed, claiming that the Prospectus contained false or misleading statements.  This Court consolidated the actions and appointed Gwyn Jones as Lead Plaintiff.  On May 30, 2008, Plaintiff filed an amended complaint, asserting claims under Sections 11, 12, and 15.

The Complaint appears to set forth various theories for why the Prospectus was false and misleading.[2]  *First*, Plaintiff's primary assertion, based on the purported statements of five CWs, is that BigBand failed to disclose various problems associated with Cuda.  According to Plaintiff, the following problems existed at the time of the IPO:  "Cuda was actually already failing as a product"; "ad hoc" attempts to add features to Cuda were exacerbating existing product problems; Cuda was a "commodity product"; and it was impossible for Cuda to compete effectively.  ¶¶ 4-8, 12, 47-74, 130, 134, 138(a).

*Second*, Plaintiff alleges, based on the purported statement of a sixth CW, that BigBand concealed its "true" or changed business strategy.  According to Plaintiff, BigBand was "secretly" pursuing a "landgrab" business strategy based on securing new customers, rather than leveraging sales to preexisting customers as described in the Prospectus.  ¶¶ 4, 8, 11-12, 47-49, 86-93, 124-25,

---

[2] This section describes what the Complaint "appears" to allege because the pleading is difficult to decipher.  Plaintiff fails to set forth, in a clear, concise, and organized manner, the statements alleged to be misleading, the reasons why Plaintiff believes they are misleading, and the facts supporting such belief.  This Court has expressly criticized exactly this type of "puzzle" pleading.  *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1073-75 (N.D. Cal. 2001) ("[P]laintiffs have failed to craft a complaint in such a way that a reader can, without undue effort, divine precisely which statements (or portions of statements) are alleged to be false or misleading, and the reason or reasons why each statement is false or misleading.").

130-31, 135-36, 138(b). Relatedly, Plaintiff alleges that, by concealing changes in its business strategy, BigBand accelerated improperly revenue recognition and thereby rendered its financial statements false. ¶¶ 8, 97-106, 138(c).

*Third*, Plaintiff points to the $5 million charge for inventory that BigBand wrote down in the third quarter of 2007 and asserts without any factual support that BigBand should have taken the charge before the IPO, again rendering its financial statements false. ¶¶ 7, 75-85, 138(c).

*Fourth*, Plaintiff alleges that BigBand failed to disclose that it was "stuffing its customers with excess BigBand product." ¶¶ 65, 155.

## ARGUMENT

## I.    Plaintiff's Section 11 Claim Should Be Dismissed

### A.    Applicable Standards

***Section 11.*** Section 11 creates a private remedy for any purchaser of a security if any part of a registration statement, "when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). To state a claim under Section 11, a plaintiff must demonstrate: "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403-04 (9th Cir. 1996) (internal marks and citations omitted).

With respect to alleged omissions, there is no duty to disclose *all* information related to a stock offering, even if material. *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (securities laws "prohibit *only* misleading and untrue statements, not statements that are incomplete"); *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1190 (11th Cir. 2002) (prospectus need not disclose all information material to offering). Rather, it is axiomatic that "silence is not misleading in the absence of a duty to disclose." *In re VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1480 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993).

Section 11 imposes a duty to disclose an omitted fact in only two circumstances: (i) where the omitted fact is necessary to make the affirmative statements in the prospectus not misleading,

1    and (ii) where the omitted fact is required to be stated by SEC rule.  15 U.S.C. § 77k(a).  As

2    described below, neither circumstance exists here.

3        **Pleading Requirements.**  A court should dismiss a complaint under Fed. R. Civ. P. 12(b)(6)

4    for "lack of a cognizable legal theory" or "absence of sufficient facts alleged under a cognizable

5    legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  The Supreme

6    Court recently made clear that, under Rule 8(a), a plaintiff's "obligation to provide the grounds of

7    his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

8    elements of a cause of action will not do."  *Twombly*, 127 S. Ct. at 1964-65 (internal marks

9    omitted).  The factual allegations in a complaint "must be enough to raise a right to relief above the

10   speculative level."  *Id.* at 1965.  To defeat a motion to dismiss, courts require "enough facts to state

11   a claim to relief that is plausible on its face."  *Id.* at 1974; *see also id.* at 1966 (complaint must

12   contain "allegations plausibly suggesting (not merely consistent with)" conduct alleged); *see also*

13   *Belodoff v. Netlist, Inc.*, 2008 WL 2356699, *12 (C.D. Cal. May 30, 2008) (dismissing Section 11

14   claims under *Twombly*).

15       Although a court must accept well-pleaded allegations as true and construe all reasonable

16   inferences in plaintiff's favor, conclusory allegations and unwarranted inferences are insufficient to

17   defeat a motion to dismiss.  *In re Verifone Sec. Litig.*, 11 F.3d 865, 868 (9th Cir. 1993); *accord*

18   *North Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 583 (9th Cir. 1983).  A court is not required

19   to accept conclusory allegations that are contradicted by documents referenced in the complaint.

20   *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295 (9th Cir. 1998).

21       Section 11 does not contain an element of scienter or fraudulent intent.  But, in addition to

22   the standard discussed in *Twombly*, Section 11 claims may also be subject to the heightened

23   pleading requirements of Rule 9(b) if they "sound in fraud."  *In re Daou Sys., Inc.*, 411 F.3d 1006,

24   1027 (9th Cir. 2005); *Stac*, 89 F.3d at 1404-05.  Rule 9(b) requires that "[i]n alleging fraud or

25   mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed.

26   R. Civ. P. 9(b).  The rule requires a plaintiff to detail not only the time, place, and content of an

27   alleged misrepresentation, but also what is false about a statement, why it is false, and why it was

28   false when made.  *Yourish v. Cal. Amplifier*, 191 F.3d 983, 992-93 (9th Cir. 1999).

**B.    Plaintiff's Allegations Regarding Cuda Are Fatally Deficient**

The bulk of the Complaint maintains that the Prospectus failed to disclose information about BigBand's Cuda product.  ¶¶ 4-8, 12, 47-74, 130, 134, 138(a).  These allegations fail to state a claim because there was no duty to disclose the allegedly omitted information.

