Exhibit A

Part 2 of 3

Table of Contents

**BUSINESS**

**Overview**

We develop, market and sell network-based platforms that enable cable operators and telephone companies to offer video, voice and data services across coaxial, fiber and copper networks. We have significant expertise in rich media processing, communications networking and bandwidth management. We have delivered what we believe to be the only successful commercial deployments of switched broadcast, an application that substantially increases the volume of content that a service provider can offer. In addition, we believe we were the first to implement what has become the industry's de facto network architecture for digital simulcast, an application that facilitates the insertion of advertising and the transmission of video in a digital format across a network while still providing service to analog subscribers. Our product applications of Digital Simulcast, TelcoTV, Switched Broadcast, and High-Speed Data and Voice-over-IP are a combination of our modular software and programmable video and data hardware platforms. Leading service providers use our product applications to offer video, voice and data services to tens of millions of subscribers, 24 hours a day, seven days a week. We outsource the manufacturing of our products. We have sold our product applications to more than 100 customers globally. We sell our product applications domestically to customers through a direct sales model, and internationally, through a combination of direct sales to service providers and sales through independent resellers. Our customers include Cablevision, Charter, Comcast, Cox, Time Warner Cable and Verizon, which are six of the ten largest service providers in the United States.

**Industry Background**

Cable operators and telephone companies derive most of their revenue from consumer subscriptions for video, voice or data services and from advertising. To attract and retain subscribers, service providers are increasingly bundling video, voice and data services, often called a "triple-play" offering. Video has the most stringent bandwidth requirements, is the most technically demanding and provides the richest user experience. Video consumes up to ten times the bandwidth and is approximately 1,000 times more sensitive to packet error, loss and delay when compared with typical voice and data services. Video also offers the greatest revenue per subscriber of the triple-play services. As of December 2006, Yankee Group Research, an independent industry research group, estimates that, on average, consumers spend $68 per month for digital video services compared to $47 for voice and $33 for data services. As a result, video presents the greatest opportunities and greatest challenges in delivering the triple-play bundle.

*Competitive Dynamics Changing Video, Voice and Data Networks*

The competition for video subscriptions has been increasing over time, and this competition has fueled recurring cycles of network investment as service providers seek to capture increasing revenues from subscribers by offering additional services. Satellite broadcasters, starting in 1994, began offering improved digital video services. They started to capture video subscribers from cable operators and, by the end of the third quarter of 2005, had gained an estimated 28% of the total U.S. paid television subscribers according to IDC, an independent industry research firm. In response, cable operators upgraded their coaxial networks to provide comparable digital video services. Kagan Research LLC, an independent research firm, estimates that cable operators have invested over $100 billion building networks that increased their capacity to offer digital video services and were capable of two-way communication.

The competition for control over the delivery of triple-play services, particularly video, to the home has dramatically increased with the recent entrance of the telephone companies into the market in 2005. Historically, telephone companies built networks to offer voice services, while cable operators built networks for broadcast television. The two did not directly compete with one another. In recent years, additional regulatory, technological and competitive factors have enabled service providers to compete directly and aggressively in each others' markets. Initial competition among cable operators and telephone companies began with both offering high-speed data services. Then, cable operators used their two-way broadcast networks to offer VoIP

50

**Table of Contents**

services. As of September 2006, cable operators offering VoIP services had added approximately eight million voice subscribers in North America, according to In-Stat, an independent market research firm. Similarly, telephone companies have started upgrading their networks, which were originally built for voice and later upgraded to enable the delivery of high-bandwidth video services and higher speed data services. For example, Verizon recently announced plans to spend $18 billion by 2010 to significantly expand its fiber-optic network infrastructure and to add an estimated 11 million video and data subscribers. Other telephone companies have announced plans to develop interactive video services that leverage internet protocols to stream particular television shows, movies or other video content as they are demanded by individual subscribers, instead of broadcasting all content to all subscribers, regardless of the actual content being watched. The ability of telephone companies to offer these advanced services that feature video have, in turn, forced cable operators to increase the capacity and performance of their networks to keep pace.

In addition to competing with one another, service providers must react to Internet content aggregators and media companies offering competitive video, voice and advertising services directly to consumers through the Internet. For example, in an effort to increase sales of its iPod devices, Apple Computer offers video content that can be downloaded through the Internet through its iTunes store. Likewise, ABC.com is offering individual television programs and other video content directly to consumers over the Internet, and a number of providers are offering low cost voice services over the Internet. At the same time, online media companies like Google and Yahoo are aggregating or facilitating access to content and increasing the relevance, interactivity and measurability of advertising to attract advertising spending. Competitive activities such as these pose a threat to service providers' paid subscriber and advertising revenues.

*Changing Consumer Demands*

Given increasing competition, service providers are attempting to differentiate their offerings by addressing changing consumer behavior and evolving advertiser demands. Consumers are increasingly directing their spending on video, voice and data services to those providers offering services that more closely match their preferences. In particular, consumers are seeking greater personalization of content, a higher quality experience and greater ease and speed of access to their video, voice and data services.

- *Personalization.* With the proliferation in content, consumers are seeking content that is increasingly customized to their personal interests. This personalized content spans everything from the purchase of downloadable songs to customized video programming, such as VOD and niche channel packages.

- *Richer Content.* Consumers are demanding a higher quality experience, whether it is online or in their television viewing. As a result, a rapidly growing number of consumers are purchasing HDTVs and high-speed data services to access richer content, such as HD programming, user-generated video clips and interactive online video games.

- *Ease and Speed of Access.* In an increasingly mobile world, consumers desire faster access to content, whether voice, video or data, from virtually anywhere using a wide range of devices, such as portable media players, televisions, mobile phones, personal digital assistants and personal computers.

Consumers have been able to gain greater personalization, richer content and better access to their voice and data services delivered through the Internet using network-based technologies. For video, however, there has been only a limited response to these consumer demands. To offer richer, more personalized content at the speeds consumers expect and to capture the larger video subscription opportunity, service providers are developing networks with the bandwidth to deliver richer services and the intelligence to tailor video services and direct advertising to individual subscribers.

*Advertisers Demand Greater Intelligence in Video-Based Advertising*

Traditionally, advertisers attempted to reach consumers through media channels such as broadcast television that distributed the same advertising to wide audiences. The Internet offers advertisers a distribution channel that

51

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

delivers more relevant ads. while at the same time offering the interactivity required to measure return on ad spending. Advertisers are demanding that video-based advertising networks increase the relevancy, interactivity and measurability of their networks

- *Relevancy.*    Advertisers are demanding that their ads be addressed to a relevant audience. For example, they desire to target video advertising to particular geographic zones, and ultimately want to tailor advertising to specific subscribers.

- *Interactivity.*    Advertisers want to provide consumers with an easy and immediate way to respond to an advertisement. For example, advertisers would like to provide subscribers with the ability to use a remote control to immediately access additional product information associated with a television advertisement.

- *Measurability.*    Advertisers are seeking ad distribution networks that allow them to measure the effectiveness of their ad spending and are willing to pay more for video advertisements that result in a higher consumer response rate.

According to ZenithOptimedia Group, a market research firm, the market for North American television advertising in 2005 was approximately $58 billion. However, a survey of advertising executives conducted by the industry group, American Advertising Federation, indicated that 97% of respondents intend to shift spending away from traditional broadcast and cable TV ads to online video ads, with nearly 43% planning to shift at least 20% of their spending by 2010. To encourage advertisers to direct more spending toward television advertisements, service providers must be able to deliver relevant advertisements and measure the effectiveness of marketing campaigns for advertisers. The current video networks of service providers are limited in their ability to provide the intelligence necessary for the relevancy, interactivity and measurability required to meet the expanding demands of advertisers.

### Intelligent, High-Bandwidth Video Networks are Needed

Current service provider networks, originally built to deliver voice or video services, are not well suited to offer the entire suite of triple-play services and relevant advertising. In particular, these networks are not equipped for increasingly rich and interactive video content. Cable operators originally built their networks for the one-way broadcast of analog video content. In response to competition by satellite providers, they upgraded their networks to digital, but these networks still lack the capacity to deliver the rich content and interactivity increasingly required by consumers and advertisers. Telephone companies originally constructed low-bandwidth networks that were capable of delivering highly interactive voice services, but these networks lack the bandwidth necessary to deliver rich video services. However, with increasing competition for traditional voice services and the revenue opportunities and network requirements of video, these telephone companies need networks with the bandwidth and interactivity that enable advanced video services that meet the demands of consumers and advertisers. Cable operators and telephone companies therefore must develop intelligent, high-bandwidth video networks for their consumer and advertiser customers.

Delivering high-quality, personalized video services and relevant video-based advertising has strained service providers' existing network infrastructures and requires service providers to overcome the following challenges:

- *Bandwidth Limitations Posed by Video.*    Service providers' fixed-bandwidth networks are not equipped for the volume and richness of content being demanded by subscribers. For example, a typical HDTV video stream requires 19.4 Mbps of continuous bandwidth, which is up to ten times the bandwidth required by a standard definition video stream and substantially greater than the 10 Mbps limit of most copper-based network data connections. To meet the demand for more and richer content such as HDTV, service providers must either undertake a costly capital expansion of their network infrastructures or use their existing infrastructure more efficiently.

- *Difficulty of Delivering a High-Quality Video Experience.*    Service provider networks are inherently prone to packet loss, error and delay. This problem is exacerbated as the richness and volume of the

52

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

content being delivered across the network increases. Among video, voice and data services, video delivery has the most stringent requirements for packet order, loss and timing, as well as the need for the greatest network capacity and scalability. For example, HDTV is approximately 1,000 times more sensitive to packet loss, error and delay than voice and data services. To ensure a consistently high-quality subscriber viewing experience, service providers must find solutions that maintain the integrity of the video streams as these streams move across their networks.

- *Lack of Customized Video Programming.* Existing network infrastructures lack the intelligence to allow service providers to understand and react to subscriber television viewing behavior. As a result, service providers lack the ability to deliver video programming packages tailored to the interests of specific subscribers or groups of subscribers. Service providers require network infrastructure that will enable them to understand subscriber viewing behavior and, based on that assessment, allow them to deliver new video channels and programming packages to specific subscribers or groups of subscribers.

- *Requirement for More Relevant Video Advertising.* Advertisers are demanding that their ads be addressed to a relevant audience. To satisfy this demand, service providers need the capability to deliver video advertising to particular geographic segments and demographic groups, and ultimately, to tailor advertising to specific subscribers. In most broadcast implementations, service providers lack the media processing capabilities to distinguish one subscriber from another and the capacity to insert tailored advertising into a continuous video stream without degrading service quality. Service providers are seeking solutions that will enable the seamless insertion of relevant advertisements into video streams.

- *High Cost of Infrastructure Investment.* Service providers have invested heavily to establish their existing network infrastructures, including the deployment of a significant amount of CPE, such as cable set-top boxes and cable modems. Service providers must either make significant investments to upgrade or replace their existing infrastructure, or find ways to extend the useful life of their installed equipment. Service providers generally prefer network-based capital investments since these costs can be allocated across many subscribers without costly replacement of existing CPE.

- *Need to Rapidly Deliver Advanced Services.* Historically, service providers have needed to make very large capital expenditures to purchase replacement network equipment to support next-generation services. With the increasing pace of change, service providers require platforms with the flexibility to rapidly deploy advanced video and data services while minimizing lengthy and capital-intensive network upgrades.

Although service providers face a common challenge—how to rapidly and economically offer an increasing amount of video, voice and data content, deliver a more compelling user experience, and deliver more relevant programming and advertising to their subscribers—the technical and bandwidth challenges associated with video are greater than those of data and voice services. As a result, there is a need for platforms designed primarily for reliable and cost-effective video delivery, which in turn enable the entire triple-play offering.

**The BigBand Solution**

We develop, market and sell network-based platforms that enable service providers to offer video, voice and data services across coaxial, fiber and copper networks. Our software and hardware product applications are used to offer video, voice and data services commercially to tens of millions of subscribers, 24 hours a day, seven days a week and have been successfully deployed by leading service providers worldwide including six of the ten largest service providers in the United States.

We combine rich media processing, modular software and high-speed switching and routing with carrier-class hardware configurations into product applications designed to address specific service provider needs. Our product applications enable service providers to deliver high-quality video, voice and data services and offer more effective video advertising. Our key product applications include Digital Simulcast, TelcoTV, Switched Broadcast, and High-Speed Data and Voice-over-IP.

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

Our solution offers the following key benefits:

- *Intelligent Bandwidth Management.* Using our product applications, service providers can address their increasing bandwidth needs. For example, we offer what we believe to be the only switched broadcast application commercially deployed today. Our Switched Broadcast product application only transmits channels to subscribers when the subscribers in a service group are in the process of watching those channels, instead of broadcasting all channels to all subscribers all the time. This enables service providers to achieve up to 50% savings in bandwidth usage for digital subscribers, allowing service providers to offer additional services without altering the subscriber viewing experience. One of our customers that had used all of its available bandwidth capacity for existing channel programming was able to use our Switched Broadcast product application to add new, higher revenue HDTV channels without dropping existing channels.

- *High-Quality Video Experience.* Our product applications allow service providers to minimize the likelihood of video quality errors by detecting potential video quality degradation in real-time and correcting such degradation before the video stream is delivered to subscribers. Our core suite of video processing software modules are designed to enhance the richness of the viewing experience by optimizing the delivery of video streams, while our program level redundancy functionality adds the switching capability to automatically provision an alternative video stream should the quality of the primary stream begin to degrade.

- *Enhanced Video Personalization.* Using our product applications, service providers interact with their subscribers down to the individual channel change and, as a result, can more accurately tailor programming packages to the interests of their subscribers. For example, our Switched Broadcast product application enables service providers to satisfy consumer demand for increasingly personalized content by expanding the number of channels that can be offered because selected channels are only delivered when the channel is requested by a subscriber in the service group. Using this application, one of our customers was able to offer additional channel packages tailored to demographic groups.

- *Ability to Deliver Relevant Video Advertising.* Our product applications allow service providers to insert advertising tailored to specific subscriber groups. For example, using our Digital Simulcast application, service providers can simultaneously insert different ads into multiple copies of the same program and forward them to specific geographic zones. This allows service providers to attract advertisers interested in reaching niche markets.

- *Optimize Return on Existing Infrastructure Investment.* Our network-based product applications allow service providers to manage service quality from the network, rather than deploying costly personnel and equipment at the customer premises. Because our product applications are deployed at the network level, service providers can leverage their infrastructure investment across many subscribers and avoid the hardware and service costs associated with an upgrade of equipment in the homes of subscribers. For example, using our M-CMTS architecture, service providers will be able to quadruple the existing downstream capacity of our High-Speed Data product application without the need to replace CPE. The need for higher speeds is increasingly required for the delivery of video over the Internet.

- *Platform Flexibility.* Our product applications feature a fully programmable hardware and modular software architecture. Our field-upgradable hardware is designed to meet service provider platform flexibility requirements and to minimize the need to replace existing hardware. For example, one customer initially purchased our equipment for basic media processing functionality and was subsequently able to further enhance this same hardware platform within a matter of hours to deliver our advanced Digital Simulcast product application simply by licensing an additional software application from us.

54

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

**Strategy**

Our objective is to be the leading provider of network-based products that enable the delivery of high-bandwidth, high-quality video, voice and data services and more effective video advertising. Key elements of our strategy include the following:

- *Further Technology Leadership Position.* Over the past eight years, we have developed differentiated media processing and video systems design expertise. We used our media processing expertise to deliver what we believe to be the only switched broadcast product commercially deployed today. We are also building upon our IP networking and media processing expertise to develop the first M-CMTS solution. We will continue leveraging our expertise to deliver products that focus on optimizing network infrastructure and enabling delivery of a high-quality user experience.

- *Leverage Modular Architecture to Accelerate New Product Introduction.* We have created a series of media processing software modules that, when combined with our programmable hardware and switching fabric, serve as the foundation for a range of network-based product applications. The competition between cable operators and telephone companies is accelerating the rate of change in their networks, and we believe our software modules will serve as the foundation for rapidly delivering solutions that address our customers' bandwidth and service delivery needs.

- *Expand Footprint Within Existing Customer Base.* We are intensely customer focused. We have customer relationships with a number of service providers both in the United States and internationally, including six of the ten largest service providers in the United States. We believe these customer relationships give us a strong advantage in understanding our customers' network challenges and delivering timely solutions, as we did with our Switched Broadcast product application. We will continue to work closely with our customers on the designs of their network architectures and emerging services, expand our relationships with these customers to deploy more of our existing applications, and develop and deliver new applications to address their network challenges.

- *Expand Customer Base Regardless of Access Technology.* Service providers deploy video, voice and data services to subscribers across networks based on coaxial, fiber and copper. We have successfully deployed our product applications across these access technologies. We are currently providing Verizon with a solution that allows both digital and analog transmission of video over fiber-optic lines. Other telephone companies deploying video services over existing DSL lines leverage our media processing expertise to provide such video services. Still others use our product applications to carry services over coaxial cable. We intend to leverage our media processing expertise to penetrate new customers worldwide, regardless of the type of access networks they use.

- *Broaden Addressable Advertising Capabilities.* We currently enable service providers to insert video advertisements targeted to subscribers in specific geographic zones. We intend to collaborate with our customers to continue developing and deploying next-generation advertising solutions and are currently in field trials with a leading cable operator for the delivery of ads tailored down to the individual subscriber level.

- *Leverage Video Over IP Expertise.* We believe that service providers will seek to offer live and on-demand video services to an increasing array of IP-capable devices, such as TVs, personal computers, mobile phones and portable devices, as well as attempt to integrate video, VoIP and data into new services. This will create a need for platforms that integrate video processing and IP networking. Since inception, our development efforts have focused on combining networking with real-time processing of video. Our M-CMTS architecture is the first step in our plan to meet the market demand for video over IP by enabling cable operators to more cost effectively offer bandwidth to IP-enabled devices. We intend to further leverage our video expertise to provide a broader array of solutions to cable operators as they scale their video-enhanced triple-play services directed at PCs and other IP-capable devices.

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents
**Product Applications**

We deliver product applications that provide rich media processing and high-speed switching and routing, which enable service providers to offer advanced video, voice and data services to subscribers and advertisers. Our product applications are a combination of our video or data hardware platforms and key software modules that run inside our carrier-class hardware platforms and deliver the application-specific functions.

*Video*

We combine our carrier-class hardware platforms and modular media processing software to deliver the following product applications:

*Digital Simulcast.*    We were first to implement what we believe has become the industry's de facto network architecture for digital simulcast. Historically, video content was broadcast only in analog form. Analog video presents a number of limitations to service providers, including deterioration of video quality, higher cost to insert relevant advertising in the video stream, and the cost of converting analog to digital for certain digital devices in the home, such as digital video recorders.