**1.    There Was No Duty to Disclose Alleged Cuda Product Problems**

Relying on the purported statements of five CWs, Plaintiff's primary assertion is that the Prospectus failed to disclose allegedly then-existing problems with Cuda.  But this purportedly undisclosed information was not necessary to make affirmative statements in the Prospectus not misleading, and it was not otherwise required to be included by SEC rule.  Thus, BigBand had no duty to disclose the information, and the alleged failure to disclose cannot be actionable.

**a.    Disclosure of Product Problems Was Not Necessary to Make Any Affirmative Statements in the Prospectus Not Misleading**

Plaintiff cannot demonstrate a duty to disclose the alleged product problems for at least three reasons.  These reasons, whether separately or in combination, require dismissal.

*First*, Plaintiff cannot plead that there was any link between what the Prospectus actually said about Cuda and the alleged omissions related to product problems.  Abundant caselaw makes clear that such a link is essential.  For example, in *Verifone*, the Plaintiffs brought a Section 11 claim alleging that a prospectus was misleading because, while the company listed 52 prominent customers, the company failed to disclose that it did not have orders with those customers.  11 F.3d at 869-70.  The Ninth Circuit rejected the claim, observing that the customer list appeared in a discussion of VeriFone's historical marketing strategy, and "connote[d] nothing" about the status of existing or prospective orders.  *Id.*

Likewise, in *In re iAsia Works, Inc., Securities Litigation*, 2002 WL 1034041, *7 (N.D. Cal. May 15, 2002), the court rejected a Section 11 claim for lack of a nexus between challenged statements and alleged omissions.  The plaintiffs challenged the statement that "most" of the company's "large-scale" data centers would be expected to exceed 50,000 square feet, because the company had already constructed centers much larger.  *Id.*  The court dismissed the claim, reasoning that the statement "contained no implication of an upper limit" of the centers' size, and

1    no implication that the company had not yet begun to build centers exceeding 50,000 feet. *Id.*; *see*

2    *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 926-28 & n.13 (S.D. Ind. 2008) (rejecting

3    challenge to statements about increased defibrillator sales based on omission of purportedly known

4    defibrillator defects;  plaintiffs failed to demonstrate "how omission of product defect information

5    rendered any specific affirmative statements misleading.").[3]

6            Here, Plaintiff does not and cannot articulate the necessary link between the Prospectus'

7    affirmative statements about Cuda and allegedly existing product problems.  Indeed, Plaintiff is

8    hard-pressed to point to *any* affirmative statements about Cuda, because the Prospectus made such

9    limited references to and statements about it.  All that Plaintiff cites are two statements generically

10   describing Cuda's characteristics:

11           *High-Speed Data and Voice-over-IP*.    Our High-Speed Data product application
            enables cable operators to offer real-time services, such as VoIP and streaming video
12           content over the Internet. Using our High-Speed Data product application, cable
            operators can offer different levels of data speeds, which can be tiered based on the
13           level of subscriber fees or on real-time bandwidth needs. Our High-Speed Data
            product application offers redundancy characteristics and a distributed switch fabric
14           with routing and forwarding capabilities across multiple application modules, instead
            of in a central core where switching latency can be exacerbated. As a result, those
15           cable operators that are deploying voice services can leverage the ability of our High-
            Speed Data product application to reduce dropped packets and latency to deliver
16           high-quality and reliable voice services. . . .

17           *Cuda Cable Modem Termination System (CMTS)*.    Our Cuda CMTS is a DOCSIS
            2.0-qualified hardware platform dedicated to the delivery of our data applications for
18           cable operators. Instead of locating all routing and forwarding in a central switching
            core, our Cuda hardware system architecture distributes these capabilities across
19           multiple application modules to offer carrier-class reliability. It has a total switching
            capacity of 204 Gbps and provides the superior RF performance critical for real-time
20           services, such as VoIP and streaming video, that require very low packet error rates.
            Our CMTS platform supports QAM RF modulation for both downstream and
21           upstream digital traffic. Because of its high-density design, this platform allows our
            customers to scale their services with reduced space and power consumption.
22           Moreover, like the BMR and BME, the Cuda is field-upgradeable to support new
            services and network architectures.

23

24           [3] *Accord Belodoff*, 2008 WL 2356699 at *11 (challenged statements concerning company's
     business objectives were "disconnected from the alleged omissions" concerning then-current
25   market trend; alleged omissions "would have no bearing" on company's strategy); *In re OPUS360
     Corp. Sec. Litig.*, 2002 WL 31190157, *8 n.5 (S.D.N.Y. Oct. 2, 2002) (rejecting claim that
26   prospectus failed to disclose software gaps, because plaintiffs cited "no portion of the Prospectus,
     that indicates that there was any basis to make conclusions regarding [the product] with respect to
27   specific functionality, security, or viability.  The Prospectus spoke only in general terms about the
     goals of the new software, and did not delve into specifics concerning the software's programming
28   capabilities or status.").

1  Ex. A at 57-58.  These statements include no representations regarding problems or defects

2  (or the lack thereof) in Cuda products.  Nor did the statements make any representations

3  regarding the products' commercial or engineering viability (or lack thereof).  Even

4  assuming arguendo that Defendants knew about existing product problems for Cuda – which

5  Plaintiff fails to plead, *see infra* at 13-15 – that has no bearing on the truth or falsity of what

6  BigBand said about Cuda in the Prospectus.

7       *Second*, BigBand not only made *no* representations about the absence of problems in Cuda

8  products; in fact BigBand expressly warned investors that *all* of its business was subject to the risk

9  of product defects.  Addendum A; Ex. A at 16-17.  The Prospectus' extensive warnings included

10  that BigBand's products were "very complex and can frequently contain undetected errors or

11  failures," and that such problems could cause BigBand "to lose revenue or market share, increase

12  our service costs, cause us to incur substantial costs in redesigning the products, subject us to

13  liability for damages and divert our resources from other tasks, any one of which could materially

14  adversely affect our business, results of operations and financial condition."  *Id.*  BigBand further

15  warned that errors in software or defects in hardware could cause interoperability problems and

16  negatively affect the business.  Addendum B; Ex. A at 15.