Our Digital Simulcast product application enables service providers to create a digital version of analog inputs and deliver both analog and digital video streams to subscribers. This gives service providers a cost-efficient way of migrating subscribers from analog to digital video, which uses lower cost all-digital set-top boxes, while still supporting a large installed base of analog set-top boxes and televisions. In addition, using our Digital Simulcast product application, service providers can overcome the video quality limitations inherent in the transport of analog over long distances and the low-quality conversion from analog to digital in consumer digital devices. They also can reduce their investment in costly equipment used to transport analog signals and achieve operational efficiency by using a converged digital network. Finally, our Digital Simulcast application allows service providers to insert advertisements into the digital video stream and deliver those ads either in digital or analog form to subscribers. This offers our customers incremental revenue opportunities through the ability to insert advertisements into the digital stream targeted to specific geographic zones.

We deliver our Digital Simulcast product application by combining our Broadband Multimedia-Service Router hardware platform, which we refer to as our BMR, with our core media processing modules with advanced splicing capability.

*TelcoTV.*    Telephone companies use our BMR to provide a very high-quality viewing experience, while still benefiting from the use of digital video transport throughout their networks. We enable telephone companies to leverage their existing Synchronous Optical Network, or SONET, infrastructure, which was originally designed for voice communications, to transport video content throughout the network. This provides significant cost savings as telephone companies are not required to build a dedicated video transport network. They deploy our video application in network locations called video serving offices, or VSOs, that provide service directly to consumers. This product application leverages the same key technologies and the low-quality conversion previously deployed in many of the largest cable operator networks in the world. Our TelcoTV product application integrates our core media processing modules with our BMR with built-in radio frequency, or RF, modulation, analog decoding and local content insertion. Our platforms have been engineered to comply with the Level-3 Network Equipment Building System standard, or NEBS, which is a set of telecommunications industry safety and environmental design guidelines for equipment in central offices.

*Switched Broadcast.*    We believe we were the first company to develop and commercially deploy a switched broadcast application. Traditionally, service providers broadcast all channels to all subscribers at all times. Our Switched Broadcast application enables service providers to transmit video channels to subscribers only when the subscribers in a smaller subset of subscribers within a network, called a service group, are in the process of watching those channels. Depending on the number of subscribers and the amount of duplicate channels within a service group, our Switched Broadcast product application typically allows service providers to achieve up to 50% bandwidth savings in the delivery of digital video content and use the reclaimed bandwidth to offer additional content. This reclaimed bandwidth can be used to deliver niche video packages, more HDTV

56

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

channels, high-speed data service and/or voice service. Service providers often use our Switched Broadcast product application as a means to free up the bandwidth to implement digital simulcast. The diagram below illustrates how bandwidth can be reclaimed using our Switched Broadcast product application, which broadcasts only those channels that are being watched within a service group



In addition, our Switched Broadcast product application gives our service providers real-time access to the actual viewing habits of their subscriber groups, information that is increasingly valuable as they and their advertisers seek to tailor advertising or personalized channel services to specific subscriber groups and individual subscribers.

We deliver our Switched Broadcast product application by combining our core media processing modules with our BMR, Switched Broadcast Session Server and Broadband Multimedia-Service Edge hardware platform, which we refer to as our BME.

### Data

*High-Speed Data and Voice-over-IP.*   Our High-Speed Data product application enables cable operators to offer real-time services, such as VoIP and streaming video content over the Internet. Using our High-Speed Data product application, cable operators can offer different levels of data speeds, which can be tiered based on the level of subscriber fees or on real-time bandwidth needs. Our High-Speed Data product application offers redundancy characteristics and a distributed switch fabric with routing and forwarding capabilities across multiple application modules, instead of in a central core where switching latency can be exacerbated. As a result, those cable operators that are deploying voice services can leverage the ability of our High-Speed Data product application to reduce dropped packets and latency to deliver high-quality and reliable voice services.

Modular CMTS is the next generation of our High-Speed Data product application, which is currently in multiple customer trials on three continents. Customers using our existing CMTS product will be able to cost-effectively upgrade to our M-CMTS platform. This will allow them to quadruple their downstream delivery capacity without additional CMTS equipment or next-generation cable modems. We accomplish this by combining a software upgrade with an external edge quadrature amplitude modulation, or QAM, modulator for downstream traffic, freeing up processing capacity in our CMTS to process more downstream traffic on the same hardware. We expect to begin commercial deployment of our M-CMTS product in the first half of 2007.

### Platforms and Technologies

Our intelligent, network-based product applications are built on an architecture that combines modular software with extensible video and data hardware platforms. Our modular software architecture enables us to more quickly and cost effectively develop new features and products. Our hardware platforms offer field-upgradeable hardware, high-speed switching and routing with general-purpose processing capabilities in a chassis-based design. This hardware and software approach provides our customers with rich media processing capabilities in a carrier-class hardware configuration that can be extended across multiple network locations and, as needed, to accommodate more services and more subscribers. Our hardware platforms and modular software consist of:

### Hardware and Management Software Platforms

*Broadband Multimedia-Service Router (BMR)*   Our Broadband Multimedia-Service Router is our hardware platform that is designed for the real-time processing and switching of video. The BMR platform is a

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

protocol-neutral architecture that processes and switches MPEG, IP and Ethernet packets. We accelerate our software media processing functionality through digital signal processors and field programmable gate arrays, which also allow the BMR to be upgraded or reconfigured over time and from remote locations. The BMR has a chassis-based design that provides carrier-class reliability and flexibility to expand functionality and capacity as network requirements evolve by adding new network cards. The BMR supports the transmission of digital and analog signals using radio frequency, or RF, interfaces to the physical cable network through QAM, quadrature phase shift keying and analog RF.

*Broadband Multimedia-Service Edge (BME).* The Broadband Multimedia-Service Edge is our hardware platform that is optimized to communicate directly with subscriber set-top boxes and cable modems from the edge of the service provider's network. Our BME provides media processing and switching of video services, such as VOD and Switched Broadcast, and of data services when used with the Cuda CMTS in our modular CMTS architecture. This allows service providers to utilize Gigabit Ethernet transport to the edge of their network, without the need to upgrade CPE. The BME provides high reliability while terminating 24 QAM channels, which gives our customers a space-efficient and cost-effective system that can scale as capacity needs dictate.

*Cuda Cable Modem Termination System (CMTS).* Our Cuda CMTS is a DOCSIS 2.0-qualified hardware platform dedicated to the delivery of our data applications for cable operators. Instead of locating all routing and forwarding in a central switching core, our Cuda hardware system architecture distributes these capabilities across multiple application modules to offer carrier-class reliability. It has a total switching capacity of 204 Gbps and provides the superior RF performance critical for real-time services, such as VoIP and streaming video, that require very low packet error rates. Our CMTS platform supports QAM RF modulation for both downstream and upstream digital traffic. Because of its high-density design, this platform allows our customers to scale their services with reduced space and power consumption. Moreover, like the BMR and BME, the Cuda is field-upgradeable to support new services and network architectures.

*BigBand Session and Resource Manager.* Our Session and Resource Manager is an application server platform for real-time control and management of video and data traffic traversing the network. Our Switched Broadcast Session Server, or SBSS, manages customer transactions down to the channel change level to allow service providers to dynamically switch the broadcast content being requested in a service group. With the knowledge of the customer transactions, the SBSS can switch and load-balance broadcast channels across the BMEs in the network.

*BigBand FastFlow Broadband Provisioning Manager (BPM).* FastFlow is our network-based software suite for provisioning high-speed data and voice services to cable modems. FastFlow configures, activates and monitors the performance of a wide variety of devices, including DOCSIS set-top boxes, cable modems and multimedia terminal adapters. With extensive support for user self-provisioning capabilities, our FastFlow BPM platform often eliminates the need for expensive field personnel to be dispatched to a subscriber's home to provision new services.

### Software Modules

*Video Software Modules.* We have created a set of individual software modules that define the attributes and functionality of our product applications. We design these modules with well-defined software interfaces to facilitate software development and maintenance, enabling faster response to service provider needs and the delivery of new features. Our software architecture also allows these modules to be combined with one another in various configurations. Selected modular software components are described below.

- *RateShaping.* Our RateShaping module combines digital signal processing and statistical multiplexing using complex algorithms to enable more video streams to be transported using the same amount of bandwidth. With RateShaping, we conserve bandwidth by intelligently allocating bandwidth to programs that require more, while reducing bandwidth to programs that require less. The diagram below

58

Table of Contents

depicts how our RateShaping module can take variable-rate video streams and adjust them to conform to a fixed amount of bandwidth capacity.



Variable-rate        BigBand        Fixed-bandwidth
video streams        Platform       network

- *RateClamping.*   The amount of bandwidth required to deliver a digital video program varies based on the complexity of the picture being transmitted within that program. For applications where a constant bit rate is desired, such as Switched Broadcast, RateClamping converts variable input feeds into constant bit rate streams, with the output bandwidth determined according to the service provider's priorities. RateClamping is frequently utilized to deliver services such as VOD, Switched Broadcast and network-based digital video recorders. The diagram below depicts how our RateClamping module can convert variable-rate video streams into constant-rate video streams.



Variable-rate        BigBand        Constant-rate
video streams        Platform       video streams

- *Splicing.*   Our Splicing functionality allows an alternate program, usually an advertisement, to be seamlessly inserted into an existing video stream. Using our Splicing functionality, service providers can perform hundreds of concurrent splices of different ads to multiple advertising zones, targeting different neighborhoods, in a single BMR. Our Splicing functionality is integral to our Digital Simulcast solution.

- *Video over Ethernet.*   Using our Video over Ethernet functionality, service providers can process and transmit digital video streams over IP inputs and outputs, which is less expensive than legacy video- specific interfaces, such as Asynchronous Serial Interface, or ASI. Ethernet, however, can cause latency problems in the network, which are particularly problematic in the delivery of video programming. Our Video over Ethernet functionality corrects the inherent timing effects introduced by Ethernet as it arrives in the BMR and encapsulates video into IP packets on video outputs.

- *Encryption.*   Our Encryption module scrambles the video stream and interfaces with a standards-based conditional access system to allow operators to secure their video content and restrict usage to only authorized subscribers.

- *Program-level Redundancy.*   Our Redundancy module inspects a video stream at the individual program level to detect errors and switches to the back-up source program without interrupting other programs on the same transport stream. By contrast, other competitive redundancy solutions do not detect problems with individual programs, which can result in a lower quality viewer experience.

- *Metadata Processing.*   Our applications process metadata such as the name of the program, plot summary and actors. This allows the service provider to actively control the type and amount of metadata that is provided to the subscriber's television, thus enabling the service provider to populate program guide content and provide enhanced interactive TV functions.

*Modular Data Software.*   Our High-Speed Data and Voice-over-IP product applications use a modular design where various functions run as separate modules such that modifications to one set of functions or protocols will not disrupt the functionality of others. Our High-Speed Data and Voice-over-IP product

59

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

applications support the DOCSIS 1.0, 1.1 and 2.0, EuroDOCSIS, PacketCable, PacketCable Multimedia, and DOCSIS Set-Top Gateway, or DSG, industry standards and formats.

Select features of our data software are as follows:

- *Security Enhancements.* Our software helps service providers to secure the granting of IP addresses to new subscribers, the ability to filter certain IP addresses and encrypted communication between our data platform and a wide variety of cable modems.

- *Troubleshooting and Capacity Planning Analysis.* Using our software, service providers can gather detailed statistics about traffic flows through their system, allowing them to troubleshoot customer specific problems and perform trending and capacity planning functions.

- *Automated Service Interruption Protection.* Our software is designed to allow service providers to deliver uninterrupted service to their subscribers despite problems inherent in hardware, software and in the hybrid-fiber coaxial network infrastructure. Our data software includes spectrum management for monitoring and mitigating RF noise conditions affecting certain channels; redundancy to recover from hardware or software faults on particular components of the system; and routing protocol enhancements to mitigate loss of service due to fiber cuts or equipment failures in a service provider's network.

## Customers

We sell our products to cable operators and telephone companies worldwide. In the United States, our products are deployed by six of the ten largest service providers. The following is a list of our customers from which we have recognized at least $250,000 in net revenues since January 1, 2005:

| | | | |
|---|---|---|---|
| Adelphia | Delta | Media Technology | Service Electric Company |
| Bright House Networks | Ehime CATV | Megacable | Siemens |
| Cable Bahamas | Eidolon | Metro Systems | Starpower Communication |
| Cablecom | Essent | Millennium Digital Media | Suddenlink |
| Cableone | Euro Connect | MiraeOnline | Time Warner Cable |
| Cablevision | Fort Mill Telephone | Multikabel | TKS Telepost |
| CAIW | Huawei Technologies | Musashino Mitaka CATV | TVC Communications |
| Casema | IdeaTel Belgium | Nissho Electronics | Verizon |
| Cebridge Connections | Iesy | Orion Cable | Videotron |
| Charter | ish | Phoenix CATV | Wave Broadband |
| Cisco Systems | Jcom | RCN | Wide Open West |
| Comcast | Jupiter Telecom KBW | Rock Hill Telephone | Yamaguchi Cablevision |
| Cox | Kabel Baden-Wurttemberg | Satlan | |

A substantial majority of our sales have been to relatively few customers. However, our large customers have changed over time. Sales to our five largest customers represented 79%, 69% and 61% of our net revenues in the year ended December 31, 2006, the year ended December 31, 2005, and the year ended December 31, 2004, respectively, and were particularly significant in the three months ended December 31, 2006 when they represented approximately 90% of our net revenues. In 2006, Comcast, Cox, Time Warner Cable and Verizon each represented 10% or more of our net revenues. In 2005, Adelphia, Cox and Time Warner Cable each represented 10% or more of our net revenues. In 2004, Adelphia, Comcast, Cox and Time Warner Cable each represented 10% or more of our net revenues. Although we are attempting to broaden our customer base by penetrating new markets and expanding internationally, we expect continuing customer concentration due to the significant capital costs of constructing service provider networks and industry consolidation. We expect that in future periods a limited number of large customers will continue to comprise a large percentage of our revenues.

Sales to customers outside of the United States represented approximately $19.2 million of net revenues for the year ended December 31, 2006, $16.8 million of net revenues for the year ended December 31, 2005, and $6.9 million of net revenues for the year ended December 31, 2004.

60

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

**Backlog**

We schedule production of our products based upon our backlog, open contracts, informal commitments from customers and sales projections. Our backlog consists of firm purchase orders by customers for delivery within the next six months. As of December 31, 2006, we had backlog of $36.2 million, compared with backlog of $33.1 million as of December 31, 2005. Anticipated orders from customers may fail to materialize and delivery schedules may be deferred or canceled for a number of reasons, including reductions in capital spending by service providers or changes in specific customer requirements. Because of the complexity of our customer acceptance and revenue recognition criteria, in addition to backlog, we have significant deferred revenues. As a result, our backlog alone is not necessarily indicative of revenues for any succeeding period.

**Sales and Marketing**

We sell our products in the United States primarily through our direct sales force and internationally through a combination of direct sales to service providers and sales through independent resellers. Our direct sales force, distributors and resellers are supported by our highly trained technical staff, which includes application engineers who work closely with service providers to develop technical proposals and design systems to optimize performance and economic benefits to potential customers. Our sales offices outside of the United States are located in the United Kingdom, France, Germany, China, Hong Kong, Korea and Japan. International resellers are generally responsible for importing our products and providing certain installation, technical support and other services to customers in their territory.

Our marketing organization develops strategies for product lines and market segments, and, in conjunction with our sales force, identifies the evolving technical and application needs of customers so that our product development resources can be deployed to meet anticipated product requirements. Our marketing organization is also responsible for setting price levels, forecasting demand and generally supporting the sales force, particularly at major accounts. We have many programs in place to heighten industry awareness of our company and our products, including participation in technical conferences, industry initiatives such as CableLabs' PacketCable Multimedia and DOCSIS 3.0 working groups, publication of articles in industry journals and exhibitions at trade-shows.

**Customer Service and Technical Support**

We offer our customers a range of support offerings, including program management, training, installation and post-sales technical support. As a part of our pre-sales effort, our engineers design the implementation of our products in our customers' environments to meet their performance and interoperability requirements. We also offer training classes to assist them in the management of our product applications.

Our technical support organization, with personnel in the United States, Europe and Asia, offers support 24 hours a day, seven days a week. For our direct customers, we offer tiered customer support programs depending upon the service needs of our customers' deployments. Using our standard support package, our customers receive telephone support and access to online technical information. Under our enhanced support package, in addition to the standard support offerings, our customers are entitled to software product upgrades and maintenance releases, advanced return materials authorization and on-site support, if necessary. Support contracts typically have a one-year term. For end customers purchasing through resellers, primary product support is provided by our resellers, with escalation support provided by us.

**Research and Development**

We focus our research and development efforts on developing new products and systems, and adding new features to existing products and systems. Our development strategy is to identify features, products and systems for both software and hardware that are, or are expected to be, needed by our customers. Our success in designing, developing, manufacturing and selling new or enhanced products will depend on a variety of factors.

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

including the identification of market demand for new products, product selection, timely implementation of product design and development, product performance, effective manufacturing and assembly processes and sales and marketing. Because these research and development efforts are complex, we may not be able to successfully develop new products, and any new products developed by us may not achieve market acceptance.

Research and development expense in the year ended December 31, 2006 was $37.2 million, in the year ended December 31, 2005 was $30.7 million and in the year ended December 31, 2004 was $21.6 million.

**Intellectual Property**

As of February 15, 2007, we held 26 issued U.S. patents, 16 of which relate to our video products and ten of which relate to our CMTS products. Additionally, we had 58 U.S. patent applications pending, 33 of which relate to our video products and 25 of which relate to our CMTS products. Although we attempt to protect our intellectual property rights through patents, trademarks, copyrights, licensing arrangements, trade secrets and other measures, there is a risk that any patent, trademark, copyright or other intellectual property rights owned by us may be invalidated, circumvented or challenged; that these intellectual property rights may not provide competitive advantages to us; and that any of our pending or future patent applications may not be issued with the scope of the claims sought by us, if at all. Others may develop technologies that are similar or superior to our technology, duplicate our technology or design around the patents that we own. In addition, effective patent, copyright and trade secret protection may be unavailable or limited in certain foreign countries in which we do business or may do business in the future.

We generally enter into confidentiality or license agreements with our employees, consultants, vendors and customers, and generally limit access to and distribution of our proprietary information. Nevertheless, we cannot assure you that the steps taken by us will prevent misappropriation of our technology. In addition, from time to time, legal action by us may be necessary to enforce our patents and other intellectual property rights, to protect our trade secrets, to determine the validity and scope of the proprietary rights of others or to defend against claims of infringement or invalidity. Such litigation could result in substantial costs and diversion of resources and could negatively affect our business, operating results and financial condition.

From time to time, it may be necessary for us to enter into technology development or licensing agreements with third parties. Although many companies are often willing to enter into such technology development or licensing agreements, we may not be able to negotiate these agreements on terms acceptable to us, or at all. Our failure to enter into technology development or licensing agreements, when necessary, could limit our ability to develop and market new products and could cause our business to suffer.

Our industry is characterized by the existence of a large number of patents and frequent claims and related litigation regarding patent and other intellectual property rights. In particular, leading companies in the networking industry have extensive patent portfolios. From time to time, third parties, including certain of these leading companies, have asserted and may assert exclusive patent, copyright, trademark and other intellectual property rights against us or our customers. Although these third parties may offer a license to their technology, the terms of any offered license may not be acceptable and the failure to obtain a license or the costs associated with any license could cause our business, operating results or financial condition to be materially adversely affected.