17       The Ninth Circuit has made clear that a company's risk disclosures can contain enough

18  cautionary language to protect the company, as a matter of law, from securities claims.  *In re*

19  *Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994); *accord Stac*, 89 F.3d at 1406.  In

20  *Worlds of Wonder*, the plaintiffs alleged that the defendant company had ongoing, "crippling

21  deficiencies" in internal controls but failed to disclose them.  The Circuit disagreed, finding that the

22  Prospectus never stated that internal control problems were "in the past."  Rather, the Court found,

23  the prospectus adequately and "clearly warned that the company's attempt to improve internal

24  controls could prove to be inadequate."  *Id.* at 1417.  Similarly, in *Stac*, the plaintiffs charged that

25  the defendant company went public knowing, but not disclosing, that Microsoft was about to come

26  out with a competitive product that would impinge market share.  89 F.3d at 1406.  The Circuit

27  found that the prospectus adequately warned that "[t]here can be no assurance that Microsoft . . .

28  will not incorporate a competitive . . . technology in their products."  *Id.*

1    The Circuit also relied on risk disclosures in rejecting claims of misleading omissions based

2  on product problems in *In re Convergent Technologies Securities Litigation*, 948 F.2d 507 (9th Cir.

3  1991). The plaintiffs alleged that defendants misled investors by concealing certain production

4  problems with its NGEN product, particularly given the company's claim that "the technical risks

5  in the development of NGEN are well controlled."  *Id.* at 515.  The Circuit concluded that the

6  company adequately disclosed the relevant risks by stating:  "The Company is undertaking

7  substantial development, manufacturing and marketing risks," and "There can be no assurance that

8  the Company will successfully complete the development of its new products or that it will be

9  successful in manufacturing the new products in high volume or marketing the products in the face

10  of intense competition."  *Id.*  The Circuit also rejected claims that the company failed to adequately

11  warn about known delays and mechanization problems in another product, given the following risk

12  disclosures:  risks include implementation of advanced manufacturing processes; successful volume

13  production will depend on various areas in which the company had no prior experience; the

14  company had not manufactured its new products in volume; and the company "may" experience

15  unanticipated problems in manufacturing.  *Id.* at 516.  The Court reasoned:

16          A company need not detail every corporate event, current or prospective . . .  The
           securities laws do not require management to bury the shareholders in an avalanche
17          of trivial information – a result that is hardly conducive to informed decisionmaking.

18  *Id.* (internal marks and citations omitted).

19          Apparently conceding the effect of BigBand's risk disclosures, Plaintiff alleges that they

20  were misleading because they did not disclose that alleged Cuda product problems *already* existed

21  at the time of the IPO.  ¶ 54.  But courts have repeatedly rejected this argument, finding that

22  virtually identical risk disclosures – which describe purportedly existing problems as contingencies

23  – precluded any finding of a misleading statement.  For example, in *Stac*, the Circuit found

24  adequate a warning that there could be "no assurance" Microsoft "will not" come out with a

25  competitive product, despite plaintiffs' assertion that the defendant company already knew

26  Microsoft was going to do so.  89 F.3d at 1406.  In *Convergent*, the Circuit found adequate a

27  warning that the company "may" experience manufacturing problems, despite the allegation that

28  there were known problems.  948 F.2d at 516.

The court in *OPUS360* applied this well-settled principle to similar facts as here. The plaintiffs claimed that a prospectus failed to disclose that the company's software product "was known to be a fatally flawed application which had failed all of its internal testing and contained significant software and security problems that were basically incurable." 2002 WL 31190157 at *8. The court dismissed the claim, finding among other things that there was "adequate disclosure" of potential flaws in the software, notwithstanding the allegation that the flaws were known; the company had warned that "[o]ur services *may* contain defects or errors that could damage our reputation." *Id.* (emphasis added); *see also Plevy v. Haggerty*, 38 F. Supp. 2d 816, 832 (C.D. Cal. 1998) ("where a company's filings contain abundant and specific disclosures regarding the risks facing the company . . . the investing public is on notice of these risks and cannot be heard to complain that the risks were masked as mere contingencies").

As courts have repeatedly held, not every product problem or defect need be disclosed in a prospectus. That is particularly true where, as here, the company did not affirmatively tout its products as problem-free but instead expressly warned that they can "frequently" suffer defects. *See Shuster v. Symmetricon, Inc.*, 1997 WL 269490, *6 (N.D. Cal. Feb. 25, 1997) (rejecting claim that defendants failed to disclose that product had "numerous unresolved operating problems," where defendants stated product was still being developed and they were working to improve it; "The law is clear that companies are not obligated to disclose every potential problem a product may have."); *accord In re Allscripts, Inc. Sec. Litig.*, 2001 WL 743411, *9 (N.D. Ill. June 29, 2001) ("Corporate executives have no general duty to disclose every problem that arises in selling a Company's products."). Plaintiff's emphasis on alleged Cuda problems is also undermined by the fact that, prior to the IPO, data services (including Cuda) comprised less than 21% of BigBand's net revenues, as the Prospectus made clear. Ex. A at F-14.

*Third*, even if Plaintiff could establish a duty to disclose known product problems (which he cannot), he fails to plead adequate facts to establish that there indeed were existing problems that should have been disclosed or that the BigBand Defendants knew about them. Plaintiff's allegations consist primarily of the conclusory opinions of five relatively low-level BigBand

employees[4] – out of more than 560 – that Cuda was a bad product:

- Former Senior Executive Engineer said that Cuda was "mediocre," "hung together poorly" and had poor performance, "lacked stability" and had frequent failures and crashes, did not "fit in" with other BigBand products, and its quality had deteriorated to unsatisfactory levels, ¶¶ 56-57;

- Former Executive Software Engineer said that Cuda was a "hack" product with a "shaky" foundation, and each version grew worse and more problematic, ¶ 62;

- Former Senior Network Support Engineer said that the constant addition of new features was "Killing Cuda," ¶ 66;

- Former Cuda CMTS Account Manager said that BigBand lacked resources to successfully add new features, ¶ 71; and

- Former Sales Director said that BigBand was unsuccessfully adding features to a system that was "fraught" with operability problems, ¶ 72.