**Manufacturing and Suppliers**

We outsource the manufacturing of our products. Flextronics Corporation serves as our sole contract manufacturer for our video products, and ACT Corporation serves as our sole contract manufacturer for our CMTS products. Once our products are manufactured, they are sent to our headquarters in Redwood City, California or our facility in Westborough, Massachusetts, where we perform final assembly and quality-control testing. We believe that outsourcing our manufacturing enables us to conserve capital, better adjust manufacturing volumes to meet changes in demand and more quickly deliver products.

62

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

We submit purchase orders to our contract manufacturers that describe the type and quantities of our products to be manufactured, the delivery date and other delivery terms. Neither Flextronics nor ACT has any written contractual obligation to accept any purchase order that we submit. We do not have a written agreement with ACT.

We and our contract manufacturers purchase many of our components from a sole supplier or a limited group of suppliers. For example, we depend on Vecima Networks for decoding video components. We do not have a written agreement with many of these component suppliers, and we do not require our contract manufacturers to have written agreements with these component manufacturers. As a result, we may not be able to obtain an adequate supply of components on a timely basis. Our reliance on sole or limited suppliers involves several risks, including a potential inability to obtain an adequate supply of required components and reduced control over pricing, quality and timely delivery of components. We monitor the supply of the component parts and the availability of alternative sources. If our supply of any key component is disrupted, we may be unable to deliver our products to our customers on a timely basis, which could result in lost or delayed revenues, injury to our reputation, increased manufacturing costs and exposure to claims by our customers. Even if alternate suppliers are available, we may have difficulty identifying them in a timely manner, we may incur significant additional expense in changing suppliers, and we may experience difficulties or delays in the manufacturing of our products.

Our manufacturing operations consist primarily of supply chain managers, new product introduction and test engineering personnel. Our manufacturing organization designs, develops and implements complex test processes to help ensure the quality and reliability of our products. The manufacturing of our products is a complex process, and we may experience production problems or manufacturing delays in the future. Any difficulties we experience in managing relationships with our contract manufacturers, or any interruption in our own or our contract manufacturers operations, could impede our ability to meet our customers' requirements and harm our business, operating results and financial condition.

## Competition

The markets for our products are extremely competitive and are characterized by rapid technological change. The principal competitive factors in our markets include the following

- product performance, features, interoperability and reliability;

- technological expertise;

- relationships with service providers;

- price of products and services and cost of ownership;

- sales and distribution capabilities;

- customer service and support;

- compliance with industry standards and certifications;

- size and financial stability of operations;

- breadth of product line;

- intellectual property portfolio; and

- ability to scale manufacturing.

We believe we compete principally on the performance, features, interoperability and reliability of our products and our technological expertise. Several companies, including companies that are significantly larger and more established, such as Cisco Systems and Motorola, also compete in these markets. Many of these larger competitors have substantially broader product offerings and bundle their products or incorporate functionality

63

Table of Contents

into existing products in a manner that discourages users from purchasing our products or that may require us to add incremental features and functionality to differentiate our products or lower our prices. Furthermore, many of our competitors have greater financial, technical, marketing, distribution, customer support and other resources, as well as better name recognition and access to customers than we do.

Conditions in our markets could change rapidly and significantly as a result of technological advancements or continuing market consolidation. The development and market acceptance of alternative technologies could decrease the demand for our products or render them obsolete. Our competitors may introduce products that are less costly, provide superior performance or achieve greater market acceptance than our products. In addition, these larger competitors often have broader product lines and market focus, are in a better position to withstand any significant reduction in capital spending by customers in these markets, and will therefore not be as susceptible to downturns in a particular market. These competitive pressures are likely to continue to adversely impact our business. We may not be able to compete successfully in the future, and competition may harm our business.

We believe standards bodies may commoditize the markets in which we compete and would require that we add incremental features and functions to differentiate our products. If the product design or technology of our competitors were to become an industry standard, our business could be seriously harmed.

**Employees**

As of December 31, 2006, we employed a total of 562 people, including 197 in sales, service and marketing, 254 in research and development, 41 in manufacturing operations and 70 in a general and administrative capacity. As of such date, we had 353 employees in the United States, 176 in Israel and 33 in other foreign countries. We also engage a number of temporary employees and consultants. None of our employees is represented by a labor union with respect to his or her employment with us. We have not experienced any work stoppages, and we consider our relations with our employees to be good. Our future success will depend upon our ability to attract and retain qualified personnel. Competition for qualified personnel remains strong, and we may not be successful in retaining our key employees or attracting skilled personnel.

**Facilities**

Our corporate headquarters are located at 475 Broadway Street, Redwood City, California. These offices consist of approximately 22,336 square feet. The lease for this property expires in December 2008. We also lease additional office space located at 585 Broadway Street, Redwood City, California. These offices consist of approximately 18,783 square feet. The lease for this property expires in February 2008.

In addition to our headquarters, we lease approximately 87,319 square feet of office space in Westborough, Massachusetts under a lease that expires in March 2012 and approximately 30,784 square feet of office space in Tel Aviv, Israel that expires in July 2007. We also lease sales and support offices in Slough, England; Dusseldorf and Rosenheim, Germany; Hong Kong, Shanghai and Beijing, China; Tokyo, Japan; and Merignac, France.

We believe that our existing properties are in good condition and are sufficient and suitable for the conduct of our business. As our existing leases expire and as we continue to expand our operations, we believe that suitable space will be available on commercially reasonable terms.

**Legal Proceedings**

From time to time, we are involved in various legal proceedings arising from the normal course of business activities. We are not presently a party to any litigation the outcome of which, if determined adversely to us, would individually or in the aggregate have a material adverse effect on our business, operating results or financial condition.

64

Source: BigBand Networks, In, 424B4, March 15, 2007

**Table of Contents**

MANAGEMENT

**Executive Officers and Directors**

The following table sets forth information about our executive officers and directors as of February 22, 2007:

| Name | Age | Position(s) |
|---|---|---|
| **Executive Officers:** | | |
| Amir Bassan-Eskenazi | 42 | President, Chief Executive Officer and Chairman of the Board |
| Frederick Ball | 44 | Senior Vice President and Chief Financial Officer |
| David Heard | 38 | Senior Vice President and General Manager of Product Operations |
| Robert Horton | 35 | Vice President and General Counsel |
| Jeffrey Lindholm | 50 | Senior Vice President of Worldwide Field Operations |
| Ran Oz | 39 | Executive Vice President, Chief Technology Officer and Director |
| **Non-Employee Directors:** | | |
| Lloyd Carney [1][2] | 45 | Director |
| Dean Gilbert | 50 | Director |
| Ken Goldman [1] | 57 | Director |
| Gal Israely [1] | 46 | Director |
| Bruce Sachs [2][3] | 47 | Director |
| Robert Sachs [3] | 58 | Director |
| Geoffrey Yang [2][3] | 47 | Director |

(1)   Member of our audit committee
(2)   Member of our compensation committee
(3)   Member of our nominating and governance committee

*Amir Bassan-Eskenazi* has served as our President, Chief Executive Officer and Chairman of the Board of Directors since he co-founded the company in December 1998. Prior to co-founding BigBand, Mr. Bassan-Eskenazi served in various executive capacities at Optibase Ltd., a provider of digital video solutions from 1991 to 1998, including as Executive Vice President of Marketing and Chief Operating Officer. Mr. Bassan-Eskenazi holds a B.S. in Electrical Engineering from Technion, Israel Institute of Technology.

*Frederick Ball* has served as our Senior Vice President and Chief Financial Officer since August 2004. Prior to joining BigBand, Mr. Ball served as Chief Operating Officer and director of CallTrex Corporation, a provider of customer service solutions, from October 2003 to May 2004. From September 1999 to July 2003, Mr. Ball served as Chief Financial Officer and Executive Vice President of Corporate Development and Mergers and Acquisitions at Borland Software Corporation, a software company. Mr. Ball currently serves as a member of the board of directors of Electro Scientific Industries, a supplier of laser systems. Mr. Ball holds a B.S. in Accounting from Virginia Polytechnic Institute and State University.

*David Heard* has served as our Senior Vice President and General Manager of Product Operations since February 2007. Prior to joining BigBand, Mr. Heard served as the President and Chief Executive Officer of Somera Communications, Inc., a telecommunications equipment company, from May 2004 to February 2006. From June 2003 to May 2004, Mr. Heard served as the President and General Manager of the Network Switching Division of Tekelec, Inc., a manufacturer of switching equipment. From February 2000 to June 2003, Mr. Heard served as the President and Chief Executive Officer of Santera Systems, Inc., a networking company that was acquired by Tekelec in 2003. Mr. Heard holds a B.A. in Production and Operations Management from The Ohio State University, an M.B.A. from the University of Dayton and an M.S. in management from the Stanford Graduate School of Business.

*Robert Horton* has served as our Vice President and General Counsel since February 2005. Prior to joining BigBand, Mr. Horton served as Senior Counsel for Borland Software Corporation, a software company, from November 2002 to January 2005. From January 2002 to November 2002, Mr. Horton served as an associate at

65

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

the law firm of Covington & Burling LLP. From 1997 to November 2001, Mr. Horton served as an associate at the law firm of Wilson Sonsini Goodrich & Rosati, P.C. Mr. Horton holds a B.A. in History from the University of Notre Dame and a J.D. from Northwestern University.

*Jeffrey Lindholm* has served as our Senior Vice President of Worldwide Field Operations since November 2006. Prior to joining BigBand, Mr. Lindholm served in various executive positions at Juniper Networks, a networking equipment company, from February 2002 to November 2006, including as Chief Marketing Officer from January 2006 to November 2006 and as Vice President of Worldwide Sales from February 2002 to January 2006. Mr. Lindholm served as Vice President of Worldwide Sales and Support of Unisphere Networks, a provider of carrier-class IP infrastructure products, from March 1999 until its acquisition by Juniper Networks in February 2002. Mr. Lindholm holds a B.S. degree in Marketing from Boston College School of Management.

*Ran Oz* has served as our Executive Vice President and Chief Technology Officer since he co-founded the company in December 1998, and as a director since May 2005. Mr. Oz holds a B.S. degree in Electrical Engineering from Technion, Israel Institute of Technology, an M.S. in Electrical Engineering from Tel Aviv University and an M.B.A from the University of Phoenix.

*Lloyd Carney* has served as a director since April 2006. Mr. Carney has been the General Manager of Netcool Products for IBM, an information technology company, since February 2006. Prior to joining IBM, Mr. Carney served as Chairman of the Board and Chief Executive Officer of MicroMuse, a provider of service and business assurance software, from July 2003 through its February 2006 acquisition by IBM. From January 2002 to July 2003, Mr. Carney served as Chief Operating Officer and Executive Vice President of Juniper Networks, a networking equipment company. Mr. Carney also previously served in various executive positions at Nortel Networks from June 1997 to September 2001. Mr. Carney currently serves as a member of the board of directors of Cypress Semiconductor. Mr. Carney holds a B.S. in Electrical Engineering Technology from Wentworth Institute and an M.A. in Applied Business Management from Leslie College.

*Dean Gilbert* has served as a director since February 2002. Since September 2006, Mr. Gilbert has been a Vice President of Syndication at Google, an Internet search company. Mr. Gilbert has also been a Managing Partner of Sandalwood Investments, an independent venture investment and consulting firm, since January 2001. Prior to this time, Mr. Gilbert served as Executive Vice President and General Manager of @Home Networks from 1996 to 2000. Mr. Gilbert co-founded Quintess, a top-rated private residence club, in June 2003 and was responsible for its early membership development and real estate acquisition strategy through March 2005. Mr. Gilbert holds a B.A. in Telecommunications and an M.A. in Telecommunications and Business from Michigan State University.

*Ken Goldman* has served as a director since April 2006. Mr. Goldman has been the Executive Vice President and Chief Financial Officer of Dexterra, Inc., a provider of mobile enterprise software, since November 2006. Prior to joining Dexterra, Mr. Goldman was Senior Vice President of Finance and Administration and Chief Financial Officer of Siebel Systems, Inc., a supplier of customer software solutions and services that was acquired by Oracle Corporation in January 2006, from August 2000 through March 2006. From December 1999 to December 2003, Mr. Goldman was a member of the Financial Accounting Standards Advisory Council. Mr. Goldman currently serves as a member of the board of directors of Juniper Networks, a networking equipment company, and of Leadis Technology, Inc., a semiconductor design and development company. Mr. Goldman holds a B.S. in Electrical Engineering from Cornell University and an M.B.A. from Harvard Business School.

*Gal Israely* has served as a director since inception in December 1998. Mr. Israely is a managing partner of Cedar Fund, a venture capital firm he co-founded in 1997. Prior to co-founding Cedar, Mr. Israely was a Managing Director in the high technology investment banking group of Bear, Stearns & Co. Inc. Mr. Israely holds a B.A. in Economics and an M.B.A. in Finance from Tel Aviv University.

*Bruce Sachs* has served as a director since July 2005. Mr. Sachs has been a General Partner at Charles River Ventures, a venture capital firm, since October 1999. Prior to joining Charles River Ventures, Mr. Sachs served as an executive at numerous companies, including Ascend Communications, Stratus Computer, Bay Networks

66

Table of Contents

and Xylogics. Mr. Sachs currently serves as a member of the board of directors of Vertex Pharmaceuticals. Mr. Sachs holds a B.S. in Electrical Engineering from Bucknell University and an M.S. in Electrical Engineering from Cornell University, as well as an M.B.A. from Northeastern University.

*Robert Sachs* has served as a director since January 2006. Mr. Sachs is a Principal of the Continental Consulting Group, LLC, a Boston-based cable and telecommunications consulting firm, which Mr. Sachs co-founded in January 1998. After founding Continental Consulting Group, Mr. Sachs served as President and Chief Executive Officer of the National Cable & Telecommunications Association, from August 1999 through February 2005. Prior to January 1998, Mr. Sachs served as an executive of Continental Cablevision and MediaOne for more than 18 years. Mr. Sachs also serves as a member of the board of directors of Global Crossing. Mr. Sachs holds a B.S. in Political Science from the University of Rochester, an M.S. in Journalism from Columbia University and a J.D. from Georgetown University.

*Geoffrey Yang* has served as a director since April 2000. Mr. Yang is a Partner at Redpoint Ventures, a venture capital firm, which he co-founded in 1999. Immediately prior to co-founding Redpoint Ventures, Mr. Yang was a General Partner with Institutional Venture Partners, a venture capital firm. Mr. Yang currently serves as a member of the board of directors of TiVo, as well as numerous private companies. Mr. Yang holds a B.A. in Economics from Princeton University, a B.S.E. in Engineering and Management Systems from Princeton University and an M.B.A. from Stanford University.

Our executive officers are appointed by our board of directors and serve until their successors have been duly elected and qualified. There are no family relationships among any of our directors or executive officers.

## Codes of Ethics

We have adopted a Code of Ethics for Principal Executive and Senior Financial Officers applicable to our Chief Executive Officer, Chief Financial Officer and other principal executive and senior financial officers. In addition, we have adopted a Code of Business Conduct and Ethics for all employees, officers and directors. These codes will become effective as of the effective date of this offering.

## Board of Directors

Our board of directors currently consists of nine members. Our bylaws permit our board of directors to establish by resolution the authorized number of directors, and nine directors are currently authorized.

Pursuant to a stockholders agreement among us and significant holders of our convertible preferred stock and common stock, who together have substantial control of the total voting power of our outstanding capital stock, those holders vote together to cause the election of five of our directors as follows:

- Mr. Bassan-Eskenazi, who is elected by virtue of being our chief executive officer;

- Mr. Oz, who is elected as the designee of certain founder stockholders who hold a majority of the outstanding shares of our Class A Common Stock;

- Mr. Yang, who is elected as the designee of Redpoint Ventures;

- Mr. Israely, who is elected as the designee of the holders of our Series A Preferred Stock, Series A-1 Preferred Stock and Series A-2 Preferred Stock, voting together; and

- Bruce Sachs, who is elected as the designee of Charles River Ventures.

Upon the completion of this offering, the stockholders agreement by which these directors were elected will terminate. Although these directors will no longer be elected pursuant to a contractual right, they will continue to serve as directors until the earlier of their resignation or an annual stockholder meeting for which our nominating and governance committee does not nominate them for re-election or they are otherwise not re-elected by our stockholders.

67

Table of Contents

As of the closing of this offering, our amended and restated certificate of incorporation and amended and restated bylaws will provide for a classified board of directors consisting of three classes of directors, each serving staggered three-year terms, as follows:

- the Class I directors will be Ran Oz, Amir Bassan-Eskenazi and Ken Goldman, and their terms will expire at the annual meeting of stockholders to be held in 2007;

- the Class II directors will be Lloyd Carney, Gal Israely and Bruce Sachs, and their terms will expire at the annual meeting of stockholders to be held in 2008; and

- the Class III directors will be Geoffrey Yang, Dean Gilbert and Robert Sachs, and their terms will expire at the annual meeting of stockholders to be held in 2009.

Upon expiration of the term of a class of directors, directors for that class will be elected for three-year terms at the annual meeting of stockholders in the year in which that term expires. Each director's term continues until the election and qualification of his successor, or his earlier death, resignation or removal. Any increase or decrease in the number of directors will be distributed among the three classes so that, as nearly as possible, each class will consist of one-third of the directors. This classification of our board of directors may have the effect of delaying or preventing changes in control of our company.

**Director Independence**

In December 2006, our board of directors undertook a review of the independence of each director and considered whether any director has a material relationship with us that could compromise his ability to exercise independent judgment in carrying out his responsibilities. As a result of this review, our board of directors determined that Lloyd Carney, Ken Goldman, Gal Israely, Robert Sachs, Bruce Sachs and Geoffrey Yang, representing six of our nine directors, are "independent directors" as defined under the rules of the NASD, constituting a majority of independent directors of our board of directors as required by the rules of the NASDAQ.

**Committees of the Board of Directors**

Our board of directors has established an audit committee, a compensation committee and a nominating and governance committee, each of which will have the composition and responsibilities described below.

*Audit Committee*

Our audit committee is comprised of Lloyd Carney, Ken Goldman and Gal Israely, each of whom is a non-employee member of our board of directors. Mr. Goldman is the chairperson of our audit committee. Our board of directors has determined that each member of our audit committee meets the requirements for independence and financial literacy under the requirements of the NASDAQ and SEC rules and regulations. Mr. Goldman is our audit committee financial expert, as that term is defined under the SEC rules implementing Section 407 of the Sarbanes-Oxley Act of 2002 and possesses financial sophistication as required by the NASDAQ rules. Our audit committee is responsible for, among other things:

- selecting and hiring our independent auditors, and approving the audit and non-audit services to be performed by our independent auditors;

- evaluating the qualifications, performance and independence of our independent auditors;

- monitoring the integrity of our financial statements and our compliance with legal and regulatory requirements as they relate to financial statements or accounting matters;

- reviewing the adequacy and effectiveness of our internal control policies and procedures;

- discussing the scope and results of the audit with the independent auditors and reviewing with management and the independent auditors our interim and year-end operating results; and

- preparing the audit committee report that the SEC requires in our annual proxy statement.