None of these conclusory descriptions constitutes a *factual* basis for Plaintiff's claims. *See Twombly*, 127 S. Ct. at 1974. Such vague, generic allegations are routinely rejected as insufficient. *See generally In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1088 (9th Cir. 2002).[5]

        In addition, only one of the CWs (Senior Executive Engineer) even claims to have had direct communication with any Individual Defendant. Senior Executive Engineer purportedly told Bassan-Eskenazi that Cuda was "failing." ¶¶ 4, 57, 61. This CW, however, never specifies whether the purported failure was due to a product defect or something else. This CW also purportedly discussed with Bassan-Eskenazi *whether* unidentified "problems" with Cuda were so severe that the product should be discontinued. ¶¶ 57-58. Tellingly, Senior Executive Engineer does not describe Bassan-Eskenazi's response. These allegations do not rise above pure speculation that any of the Individual Defendants knew that specific problems existed; the size, magnitude or scope of any problems; or whether the problems could be resolved. The allegations certainly do not indicate that the BigBand Defendants knew and agreed that Cuda was nonviable prior to the IPO.

        Beyond conclusory opinions, the sparse facts provided by the CWs are deficient. One CW

---

[4] None of the CWs reported directly to any of the Individual Defendants. Rather, they were two, three, and four levels below them. ¶¶ 56, 62, 65, 71, 72.

[5] *Accord In re Leapfrog Enter. Sec. Litig.*, 2006 WL 2192116, *2 (N.D. Cal. Aug. 1, 2006); *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1155 (W.D. Wash. 2006); *In re Business Objects S.A. Sec. Litig.*, 2005 WL 1787860, *6 (N.D. Cal. July 27, 2005); *In re Metawave Comms. Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1073-74 (W.D. Wash. 2004).

1    purportedly said that, before the IPO, the number and severity of field problems was high,

2    increasing, and regularly reported to Bassan-Eskenazi.  ¶ 63.  But nothing further was provided,

3    including the nature of the problem, whether the problem could be readily resolved, or whether the

4    problem was one of the frequently-occurring "bugs" about which the Prospectus expressly warned.

5    Two CWs said that product returns were "high" and "overwhelmed" the supply of replacement

6    parts.  ¶¶ 67, 71.  Again, Plaintiff fails to provide similar contextual information.  Another CW

7    pointed to a single instance in which a Cuda product caught fire at one customer's facility in

8    December 2006; according to Plaintiff's own allegations, the fire was caused by the fact that certain

9    boards were not installed correctly.  ¶¶ 68-69.[6]  Plaintiff cannot point to any case requiring

10   disclosure of a single field incident – purportedly resulting from improper installation – at one of

11   multiple customer facilities.  That kind of detail would surely bury the investing public in an

12   avalanche of trivial information.  *See generally Convergent*, 948 F.2d at 516.

13          The decision in *Panther Partners, Inc. v. Ikanos Communications, Inc.*, 538 F. Supp. 2d 662

14   (S.D.N.Y. 2008), makes clear that the scarce facts proffered by Plaintiff are insufficient to establish

15   a duty to disclose.  The plaintiffs alleged that Ikanos knew, but failed to disclose, that its computer

16   chips were defective and failing in 25-30% of cases.  *Id.* at 672.  The court dismissed the Section 11

17   claims, finding that plaintiffs failed to provide key contextual facts:

18          To state a plausible claim under the *Twombly* standard, further context must be
             provided about these chip defect allegations.  The Plaintiff must tell the Court what
19          was going on when – and how much the defect experienced actually differed from
             the norm.  This is especially true where, as here, the nature of the allegation is an
20          exercise in "backwards" pleading – an attempt to allege liability for disclosures not
             made because the material fact was unknowable or had not even occurred as of the
21          critical date.  No plausibly pleaded fact suggests that Ikanos new or should have
             known of the scope or magnitude of the defect problem at the time of the Secondary
22          Offering.

23   *Id.* at 673.  The court also observed that, as here, the company specifically disclosed the risk that its

24   products "frequently contain defects and bugs."  *Id.*; *see also Garber v. Legg Mason*, 537 F. Supp.

25   2d 597, 613 (S.D.N.Y. 2008) (dismissing, under *Twombly*, allegations that prospectus failed to

26   disclose increases in customer withdrawals and integration costs; plaintiffs failed to "describe in

27   _____

28          [6] This CW also said that a second Cuda product caught fire in July 2007, months *after* the IPO.
     ¶ 69.  The Prospectus could not disclose an event that had not yet taken place.

1   any way the magnitude of the increase, the initial projection, or by how much the actual costs

2   exceeded the internal budget.  The pleadings are simply too conclusory. . . .").

3        At bottom, Plaintiff's allegations regarding allegedly then-existing problems rest on the fact

4   that, on October 30, 2007, BigBand announced that it was retiring the Cuda product line.  Exs. H, I.

5   That is classic hindsight pleading.  Plaintiff does not plead that BigBand knew at the time of the

6   IPO that it would retire Cuda.  As BigBand explained on October 30, 2007, the decision to retire

7   Cuda was made as a result of customer interviews undertaken several months *after* the IPO.  Ex. H;

8   Ex. I at 1-2.  Indeed, the fact that BigBand did not retire Cuda until seven months *after* the IPO

9   undermines any inference that significant problems existed earlier.  *See OPUS360*, 2002 WL

10  31190157 at *8 (allegations of pre-IPO product flaws were undermined by fact that "it was only in

11  September, 2000, five months *after* the prospectus was issued" that OPUS abandoned its efforts to

12  develop product).[7]

13       Given the limited statements actually made about Cuda, the extensive risk disclosures

14  provided, and Plaintiff's scant allegations regarding purportedly existing problems, disclosure of

15  such problems was not required to make affirmative statements in the Prospectus not misleading.

16                    **b.       Disclosure of Product Problems Was Not Required by SEC Rule**

17       Disclosure of purported Cuda product problems likewise was not required under the second

18  circumstance delineated in Section 11.  No SEC rule required the information to be stated.  *See* 15

19  U.S.C. § 77k(a).

20       At the end of his Complaint, Plaintiff asserts that omissions from the Prospectus violated

21  Regulation S-K, Item 303(a), 17 C.F.R. § 229.303(a).  ¶ 155.  Plaintiff misleadingly asserts that this

22  regulation "requires that trends which will have a material effect on a registrant's results be

23  disclosed."  *Id.*  Plaintiff intentionally omits a key word from the regulation:  Item 303(a) actually

24  requires disclosure only of "*known* trends or uncertainties that have had or that the registrant

25       [7] Plaintiff also asserts that, before the IPO, BigBand reorganized its data services division and

26  personnel.  ¶¶ 6, 48, 63-64.  It is sheer speculation that the reorganization was caused by knowledge
    of some then-existing problems that had to be disclosed.  No Prospectus details a company's

27  organizational charts (or changes thereto) of particular divisions; such detail would overwhelm
    investors.  If anything, a change in structure or personnel demonstrates that BigBand was

28  committed to the viability of Cuda; if BigBand had not been so committed, there would have been
    no reason for change.