68

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

### Compensation Committee

Our compensation committee is currently comprised of Lloyd Carney, Geoffrey Yang and Bruce Sachs, each of whom is a non-employee member of our board of directors. Mr. Carney is the chairperson of our compensation committee. Our board of directors has determined that each member of our compensation committee meets the requirements for independence under the current requirements of the NASDAQ. The compensation committee is responsible for, among other things:

- reviewing and approving for our executive officers: the annual base salary, the annual incentive bonus, including the specific goals and amount, equity compensation, employment agreements, severance arrangements and change in control arrangements, and any other benefits, compensations or arrangements;

- reviewing the succession planning for our executive officers;

- reviewing and recommending compensation goals and bonus and stock compensation criteria for the Company's employees;

- preparing the compensation committee report that the SEC requires to be included in our annual proxy statement; and

- administrating, reviewing and making recommendations with respect to our equity compensation plans.

### Nominating and Governance Committee

Our nominating and governance committee is comprised of Geoffrey Yang, Bruce Sachs and Robert Sachs, each of whom is a non-employee member of our board of directors. Robert Sachs is the chairperson of our nominating and governance committee. Our board of directors has determined that each member of our nominating and governance committee satisfies the requirements for independence under the NASDAQ rules. The nominating and governance committee is responsible for, among other things:

- assisting our board of directors in identifying prospective director nominees and recommending nominees for each annual meeting of stockholders to the board of directors;

- reviewing developments in corporate governance practices and developing and recommending governance principles applicable to our board of directors;

- overseeing the evaluation of our board of directors and management; and

- recommending members for each board committee to our board of directors.

### Director Compensation

Effective upon the closing of this offering, our board of directors adopted a compensation policy that will be applicable to all of our non-employee directors. This compensation policy provides that each such non-employee director will receive the following compensation for board services:

- an annual director cash retainer of $20,000;

- an additional annual cash retainer for serving as the chairman of the audit committee of $20,000, for serving as the chairman of the compensation committee of $12,000 and for serving as the chairman of the nominating and governance committee of $5,000;

- compensation for attending board meetings in-person of $2,000 per meeting;

- compensation for attending committee meetings in-person of $1,000 per meeting;

- compensation for attending board or committee meetings telephonically of $500 per meeting, or $750 per meeting if such telephonic meeting lasts for longer than one hour;

- upon first joining the board, an automatic initial grant of a stock option to purchase 50,000 shares of our common stock vesting as to 25% of the shares on the first anniversary of the grant date and an additional

69

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

1/48th of the total shares vesting monthly thereafter so that the award is fully vested four years after the grant date;

- for each director whose term continues following an annual meeting, an automatic annual grant of a stock option for the purchase of 18,750 shares of our common stock vesting as to 1/12th of the shares per month so that the award is fully vested one year after the grant date; and

- for each full year of service, for the chairperson of the audit committee, an automatic additional grant of a stock option to purchase 6,250 shares of our common stock, for the chairperson of the compensation committee, an automatic additional grant of a stock option to purchase 3,750 shares, and for the chairperson of the nominating and governance committee, an automatic additional grant of a stock option to purchase 1,250 shares, in each case vesting as to 1/12th of the shares per month so that the award is fully vested one year after the grant date.

If, following a change of control, a director is terminated, all options granted to the director pursuant to the compensation policy shall fully vest and become immediately exercisable.

Prior to the above policy being effective, certain of our non-employee directors have received options to purchase shares of our common stock under our stock option plans in connection with their service to the company. In January 2006, we granted options to purchase 50,000 shares of our common stock at an exercise price of $1.88 per share to Robert Sachs. In April 2006, we granted options to purchase 50,000 shares of our common stock to Mr. Carney at an exercise price of $2.20 per share and options to purchase 51,250 shares of our common stock to Mr. Goldman at an exercise price of $2.20 per share, of which options to purchase 1,250 shares were granted to Mr. Goldman in connection with his service as the chairperson of our audit committee. These options vest over four years at a rate of 25% after one year and 1/48th per month thereafter, so long as the holder continues to serve as a director, except that options to purchase 1,250 shares of Mr. Goldman's options are fully vested on the first anniversary of the date of the grant. In November 2006, we granted Mr. Goldman options to purchase an additional 5,000 shares of our common stock at an exercise price of $5.28 per share. In February 2007, we granted each of Messrs. Israely, Bruce Sachs and Yang an option to purchase 50,000 shares of our common stock at an exercise price of $7.34 per share. These options vest at a rate of 25% after one year and 1/48th per month thereafter, so long as the holder continues to serve as a director.

In February 2002, we granted Mr. Gilbert options to purchase 97,508 shares at an exercise price of $0.80 per share and in December 2003, we granted Mr. Gilbert options to purchase 37,500 shares at an exercise price of $0.76 per share. These options vest over four years at a rate of 1/48th per month, so long as the holder continues to serve as a director. Pursuant to Mr. Gilbert's option agreements, in the event of an acquisition any remaining unvested shares subject to Mr. Gilbert's options would accelerate and become vested and exercisable immediately prior to the closing of the acquisition. Our board of directors may require our stockholders' approval for the grant of this acceleration right to Mr. Gilbert. An acquisition is defined in the 2001 Plan and 2003 Plan to mean any merger or consolidation after which the voting securities of our company outstanding immediately prior thereto represent less than a majority of the combined voting power of the voting securities of our company or other acquiring or such surviving or acquiring entity outstanding immediately after the event, any sale of all or substantially all of the assets or capital stock of our company or any other acquisition of the business of our company as determined by our board of directors. In December 2006, we granted Mr. Gilbert an option to purchase 50,000 shares at an exercise price of $5.36 per share. This option vests over four years at a rate of 25% after one year and 1/48th per month thereafter, so long as the holder continues to serve as a director.

70

**Table of Contents**

The following table sets forth the aggregate compensation awarded to, earned by or paid to our non-employee directors during 2006:

| Name | Fees Earned or Paid in Cash | Option Awards [1] | Total |
|---|---|---|---|
| Lloyd Carney | $    36,187 | $18,024[2] | $54,211 |
| Dean Gilbert | 83,406 | 1,578[3] | 84,984 |
| Ken Goldman | 33,973 | 20,098[4] | 54,071 |
| Gal Israely | — | — | — |
| Bruce Sachs | — | — | — |
| Robert Sachs | 46,239 | 24,023[5] | 70,262 |
| Geoffrey Yang | — | — | — |

(1)    Amounts represent the expensed fair value for fiscal year 2006 of stock options granted in 2006 under SFAS 123R as discussed in Note 10, Stockholders' Equity (Deficit) subheading "Stock-Based Compensation," of the Notes to Consolidated Financial Statements included in this prospectus.

(2)    Stock options for the purchase of an aggregate of 53,750 shares were outstanding as of December 31, 2006.

(3)    Stock options for the purchase of an aggregate of 185,008 shares were outstanding as of December 31, 2006.

(4)    Stock options for the purchase of an aggregate of 56,250 shares were outstanding as of December 31, 2006.

(5)    Stock options for the purchase of an aggregate of 51,250 shares were outstanding as of December 31, 2006.

**Compensation Committee Interlocks and Insider Participation**

None of the members of our compensation committee is an officer or employee of our company. None of our executive officers currently serves, or in the past year has served, as a member of the board of directors or compensation committee of any entity that has one or more executive officers serving on our board of directors or compensation committee.

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

## EXECUTIVE COMPENSATION

### Compensation Discussion and Analysis

*The following discussion and analysis of compensation arrangements of our named executive officers for 2006 should be read together with the compensation tables and related disclosures set forth below. This discussion contains forward looking statements that are based on our current plans, considerations, expectations and determinations regarding future compensation programs. Actual compensation programs that we adopt may differ materially from currently planned programs as summarized in this discussion.*

*Overview*

We compete with many other technology companies in seeking to attract and retain a skilled work force. To meet this challenge, we have implemented the Total Compensation Philosophy to enable our management to make decisions regarding our compensation programs, to manage these programs, and to effectively communicate the goals of these programs to our employees and stockholders.

Our Total Compensation Philosophy is to offer our employees compensation and benefits that are competitive and that meet our goals of attracting, retaining and motivating highly skilled employees so that we can achieve our financial and strategic objectives.

Utilizing this philosophy, our compensation programs are designed to:

- be "market-based" and reflect the competitive environment for personnel;

- stress our "pay for performance" approach to managing pay levels;

- share risks and rewards with employees at all levels;

- be affordable, within the context of our operating expense model;

- align the interests of our employees with those of our stockholders;

- reflect our values; and

- be fairly and equitably administered.

In addition, as we administer our compensation programs, we plan to:

- evolve and modify our programs to reflect the competitive environment and our changing business needs;

- focus on simplicity, flexibility and choice wherever possible;

- openly communicate the details of our programs with our employees and managers to ensure that our programs and their goals are understood;

- provide our managers and employees with the tools they need to administer our compensation programs; and

- consistently apply our Total Compensation Philosophy to all our locations, although our specific programs may vary from country to country.

*Elements of Our Compensation Program*

As a total rewards package, we design our compensation program to enable us to attract and retain talented personnel. The individual elements of our compensation program serve to satisfy this larger goal in specific ways as described below.

We design base pay to provide the essential reward for an employee's work, and is required to be competitive in attracting talent. Once base pay levels are initially determined, increases in base pay are provided

72

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

to recognize an employee's specific performance achievements. Consistent with our Total Compensation Philosophy, we implement a "pay for performance" approach that provides higher levels of compensation to individual employees whose results merit greater rewards. Our managers typically make performance assessments throughout the year, and provide ongoing feedback to employees, provide resources and maximize individual and team performance levels.

We design equity-based compensation, including stock options, to ensure that we have the ability to retain talent over a longer period of time, and to provide optionees with a form of reward that aligns their interests with those of our stockholders. Employees whose skills and results we deem to be critical to our long-term success are eligible to receive higher levels of equity-based compensation.

We also utilize various forms of variable compensation, including cash bonuses, commissions, and an incentive plan that allow us to remain competitive with other companies while providing upside potential to those employees who achieve outstanding results.

Core benefits, such as our basic health benefits, 401(k) program and life insurance, are designed to provide a stable array of support to employees and their families throughout various stages of their careers, and are provided to all employees regardless of their individual performance levels.

The four key elements of our Total Compensation package are:

- base pay;

- variable pay;

- equity-based pay; and

- benefits.

Consistent with our Total Compensation Philosophy, we have structured each element of our rewards package as follows:

### Base Pay

We create a set of base pay structures that are both affordable and competitive in relation to the market. We continuously monitor base pay levels within the market and make adjustments to our structures as needed. In general, an employee's base pay level should reflect the employee's overall sustained performance level and contribution to BigBand over time. We seek to structure the base pay for our top performers to be aggressive in relation to the market.

### Variable Pay

We design our variable pay programs to be both affordable and competitive in relation to the market. We monitor the market and adjust our variable pay programs as needed. Our variable pay programs, such as our sales commissions program and bonus program, are designed to motivate employees to achieve overall goals. Our programs are designed to avoid entitlements, to align actual payouts with the actual results achieved and to be easy to understand and administer.

### Equity-Based Rewards

We design our equity programs to be both affordable and competitive in relation to the market. We monitor the market and applicable accounting, corporate, securities and tax laws and regulations and adjust our equity programs as needed. Stock options and other forms of equity compensation are designed to reflect and reward a high level of sustained individual performance over time. We design our equity programs to align employees' interests with those of our stockholders.

73

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

*Benefits Programs*

We design our benefits programs to be both affordable and competitive in relation to the market while conforming with local laws and practices. We monitor the market, local laws and practices and adjust our benefits programs as needed. We design our benefits programs to provide an element of core benefits, and to the extent possible, offer options for additional benefits, be tax-effective for employees in each country and balance costs and cost sharing between us and our employees.

*Determining the Amount of Each Element of Compensation*

*Overview.*    The amount of each element of our compensation program is determined at a high level by analyzing the type and level of similar programs offered by the companies with which we compete for talent. This analysis is performed by participating in salary surveys administered by third parties, and reviewing the data from these surveys. The compensation committee of the board of directors authorizes the actual levels of pay for our officers and executives, after review and analysis of this third party survey data, typically with the assistance of outside compensation experts. We hire compensation experts for their subject matter expertise and independence from the Company's management. We currently use a compensation expert, J. Richard & Co., for director compensation matters and Compensia for executive management cash and equity compensation matters.

*Base Pay.*    Once an initial compensation framework is developed from the results of third party surveys, our managers assess the ongoing performance levels of the employees they supervise, and make recommendations regarding changes in compensation levels. These recommendations are collected as part of our annual performance review process, although we do occasionally increase base pay at the time of an employee's promotion to a position of greater responsibility. In establishing our compensation framework for base pay, we intend to target above-average levels based on the surveyed market to establish the midpoint of our salary ranges and establish a minimum and maximum pay level around the midpoint.

*Variable Pay.*    Similarly, we determine the targeted level of variable compensation by participating in salary surveys administered by third parties. After developing a competitive framework, we determine the employee's actual level of variable compensation by assessing the employee's actual results, and rewarding the employee in accordance with the terms of the variable pay program. In developing the competitive framework, we seek to set "total cash compensation" (base salary plus variable pay) above the average of the surveyed market to meet our goal of ensuring that our cash compensation levels are very competitive, and enable us to attract and retain key talent in the future.

Beginning in 2007, we have two primary variable compensation programs: a newly-established Incentive Compensation Plan, or ICP, and our 2007 Sales Compensation Plan. Employees participate in either the ICP or the Sales Compensation Plan, but not both.

We base the ICP funding on our achievement of pre-determined revenue and operating contribution targets. Under the ICP, target bonuses are expressed as a percentage of the employee's base salary. The ICP will be semi-annual, providing two bonus opportunities for participants each fiscal year. The annual bonus number is halved, establishing a semi-annual target bonus amount. Participants are required to submit three to five "stretch" achievement goals at the beginning of each measurement period, with such goals to be approved by the participant's supervisor. The participant is then compensated under the ICP based on their achievement of the stretch goals. Final payouts at the end of each fiscal half year will be determined by multiplying the semi-annual bonus target by the financial performance (funding) percent as well as the individual performance rating percent.

The 2007 Sales Compensation Plan is a sales commission program and provides a payout to eligible sales employees based on their achievement of sales objectives, or quotas. Employees receive a standard commission for sales up to 100% of quota and accelerated commissions based on over-achievement. Quota is retired, or commissions are "earned," at the time of booking, and commissions are paid at the time products are shipped to the customer.

74

Table of Contents

*Equity-Based Pay.* With respect to the level of equity-based compensation, we also participate in surveys administered by third parties. After analyzing this data, our management recommends a rewards framework to our board of directors. Once we establish a framework, we assess, typically on an annual basis, the status of our equity-based compensation across our workforce, and collect recommendations from team managers based on their assessment of the employee's performance, and the criticality of the employee's skills to our retention goals, within the limits of available shares. Our executive management compiles and reviews recommendations by our managers and then presents them to our compensation committee for approval. In general, we have taken an "at market" competitive stance based on the surveyed market to establish our grant guidelines for new hires as well as "refresh" grants to existing employees.

*Allocation of Equity Compensation Awards*

In 2006, we granted a total of 6,283,264 option shares, of which a total of 1,241,250 option shares were granted to our executives, representing 19.8% of all option shares granted in 2006. Options granted to executives and other employees vest over a period of four years. Our board of directors does not apply a rigid formula in allocating stock options to executives as a group or to any particular executive. Instead, our board of directors exercises its judgment and discretion and considers, among other things, the role and responsibility of the executive, competitive factors, the amount of stock-based equity compensation already held by the executive, the non-equity compensation received by the executive and the total number of options to be granted to all participants during the year. The number of stock options granted to each executive is set forth in the "Grants of Plan-Based Awards Table." The value of such grants, as determined in accordance with SFAS 123R for each individual named executive officer is set forth in the column "Stock Awards" in the "Summary Compensation Table."

*Timing of Equity Awards*

Our board of directors generally grants stock options to executives and current employees once per year. Such grants are typically made at a meeting of the board of directors held in the fourth quarter of the year. With respect to newly hired employees, our practice is typically to make stock grants at the first meeting of the compensation committee following such employee's hire date. We do not have any program, plan or practice to time stock options grants in coordination with the release of material non-public information. We do not time, nor do we plan to time, the release of material non-public information for the purposes of affecting the value of executive compensation. Our board of directors determines the exercise price of stock options based on third-party valuation reports as of a date concurrent with the option grant date.

*Executive Equity Ownership*

We encourage our executives to hold a significant equity interest in BigBand. However, we do not have specific share retention and ownership guidelines for our executives. We have a policy that, once we become a publicly traded company following this offering, we will not permit our executives to sell short our stock, will prohibit our executives from holding our stock in a margin account, and will discourage the purchase and sale of exchange-traded options on our stock by our executives.

*Type of Equity Awards*

Prior to this offering, the long-term equity incentive component of our compensation program consisted solely of stock options. Following this offering, we may begin utilizing restricted stock and/or restricted stock units as additional forms of equity compensation incentives. Under our 2007 Equity Incentive Plan, we are permitted to issue stock options, restricted stock units, restricted stock, stock appreciation rights, performance units and performance shares.

Concurrently with this offering, we intend to establish our Employee Stock Purchase Plan, or ESPP. All of our employees, including executives, are eligible to participate if they are customarily employed by us or any

75

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

participating subsidiary for at least 20 hours per week and more than five months in any calendar year. Our ESPP is intended to qualify under Section 423 of the Internal Revenue Code, and provides for consecutive, non-overlapping six-month offering periods. The first offering period will commence on the first trading day on or after the effective date of this offering and will end on the first trading day on or after November 15, 2007. Our ESPP permits participants to purchase common stock through payroll deductions. Amounts deducted and accumulated by the participant are used to purchase shares of our common stock at the end of each six-month offering period. The purchase price is 85% of the fair market value of our common stock at the exercise date.

*Performance-Based Compensation and Financial Restatement*

We have not considered or implemented a policy regarding retroactive adjustments to any cash or equity-based incentive compensation paid to our executives and other employees where such payments were predicated upon the achievement of certain financial results that were subsequently the subject of a financial restatement.

*Severance and Change in Control Arrangements*

Several of our executives have employment and other agreements which provide for severance payment arrangements and/or acceleration of stock option vesting that would be triggered by an acquisition or other change in control of BigBand. See "—Employment Agreements" above for a description of the severance and change in control arrangements for our named executive officers.

Each of our equity incentive plans provides for a potential acceleration of outstanding awards in the event that we undergo a change in control, as defined in such plans. See "—Employee Benefit Plans" below for a description of the change in control provisions contained in our equity incentive plans.