1  reasonably expects will have a material favorable or unfavorable impact" on sales, revenues, or

2  income.  17 C.F.R. § 229.303(a)(3)(ii) (emphasis added).  Item 303(a) gives rise to a duty to

3  disclose only where defendants *knew* about the trend, *knew* that the trend was reasonably likely to

4  occur, and *knew* – based on their present-day perspective – that the trend was reasonably likely to

5  have a material impact.  *Steckman*, 143 F.3d at 1296-97; *In re Dreamworks Animation SKG, Inc.,*

6  *Sec. Litig.*, 2006 U.S. Dist. LEXIS 24456, *10 (C.D. Cal. Apr. 12, 2006).

7          As described *supra*, Plaintiff's allegations fail to establish, beyond a speculative level, that

8  the BigBand Defendants knew about allegedly existing Cuda problems.  The allegations also

9  provide *no* information regarding purported knowledge that problems were reasonably likely to

10  have a material impact on BigBand's financial results.  *See Steckman*, 143 F.3d at 1297-98

11  (defendants could not have reasonably been expected to know that slowdown was "anything more

12  than a regular fourth quarter slowdown" or would have material impact on net sales).

13                  **2.      Further Disclosure Regarding Cuda Was Not Required**

14          Plaintiff's remaining alleged omissions regarding Cuda are even weaker.  Plaintiff first

15  alleges that the Prospectus failed to disclose that Cuda was a "commodity" product.  *See, e.g.*, ¶¶ 4,

16  12, 49, 54, 72.  Plaintiff is wrong. BigBand did not have a duty to denigrate its products by labeling

17  them "commodities."  *See In re DSP Group, Inc. Sec. Litig.*, 1997 WL 678151, *6 (N.D. Cal. Mar.

18  5, 1997) ("[D]efendants do not have a duty to disclose a competitor's market advantage or to

19  denigrate their own product.").[8]  Also, the Prospectus expressly noted that data products – including

20  Cuda – were lower margin products. Ex. A at 8, 33, 41.  The fact that the Prospectus did not use the

21  word "commodity" is irrelevant.  There is no talismanic formula; the securities laws impose no duty

22  to use particular or identical words to describe the same concept.

23          Plaintiff next complains that Defendants failed to disclose Cuda's alleged commercial

24  nonviability and inability to compete.  *See, e.g.*, ¶¶ 4-5, 12, 48-49, 53, 138(a).  This claim fails for

25  several reasons.  Most fundamentally, Plaintiff alleges no facts supporting it.  *See supra* at 13-15.

26  Additionally, the Prospectus extensively disclosed the intense competition that BigBand faced in

27  _____

28          [8] *Accord In re Syntex Corp. Sec. Litig.*, 1993 WL 476646, *7 (N.D. Cal. Sept. 1, 1993); *In re*
   *Wyse Tech. Sec. Litig.*, 1990 WL 169149, *2 (N.D. Cal. Sept. 13, 1990).

1    the data services market.  Addenda C-D; Ex. A at 12-13, 63-64.  The Prospectus further warned that

2    BigBand's competitors were "substantially larger and have greater financial, technical, marketing

3    and other resources than" BigBand.  *Id.* at 13.  In the face of such risk disclosure, the Prospectus

4    was not, as a matter of law, misleading.  *Supra* at 11-13.

5    Moreover, BigBand again did not have a duty to denigrate its products and predict that Cuda

6    could not compete in the data services market.  *Supra* at 17.  In any event, BigBand expressly

7    warned that there was no guarantee of continued profitability from its products, particularly given

8    that BigBand had only recently become profitable.  Ex. A at 10.

9    Finally, Plaintiff's assertion is nothing more than a demand that the Prospectus disclose a

10    negative forecast.  Well-established precedent makes clear that such forward-looking disclosure is

11    not required.  *See Verifone*, 11 F.3d at 869 (failure to include forecasts in prospectus did not render

12    statements misleading); *accord Belodoff*, 2008 WL 2356699 at *8 (no duty to disclose defendants'

13    "then-present knowledge" that market was already in downward trend).[9]

14    **C.    Plaintiff's Remaining Allegations Are Baseless**

15    Beyond purported omissions regarding Cuda, the Complaint challenges a handful of sundry

16    omissions from the Prospectus.  These claims are baseless.

17    ***Alleged Secret Change in Business Strategy.***  Plaintiff complains that the Prospectus failed

18    to disclose that BigBand had abandoned its stated business plan of leveraging sales to pre-existing

19    customers, and was instead pursuing a "landgrab" approach of targeting new customers.  ¶¶ 4, 8,

20    11-12, 47-49, 86-93, 124-25, 130-31, 135-36, 138(b).[10]  This assertion is frivolous.

21    BigBand expressly – and not surprisingly – told investors that the key elements of its

22    business strategy included expanding its customer base:

23    *Expand Customer Base Regardless of Access Technology.*    Service providers
      deploy video, voice and data services to subscribers across networks based on
24    coaxial, fiber and copper. We have successfully deployed our product applications
      across these access technologies. We are currently providing Verizon with a

25    _____

      [9] *See also In re Lyondell Petrochemical Co. Sec. Litig.*, 984 F.2d 1050, 1053 (9th Cir. 1993);
26    *May v. Borik*, 1997 WL 314166, *10 (C.D. Cal. Mar. 3, 1997).

27    [10] Plaintiff proffers only one CW statement in support of this allegation.  Senior Business
      Analyst – who joined BigBand only *after* the IPO – purportedly said that there was a "top down"
28    business plan that did not support the "top down" plan in the Prospectus.  ¶¶ 8, 74.  Even putting
      aside that this statement is vague and conclusory, it does not support Plaintiff's assertion.