*Effect of Accounting and Tax Treatment on Compensation Decisions*

In the review and establishment of our compensation programs, we consider the anticipated accounting and tax implications to us and our executives. In this regard, in 2007, following the completion of this offering, we may begin utilizing restricted stock and/or restricted stock units as additional forms of equity compensation incentives in response to changes in the accounting treatment of equity awards under SFAS 123R. While we consider the applicable accounting and tax treatment, these factors alone are not dispositive, and we also consider the cash and non-cash impact of the programs and whether a program is consistent with our overall compensation philosophy and objectives.

Section 162(m) of the Internal Revenue Code imposes a limit on the amount of compensation that we may deduct in any one year with respect to our chief executive officer and each of our next four most highly compensated executive officers, unless certain specific and detailed criteria are satisfied. Performance-based compensation, as defined in the Internal Revenue Code, is fully deductible if the programs are approved by stockholders and meet other requirements. We believe that grants of equity awards under our existing stock plans qualify as performance-based for purposes of satisfying the conditions of Section 162(m), thereby permitting us to receive a federal income tax deduction in connection with such awards. In general, we have determined that we will not seek to limit executive compensation so that it is deductible under Section 162(m). However, from time to time, we monitor whether it might be in our interests to structure our compensation programs to satisfy the requirements of Section 162(m). We seek to maintain flexibility in compensating our executives in a manner designed to promote our corporate goals and therefore our compensation committee has not adopted a policy requiring all compensation to be deductible. Our compensation committee will continue to assess the impact of Section 162(m) on our compensation practices and determine what further action, if any, is appropriate.

*Role of Executives in Executive Compensation Decisions*

Our board of directors and our compensation committee generally seek input from our President and Chief Executive Officer, Amir Bassan-Eskenazi, when discussing the performance of, and compensation levels for

76

**Table of Contents**

executives other than himself. The compensation committee also works with Mr. Bassan-Eskenazi and with our chief financial officer and vice president of human resources in evaluating the financial, accounting, tax and retention implications of our various compensation programs. Neither Mr. Bassan-Eskenazi nor any of our other executives participates in deliberations relating to his or her own compensation.

### Summary Compensation Table

The following table provides information regarding the compensation of our chief executive officer, chief financial officer and each of our other three most highly compensated executive officers during 2006. We refer to these executive officers as our named executive officers.

| Name and Principal Position | Salary | Bonus | Option Awards[1] | All Other Compensation | Total |
|---|---|---|---|---|---|
| Amir Bassan-Eskenazi, President and Chief Executive Officer | $265,152 | $60,125 | $10,981 | — | $336,258 |
| Frederick Ball, Senior Vice President and Chief Financial Officer | 218,167 | 39,833 | 7,912 | — | 265,912 |
| Ran Oz, Chief Technology Officer and Executive Vice President | 178,125 | 32,062 | 4,013 | $ 22,531[2] | 236,731 |
| Robert Horton, Vice President and General Counsel | 182,500 | 24,344 | 27,485 | — | 234,329 |
| John Connelly, Executive Vice President of Marketing & Business Development | 200,000 | 32,655 | — | — | 232,655 |

(1)   Amounts represent stock-based compensation expense for fiscal year 2006 for stock options granted in 2006 under SFAS 123R as discussed in Note 10, Stockholders' Equity (Deficit) subheading "Stock-Based Compensation," of the Notes to Consolidated Financial Statements included elsewhere in this prospectus.

(2)   Consists of payment for car leasing expenses in the amount of $5,921, taxes related to a car expense benefit in the amount of $6,161 and other benefits in the amount of $10,449.

### Grants of Plan-Based Awards in 2006

The following table lists grants of plan-based awards made to our named executive officers in 2006 and related fair value compensation for 2006.

| Name | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards | | | All Other Option Awards: Number of Securities Underlying Options | Exercise or Base Price of Option Awards($/Sh) | Grant Date Fair Value of Stock and Option Awards[1] |
|---|---|---|---|---|---|---|---|
| | | Threshold | Target | Maximum | | | |
| Amir Bassan-Eskenazi | 11/2/06 | $ 50,750 | $ 72,500 | $ 94,250 | 375,000 | $ 5.28 | $ 1,540,200 |
| Frederick Ball | 11/1/06 | 39,375 | 56,250 | 73,125 | 116,250 | 5.28 | 477,462 |
| Ran Oz | 11/2/06 | 37,274 | 53,248 | 69,222 | 187,500 | 5.28 | 770,100 |
| | 11/8/06 | — | — | — | 62,500 | 5.28 | 256,700 |
| Robert Horton | 4/10/06 | 26,600 | 38,000 | 49,400 | 75,000 | 2.20 | 147,150 |
| John Connelly | — | 35,000 | 50,000 | 65,000 | — | — | — |

(1)   Amounts represent total fair value of stock options granted in 2006 under SFAS 123R as discussed in Note 10, Stockholders' Equity (Deficit) subheading "Stock-Based Compensation," of the Notes to Consolidated Financial Statements included elsewhere in this prospectus.

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

**Outstanding Equity Awards at 2006 Fiscal Year-End**

The following table lists all outstanding equity awards held by our named executive officers as of December 31, 2006.

| | Option Awards | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options Exercisable | Number of Securities Underlying Unexercised Options Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options | Option Exercise Price | Option Expiration Date | Number of Shares of Stock That Have Not Vested | Market Value of Shares of Stock That Have Not Vested | Equity Incentive Plan Awards: Number of Unearned Shares or Other Rights That Have Not Vested | Equity Incentive Plan Awards: Market Value of Unearned Shares or Other Rights That Have Not Vested |
| Amir Bassan-Eskenazi | 738,174 | — | — | $ 0.60 | 12/3/2012(1) | — | — | — | — |
| | 103,500 | — | — | 0.60 | 4/30/2013(2) | — | — | — | — |
| | 544,750 | 143,356 | — | 1.00 | 9/28/2014(6) | — | — | — | — |
| | — | 375,000 | — | 5.28 | 11/7/2016(3) | — | — | — | — |
| Frederick Ball | 306,250 | 218,750 | — | 1.00 | 9/28/2014(4) | — | — | — | — |
| | 969 | 115,281 | — | 5.28 | 11/7/2016(5) | — | — | — | — |
| Ran Oz | 544,750 | 143,356 | — | 0.76 | 9/28/2014(6) | — | — | — | — |
| | — | 187,500 | — | 5.28 | 11/7/2016(3) | — | — | — | — |
| | — | 62,500 | — | 5.28 | 11/8/2016(3) | — | — | — | — |
| Robert Horton | 53,854 | 63,646 | — | 1.32 | 3/16/2015(6) | — | — | — | — |
| | 12,500 | 62,500 | — | 2.20 | 4/10/2016(2) | — | — | — | — |
| John Connelly | 257,291 | 67,709 | — | 0.76 | 12/24/2013(6) | — | — | — | — |

(1) The shares underlying this option vest over two years at a rate of $1/24$ per month following the vesting commencement date.

(2) The shares underlying this option vest over four years at a rate of $1/48$ per month following the vesting commencement date.

(3) The shares underlying this option vest over three years at a rate of $1/36$ per month following the vesting commencement date.

(4) The shares underlying this option vest as to 12.5% of the shares on the six-month anniversary date following the vesting commencement date, with the remainder of the shares vesting in ratable installments monthly thereafter.

(5) The shares underlying this option vest over four years at a rate of 0.8333% of the shares on a monthly basis for the first two years following the vesting commencement date, with an additional 3.33% of the shares vesting on a monthly basis following the second anniversary of the vesting commencement date.

(6) The shares underlying this option vest as to 25% of the shares on the one year anniversary of the vesting commencement date and $1/48$ per month thereafter.

**Option Exercises and Stock Vested in 2006**

None of our named executive officers exercised stock options or had any restricted stock vest during 2006.

**Pension Benefits**

None of our named executive officers participates in or has account balances in qualified or non-qualified defined benefit plans sponsored by us.

**Nonqualified Deferred Compensation**

None of our named executive officers participate in or have account balances in non-qualified defined contribution plans or other deferred compensation plans maintained by us.

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

**Employment Agreements and Change in Control Arrangements**

*Amir Bassan-Eskenazi.* We have entered into an employment agreement, dated January 1, 2000, with Mr. Bassan-Eskenazi, our President and Chief Executive Officer. Mr. Bassan-Eskenazi's current annual salary is $290,000. Pursuant to his employment agreement, Mr. Bassan-Eskenazi may receive a bonus of up to 30% of his base salary. The level of Mr. Bassan-Eskenazi's bonus is determined at our discretion and is based on Mr. Bassan-Eskenazi's performance and our performance, among other factors. Mr. Bassan-Eskenazi's employment agreement provides that, if Mr. Bassan-Eskenazi's employment is terminated without cause and not due to death or disability, Mr. Bassan-Eskenazi would be entitled to a severance payment in an amount equal to twelve months of his then-current base salary and our company's contribution to his health insurance premiums. This payment is conditioned on Mr. Bassan-Eskenazi's execution of a comprehensive release of claims. Pursuant to Mr. Bassan-Eskenazi's agreement, termination within one year following a sale of all or substantially all of our assets, technology or stock, a merger, consolidation or any other change in share ownership resulting in a change of control of BigBand is deemed to be termination without cause if one of the following has occurred (i) a reduction in salary or a material reduction in the level of benefits in effect immediately prior to the change in control, (ii) a diminution in the nature or scope of authority, duties or responsibility in effect immediately prior to the change in control or (iii) a required change in location of more than 50 miles of the principal office to which Mr. Bassan-Eskenazi would report. Pursuant to his employment agreement, Mr. Bassan-Eskenazi may terminate the agreement at any time with at least six months' written notice. Mr. Bassan-Eskenazi's employment agreement further provides that upon the termination of Mr. Bassan-Eskenazi's employment with us, we will reimburse Mr. Bassan-Eskenazi for moving and relocation expenses to Israel for Mr. Bassan-Eskenazi and his family. If such relocation reimbursements are considered compensation includible in gross income, we have agreed under Mr. Bassan-Eskenazi's employment agreement to make a gross up payment in order to put him in the same financial position after the payment of taxes with respect to such includible amounts as he would have been if none of the reimbursement amounts had been includible in gross income.

We also entered into stock option agreements with Mr. Bassan-Eskenazi, pursuant to which, Mr. Bassan-Eskenazi may be eligible for vesting acceleration of the stock options in certain events as follows:

- in the event of a sale of all or substantially all of our assets, technology or stock, a merger, consolidation or any other change in share ownership resulting in a change of control of our company, 50% of the shares subject to the options that at such time remain unvested would accelerate and immediately become vested and exercisable;

- in the event that Mr. Bassan-Eskenazi is terminated, without cause, within one year following any change in control as described in the preceding paragraph, all remaining unvested shares subject to the options would accelerate and become immediately vested and exercisable;

  - a termination that would trigger this option vesting acceleration event includes each of the following occurring within one year after a change in control as described above: a material reduction in salary or level of benefits in effect immediately prior to the change in control, a material diminution in the nature or scope of authority, duties or responsibility in effect immediately prior to a change in control or a required change in location of more than 50 miles of the principal office to which Mr. Bassan-Eskenazi would report.

- in the event that Mr. Bassan-Eskenazi is terminated at any time without cause, any remaining unvested shares subject to the options would accelerate and become vested and exercisable;

- in the event that Mr. Bassan-Eskenazi dies while employed by our company or ceases to be employed by our company by reason of his disability, the options granted to Mr. Bassan-Eskenazi that would have vested in the 180-day period following the date of death or disability, as applicable, would accelerate and become vested and exercisable immediately upon his death or disability, as applicable;

- in the event that Mr. Bassan-Eskenazi voluntarily terminates his employment with our company, other than in connection with an event pursuant to which we would have the right to terminate Mr. Bassan-Eskenazi for cause, the options granted to Mr. Bassan-Eskenazi that would have vested in

79

Table of Contents

the 180-day period following the date of termination would accelerate and become vested and exercisable immediately upon termination; and

- in the event any benefits or payments to Mr. Bassan-Eskenazi would be subject to an excise tax under Section 4999 or Section 280G of the Internal Revenue Code, we are required to make gross-up payments to him to compensate him for such tax payments.

The term "cause" is defined in the option agreements to mean a refusal to render services to us pursuant to any employment agreement to which Mr. Bassan-Eskenazi has entered with us; a repeated refusal to follow our company rules or policies; the commission of any act of disloyalty, gross negligence, dishonesty or breach of fiduciary duty toward our company or our customers, a material breach of any employment agreement, non-disclosure or non-competition agreement that he has entered with us; a commission of a felony or an act of fraud or embezzlement or the misappropriation of money or other assets of the company; or unfairly competing with the company.

Under the terms of the employment agreement and option agreements described above, assuming a change of control of our company or a termination, resignation, death or disability of Mr. Bassan-Eskenazi, occurred on December 31, 2006, if we terminate Mr. Bassan-Eskenazi's employment without cause and not due to death or disability, we would potentially pay Mr. Bassan-Eskenazi a severance payment in an amount of $290,000 and an estimated amount of $10,639 for our contribution to his health insurance premiums. Mr. Bassan-Eskenazi would also potentially gain the following amounts due to stock option vesting acceleration, assuming that the price per share of our common stock as of December 31, 2006 is $13.00, which is the initial public offering price. In the event of a change of control, Mr. Bassan-Eskenazi would potentially gain an amount of $2,307,636 from the vesting acceleration of 50% of his shares subject to options. If we terminate Mr. Bassan-Eskenazi's employment at any time without cause, he would potentially gain an amount of $4,615,272 from the vesting acceleration of the remainder of his shares subject to options. In the event of Mr. Bassan-Eskenazi's death, termination of his employment due to disability or his resignation, Mr. Bassan-Eskenazi or his estate would potentially gain an amount of $1,032,156 from the vesting acceleration of certain of his shares subject to options.

*Frederick Ball.*    We have entered into an offer letter agreement dated August 5, 2004, as amended, with Mr. Ball, our Senior Vice President and Chief Financial Officer. Mr. Ball's current annual salary is $225,000. Mr. Ball's offer letter provides that if we terminate Mr. Ball without cause, he will receive a severance payment equal to six months of his then-current annual salary. The offer letter agreement defines "cause" to mean a serious violation of any company policy or engaging in criminal conduct. In addition, the offer letter provides that if Mr. Ball is terminated or constructively terminated within six months following a change of control, the greater of the equivalent of twelve months accelerated vesting or 50% of the remaining unvested shares subject to Mr. Ball's outstanding stock options, would become immediately vested and exercisable. If any payments or benefits to Mr. Ball would be subject to an excise tax under Section 4999 or Section 280G of the Internal Revenue Code or any similar successor provision, we are required to make gross-up payments to Mr. Ball to compensate him for any tax losses pursuant to the letter agreement.

In the related option agreements we entered into with Mr. Ball, a "change in control" is defined to mean a sale of all or substantially all of our assets, technology or stock, a merger, consolidation or any other change in share ownership resulting in a change of control of our company. A termination that would trigger the option vesting acceleration event includes constructive termination by the new controlling party and Mr. Ball not holding a comparable position within six months of the change of control. The related option agreements further define a "termination event" to mean an involuntary termination without cause within six months of a change in control, or each of the following occurring within six months after a change in control: a material reduction in salary or level of benefits in effect immediately prior to the change in control or a material diminution in the nature or scope of authority, duties or responsibility in effect immediately prior to the change in control

Under the terms of the employment agreement and option agreements described above, assuming a change of control of our company or a termination of Mr. Ball's employment occurred on December 31, 2006 and

80

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

assuming that the price per share of our common stock as of December 31, 2006 is $13.00, which is the initial public offering price, if we terminate Mr. Ball's employment without cause, we would potentially pay Mr. Ball a severance payment in an amount of $112,500 and an additional estimated amount of $5,098 for continued benefit plans payments. If Mr. Ball's employment is terminated in connection with a change of control, he would potentially gain an amount of $2,019,985 from the vesting acceleration of certain of his shares subject to options.

*Robert Horton.*   We have entered into an offer letter agreement dated January 4, 2005, with Mr. Horton, our Vice President and General Counsel. Mr. Horton's current annual salary is $190,000. The offer letter provides that if we terminate Mr. Horton without cause, he will receive a severance payment equal to six months of his then-current annual salary, and we will continue to provide Mr. Horton with any benefit plan offered to other executives for a period of six months following the date of Mr. Horton's termination. The offer letter agreement defines "cause" to mean a serious violation of any company policy or engaging in criminal conduct. In addition, the offer letter provides that if Mr. Horton is terminated, constructively terminated or does not hold a comparable position within six months following a change of control, the greater of the equivalent of twelve months accelerated vesting or 50% of the remaining unvested shares subject to Mr. Horton's outstanding stock options would become immediately vested and exercisable.

In the related option agreements we entered into with Mr. Horton, a "change in control" is defined to mean a sale of all or substantially all of our assets, technology or stock, a merger, consolidation or any other change in share ownership resulting in a change of control of our company. A termination that would trigger the option vesting acceleration event includes constructive termination by the new controlling party and Mr. Horton not holding a comparable position within six months following the change of control. The related option agreements further define a "termination event" to mean an involuntary termination without cause within six months of a change in control, or any of the following occurring within six months after a change in control: a material reduction in salary or level of benefits in effect immediately prior to the change in control, or a material diminution in the nature or scope of authority, duties or responsibility in effect immediately prior to the change in control.

Under the terms of the employment agreement and option agreements described above, assuming a change of control of our company or a termination of Mr. Horton's employment occurred on December 31, 2006 and assuming that the price per share of our common stock as of December 31, 2006 is $13.00, which is the initial public offering price, if we terminate Mr. Horton's employment without cause, we would potentially pay Mr. Horton a severance payment in an amount of $95,000 and an additional estimated amount of $2,629 for continued benefit plans payments. If Mr. Horton's employment is terminated in connection with a change of control, Mr. Horton will potentially gain an amount of $709,193 from the vesting acceleration of certain of his shares subject to options.

*Ran Oz.*   Our wholly-owned Israeli subsidiary, BigBand Networks, Ltd., entered into an employment agreement dated January 2, 2000 with Mr. Oz, our Executive Vice President and Chief Technology Officer. Mr. Oz's current annual base salary is $200,000. Mr. Oz's employment agreement provides for a bonus of up to 30% of his salary for the relevant period, the level of which is determined by the achievement of certain tasks, as agreed by Mr. Oz and our company. In addition, the agreement provides for payment for a car for Mr. Oz and for social benefits, including contributions to a pension or insurance fund in an amount equal to 13.3% of Mr. Oz's base salary, contributions to a professional advancement fund in an amount equal to 7.5% of Mr. Oz's base salary, subject to Mr. Oz's self-participation in the fund, and a disability insurance premium equal to 2.5% of Mr. Oz's base salary.