1   solution that allows both digital and analog transmission of video over fiber-optic
2   lines. Other telephone companies deploying video services over existing DSL lines
    leverage our media processing expertise to provide such video services. Still others
3   use our product applications to carry services over coaxial cable. We intend to
    leverage our media processing expertise to penetrate new customers worldwide,
    regardless of the type of access networks they use.
4

5   Ex. A at 55.  Plaintiff quotes the business strategy section of the Prospectus, but *omits* this particular

6   paragraph.  ¶ 87.  Plaintiff cannot manufacture a securities claim by quoting selectively from the

7   Prospectus.  *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999); *Wietschner v.*

8   *Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1109 (N.D. Cal. 2003).

9       Moreover, that BigBand would pursue a "landgrab" approach to acquire new customers is

10  neither inconsistent with its other stated strategies, nor in any way surprising.  A company can *both*

11  leverage sales to pre-existing customers and look to gain new customers – and then leverage sales

12  to those new customers once signed up.  Indeed, investors expect companies to do so.

13      ***Allegedly False Financial Statements and Statements Concerning Revenue Recognition.***

14  Plaintiff next complains that the Prospectus contained false financial statements because the

15  "concealed" change in business model somehow allowed BigBand to accelerate the recognition of

16  millions of dollars of revenue.  ¶¶ 8, 97-106, 138(c).

17      Plaintiff never explains the purported tie between the "secret" change in business plan and

18  allegedly accelerated revenue recognition.  In any event, as described *supra*, there was no "secret"

19  change.  Plaintiff also appears to claim that revenue recognition was accelerated through the

20  adoption of "unreasonably short product cycle assumptions and disclosures."  ¶ 94.  But Plaintiff

21  alleges no facts in connection with this conclusory allegation, including what assumptions were

22  used or why they were "unreasonably short."  To the extent Plaintiff alleges that the Prospectus

23  falsely stated that sales cycles were 9 to 18 months, ¶¶ 90, 91, 93, the Prospectus did no such thing.

24  Rather, the Prospectus noted that cycles were "lengthy," "unpredictable," and typically lasted 9 to

25  18 months "but can last longer."  Ex. A at 3, 8, 10, 32.

26      Plaintiff also provides no facts to support his claim that revenue was accelerated or that

27  financial statements falsely reported revenue.  Of course, Plaintiff does not – because he cannot –

28  claim that BigBand ever restated its financial reporting.  To the contrary, the financial statements

1   provided in the Prospectus were audited by BigBand's independent registered public accounting

2   firm, and that firm opined that the statements "present fairly, in all material respects, the

3   consolidated financial position of BigBand Networks." Ex. A at F-2. The only "proof" advanced

4   by Plaintiff is a table of post-IPO estimated billings, which indicate that billings subsequently

5   decreased and deferred revenues increased. ¶ 98. Plaintiff provides no explanation for how these

6   numbers reflect false financial statements in the Prospectus. If anything, the table shows that

7   BigBand was *deferring* revenue recognition, not accelerating it; the chart shows increases in

8   deferred revenue for three of the four quarters. *Id.*

9        ***Alleged Failure to Write Down Value of Inventory.*** Plaintiff observes that BigBand took a

10  $5 million charge for Cuda inventory six months *after* the IPO, and contends that the write down

11  should have occurred prior to the IPO. ¶¶ 7, 75-85, 138(c). Plaintiff reasons that the factors

12  requiring this charge must have existed before the IPO, and thus the charge should have been taken

13  earlier. ¶ 78. But that is hindsight pleading. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.

14  1990) ("No matter when a bank [writes down a loan], someone may say that it should have acted

15  sooner.").

16       Plaintiff pleads no facts supporting his claim that the charge was required before the IPO.

17  Merely repeating the conclusory assertion that the BigBand Defendants already knew that the Cuda

18  business was failing, ¶ 77, is insufficient. Also, none of Plaintiff's CWs made *any* statements

19  regarding allegedly obsolete inventory before the IPO. According to Plaintiff, GAAP and cost basis

20  accounting require an inventory write down if "the utility of the goods, in their disposal in the

21  ordinary course of business, will be less than cost." ¶ 79. But Plaintiff alleges no facts concerning

22  the price at which Cuda products were selling, or whether that price was less than cost. That failure

23  is fatal to Plaintiff's claim.

24       *Plevy* makes clear that the Complaint is deficient on this point. The plaintiffs alleged that

25  the defendants failed to take a required write-down for obsolete inventory, pointing to the facts that

26  inventory rose through the alleged class period and that the company subsequently recorded an

27  inventory impairment. 38 F. Supp. 2d at 824. The court dismissed the claim, noting that the

28  products were still sold at a profit during the class period and thus they were not obsolete under cost

basis accounting.  *Id.* at 825.  The court further noted that the company cautioned investors about

the possibility of obsolescence and inventory write-downs – just as BigBand did in the Prospectus.

*Id.*; Ex. A at 35, 64.[11]

     ***Alleged Channel Stuffing.***  Plaintiff's lengthy Complaint makes only two brief references

to alleged "stuffing" of customers.  ¶¶ 65, 155.  These allegations readily fail.  Channel stuffing is

the "oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the

next quarter as the distributors no longer make orders while they deplete their excess supply."

*Steckman*, 143 F.3d at 1298.  The Ninth Circuit has rejected allegations of channel stuffing as

indicia of a duty to disclose some known trend, calling them "speculation made in hindsight."  *Id.*;

*Dreamworks*, 2006 U.S. Dist. LEXIS 24456 at *10.

     More fundamentally, Plaintiff's allegations of channel stuffing are threadbare.  Plaintiff

proffers only the conclusory statement of an alleged Senior Network Support Engineer that

BigBand oversold products and that it was "known" that customers would not re-order in the

foreseeable future.  ¶ 65.  *No* facts are offered, except that a single unnamed customer informed this

CW – five months before the IPO – that it had high inventory and could not be expected to reorder

new Cuda products.  *Id.*  Two other customers allegedly said they had excess inventory, but

indicated nothing about whether they would or would not reorder.  Such allegations are woefully

insufficient to state a claim under Section 11.  *See Belodoff*, 2008 WL 2356699 at *12 (dismissing

"channel stuffing" allegation where plaintiff provided no factual basis for claim that defendant

"stuffed" customers and no explanation for how "stuffing" made statements in prospectus

misleading); *accord Panther Partners*, 538 F. Supp. 2d at 670.