The agreement further provides that, if the employment of Mr. Oz is terminated without good cause and not due to death or disability, Mr. Oz would be entitled to a 12-month prior notice or the payment of an amount equal to twelve months of his then-current salary and benefits. Pursuant to this agreement, termination within one year following a sale of all or substantially all of our assets, technology or stock, a merger, consolidation or any other change in share ownership resulting in a change of control of our company is deemed to be a termination without good cause. A reduction in salary or a material reduction in the level of benefits in effect immediately prior to the change in control, a diminution in the nature or scope of authority, duties or responsibility in effect immediately

81

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

prior to the change in control or a required change in location of more than 50 miles of the principal office to which Mr. Oz would report, each within one year following a change in control, are deemed "termination" in the agreement. In addition, any material adverse change by the company to Mr. Oz's scope of responsibility, position or job description may be deemed, at Mr. Oz's option, as a termination without cause. The agreement also provides that Mr. Oz is entitled to terminate his employment with our company following a six-month prior notice and receive an amount equal to six months of his then-current salary and benefits, regardless of whether our company continues his employment following such notice.

We also entered into an option agreement with Mr. Oz, pursuant to which Mr. Oz may be eligible for vesting acceleration of his stock options in certain events as follows:

- in the event of a sale of all or substantially all of our assets, technology or stock, a merger, consolidation or any other change in share ownership resulting in a change of control of our company, 50% of the shares subject to the options that at such time remain unvested would accelerate and immediately become vested and exercisable;

- in the event that Mr. Oz is terminated, without cause, within one year following any change in control as described in the preceding paragraph, all remaining unvested shares subject to his option would accelerate and become immediately vested and exercisable;

  - a termination that would trigger this option vesting acceleration event includes each of the following occurring within one year after a change in control as described above: a material reduction in salary or level of benefits in effect immediately prior to the change in control, a material diminution in the nature or scope of authority, duties or responsibility in effect immediately prior to a change in control or a required change in location of more than 50 miles of the principal office to which Mr. Oz would report.

- in the event that Mr. Oz is terminated at any time without cause, any remaining unvested shares subject to the options would accelerate and become vested and exercisable;

- in the event that Mr. Oz dies while employed by our company or ceases to be employed by our company by reason of his disability, the options granted to Mr. Oz that would have vested in the 180-day period following the date of death or disability, as applicable, would accelerate and become vested and exercisable immediately upon his death or disability, as applicable; and

- in the event that Mr. Oz voluntarily terminates his employment with our company, other than in connection with an event pursuant to which we would have the right to terminate Mr. Oz for cause, the options granted to Mr. Oz that would have vested in the 180-day period following the date of termination would accelerate and become vested and exercisable immediately upon termination.

The term "cause" is defined in Mr. Oz's the option agreement to mean a refusal to render services to us pursuant to any employment agreement to which Mr. Oz has entered with us; a repeated refusal to follow our company rules or policies; the commission of any act of disloyalty, gross negligence, dishonesty or breach of fiduciary duty towards our company or our customers; a material breach of any employment agreement, non-disclosure or non-competition agreement that he has entered with us; a commission of a felony or an act of fraud or embezzlement or the misappropriation of money or other assets of our company; or unfairly competing with our company.

Under the terms of the employment agreement and option agreement described above, assuming a change of control of our company or a termination, resignation, death or disability of Mr. Oz occurred on December 31, 2006, if we terminate Mr. Oz's employment without cause and not due to death or disability, we would potentially pay Mr. Oz a severance payment in an amount of $245,254. If Mr. Oz resigns, he may receive a payment of up to $122,627, equal to six months of his then-current salary and benefits. Mr. Oz would also potentially gain the following amounts due to stock options vesting accelerations, assuming that the price per share of our common stock as of December 31, 2006 is $13.00, which is the initial public offering price, in the

82

Table of Contents

event of a change of control, Mr. Oz will potentially gain an amount of $1,842,339 from the vesting acceleration of 50% of his shares subject to options. If we terminate Mr. Oz's employment within six months following a change of control, Mr. Oz will potentially gain an amount of $1,842,339 from the vesting acceleration of the remainder of his shares subject to options. If we terminate Mr. Oz's employment at any time without cause, he will potentially gain an amount of $3,684,677 from the vesting acceleration of the remainder of his shares subject to options. In the event of Mr. Oz's death, termination of his employment due to disability or his resignation, Mr. Oz or his estate would potentially gain an amount of $1,052,799 from the vesting acceleration of certain of his shares subject to options.

   *John Connelly.*   We entered into an offer letter agreement dated October 11, 2003 with Mr. Connelly, our Executive Vice President of Marketing and Business Development. Mr. Connelly's current annual salary is $200,000. The offer letter provides that if we terminate Mr. Connelly without cause, he will receive a severance payment equal to three months of his then-current salary, provided that he signs a comprehensive release of claims.

   The offer letter agreement refers to an option plan for the definition of cause. In the 2003 Plan, under which Mr. Connelly was granted options, "cause" is defined to mean disloyalty, dishonesty, fraud or any termination for reasons of negligence in the discharge of duties, breach of fiduciary duty, willful cause of damage or loss to our company or any of its affiliate in any fashion or similar cause, or any other breach of an employment or other agreement with our company which results in direct or indirect loss, damages or injury to our company or any affiliate, or the unauthorized disclosure of any trade secrets or confidential information of our company or any of its affiliates.

   Under the terms of the employment agreement described above, we would potentially make a severance payment to Mr. Connelly in an amount of $50,000, in the event of our termination of Mr. Connelly's employment without cause.

   *Jeffrey Lindholm.*   We entered into an offer letter agreement dated October 30, 2006, with Mr. Lindholm, our Senior Vice President of Worldwide Field Operations, which provides for an annual base salary of $250,000, with an annual additional variable compensation of up to $150,000. The level of Mr. Lindholm's additional variable compensation is determined based on a combination of sales compensation in accordance with our sales compensation plan and participation in our performance bonus program on the same basis as other members of our senior management. In addition, the offer letter provides for a sign-up bonus in an aggregate amount of $50,000, paid in equal installments on January 1, 2007, March 1, 2007 and May 1, 2007 if Mr. Lindholm remains actively employed on each of these dates. The offer letter provides that if Mr. Lindholm is terminated or constructively terminated, without his misconduct, within six months following a change in control, the greater of the equivalent of twelve months accelerated vesting or 50% of the remaining unvested shares subject to Mr. Lindholm's outstanding stock options would become immediately vested and exercisable. In addition, upon the above-described termination and subject to execution of a general release, Mr. Lindholm will receive a severance payment equal to six months of his then-current base salary.

   The offer letter agreement refers to the option agreement, to be entered into, for the definition of a change in control. In the offer letter agreement, "misconduct" is defined to mean the commission of any act of fraud, embezzlement or dishonesty, any unauthorized use or disclosure of confidential information of our company or its subsidiaries or any other intentional misconduct adversely affecting the business or affairs of our company or its subsidiaries in a material manner. A "constructive termination" is defined in the offer letter agreement to mean a required change in location of more than 50 miles of the principal office to which Mr. Lindholm would report, a failure to pay, or a material reduction of, salary or level of benefits unless reductions comparable in amount and duration are concurrently made for all other employees at a comparable level, a significant reduction of duties, position or responsibilities unless the reduction is solely by virtue of the company being acquired and made part of a larger entity or our determination that Mr. Lindholm's services are no longer needed, unless Mr. Lindholm has expressly consented in writing.

83

Table of Contents

**Employee Benefit Plans**

*2007 Equity Incentive Plan*

Our board of directors has adopted, and we expect our stockholders to approve prior to the completion of this offering, our 2007 Equity Incentive Plan, or 2007 Plan. Our 2007 Plan provides for the grant of incentive stock options, within the meaning of Section 422 of the Internal Revenue Code, to our employees and any parent and subsidiary corporations' employees, and for the grant of nonstatutory stock options, stock appreciation rights, restricted stock, restricted stock units, performance units and performance shares to our employees, directors and consultants and our parent and subsidiary corporations' employees and consultants.

We have reserved a total of 6,000,000 shares of our common stock for issuance under the 2007 Plan, plus (a) any shares which have been reserved but not issued under our 1999 Plan, 2001 Plan and 2003 Plan as of this offering and (b) any shares subject to stock options or similar awards granted under our 1999 Plan, 2001 Plan and 2003 Plan that expire or otherwise terminate without having been exercised in full and shares issued pursuant to awards granted under such plans that are forfeited to or repurchased by us. In addition, our 2007 Plan provides for annual increases in the number of shares available for issuance thereunder on the first day of each fiscal year, beginning with our 2008 fiscal year, equal to the lesser of:

- 5.0% of the outstanding shares of our common stock on the last day of the immediately preceding fiscal year;

- 6,000,000 shares; or

- such other amount as our board of directors may determine

In the case of options intended to qualify as "performance-based compensation" within the meaning of Section 162(m) of the Internal Revenue Code, the committee will consist of two or more "outside directors" within the meaning of Section 162(m) of the Internal Revenue Code. The administrator has the power to determine the terms of the awards, including the exercise price, the number of shares subject to each such award, the exercisability of the awards and the form of consideration payable upon exercise. The administrator also has the authority to institute an exchange program whereby the exercise prices of outstanding awards may be reduced, outstanding awards may be surrendered in exchange for awards with a lower exercise price or outstanding awards may be transferred to a third party.

The exercise price of options granted under our 2007 Plan must at least be equal to the fair market value of our common stock on the date of grant. The term of an incentive stock option may not exceed ten years, except that with respect to any participant who owns more than 10% of the voting power of all classes of our outstanding stock as of the grant date, the term must not exceed five years and the exercise price must equal at least 110% of the fair market value on the grant date. The administrator determines the term of all other options.

After termination of an employee, director or consultant, he or she may exercise the vested portion of his or her option for the period of time stated in the option agreement. Generally, if termination is due to death or disability, the option will remain exercisable for 12 months. In all other cases, the option will generally remain exercisable for three months. However, an option generally may not be exercised later than the expiration of its term.

Stock appreciation rights may be granted under our 2007 Plan, which allow the recipient to receive the appreciation in the fair market value of our common stock between the exercise date and the date of grant. The administrator determines the terms of stock appreciation rights, including when such rights become exercisable and whether to pay the increased appreciation in cash or with shares of our common stock, or a combination thereof. Stock appreciation rights expire under the same rules that apply to stock options.

Restricted stock may be granted under our 2007 Plan, which are awards of our shares of common stock that vest in accordance with terms and conditions established by the administrator. The administrator will determine the number of shares of restricted stock granted to any participant. The administrator may impose whatever conditions to vesting it determines to be appropriate. For example, the administrator may set restrictions based on

84

Table of Contents

the achievement of specific performance goals. Shares of restricted stock that do not vest are subject to our right of repurchase or forfeiture.

Restricted stock units may be granted under our 2007 Plan, which are awards that are paid out in installments or on a deferred basis. The administrator determines the terms and conditions of restricted stock units including the vesting criteria and the form and timing of payment.

Performance units and performance shares may be granted under our 2007 Plan. Performance units and performance shares are awards that will result in a payment to a participant only if performance goals established by the administrator are achieved or the awards otherwise vest. The administrator will establish organizational or individual performance goals in its discretion, which, depending on the extent to which they are met, will determine the number and/or the value of performance units and performance shares to be paid out to participants. Performance units shall have an initial dollar value established by the administrator prior to the grant date. Performance shares shall have an initial value equal to the fair market value of our common stock on the grant date. Payment for performance units and performance shares may be made in cash or in shares of our common stock with equivalent value, or in some combination, as determined by the administrator.

Unless the administrator provides otherwise, our 2007 Plan does not allow for the transfer of awards and only the recipient of an award may exercise an award during his or her lifetime.

Our 2007 Plan provides that in the event of our change in control, as defined in the 2007 Plan, each outstanding award will be treated as the administrator determines, including that the successor corporation or its parent or subsidiary will assume or substitute an equivalent award for each outstanding award. The administrator is not required to treat all awards similarly. If there is no assumption or substitution of outstanding awards, the awards will fully vest, all restrictions will lapse and the awards will become fully exercisable. The administrator will provide notice to the recipient that he or she has the right to exercise the option and stock appreciation right as to all of the shares subject to the award, all restrictions on restricted stock will lapse and all performance goals or other vesting requirements for performance shares and units will be deemed achieved, and all other terms and conditions met. The option or stock appreciation right will terminate upon the expiration of the period of time the administrator provides in the notice. In the event the service of an outside director is terminated on or following a change in control, other than pursuant to a voluntary resignation, his or her options and stock appreciation rights will fully vest and become immediately exercisable, all restrictions on restricted stock will lapse and all performance goals or other vesting requirements for performance shares and units will be deemed achieved, and all other terms and conditions met.

Our 2007 Plan will automatically terminate in 2017, unless we terminate it sooner. In addition, our board of directors has the authority to amend, suspend or terminate the 2007 Plan, provided such action does not impair the rights of any participant.

### 2003 Share Option and Incentive Plan

Our board of directors adopted our 2003 Share Option and Incentive Plan in September 2003, and our stockholders approved it in August 2004. Our board of directors has determined not to grant any additional awards under the 2003 Plan after the completion of this offering. However, the 2003 Plan will continue to govern the terms and conditions of the outstanding awards granted under it. As of December 31, 2006, options to purchase a total of 13,581,469 shares of our common stock were issued and outstanding, and a total of 819,127 shares of our common stock had been issued upon the exercise of options and restricted stock awards granted under the 2003 Plan that had not been repurchased by us.

Our 2003 Plan provides for the grant of options and restricted stock awards to our service providers. Nonqualified options and restricted stock awards may be granted to our employees, directors and consultants, and incentive stock options, within the meaning of Section 422 of the Internal Revenue Code, may be granted only to our employees. Our board of directors or a committee of our board of directors administers our 2003 Plan. The administrator has the authority to determine the terms and conditions of the awards granted under our 2003 Plan.

85

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

Our 2003 Plan provides that in the event of our acquisition, we or our successor will make provisions for the continuation of awards outstanding at such time or the assumption of such awards by our successor. In addition to or in lieu of the foregoing, with respect to options outstanding at the time of the acquisition, we can provide notice to participants that either they (i) must exercise their options within a period we specify in the notice and that the options will terminate upon the expiration of such period or (ii) will receive a cash payment equal to the difference between the fair market value of the shares subject to such options over the exercise price of such options and that the options will terminate upon consummation of the acquisition; provided, however, that before terminating any portion of an unvested and exercisable option (other than in exchange for a cash payment), we must first accelerate in full the exercisability of the option that is to be terminated.

### 2001 Share Option and Incentive Plan

Our board of directors adopted our 2001 Share Option and Incentive Plan in October 2001, and our stockholders approved it in November 2001. Our board of directors has determined not to grant any additional awards under the 2001 Plan after the completion of this offering. However, the 2001 Plan will continue to govern the terms and conditions of the outstanding awards granted under it. As of December 31, 2006, options to purchase a total of 1,700,619 shares of our common stock were issued and outstanding, and a total of 473,645 shares of our common stock had been issued upon the exercise of options and restricted stock awards granted under the 2001 Plan that had not been repurchased by us.

Our 2001 Plan provides for the grant of options and restricted stock awards to our service providers. Our 2001 Plan provides for the grant of stock options that qualify either as incentive stock options within the meaning of Section 422 of the Internal Revenue Code, or as options granted pursuant to the provisions of Sections 102 or 3(i) of the Israeli Tax Ordinance (New Version) of 1961, or the Israeli Tax Ordinance. Nonqualified options and restricted stock awards may be granted to our employees, directors and consultants, and incentive stock options and options granted pursuant to Section 102 of the Ordinance may be granted only to our employees. Our board of directors or a committee of our board of directors administers our 2001 Plan. The administrator has the authority to determine the terms and conditions of the awards granted under our 2001 Plan.

Our 2001 Plan provides that in the event of our acquisition, we or our successor will make provisions for the continuation of awards outstanding at such time or the assumption of such awards by our successor. In addition to or in lieu of the foregoing, with respect to options outstanding at the time of the acquisition, we can provide notice to participants that either they must exercise their options within the period we specify in the notice and that the options will terminate upon the expiration of such period, or will receive a cash payment equal to the difference between the fair market value of the shares subject to such options over the exercise price of such options and that the options will terminate upon consummation of the acquisition.

### 1999 Share Option and Incentive Plan

Our board of directors adopted our 1999 Share Option and Incentive Plan in November 1999, and our stockholders approved it in December 1999. Our board of directors has determined not to grant any additional awards under the 1999 Plan after the completion of this offering. However, the 1999 Plan will continue to govern the terms and conditions of the outstanding awards granted under the 1999 Plan. As of December 31, 2006, options to purchase a total of 737,844 shares of our common stock were issued and outstanding, and a total of 567,189 shares of our common stock had been issued upon the exercise of options and restricted stock awards granted under the 1999 Plan that had not been repurchased by us.

Our 1999 Plan provides for the grant of options and restricted stock awards to our service providers. Our 1999 Plan provides for the grant of stock options that qualify either as incentive stock options within the meaning of Section 422 of the Internal Revenue Code, or as options granted pursuant to the provisions of Sections 102 or 3(i) of the Israeli Tax Ordinance. Nonqualified options and restricted stock awards may be granted to our employees, directors and consultants, and incentive stock options and options granted pursuant to Section 102 of the Ordinance may be granted only to our employees. Our board of directors or a committee of our board of

86

Table of Contents

directors administers our 1999 Plan. The administrator has the authority to determine the terms and conditions of the awards granted under our 1999 Plan.

Our 1999 Plan provides that in the event of our acquisition, we or our successor will make provisions for the continuation of awards outstanding at such time or the assumption of such awards by our successor. In addition to or in lieu of the foregoing, with respect to options outstanding at the time of the acquisition, we can provide notice to participants that either they must exercise their options within the period we specify in the notice and that the options will terminate upon the expiration of such period, or will receive a cash payment equal to the difference between the fair market value of the shares subject to such options over the exercise price of such options and that the options will terminate upon consummation of the acquisition.

### *Employee Stock Purchase Plan*

Concurrently with this offering, we are establishing our ESPP. Our board of directors has adopted, and we expect our stockholders to approve, the ESPP prior to the completion of this offering.

A total of 1,000,000 shares of our common stock will be made available for sale under our ESPP. In addition, our ESPP provides for annual increases in the number of shares available for issuance under the plan on the first day of each fiscal year, beginning with our 2008 fiscal year, equal to the lesser of:

- 2.0% of the outstanding shares of our common stock on the first day of the fiscal year;

- 3,000,000 shares; or

- such other amount as may be determined by our board of directors.

Our board of directors or its committee has full and exclusive authority to interpret the terms of the ESPP and determine eligibility.

All of our employees are eligible to participate if they are customarily employed by us or any participating subsidiary for at least 20 hours per week and more than five months in any calendar year. However, an employee may not be granted rights to purchase stock if:

- such employee immediately after the grant would own stock possessing 5% or more of the total combined voting power or value of all classes of our capital stock; or

- such employee's rights to purchase stock under all of our employee stock purchase plans would accrue at a rate that exceeds $25,000 worth of our stock for each calendar year in which such rights are outstanding.

Our ESPP is intended to qualify under Section 423 of the Internal Revenue Code, and provides for consecutive, non-overlapping six-month offering periods. The offering periods generally start on the first trading day on or after November 15 and May 15 of each year, except for the first such offering period which will commence on the tenth trading day after the effective date of the S-8 registration statement and will end on the first trading day on or after November 15, 2007.