     In sum, under *Twombly*, Plaintiff fails to plead facts sufficient to state a claim that the

BigBand Defendants had a duty to disclose any further information in the Prospectus.[12]

---

[11] *Accord In re ICN Pharms. Inc. Sec. Litig.*, 299 F. Supp. 2d 1055, 1065 (C.D. Cal. 2004) (rejecting claim based on failure to write down inventory where plaintiffs only "speculate" about when defendants came to know that assets were impaired); *In re PETsMART, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 993 (D. Ariz. 1999) (same where plaintiffs failed to include facts indicating that timing of write-down was unusual or reckless).

[12] Toward the end of his Complaint, Plaintiff asserts that the Prospectus was misleading because it failed to disclose three additional "negative conditions" that purportedly existed at the time of the IPO:  problems with switched digital video products; internal control deficiencies; and that the

*Continued . . .*

### D.    Plaintiff's Allegations Separately Fail Under Rule 9(b)

In addition to failure under Rule 8(a) and *Twombly*, Plaintiff's claims separately fail under the heightened pleading requirements imposed by Rule 9(b).

It is now beyond question that Rule 9(b) applies to Section 11 claims that "sound in fraud." *Supra* at 8.  A plaintiff's disclaimer of fraud cannot be taken at face value; rather, the Court must inquire into the substance of the plaintiff's allegations to determine if they actually sound in fraud. *Stac*, 89 F.3d at 1404-05 & n.2; *In re Leadis Tech., Inc. Sec. Litig.*, 2006 WL 496039, *3 (N.D. Cal. Mar. 1, 2006).

Courts in this Circuit have made clear that Rule 9(b) applies where a plaintiff's theory is that the defendants deliberately concealed known facts, such as problems that were already occurring or a business plan that was kept hidden from investors.  *See In re DDi Corp. Sec. Litig.* 2005 U.S. Dist. LEXIS 1056, *59 (C.D. Cal. Jan. 7, 2005) (claims "sound clearly in fraud" where they were "based, in part, on Defendants' alleged failure to disclose a *known* decline in demand"); *iAsia Works*, 2002 WL 1034041 at *5 (same where plaintiffs alleged that defendants pursued "true business plan" kept hidden from investors).[13]  Courts have also applied Rule 9(b) to channel stuffing claims.  *Stac*, 89 F.3d at 1402-04; *Belodoff*, 2008 WL 2356699 at *6.

These types of allegations subject to Rule 9(b) – concealment of known problems or a true business plan, acceleration of revenue recognition to inflate revenues, and channel stuffing – are

---

*(Continued from prior page)*
Company's guidance was not reasonable.  ¶¶ 138(b)-(e).  These claims are specious.  Plaintiff makes his assertions in pure conclusory fashion, failing to allege any facts to support them. Plaintiff provides *not a single fact* concerning video products prior to the IPO.  Rather, Plaintiff points only to BigBand's subsequent statement, on September 27, 2007, that there were unexpected software customization, integration, and interoperability issues.  Ex. J; ¶¶ 119, 121.  That is improper hindsight pleading.  Moreover, the Prospectus provided extensive warnings concerning interoperability challenges.  Addendum B; Ex. A at 15.  As for internal controls, the Prospectus expressly warned that BigBand's accountants had identified material weaknesses in internal controls for 2004 and 2005, that remediation efforts might not be successful, and that financial reporting might be inaccurate.  Addendum G; Ex. A at 10-11.  As for guidance, BigBand provided none in the Prospectus.  And, it expressly warned that subsequent guidance – whether from the Company or analysts – might not be met.  Addendum C; Ex. A at 7-8.

[13] *See Leadis*, 2006 WL 496039 at *4 ("[T]he true factual basis for plaintiffs' claims is that defendants knew that the cautionary warnings . . . were already happening at the time of the IPO yet failed to disclose that information in the Prospectus.  This is a quintessential fraud claim.").

---

1   exactly the allegations that Plaintiff makes here.  *See supra* at 6-7.[14]  Yet Plaintiff's allegations are

2   woefully deficient to meet the heightened requirements imposed by Rule 9(b).

3       For example, with respect to alleged Cuda problems, Plaintiff does not specify what

4   problems existed, the scope of such problems, whether such problems could be remedied or how, or

5   whether the problems were of the type about which the Prospectus specifically warned.  Indeed,

6   Plaintiff describes only a single pre-IPO incident at one of its many customers' several facilities.

7   ¶ 69.  Likewise, Plaintiff offers no relevant facts regarding allegedly accelerated revenues or

8   excess/obsolete inventory that required an earlier write-down.  Similarly, other than a single

9   customer's vague statement months before the IPO, Plaintiff alleges no detail regarding any

10  "stuffing" that would result in decreased orders.  *See In re Portal Software, Inc. Sec. Litig.*, 2005

11  WL 1910923, **11-12, 16 (N.D. Cal. Aug. 10, 2005) (allegations that defendants failed to disclose

12  "severe interface problems" failed to provide requisite specificity; plaintiffs failed to "indicate any

13  specific customers, contracts, or dates").

14  **II.     Plaintiff's Section 12(a)(2) Claim Should Be Dismissed**

15      Like Section 11, Section 12(a)(2) requires that a plaintiff plead a false or misleading

16  statement.  15 U.S.C. § 77l(a)(2); *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1133-34 (9th Cir.

17  2002).  Plaintiff's Section 12 claim thus fails for the reasons stated above, as well as two more.

18      **A.     Plaintiff Lacks Standing to Assert a Section 12(a)(2) Claim**

19      To bring a claim under Section 12(a)(2), 15 U.S.C. § 77l(a)(2), a plaintiff must purchase his

20  shares directly in the initial distribution of shares in a public offering.  *Gustafson v. Alloyd Co.*, 513

21  U.S. 561, 571-72 (1995).  A person who purchased stock "aftermarket" (*i.e.*, in the open market rather

22  than in the initial distribution of shares from the underwriters in the offering) lacks standing to bring a

23  claim under Section 12(a)(2).  *Id.* at 569-70; *accord In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp.

24  2d 965, 982-84 (N.D. Cal. 2007); *Weinstein v. Jain*, 1995 WL 787549, *2 (N.D. Cal. Oct. 23, 1995).