Our ESPP permits participants to purchase common stock through payroll deductions of up to 15% of their eligible compensation which includes a participant's straight time gross earnings, overtime and shift premium, exclusive of payments for commissions, incentive compensation, bonuses and other compensation. A participant may purchase a maximum of 2,000 shares of common stock during a six-month offering period.

Amounts deducted and accumulated by the participant are used to purchase shares of our common stock at the end of each six-month offering period. The purchase price is 85% of the fair market value of our common stock at the first day of the offering period or the exercise date, whichever is lower. Participants may end their participation at any time during an offering period, and will be paid their payroll deductions to date. Participation ends automatically upon termination of employment with us.

87

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

A participant may not transfer rights granted under the ESPP other than by will, the laws of descent and distribution or as otherwise provided under the ESPP.

In the event of our merger or change in control, as defined under the ESPP, a successor corporation may assume or substitute each outstanding purchase right. If the successor corporation refuses to assume or substitute for the outstanding purchase rights, the offering period then in progress will be shortened, and a new exercise date will be set.

Our ESPP will automatically terminate in 2027, unless we terminate it sooner. In addition, our board of directors has the authority to amend, suspend or terminate our ESPP, except that, subject to certain exceptions described in the ESPP, no such action may adversely affect any outstanding rights to purchase stock under our ESPP.

**Limitation on Liability and Indemnification Matters**

Our amended and restated certificate of incorporation, which will be in effect upon the completion of this offering, contains provisions that limit the liability of our directors for monetary damages to the fullest extent permitted by Delaware law. Consequently, our directors will not be personally liable to us or our stockholders for monetary damages for any breach of fiduciary duties as directors, except liability for:

- any breach of the director's duty of loyalty to us or our stockholders;

- any act or omission not in good faith or that involves intentional misconduct or a knowing violation of law;

- unlawful payments of dividends or unlawful stock repurchases or redemptions as provided in Section 174 of the Delaware General Corporation Law; or

- any transaction from which the director derived an improper personal benefit.

Our amended and restated certificate of incorporation and amended and restated bylaws to be in effect upon the completion of this offering provide that we are required to indemnify our directors and officers, in each case to the fullest extent permitted by Delaware law. Our amended and restated bylaws also provide that we are obligated to advance expenses incurred by a director or officer in advance of the final disposition of any action or proceeding, and permit us to secure insurance on behalf of any officer, director, employee or other agent for any liability arising out of his or her actions in that capacity regardless of whether we would otherwise be permitted to indemnify him or her under the provisions of Delaware law. We have entered and expect to continue to enter into agreements to indemnify our directors, executive officers and other employees as determined by our board of directors. With specified exceptions, these agreements provide for indemnification for related expenses including, among other things, attorneys' fees, judgments, fines and settlement amounts incurred by any of these individuals in any action or proceeding. We believe that these bylaw provisions and indemnification agreements are necessary to attract and retain qualified persons as directors and officers. We also maintain directors' and officers' liability insurance.

The limitation of liability and indemnification provisions in our amended and restated certificate of incorporation and amended and restated bylaws may discourage stockholders from bringing a lawsuit against our directors and officers for breach of their fiduciary duty. They may also reduce the likelihood of derivative litigation against our directors and officers, even though an action, if successful, might benefit us and other stockholders. Further, a stockholder's investment may be adversely affected to the extent that we pay the costs of settlement and damage awards against directors and officers as required by these indemnification provisions. At present, there is no pending litigation or proceeding involving any of our directors, officers or employees for which indemnification is sought, and we are not aware of any threatened litigation that may result in claims for indemnification.

88

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

Since January 1, 2004, we were or will be a participant in the transactions described below in which:

- the amounts involved exceeded or will exceed $120,000; and

- a director, executive officer, holder of more than 5% of any class of our voting securities or any member of their immediate family had or will have a direct or indirect material interest.

Our board of directors approved all of the transactions set forth below. We believe that we have executed all of the transactions set forth below on terms no less favorable to us than we could have obtained from unaffiliated third parties. Our audit committee's charter delegates to that committee the responsibility of approving in advance any proposed related party transactions, as defined in applicable rules by the SEC.

### Sales of Preferred Stock

We have issued and sold an aggregate of 9,745,720 shares of preferred stock to investors in the following rounds of financing (excluding shares of preferred stock issued upon exercise of preferred stock warrants):

- in May 2004 and June 2004, we sold an aggregate of 5,737,474 shares of Series E-1 preferred stock at a price of approximately $4.37 per share; and

- in June 2004, we sold an aggregate of 4,008,246 shares of Series E-2 preferred stock in connection with the acquisition of the high-speed data BAS equipment division of ADC Telecommunications, Inc.

Upon completion of this offering, all of our outstanding shares of preferred stock will automatically convert into shares of common stock.

The following table summarizes the issuances of our preferred stock and Class B common stock since January 1, 2004 by our directors, executive officers, entities affiliated with such persons and holders of more than 5% of our outstanding common stock:

| Name | Series E-1 | Series E-2 | Class B Common Stock | Class B Common Stock Subject to Warrant |
|---|---|---|---|---|
| Funds affiliated with Redpoint Ventures, L.P. | 1,771,970 | — | — | — |
| ADC Telecommunications, Inc. | — | 4,008,246 | 3,618,873 | 400,825 |
| Funds affiliated with Charles River Partners, L.P. | 948,690 | — | — | — |
| Funds affiliated with Meritech Capital | 783,791 | — | — | — |
| Funds affiliated with Evergreen Partners U.S. Direct Fund III, L.P. | 538,474 | — | — | — |
| Funds affiliated with Pilot House Ventures | 537,878 | — | — | — |

### Transactions with ADC Telecommunications

*BAS Acquisition from ADC*

In June 2004, we acquired the high-speed data BAS equipment division of ADC Telecommunications, Inc. As consideration for our acquisition of this business, we issued to ADC 4,008,246 shares of our Series E-2 preferred stock and 3,618,873 shares of our Class B common stock. In connection with our issuances of stock to ADC, ADC became a party to our investors' rights agreement and stockholders agreement described below.

*Loan from ADC; Warrant Issued to ADC*

At the time of the BAS acquisition, ADC loaned us $7.0 million under a credit agreement. Amounts advanced under the revolving credit arrangement accrued interest at the prime rate plus 1.0%, which was 6.25% as of December 31, 2005. All outstanding amounts under this loan were subsequently repaid by us during the

89

Source: BigBand Networks, In, 424B4, March 15, 2007

**Table of Contents**

year ended December 31, 2006. In connection with the loan from ADC, in June 2004, we granted ADC a warrant to purchase an additional 400,825 shares of our Class B non-voting common stock at an exercise price of $4.37 per share.

*Sublease with ADC*

At the time of the BAS acquisition, we entered into a sublease agreement with ADC relating to our facility in Westborough, Massachusetts. Under this sublease, we have incurred rent expense that has been paid to ADC in the amount of $750,000 in the year ended December 31, 2004, $1.5 million in the year ended December 31, 2005, and $1.4 million in the year ended December 31, 2006. This sublease expires in March 2007.

**Investors' Rights Agreement**

We have granted registration rights to holders of our preferred stock pursuant to an amended investors' rights agreement, dated June 29, 2004. See "Description of Capital Stock—Registration Rights."

**Stockholders Agreement**

We have entered into an amended stockholders agreement with certain of our stockholders, dated April 4, 2006. This agreement contains provisions concerning the composition of our board of directors. Pursuant to this agreement, Mr. Israely was selected initially as the representative of our Series A, A-1 and A-2 preferred stock. Mr. Yang, as designated by Redpoint Ventures, was selected initially as the representative of our Series B preferred stock. Bruce Sachs, as designated by Charles River Ventures, was selected initially as the representative of our Series C preferred stock and Mr. Bassan-Eskenazi and Mr. Oz were selected initially as the representatives of our common stock. In addition, pursuant to the amended stockholders agreement, the designated directors mentioned above will designate four additional independent directors for our board of directors. The agreement also provides board observation rights to Time Warner, Inc., Pilot House Venture Group and Evergreen Partners. This stockholders agreement will automatically terminate upon the completion of this offering.

**Consulting Agreement with Director**

We were party to a consulting agreement with Dean Gilbert, one of our directors, dated January 1, 2002. Pursuant to this consulting agreement, we were to pay Mr. Gilbert $7,500 per month. We paid Mr. Gilbert $87,323 in 2004, $113,969 in 2005 and $83,406 in 2006 under this agreement. The consulting agreement with Mr. Gilbert was terminated in December 2006.

**Employment and Change of Control Agreements with Executive Officers**

We have entered into certain employment and change of control arrangements with our executive officers as described under the caption "Management—Employment Agreements and Change in Control Arrangements."

**Indemnification Agreements**

We have entered and expect to continue to enter into agreements to indemnify our directors, executive officers and other employees as determined by our board of directors. For a description of these agreements, see "Management—Limitation on Liability and Indemnification Matters."

90

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

### PRINCIPAL AND SELLING STOCKHOLDERS

The following table sets forth certain information with respect to the beneficial ownership of our common stock at February 16, 2007, as adjusted to reflect the sale of common stock offered by us and the selling stockholders in this offering, for:

- each person who we know beneficially owns more than 5% of our common stock;

- each of our directors;

- each of our named executive officers;

- all of our directors and executive officers as a group; and

- all selling stockholders.

We have determined beneficial ownership in accordance with the rules of the SEC. Except as indicated by the footnotes below, we believe, based on the information furnished to us, that the persons and entities named in the table below have sole voting and investment power with respect to all shares of common stock that they beneficially own, subject to applicable community property laws.

Applicable percentage ownership is based on 50,314,337 shares of common stock outstanding at February 16, 2007. For purposes of the table below, we have assumed that 7,500,000 shares of common stock will be sold by us in this offering. In computing the number of shares of common stock beneficially owned by a person and the percentage ownership of that person, we deemed to be outstanding all shares of common stock subject to options, warrants and other convertible securities held by that person or entity that are currently exercisable or exercisable within 60 days of February 16, 2007. We did not deem these shares outstanding, however, for the purpose of computing the percentage ownership of any other person.

Unless otherwise indicated, the address of each beneficial owner listed in the table below is c/o BigBand Networks, Inc., 475 Broadway Street, Redwood City, California 94063.

| Name of Beneficial Owner | Shares Beneficially Owned Prior to this Offering | | Number of Shares Being Offered[31] | Shares Beneficially Owned After this Offering[32] | |
|---|---|---|---|---|---|
| | Number | Percentage | | Number | Percentage |
| **5% Stockholders:** | | | | | |
| Funds affiliated with Redpoint Ventures, L.P. [1] | 12,999,757 | 25.8% | — | 12,999,757 | 22.5% |
| 3000 Sand Hill Road, Bldg. 2, Suite 290 | | | | | |
| Menlo Park, CA 94025 | | | | | |
| Funds affiliated with Charles River Partners, L.P. [2] | 10,983,170 | 21.8 | — | 10,983,170 | 19.0 |
| 1000 Winter Street, Suite 3300 | | | | | |
| Waltham, MA 02451 | | | | | |
| Funds affiliated with Meritech Capital [3] | 4,915,556 | 9.8 | — | 4,915,506 | 8.5 |
| 245 Lytton Avenue, Suite 350 | | | | | |
| Palo Alto, CA 94301 | | | | | |
| Funds affiliated with Evergreen Partners U.S. Direct Fund III, L.P. [4] | 4,169,320 | 8.3 | 734,231 | 3,435,089 | 5.9 |
| 96 Rothschild Blvd. | | | | | |
| Tel Aviv, Israel 65224 | | | | | |
| Funds affiliated with Pilot House Ventures [5] | 3,920,117 | 7.8 | 690,347 | 3,229,770 | 5.6 |
| Lewis Wharf | | | | | |
| Boston, MA 02110 | | | | | |
| Funds affiliated with Cedar Funds [6] | 2,997,603 | 6.0 | 446,229 | 2,551,374 | 4.4 |
| 1050 Winter Street, Suite 2700 | | | | | |
| Waltham, MA 02451 | | | | | |

91

Table of Contents

| Name of Beneficial Owner | Shares Beneficially Owned Prior to this Offering[31] | | Number of Shares Being Offered[31] | Shares Beneficially Owned After this Offering[32] | |
|---|---|---|---|---|---|
| | Number | Percentage | | Number | Percentage |
| **Directors and Executive Officers:** | | | | | |
| Amir Bassan-Eskenazi [7] | 2,673,508 | 5.2% | 220,024 | 2,453,484 | 4.1% |
| Frederick Ball [8] | 343,905 | * | — | 343,905 | * |
| Ran Oz [9] | 2,652,767 | 5.2 | 361,131 | 2,291,636 | 3.9 |
| Robert Horton [10] | 82,396 | * | — | 82,396 | * |
| John Connelly [11] | 277,605 | * | — | 277,605 | * |
| Lloyd Carney [12] | 13,437 | * | — | 13,437 | * |
| Dean Gilbert [13] | 219,645 | * | 11,007 | 208,638 | * |
| Ken Goldman [14] | 13,750 | * | — | 13,750 | * |
| Gal Israely [15] | 2,997,603 | 6.0 | 446,229 | 2,551,374 | 4.4 |
| Bruce Sachs [16] | 10,983,170 | 21.8 | — | 10,983,170 | 19.0 |
| Robert Sachs [17] | 15,937 | * | — | 15,937 | * |
| Geoffrey Yang [18] | 12,999,757 | 25.8 | — | 12,999,757 | 22.5 |
| All executive officers and directors as a group (12 persons) | 33,273,480 | 62.7% | 1,038,391 | 32,235,089 | 53.2% |
| **Other Selling Stockholders:** | | | | | |
| Time Warner, Inc. [19] | 2,045,042 | 4.1 | 360,140 | 1,684,902 | 2.9 |
| Gary Lauder | 1,116,072 | 2.2 | 125,000 | 991,072 | 1.7 |
| Funds affiliated with Star Ventures [20] | 916,172 | 1.8 | 159,324 | 756,848 | 1.3 |
| Oro Sociedad Anonima [21] | 200,000 | * | 8,805 | 191,195 | * |
| Seth Kenvin [22] | 167,584 | * | 29,864 | 137,720 | * |
| Paul Kagan | 100,000 | * | 17,610 | 82,390 | * |
| Barry Kaplan | 100,000 | * | 17,610 | 82,390 | * |
| High Street Investors [23] | 32,198 | * | 5,670 | 26,528 | * |
| Bernd Girod | 32,198 | * | 5,670 | 26,528 | * |
| Robert Clark Fowler, Jr. [24] | 15,286 | * | 1,930 | 13,356 | * |
| Stephanie Jean Fowler [25] | 13,674 | * | 1,647 | 12,027 | * |
| Haim Bassan-Eskenazi [26] | 7,823 | * | 375 | 7,448 | * |
| Ruth Bassan-Eskenazi [27] | 7,823 | * | 375 | 7,448 | * |
| Sarit Yaffe [28] | 7,823 | * | 616 | 7,207 | * |
| Nir Yaffe [28] | 7,823 | * | 616 | 7,207 | * |
| Freda Family Trust [29] | 3,220 | * | 567 | 2,653 | * |
| Dror Amir | 1,876 | * | 330 | 1,546 | * |
| Eli Borochov | 1,668 | * | 294 | 1,374 | * |
| Zohar Eliezri | 1,668 | * | 294 | 1,374 | * |
| Eliav Korakh | 1,668 | * | 294 | 1,374 | * |

---

\*     Less than 1%

(1)     Includes 8,984,679 shares held by Redpoint Ventures I, L.P., 899,395 shares held by Redpoint Technology Partners Q-1, L.P., 328,928 shares held by Broadband Fund, L.P., 283,825 shares held by Redpoint Associates I, LLC, 130,051 shares held by Redpoint Technology Partners A-1, L.P., 2,307,624 shares held by Redpoint Omega, L.P., and 65,255 shares held by Redpoint Omega Associates, LLC. Mr. Yang is a partner of Redpoint Ventures I, L.P., Redpoint Technology Partners Q-1, L.P., Broadband Fund, L.P., Redpoint Technology Partners A-1, L.P., and Redpoint Omega, L.P., and a member of Redpoint Associates I, LLC and Redpoint Omega Associates, LLC. These share amounts include an aggregate of 3,804,515 shares purchased from ADC Telecommunications, Inc. pursuant to a purchase agreement dated January 26, 2007 at a negotiated price per share that was less than the anticipated initial public offering price set forth on the cover of this prospectus.

92

Table of Contents

(2)  Includes 10,652,828 shares held by Charles River Partnership XI, L.P., 274,938 shares held by Charles River Friends XI-A, L.P. and 55,404 shares held by Charles River Friends XI-B, L.P. Bruce Sachs is a general partner of Charles River Partnership XI, L.P., Charles River Friends XI-A, L.P. and Charles River Friends XI-B, L.P. These share amounts include an aggregate of 3,678,477 shares purchased from ADC Telecommunications, Inc. pursuant to a purchase agreement dated January 26, 2007 at a negotiated price per share that was less than the anticipated initial public offering price set forth on the cover of this prospectus.

(3)  Includes 4,756,780 shares held by Meritech Capital Partners II, 122,399 shares held by Meritech Capital Affiliates II and 36,377 shares held by MCP Entrepreneur II. These share amounts include an aggregate of 544,912 shares purchased from ADC Telecommunications, Inc. pursuant to a purchase agreement dated January 26, 2007 at a negotiated price per share that was less than the anticipated initial public offering price set forth on the cover of this prospectus.

(4)  Includes 3,560,629 shares held by Evergreen Partners U.S. Direct Fund III, L.P., 305,364 shares held by Evergreen Partners Direct Fund III (Israel 1), L.P., 282,960 shares held by Evergreen Partners Direct Fund III (Israel), L.P and 20,367 shares held by Evergreen Management Ltd. Evergreen Partners currently has board observation rights with respect to meetings of our board of directors. These board observation rights will terminate effective upon the closing of this offering. From September 2001 to April 2006, Boaz Dinte, a representative of Evergreen Partners, was a member of our board of directors.

(5)  Includes 2,356,604 shares held by Pilot House Ventures Group, LLC, 938,513 shares held by Pilot House Ventures II, LLC and 625,000 shares held by Broadband Ventures Group, LLC. Pilot House Ventures currently has board observation rights with respect to meetings of our board of directors. These board observation rights will terminate effective upon the closing of this offering. From August 2004 to October 2005, Eric Krauss, a representative of Pilot House Ventures, was a member of our board of directors.

(6)  Includes 2,091,978 shares held by Cedar Fund A L.P. and 905,625 shares held by Cedar Fund L.P. Mr. Israely is a managing partner of Cedar Fund A L.P. and Cedar Fund L.P.

(7)  Includes 642,250 shares held by NBT Ltd., 572,568 shares held by Mr. Bassan-Eskenazi's wife, 5,851 shares held by Mr. Bassan-Eskenazi's son, 5,851 shares held by Mr. Bassan-Eskenazi's daughter, 1,443,768 shares issuable upon exercise of stock options that will be vested and exercisable within 60 days of February 16, 2007, and 3,220 shares held in trust for the benefit of Julia Freda-Eskenazi, Mr. Bassan-Eskenazi's wife. Ms. Freda-Eskenazi has no voting or investment power over these shares and disclaims beneficial ownership of the shares beneficially owned by the trust.