25

26  [14] Plaintiff underscores that his claims sound in fraud by alleging "insider sales," thus suggesting
    that the Defendants were motivated to commit fraud in order to personally profit from the IPO.  ¶
27  108.  Motive is not an element of Section 11, but Plaintiff's suggestion of fraud would be easily
    defeated anyway.  Six of the ten Individual Defendants sold *no stock* in the IPO.  The remaining
28  four sold a mere 12% of their collective holdings.  *Id.*  Such limited sales do not reflect fraudulent
    intent. *See Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001).

1    Plaintiff does not allege that he purchased his BigBand shares directly in the initial

2    distribution from the underwriters on March 15, 2007, or that he purchased at the offering price of

3    $13 per share.  Rather, he merely alleges that he purchased stock "pursuant and/or traceable to the

4    Company's" Prospectus.  ¶ 18.  This boilerplate allegation is insufficient to establish standing.

5    *See Brody v. Homestore*, 2003 WL 22127108, **3-4 (C.D. Cal. Aug. 8, 2003); *Murphy v.*

6    *Hollywood Entm't Corp.*, 1996 WL 393662, *3 (D. Or. May 9, 1996).

7    Plaintiff's own submission in support of his motion for appointment as lead plaintiff –

8    which was incorporated into the Complaint, ¶ 18 – is fatal.  Plaintiff made clear that he purchased

9    shares on the open market, *above* the offering price of $13 per share.  Ex. K (first purchase on

10   3/26/07 at $17.89 per share).  Because Plaintiff did not purchase at the offering price, he could not

11   have purchased his shares in the IPO and thus lacks standing.  *See Hertzberg v. Dignity Partners,*

12   *Inc.*, 191 F.3d 1076, 1080 (9th Cir. 1999) (purchase in initial offering is "by definition" purchase

13   made at "the price at which the security was offered to the public"); *accord DeMaria v. Andersen*,

14   318 F.3d 170, 177 (2d Cir. 2003).

15       **B.    The BigBand Defendants Are Not Alleged to Have Offered or Sold Stock
                Pursuant to Section 12(a)(2)**

16

17   Plaintiff's Section 12(a)(2) claim separately fails because the BigBand Defendants did not

18   "offer or sell" stock to Plaintiff.  In *Pinter v. Dahl*, 486 U.S. 622 (1988), the Supreme Court limited

19   the scope of Section 12's "offers or sells" language, holding that it permits suits against two

20   categories of persons:  those who sold stock to the plaintiff, and those who solicited the plaintiff to

21   purchase stock.  As to the first category – sellers – the Court held that there must be direct privity

22   between the parties, *i.e.*, the defendant must pass title to the plaintiff.  *Id.* at 642-43.  Claims are thus

23   limited to "the buyer's immediate seller"; "a buyer cannot recover against his seller's seller."  *Id.* at

24   644 n.21.  As to the second category – solicitors – the Court held that the defendant must have

25   *directly* solicited the plaintiff to purchase the stock; there must be direct contact between the

26   plaintiff and defendant.  *Id.* at 651.  It is not enough that the defendant was involved in the

27   solicitation, no matter how substantially, if his involvement was remote from the plaintiff.  *Id.*  The

28   BigBand Defendants do not fall into either *Pinter* category.

1     ***The BigBand Defendants Were Not Sellers.***  The BigBand Defendants did not, and could

2    not have, sold stock directly to Plaintiff (or any putative class member) because BigBand's IPO

3    was a "firm commitment" underwriting. Ex. A at 105.  In a firm commitment underwriting, the

4    issuer sells all shares to be offered to underwriters; investors purchase the shares directly from the

5    underwriters, not the issuer.  *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1215 (1st Cir. 1996).

6    Several courts have held that issuers cannot be found liable under Section 12 in connection with

7    firm commitment underwritings.  *See, e.g.*, *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238

8    F.3d 363, 370 (5th Cir. 2001); *Cent. Laborers Pension Fund v. Merix Corp.*, 2005 WL 2244072,

9    *6 (D. Or. Sept. 15, 2005).

10     ***The BigBand Defendants Were Not Solicitors.***  Nor can Plaintiff sustain his burden

11   under the second prong of *Pinter* on the theory that the BigBand Defendants directly solicited his

12   stock purchases.  "Direct solicitation" means exactly that – a *direct* request to the ultimate

13   purchaser to buy stock.  *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1306 (10th Cir. 1998); *In*

14   *re Westinghouse Sec. Litig.*, 90 F.3d 696, 715-16 (3d Cir. 1996).

15     Plaintiff nowhere alleges that the BigBand Defendants solicited him.  Indeed, Plaintiff

16   nowhere alleges that any defendant directly communicated with him (or any member of the

17   putative class) for any reason.  Rather, Plaintiff merely states the legal conclusion that

18   "Defendants were sellers, offerors, underwriters and/or solicitors of sales of the BigBand shares."

19   ¶ 161.  Under *Twombly*, legal conclusions cannot mask as factual allegations.  127 S. Ct. at 1964-

20   65.  Accordingly, Plaintiff's Section 12(a)(2) claim should be dismissed.[15]

### CONCLUSION

22     For the foregoing reasons, the Complaint should be dismissed.

23   Dated:  August 8, 2008                    Respectfully submitted,
                                              WILSON SONSINI GOODRICH & ROSATI
24                                            Professional Corporation

25                                            By:  _____/s/ Keith E. Eggleton_____
                                                      Keith E. Eggleton

26

---

27     [15] Section 15 provides control person liability for an underlying violation of Section 11 or 12.  15
     U.S.C. § 77o.  Because Plaintiff failed to allege a violation under those sections, his claims under
28   Section 15 necessarily fail.  *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000);
     *Belodoff*, 2008 WL 2356699 at *13.

1

## **ATTESTATION**

2    I, Joni Ostler, am the ECF user whose identification and password are being used to file the

3  BIGBAND DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS

4  CONSOLIDATED CLASS ACTION COMPLAINT.  In compliance with General Order 45.X.B, I

5  hereby attest that Keith E. Eggleton has concurred in this filing.

6  Dated:  August 8, 2008                             WILSON SONSINI GOODRICH & ROSATI
                                                       Professional Corporation
7
                                                       By: _____/s/ Joni Ostler_____
8                                                              Joni Ostler

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28