(8)  Includes 206,405 shares issuable upon exercise of stock options that will be vested and exercisable within 60 days of February 16, 2007.

(9)  Includes 2,050,674 shares held by Oz Holdings Ltd. and 602,093 shares issuable upon exercise of stock options that will be vested and exercisable within 60 days of February 16, 2007.

(10)  Includes 60,425 shares issuable upon exercise of stock options that will be vested and exercisable within 60 days of February 16, 2007.

(11)  Comprised of 277,605 shares issuable upon exercise of stock options that will be vested and exercisable within 60 days of February 16, 2007.

(12)  Comprised of 13,437 shares issuable upon exercise of stock options that will be vested and exercisable within 60 days of February 16, 2007.

(13)  Includes 62,503 shares held by funds associated with Sandalwood Investments II, L.P. and 134,226 shares issuable upon exercise of stock options that will be vested and exercisable within 60 days of February 16, 2007.

(14)  Comprised of 13,750 shares issuable upon exercise of stock options that will be vested and exercisable within 60 days of February 16, 2007.

(15)  Includes 2,997,603 shares held by funds associated with Cedar Funds, of which Mr. Israely disclaims beneficial ownership except to his individual pecuniary interest therein.

(16)  Includes 10,983,170 shares held by funds associated with Charles River Partners, of which Mr. Sachs disclaims beneficial ownership except to his individual pecuniary interest therein.

(17)  Comprised of 15,937 shares issuable upon exercise of stock options that will be vested and exercisable within 60 days of February 16, 2007.

93

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

(18)   Includes 12,999,757 shares held by funds associated with Redpoint Ventures, of which Mr. Yang disclaims beneficial ownership except to his individual pecuniary interest therein.

(19)   Time Warner Cable, an affiliate of Time Warner, Inc., is a customer that has accounted for over 10% of our total net revenue in prior fiscal periods. Time Warner, Inc. also currently has board observation rights with respect to meetings of our board of directors. These board observation rights will terminate effective upon the closing of this offering. From May 2004 to July 2005, Mike LaJoie, a representative of Time Warner, was a member of our board of directors.

(20)   Includes 904,719 shares held by Star Growth Enterprise and 11,453 shares held by Star Ventures Managementgesellschaft mBh Nr. 3.

(21)   Edu Shoval has voting and investment power over the shares beneficially owned by Oro Sociedad Anonima. Mr. Shoval was a member of our board of directors from January 1999 to May 2005.

(22)   Mr. Kenvin was formerly employed by us.

(23)   Includes 12,500 shares held by High Street Investors 2000 and 19,698 shares held by High Street Investors 2002.

(24)   Mr. Fowler is the brother-in-law of Amir Bassan-Eskenazi, our President and Chief Executive Officer.

(25)   Ms. Fowler is the sister-in-law of Amir Bassan-Eskenazi, our President and Chief Executive Officer.

(26)   Haim Bassan-Eskenazi is the father of Amir Bassan-Eskenazi, our President and Chief Executive Officer.

(27)   Ruth Bassan-Eskenazi is the mother of Amir Bassan-Eskenazi, our President and Chief Executive Officer.

(28)   Ms. Yaffe is the sister of Amir Bassan-Eskenazi, our President and Chief Executive Officer, and Nir Yaffe is Ms. Yaffe's husband.

(29)   Julia Freda-Eskenazi, the wife of Amir Bassan-Eskenazi, our President and Chief Executive Officer, is the beneficiary of the Freda Family Trust. Ms. Freda-Eskenazi has no voting or investment power over these shares and disclaims beneficial ownership of the shares beneficially owned by the trust.

(30)   Dror Amir is the cousin of Ran Oz, our Executive Vice President and Chief Technology Officer.

(31)   If the underwriters' overallotment option is exercised in full, the additional shares sold would be allocated among the selling stockholders as follows:

| Selling Stockholders | Shares Subject to the Overallotment Option |
|---|---|
| Funds affiliated with Pilot House Ventures | 570,894 |
| Funds affiliated with Evergreen Partners U.S. Direct Fund III, L.P. | 315,769 |
| Time Warner, Inc. | 297,824 |
| NBT Ltd. (affiliated with Amir Bassan-Eskenazi) | 179,976 |
| Funds affiliated with Star Ventures | 131,756 |
| Oz Holdings Ltd. (affiliated with Ran Oz) | 38,869 |
| Seth Kenvin | 24,696 |
| Barry Kaplan | 14,563 |
| Sandalwood Investments II, L.P. (affiliated with Dean Gilbert) | 9,102 |
| Oro Sociedad Anonima | 7,282 |
| Bernd Girod | 4,689 |
| High Street Investors | 4,689 |
| Paul Kagan | 2,390 |
| Stephanie Jean Fowler | 853 |
| Robert Clark Fowler, Jr. | 570 |
| Dror Amir | 273 |
| Eliav Korakh | 243 |
| Eli Borochov | 243 |
| Zohar Eliezri | 243 |
| Freda Family Trust | 58 |
| Sarit Yaffe | 9 |
| Nir Yaffe | 9 |

If the underwriters' overallotment option is exercised in part, the additional shares sold would be allocated pro rata based upon the share amounts set forth in the preceding table.

(32)   Assumes no exercise of the underwriters' overallotment option.

94

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

## DESCRIPTION OF CAPITAL STOCK

### General

The following is a summary of the rights of our common stock and preferred stock and certain provisions of our amended and restated certificate of incorporation and amended and restated bylaws, as they will be in effect upon the completion of this offering. For more detailed information, please see our forms of certificate of incorporation and bylaws, which are filed as exhibits to the registration statement of which this prospectus is part.

Immediately following the completion of this offering, our authorized capital stock will consist of 255,000,000 shares, with a par value of $0.001 per share, of which:

- 250,000,000 shares are designated as common stock; and

- 5,000,000 shares are designated as preferred stock.

As of December 31, 2006, we had outstanding 49,619,068 shares of common stock, held of record by 160 stockholders, and no shares of preferred stock, assuming the automatic conversion of all outstanding shares of our preferred stock into common stock and all of the outstanding Class B common stock into common stock upon completion of this offering and the exercise of all outstanding warrants.

### Common Stock

The holders of our common stock are entitled to one vote per share on all matters to be voted on by the stockholders. Subject to preferences that may be applicable to any outstanding shares of preferred stock, holders of common stock are entitled to receive ratably such dividends as may be declared by the board of directors out of funds legally available therefor. In the event we liquidate, dissolve or wind up, holders of common stock are entitled to share ratably in all assets remaining after payment of liabilities and the liquidation preferences of any outstanding shares of preferred stock. Holders of common stock have no preemptive, conversion or subscription rights. There are no redemption or sinking fund provisions applicable to the common stock. All outstanding shares of common stock are, and all shares of common stock to be outstanding upon completion of this offering will be, fully paid and nonassessable.

### Preferred Stock

Our board of directors will have the authority, without further action by our stockholders, to issue from time to time up to 5,000,000 shares of preferred stock in one or more series. Our board of directors may designate the rights, preferences, privileges and restrictions of the preferred stock, including dividend rights, conversion rights, voting rights, terms of redemption, liquidation preference, sinking fund terms and the number of shares constituting any series or the designation of any series. The issuance of preferred stock could have the effect of restricting dividends on our common stock, diluting the voting power of our common stock, impairing the liquidation rights of our common stock, or delaying, deterring or preventing a change in control. Such issuance could have the effect of decreasing the market price of the common stock. The issuance of preferred stock or even the ability to issue preferred stock could also have the effect of delaying, deterring or preventing a change in control. We currently have no plans to issue any shares of preferred stock.

### Warrants

As of December 31, 2006, warrants to purchase an aggregate of 933,670 shares of our common stock at a weighted-average exercise price of approximately $3.63 per share were issued and outstanding, of which warrants to purchase an aggregate of 104,653 shares at a weighted-average exercise price of approximately $2.20 per share will terminate upon the closing of this offering unless exercised prior to such date.

95

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

**Registration Rights**

After this offering, the holders of an aggregate of 47,875,485 shares of our common stock, or approximately 84% of our common stock outstanding, will be entitled to certain rights with respect to registration of such shares under the Securities Act. These shares are referred to as registrable securities. The holders of registrable securities possess registration rights pursuant to the terms of our amended investors' rights agreement, as amended through June 29, 2004, entered into by us and such holders of registrable securities. The amended investors' rights agreement provides that if we determine to register any of our securities under the Securities Act, these holders are entitled to written notice of the registration and are entitled to include all or a portion of their registrable shares in the registration, subject to certain limitations. However, the underwriters have the right to limit the number of shares included in any such registration. In addition, beginning six months after the completion of this offering, these holders will have the right to require us, on no more than two occasions, to file a registration statement under the Securities Act to register all or any part of the registrable securities held by such holders, subject to certain conditions and limitations. Further, these holders may require us to register all or any portion of their registrable securities on Form S-3, when such form becomes available to us, subject to certain conditions and limitations. The registration rights provisions of the amended investors' rights agreement apply to this offering.

**Anti Takeover Effects of Delaware Law and Our Certificate of Incorporation and Bylaws**

Our amended and restated certificate of incorporation and our amended and restated bylaws contain certain provisions that could have the effect of delaying, deferring or discouraging another party from acquiring control of us. These provisions and certain provisions of Delaware law, which are summarized below, are expected to discourage coercive takeover practices and inadequate takeover bids. These provisions are also designed, in part, to encourage persons seeking to acquire control of us to negotiate first with our board of directors. We believe that the benefits of increased protection of our potential ability to negotiate more favorable terms with an unfriendly or unsolicited acquirer outweigh the disadvantages of discouraging a proposal to acquire us.

*Undesignated Preferred Stock*

As discussed above, our board of directors has the ability to issue preferred stock with voting or other rights or preferences that could impede the success of any attempt to change control of us. These and other provisions may have the effect of deterring hostile takeovers or delaying changes in control or management of our company.

*Limits on Ability of Stockholders to Act by Written Consent or Call a Special Meeting*

Our amended and restated certificate of incorporation provides that our stockholders may not act by written consent, which may lengthen the amount of time required to take stockholder actions. As a result, a holder controlling a majority of our capital stock would not be able to amend our bylaws or remove directors without holding a meeting of our stockholders called in accordance with our bylaws.

In addition, our amended and restated bylaws provide that special meetings of the stockholders may be called only by the chairperson of the board, the chief executive officer or our board of directors. Stockholders may not call a special meeting, which may delay the ability of our stockholders to force consideration of a proposal or for holders controlling a majority of our capital stock to take any action, including the removal of directors.

*Requirements for Advance Notification of Stockholder Nominations and Proposals*

Our amended and restated bylaws establish advance notice procedures with respect to stockholder proposals and the nomination of candidates for election as directors, other than nominations made by or at the direction of our board of directors or a committee of our board of directors. These provisions may have the effect of precluding the conduct of certain business at a meeting if the proper procedures are not followed. These

96

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

provisions may also discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of our company.

### Board Classification

Our board of directors is divided into three classes, one class of which is elected each year by our stockholders. The directors in each class will serve for a three-year term. For more information on the classified board, see "Management—Board of Directors." Our classified board may tend to discourage a third party from making a tender offer or otherwise attempting to obtain control of us, because it generally makes it more difficult for stockholders to replace a majority of the directors.

### No Cumulative Voting

Our amended and restated certificate of incorporation and amended and restated bylaws do not permit cumulative voting in the election of directors. Cumulative voting allows a stockholder to vote a portion or all of its shares for one or more candidates for seats on the board of directors. Without cumulative voting, a minority stockholder may not be able to gain as many seats on our board of directors as the stockholder would be able to gain if cumulative voting were permitted. The absence of cumulative voting makes it more difficult for a minority stockholder to gain a seat on our board of directors to influence our board's decision regarding a takeover.

### Amendment of Charter Provisions

The amendment of the above provisions of our amended and restated certificate of incorporation requires approval by holders of at least two-thirds of our outstanding capital stock entitled to vote generally in the election of directors.

### Delaware Anti-Takeover Statute

We are subject to the provisions of Section 203 of the Delaware General Corporation Law regulating corporate takeovers. In general, Section 203 prohibits a publicly held Delaware corporation from engaging, under certain circumstances, in a business combination with an interested stockholder for a period of three years following the date the person became an interested stockholder unless:

- prior to the date of the transaction, our board of directors approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder;

- upon completion of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, calculated as provided under Section 203; or

- at or subsequent to the date of the transaction, the business combination is approved by our board of directors and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least two-thirds of the outstanding voting stock which is not owned by the interested stockholder.

Generally, a business combination includes a merger, asset or stock sale or other transaction resulting in a financial benefit to the interested stockholder. An interested stockholder is a person who, together with affiliates and associates, owns or, within three years prior to the determination of interested stockholder status, did own 15% or more of a corporation's outstanding voting stock. We expect the existence of this provision to have an anti-takeover effect with respect to transactions our board of directors does not approve in advance. We also anticipate that Section 203 may also discourage attempts that might result in a premium over the market price for the shares of common stock held by stockholders.

97

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

The provisions of Delaware law and the provisions of our amended and restated certificate of incorporation and amended and restated bylaws, could have the effect of discouraging others from attempting hostile takeovers and, as a consequence, they might also inhibit temporary fluctuations in the market price of our common stock that often result from actual or rumored hostile takeover attempts. These provisions might also have the effect of preventing changes in our management. It is possible that these provisions could make it more difficult to accomplish transactions that stockholders might otherwise deem to be in their best interests.

### Transfer Agent and Registrar

The transfer agent and registrar for our common stock will be Mellon Investor Services LLC. The transfer agent's address is 480 Washington Blvd., Newport Office Center VII, Jersey City, NJ 07310, and its telephone number is 1-800-647-4273.

### NASDAQ Global Market Listing

Our common stock has been approved for listing on the NASDAQ Global Market under the symbol "BBND."

98

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

## SHARES ELIGIBLE FOR FUTURE SALE

Prior to this offering, there has been no public market for shares of our common stock. Future sales of substantial amounts of shares of our common stock, including shares issued upon the exercise of outstanding options and warrants, in the public market after this offering, or the possibility of these sales occurring, could adversely affect the prevailing market price for our common stock from time to time or impair our ability to raise equity capital in the future.

Upon the completion of this offering, a total of 57,119,068 shares of common stock will be outstanding. Of these shares, all 10,700,000 shares of common stock sold in this offering by us and the selling stockholders, plus any shares sold upon exercise of the underwriters' over-allotment option, will be freely tradable in the public market without restriction or further registration under the Securities Act, unless these shares are held by "affiliates," as that term is defined in Rule 144 under the Securities Act.

The remaining 46,419,068 shares of common stock will be "restricted securities," as that term is defined in Rule 144 under the Securities Act. These restricted securities are eligible for public sale only if they are registered under the Securities Act or if they qualify for an exemption from registration under Rules 144 or 701 under the Securities Act, which are summarized below.

Subject to the lock-up agreements described below and the provisions of Rules 144 and 701 under the Securities Act, these restricted securities will be available for sale in the public market as follows:

| Date | Number of Shares |
|---|---|
| On the date of this prospectus | — |
| Between 90 and 180 days after the date of this prospectus | 75,868 |
| At various times beginning more than 180 days after the date of this prospectus | 46,343,200 |

In addition, of the 16,019,932 shares of our common stock that were subject to stock options outstanding as of December 31, 2006, options to purchase 7,207,110 shares of common stock were vested as of December 31, 2006 and will be eligible for sale 180 days following the effective date of this offering, subject to extensions as described in the section entitled "Underwriters."

## Rule 144

In general, under Rule 144 as currently in effect, a person who owns shares that were acquired from us or an affiliate of us at least one year prior to the proposed sale is entitled to sell upon the expiration of the lock-up agreements described below, within any three-month period beginning 90 days after the date of this prospectus, a number of shares that does not exceed the greater of:

- 1% of the number of shares of common stock then outstanding, which will equal approximately 571,191 shares immediately after the offering; or

- the average weekly trading volume of the common stock on NASDAQ during the four calendar weeks preceding the filing with the SEC of a notice on Form 144 with respect to such sale.

## Rule 144(k)

Under Rule 144(k), a person who is not deemed to have been one of our affiliates for purposes of the Securities Act at any time during the 90 days preceding a sale and who has beneficially owned the shares proposed to be sold for at least two years, including the holding period of any prior owner other than our affiliates, is entitled to sell such shares without complying with the manner of sale, public information, volume limitation or notice provisions of Rule 144.

99

Source: BigBand Networks, In, 424B4, March 15, 2007

Table of Contents

**Rule 701**

In general, under Rule 701 as currently in effect, any of our employees, consultants or advisors who purchase shares from us in connection with a compensatory stock or option plan or other written agreement in a transaction before the effective date of this offering that was completed in reliance on, and complied with the requirements of Rule 701 will, subject to the lock-up restrictions described below, be eligible to resell such shares 90 days after the effective date of this offering in reliance on Rule 144, but without being required to comply with certain restrictions, including the holding period, manner of sale, public information, volume limitation or notice provisions contained in Rule 144.

**Lock-Up Agreements**

We, the selling stockholders, all of our directors and officers and the holders of substantially all our other outstanding shares of common stock and holders of securities exercisable for or convertible into our common stock outstanding immediately prior to this offering have agreed that, without the prior written consent of Morgan Stanley & Co. Incorporated and Merrill Lynch, Pierce, Fenner & Smith Incorporated on behalf of the underwriters, we and they will not, during the period ending 180 days after the date of this prospectus:

- offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend or otherwise transfer or dispose of, directly or indirectly, any shares of our common stock or any securities convertible into or exercisable or exchangeable for shares of our common stock, and

- enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of our common stock;

whether any transaction described above is to be settled by delivery of shares of our common stock or such other securities, in cash or otherwise. This agreement is subject to certain exceptions, and is also subject to extension for up to an additional 34 days, as set forth in the section entitled "Underwriters." In addition, substantially all of our stockholders and holders of securities exercisable for or convertible into shares of our common stock are subject to contractual lock-up restrictions with us for a period of 180 days following the date of this prospectus.

**Registration Rights**

Upon completion of this offering, the holders of 47,875,485 shares of common stock or their transferees will be entitled to various rights with respect to the registration of these shares under the Securities Act. Registration of these shares under the Securities Act would result in these shares becoming fully tradable without restriction under the Securities Act immediately upon the effectiveness of the registration, except for shares purchased by affiliates. See "Description of Capital Stock—Registration Rights" for additional information. Shares covered by a registration statement will be eligible for sale in the public market upon the expiration or release from the terms of the lock-up agreement.

**Registration Statements**

We intend to file a registration statement on Form S-8 under the Securities Act as soon as practicable following this offering to register all of the shares of common stock issued or reserved for issuance under our stock option and employee stock purchase plans. Shares covered by this registration statement will be eligible for sale in the public market, upon the expiration or release from the terms of the lock-up agreements, and subject to vesting of such shares.

100

Source: BigBand Networks, In, 424B4, March 15, 2007