# Exhibit B

# Part 3 of 3

Table of Contents

### Foreign Currency Translation

The functional currency of the Company's foreign subsidiaries is the U.S. dollar. Translation adjustments resulting from remeasuring the foreign currency denominated financial statements of subsidiaries into U.S. dollars are included in the Company's consolidated statements of operations. Translation gains and losses have not been significant to date.

### Comprehensive Income (Loss)

SFAS No. 130, *Reporting Comprehensive Income*, requires components of other comprehensive income to be included as part of total comprehensive income. Components of comprehensive income (loss) include unrealized gains and losses on available-for-sale securities, unrealized gains from derivatives designated as cash flow hedges, and realized gains from derivatives designated as cash flow hedges but not yet reclassified to operating expenses. Comprehensive income (loss) for the years ended December 31, 2007, 2006 and 2005 are as follows (in thousands):

|  | Years ended December 31, | |
|---|---|---|
|  | 2007 | 2006 |
| Net income (loss) | $ (25,367) | $ 8,877 |
| Unrealized gain on available-for-sale securities | 194 | 27 |
| Unrealized gain on derivatives designated as cash flow hedges | 3 | — |
| Realized gain on derivatives designated as cash flow hedges not yet reclassified to operating expenses | 42 | — |
| Comprehensive income (loss) | $ (25,128) | $ 8,904 |

### Research and Development

Research and development costs consist primarily of compensation and related costs for personnel, as well as costs related to materials, supplies, and equipment depreciation. All research and development costs are expensed as incurred.

### Advertising Costs

All advertising costs are expensed as incurred. Advertising costs, which are included in sales and marketing expenses, were not significant for all periods presented.

### Other Income (Expense), Net

For the years ended December 31, 2007, 2006 and 2005, other income (expense), net, included foreign currency losses, proceeds from the sale of preferred stock of an unrelated company, and the expense resulting from fair value adjustments of redeemable convertible preferred stock warrants.

### Preferred Stock Warrants

Effective July 1, 2005, the Company adopted the provisions of Financial Accounting Standards Board Staff Position (FSP) No. 150-5, *"Issuer's Accounting under Statement No. 150 for Freestanding Warrants and Other similar Instruments on Shares that are Redeemable"* (FSP 150-5), an interpretation of FASB Statement No. 150, *"Accounting for Certain Financial Instruments with Characteristics of Both Liabilities and Equity"* (SFAS 150). Pursuant to FSP 150-5, freestanding warrants for shares that are either puttable or warrants for shares that are redeemable are classified as liabilities on the consolidated balance sheet at fair value. At the end of each reporting period, changes in fair value during the period are recorded as a component of other expense, net. Prior to July 1, 2005, the Company accounted for warrants for the purchase of preferred stock under EITF Issue

64

Source: BigBand Networks, In, 10-K, March 12, 2008

Table of Contents

No. 96-18, *"Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services."*

Upon adoption of FSP 150-5, the Company reclassified the fair value of its warrants to purchase shares of its redeemable convertible preferred stock from equity to a liability and recorded a cumulative effect charge of approximately $0.6 million for the change in accounting principle. The Company recorded additional charges of approximately $0.1 million to reflect the increase in fair value between July 1, 2005 and December 31, 2005. In the years ended December 31, 2007 and 2006, the Company recorded approximately $5.0 million and $1.5 million of charges to other expense, net to reflect the increase in fair value between December 31, 2006 and March 27, 2007 and December 31, 2005 and 2006, respectively. Upon the completion of its initial public offering on March 27, 2007, the warrants to purchase redeemable convertible preferred stock became warrants to purchase the Company's common stock and accordingly the Company ceased adjusting these warrants for changes in fair value and reclassified their respective liabilities to stockholders' equity (deficit).

### Recently Issued Accounting Standards

In December 2007, the FASB issued SFAS No. 141R, *Business Combinations.* SFAS No. 141R will require, among other things, the expensing of direct transaction costs, including deal costs and restructuring costs as incurred, acquired IPR&D assets to be capitalized, certain contingent assets and liabilities to be recognized at fair value and earn-out arrangements, including contingent consideration, may be required to be measured at fair value until settled, with changes in fair value recognized each period into earnings. In addition, material adjustments made to the initial acquisition purchase accounting will be required to be recorded back to the acquisition date. This will cause companies to revise previously reported results when reporting comparative financial information in subsequent filings. SFAS No. 141R is effective for the Company on a prospective basis for transactions occurring in 2009 and earlier adoption is not permitted. The Company does not expect SFAS No 141R to have a material impact on the Company's consolidated financial position, results of operations and cash flows if it enters into material business combinations after the standard's effective date.

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurement" ("SFAS 157"), which defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements. The statement does not require any new fair value measurements. SFAS 157 is effective for all financial statements issued for fiscal years beginning after November 15, 2007. The Company is currently evaluating the impact the adoption of SFAS 157 will have on its consolidated results of operations, financial position and cash flows.

### 3. Basic and Diluted Net Income (Loss) per Share

Basic net income (loss) per common share is computed by dividing the net income (loss) attributed to common stockholders for the period by the weighted average number of common shares outstanding during the period. Diluted net income (loss) per share is computed by dividing the net income (loss) attributed to common stockholders for the period by the weighted average number of common shares, and potentially dilutive common stock equivalents outstanding during the period. Potentially dilutive common stock equivalents include incremental common stock issuable upon the exercise of stock options and warrants to purchase common and redeemable convertible preferred stock, and the conversion of redeemable convertible preferred stock (using the if-converted method) to the extent they are dilutive. Potentially dilutive common stock equivalents that are anti-dilutive are excluded from the calculation of diluted net income (loss) per common share.

65

Table of Contents

The following table sets forth the computation of basic and diluted net income (loss) per share for the periods indicated (in thousands, except per share data):

| | Years ended December 31, | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| **Numerator:** | | | |
| Net income (loss) before provision for income taxes and cumulative effect of change in accounting principle | $ (25,367) | $ 8,877 | $ (24,862) |
| Cumulative effect of change in accounting principle | — | — | (633) |
| Net income (loss) | (25,367) | 8,877 | (25,495) |
| **Denominator:** | | | |
| Weighted average shares used in computing net income (loss) per common share—basic | 49,041 | 11,433 | 10,794 |
| Add dilutive securities: | | | |
| Warrants | — | 226 | — |
| Stock options | — | 7,632 | — |
| Conversion of redeemable convertible preferred stock | — | 37,762 | — |
| Weighted average shares used in computing net income (loss) per common share—diluted | 49,041 | 57,053 | 10,794 |
| **Net income (loss) per common share—basic** | | | |
| Net income (loss) before cumulative effect of a change in accounting principle | $ (0.52) | $ 0.78 | $ (2.30) |
| Cumulative effect of a change in accounting principle | — | — | (0.06) |
| Net income (loss) | $ (0.52) | $ 0.78 | $ (2.36) |
| **Net income (loss) per common share—diluted** | | | |
| Net income (loss) before cumulative effect of a change in accounting principle | $ (0.52) | $ 0.16 | $ (2.30) |
| Cumulative effect of a change in accounting principle | — | — | (0.06) |
| Net income (loss) | $ (0.52) | $ 0.16 | $ (2.36) |

As of December 31, 2007, 2006 and 2005, the following securities were excluded from the computation of diluted shares outstanding as their effect would have been anti-dilutive due to the Company being in a loss position or due to outstanding options or warrants having exercise prices greater than the average fair market value for the respective periods presented.

Potentially dilutive securities consist of the following (shares in thousands):

| | Years ended December 31, | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| Restricted stock units | 356 | — | — |
| Stock options outstanding | 13,851 | 4,410 | 11,094 |
| Conversion of warrants to purchase redeemable convertible preferred stock | — | 160 | 550 |
| Warrants to purchase common stock | 428 | 401 | 401 |
| Conversion of redeemable convertible preferred stock | — | — | 37,762 |

## 4. Restructuring Charges

In October 2007, the Company initiated a restructuring plan to lower annual operating expenses in connection with the retirement of its cable modem termination system platform. This resulted in aggregate net charges of

Source: BigBand Networks, In, 10-K, March 12, 2008

Table of Contents

$3.0 million. Severance payments and related charges of approximately $2.2 million consisted primarily of salary and expected payroll taxes and medical benefits. The Company's plans also included vacating several leased facilities throughout the world, with lease terms expiring through fiscal 2012 with estimated lease payments of $0.7 million, net of sublease income. Severance payments associated with the restructuring plan are expected to be completed in 2008. The payment of costs associated with facility lease obligations are expected to be paid over the remaining term of the related obligations which extend to March, 2012.

| | Balance January 1, 2007 | Charges | Cash payments | Non-cash Settlements and other Adjustments | Balance, December 31, 2007 |
|---|---|---|---|---|---|
| Severance and related expenses | $ — | $ 2,193 | $ (1,462) | $ — | $ 731 |
| Vacated facility costs | — | 665 | (101) | 62 | 626 |
| Other costs | — | 140 | (34) | — | 106 |
| Total | $ — | $ 2,998 | $ (1,597) | $ 62 | $ 1,463 |

The restructuring charges above have been reflected separately as restructuring charges on the consolidated statement of operations. The balance of restructuring charges as of December 31, 2007 is included in current liabilities.

## 5. Balance Sheet Data

### Marketable Securities

Marketable securities as of December 31, 2007 and December 31, 2006 include the following available-for-sale securities. All securities have contractual maturity dates within two years (in thousands):

| | As of December 31, 2007 | | | |
|---|---|---|---|---|
| | Amortized costs | Unrealized gains | Unrealized losses | Estimated fair value |
| U.S. Agency debt securities | $ 14,494 | $ 15 | $ (2) | $ 14,507 |
| Corporate debt securities | 35,048 | 104 | (10) | 35,142 |
| Commercial paper | 36,763 | 93 | (4) | 36,852 |
| Auction rate securities | 11,650 | — | — | 11,650 |
| Municipal debt securities (taxable) | 1,200 | 7 | — | 1,207 |
| Total | $ 99,155 | $ 219 | $ (16) | $ 99,358 |

| | As of December 31, 2006 | | | |
|---|---|---|---|---|
| | Amortized costs | Unrealized gains | Unrealized losses | Estimated fair value |
| Corporate debt securities | $ 6,599 | $ — | $ — | $ 6,599 |
| Commercial paper | 15,157 | 8 | — | 15,165 |
| Asset-backed certificates | 5,139 | 1 | — | 5,140 |
| Total | $ 26,895 | $ 9 | $ — | $ 26,904 |

To date, the Company has not recorded any impairment charges on marketable securities related to other-than-temporary declines in market value. The Company recognizes an impairment charge when the decline in the estimated fair value of a marketable security below the amortized cost is determined to be other-than-temporary. The Company considers various factors in determining whether to recognize an impairment charge, including the duration of time and the severity to which the fair value has been less than amortized cost, any adverse changes in the investee's financial condition and our intent and ability to hold the marketable security for a period of time sufficient to allow for any anticipated recovery in market value.

67

Source: BigBand Networks, In, 10-K, March 12, 2008

<u>Table of Contents</u>

Gross realized losses or gains on the sale of available-for-sale securities were not significant during the years ended December 31, 2007 and 2006.

**Inventories**

Inventories are comprised of the following (in thousands):

|  | As of December 31, | |
|  | 2007 | 2006 |
|---|---|---|
| Raw materials, parts, supplies | $ 49 | $ 904 |
| Work-in-progress | 172 | 1,059 |
| Finished products | 6,611 | 5,190 |
| Total | $ 6,832 | $ 7,153 |

**Property and Equipment, Net**

Property and equipment, net is comprised of the following (in thousands):

|  | As of December 31, | |
|  | 2007 | 2006 |
|---|---|---|
| Computers, software and related equipment | $ 15,489 | $ 11,128 |
| Office furniture and fixtures | 1,372 | 836 |
| Engineering and other equipment | 24,984 | 19,408 |
| Leasehold improvements | 5,991 | 2,049 |
|  | 47,836 | 33,421 |
| Less: accumulated depreciation | (30,404) | (20,633) |
| Total property and equipment, net | $ 17,432 | $ 12,788 |

In accordance with its policy, the Company reviews the estimated useful lives of its fixed assets on an ongoing basis. In 2007, this review indicated that the actual useful lives of certain fixed assets related to the Company's cable modem termination system (CMTS) platform were shorter than the previously estimated useful lives used for depreciation purposes in the Company's financial statements. As a result of the Company's planned retirement of the CMTS product platform (see Note 4), the Company changed its estimates of the useful lives of these assets to better reflect the estimated periods during which these assets will remain in service. These changes resulted in an additional $0.8 million charge to depreciation expense for the year ended December 31, 2007, and an increase in basic and diluted loss per share of $0.02 for the year ended December 31, 2007.

**Intangible Assets**

Intangible assets are comprised of the following (in thousands):

|  | Cost | Accumulated Amortization | Net Book Value |
|---|---|---|---|
| As of December 31, 2007: |  |  |  |
| Patented products | $ 1,564 | $ (1,095) | $ 469 |
| Customer relationships | 670 | (468) | 202 |
| Trade names | 503 | (440) | 63 |
| Total | $ 2,737 | $ (2,003) | $ 734 |

68

Table of Contents

| As of December 31, 2006: | Cost | Accumulated Amortization | Net Book Value |
|---|---|---|---|
| Patented products | $ 1,564 | $ (782) | $ 782 |
| Customer relationships | 670 | (335) | 335 |
| Trade names | 503 | (314) | 189 |
| Total | $ 2,737 | $ (1,431) | $ 1,306 |

The estimated future amortization expense of intangible assets as of December 31, 2007, is as follows (in thousands):

| Years ending December 31, | |
|---|---|
| 2008 | $510 |
| 2009 | 224 |
| | $734 |

### Goodwill

The carrying value of goodwill was approximately $1.7 million at both December 31, 2007 and 2006. There were no additions or adjustments to goodwill during fiscal years 2007 and 2006.

### Other Non-current Assets

Other non-current assets consist of the following (in thousands):

| | As of December 31, | |
|---|---|---|
| | 2007 | 2006 |
| Severance pay fund | $ 2,178 | $ 1,771 |
| Deferred tax assets | 551 | 552 |
| Restricted cash | 751 | 245 |
| Security deposit | 1,692 | — |
| Other | 373 | 1,606 |
| Total | $ 5,545 | $ 4,174 |

Restricted cash consists of a certificate of deposit that is used to secure a standby letter of credit required in connection with an operating lease of the Company and cash used as credit card collateral.

### Deferred Revenues, Net

Deferred revenues, net consists of the following (in thousands):

| | As of December 31, | |
|---|---|---|
| | 2007 | 2006 |
| Deferred product revenues, net | $ 30,009 | $ 27,335 |
| Deferred service revenues | 37,279 | 23,267 |
| Total deferred revenues, net | 67,288 | 50,602 |
| Less deferred revenues, net, current portion | (48,256) | (39,553) |
| Deferred revenues, net, less current portion | $ 19,032 | $ 11,049 |

69

**Table of Contents**
### Accrued Warranty

The Company provides a warranty for its software and hardware products. Software is warranted to be free of defects generally for a period of 90 days and hardware generally for a period of one to five years from the date of shipment. The Company accrues for potential warranty claims based on the Company's historical claims experience. The adequacy of the accrual is reviewed on a periodic basis and adjusted, if necessary, based on additional information as it becomes available.

Activity related to the product warranty is as follows (in thousands):

|  | As of December 31, | |
|  | 2007 | 2006 |
|---|---|---|
| Balance at beginning of year | $ 4,136 | $ 3,913 |
| Warranty charged to cost of sales | 2,933 | 2,715 |
| Utilization of warranty | (1,848) | (2,344) |
| Other adjustments | (862) | (148) |
| Total accrued warranty | 4,359 | 4,136 |
| Less accrued warranty, current portion | (3,502) | (3,241) |
| Accrued warranty, less current portion | $    857 | $    895 |

### Other Current Liabilities

Other current liabilities consist of the following (in thousands):

|  | As of December 31, | |
|  | 2007 | 2006 |
|---|---|---|
| Foreign, franchise, and other income tax liabilities | $ 1,886 | $ 4,752 |
| Sales and use tax payable | 1,367 | 1,340 |
| Customer product trade-in provision | 601 | 1,071 |
| Customer prepayments | 2,673 | — |
| Accrued professional fees | 976 | 1,261 |
| Rent liabilities | 1,530 | — |
| Other | 2,846 | 1,300 |
| Total | $ 11,879 | $ 9,724 |

## 6. Commitments and Contingencies

### Commitments

The Company and its subsidiaries operate from leased premises in the United States, Israel, Asia, and Europe with original lease periods expiring in 2007 and 2012. The Company is committed to pay a portion of the buildings' operating expenses as determined under the lease agreements. The terms of certain lease agreements in Asia have automatic renewal provisions in one year increments. Future minimum lease payments due under the related operating leases with a remaining non-cancelable lease term in excess of one year are as follows (in thousands):

| Years ending December 31, |  |
|---|---|
| 2008 | $ 3,161 |
| 2009 | 2,733 |
| 2010 | 2,600 |
| 2011 | 2,569 |
| 2012 | 1,727 |
| Thereafter | 121 |
|  | $12,911 |

70

Table of Contents

The terms of certain lease arrangements have free or escalating rent payment provisions, and when significant, the rent expense is recognized on a straight-line basis over the lease period resulting in a deferred rent liability. Leasehold improvements are amortized over the shorter of their useful life or the contractual lease term. Rent expense under operating leases was approximately $4.0 million, $3.2 million, $3.0 million, for the years ended December 31, 2007, 2006 and 2005, respectively.

### Legal Proceedings

*Mohanty v. Amir Bassan-Eskenazi, et al.*, Case No. C 07-5101-SBA and related consolidated cases

Since October 3, 2007, a series of purported shareholder class action lawsuits were filed in the United States District Court for the Northern District of California against the Company, certain of its officers and directors, and the underwriters of the Company's initial public offering. One such suit was subsequently dismissed. In December 2007, a similar complaint was filed in the Superior Court for the City and County of San Francisco and subsequently removed by the defendants to the United States District Court. The lawsuits allege that the Company's officers and directors made false or misleading statements to investors in connection with the Company's initial public offering and thereafter, and that the Company's registration statement and prospectus contained false or misleading statements regarding the Company's business prospects. The plaintiffs purport to represent anyone who purchased the Company's common stock in the initial public offering, or purchased the Company's common stock between March 14 and September 27, 2007. The lawsuits assert causes of action for violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. In February 2008, the lawsuits were consolidated and a lead plaintiff was appointed by the Court. The Company anticipates that the lead plaintiff will file a consolidated complaint and that the defendants will respond to the consolidated complaint during the first half of 2008. The lawsuits are still in the preliminary stages, and it is not possible for the Company to quantify the extent of potential liability, if any. As a component of these lawsuits, the Company has the obligation to indemnify the underwriters for expenses related to the suit, including the cost of one counsel for the underwriters.

*Ifrah v. Bassan-Eskenazi, et. Al.*, Case No. 468401

In December, 2007, a shareholder derivative lawsuit was filed against certain of the Company's officers and directors in the Superior Court for the County of San Mateo, California. The Company is named as a nominal defendant. The complaint alleges that the defendants violated their fiduciary duties in connection with the Company's disclosures in connection with the Company's initial public offering and thereafter, in particular by allegedly issuing false and misleading statements in the Company's registration statement and prospectus regarding the Company's business prospects. To date defendants have not responded to the complaint. The lawsuit is in its earliest stages, and it is not possible for the Company to quantify the extent of potential liabilities, if any.

*BigBand Networks, Inc. v. Imagine Communications, Inc.*, Case No. 07-351

On June 5, 2007, the Company filed suit against Imagine Communications, Inc in the U.S. District Court, District of Delaware, alleging infringement of certain U.S. Patents. These patents cover advanced video processing and bandwidth management techniques. The lawsuit seeks injunctive relief, along with damages for willful infringement. The Company is subject to certain counterclaims and legal proceedings related to its lawsuit against Imagine Communications, Inc. The Company intends to defend itself vigorously against such counterclaims. Currently, the Company is unable to estimate the possible loss or range of loss associated with these actions, if any.

### Indemnities

From time to time, in its normal course of business, the Company may indemnify other parties with whom it enters into contractual relationships, including customers, lessors, and parties to other transactions with the Company. The Company may agree to hold other parties harmless against specific losses such as those that could arise from a breach of representation or breach of covenant or third-party infringement claims. It may not be

71

Table of Contents

possible to determine the maximum potential amount of liability under such indemnification obligations due to the unique facts and circumstances that are likely to be involved in each particular claim and indemnification provision. Historically, there have been no such indemnification claims.

## 7. Financing

| | December 31, | |
|---|---|---|
| | **2007** | **2006** |
| Capital lease | $  — | $    56 |
| Line of credit | — | 4,000 |
| Loans payable | — | 10,480 |
| | — | 14,536 |
| Less: current portion | — | (5,937) |
| | $  — | $ 8,599 |

In August 2006, the Company signed a loan and security agreement with a third-party financial institution providing for a term loan of $10.0 million and a revolving line of credit of up to $20.0 million. The term loan accrued interest at prime (8.25% at December 31, 2006) plus one quarter of one percent, payable monthly. Non-refundable loan commitment fees incurred at the inception of the loans were being amortized to interest expense over the term of the loan. At December 31, 2006, $10.0 million and $4.0 million were outstanding under the term loan and the revolving line of credit, respectively. During the year ended December 31, 2007, the term loan and the revolving line of credit were fully repaid and the loan and security agreement was terminated.

In December 2006, the Company entered into a license agreement with a vendor for software and related support services. The agreement provided for an initial payment due upon purchase of the license with two installment payments due in December 2007 and 2008. The Company recorded the cost of the software equal to the initial payment and the discounted value of the installment payments based on an imputed interest rate of 8.0%. The present value of the future installment payments at December 31, 2006 was approximately $479,000. This agreement was repaid in full in November 2007.

## 8. Redeemable Convertible Preferred Stock

On March 20, 2007, the closing date of the Company's IPO, and pursuant to the amended and restated certificate of incorporation, all outstanding shares of redeemable convertible preferred stock converted into an aggregate of 37,761,548 shares of common stock.

| Preferred Stock Series | Conversion Rate | Preferred Stock Shares | Common Stock Shares |
|---|---|---|---|
| A, A-1, and A-2 | 2-for-1 | 1,202,826 | 2,405,652 |
| B | 2-for-1 | 1,739,220 | 3,478,440 |
| C | 1.47*-for-1 | 11,370,745 | 16,751,543 |
| D | 1-for-1 | 5,380,201 | 5,380,201 |
| E-1 and E-2 | 1-for-1 | 9,745,712 | 9,745,712 |
| | | 29,438,704 | 37,761,548 |

\* Approximately

In connection with the conversion of the shares of redeemable convertible preferred stock, warrants to purchase shares of redeemable convertible preferred stock were converted to warrants to purchase shares of common stock.

72

Source: BigBand Networks, In, 10-K, March 12, 2008

Table of Contents

**9. Related-Party Transactions**

Beginning in 2002, the Company had an agreement with a member of its Board of Directors to provide the Company strategic advisory services. The Company recorded consulting fees for these services of approximately $90,000 for each of the years ended December 31, 2005 and 2006, which were recorded in general and administrative expenses in the accompanying consolidated statements of operations. This agreement was terminated in December 2006 and no payments were made in 2007 under the agreement.

**10. Stockholders' Equity (Deficit)**

In February 2007, the Board of Directors approved a reverse stock split of the Company's outstanding shares of common stock and preferred stock. On February 15, 2007, subsequent to stockholder approval, the Company filed an amendment to its fourth amended and restated certificate of incorporation effecting a 1-for-4 reverse stock split of all of its class A and B common stock and all redeemable convertible preferred stock. All issued and outstanding shares of common stock, preferred stock, warrants and options for common and preferred stock, and per share amounts, except for per share par value, contained in the consolidated financial statements have been retroactively adjusted to reflect this reverse stock split.

On March 20, 2007, and upon the closing of the Company's IPO, all outstanding shares of class B common stock automatically converted into 3,618,873 shares of common stock on a 1-for-1 share basis.

**Common Stock Warrants**

The Company had the following unexercised common stock warrants (in thousands, except per share data):

| Class | Expiration Date | December 31, 2007 | | December 31, 2006 | |
| | | Exercise Price per Share | Shares Unexercised | Exercise Price per Share | Shares Unexercised |
|---|---|---|---|---|---|
| Class A common | February 20, 2010 | $ 1.79 | 268 | $ — | — |
| Class A common | June 29, 2011 | $ 4.37 | 160 | $ — | — |
| Class B common | June 29, 2009 | $ — | — | $ 4.37 | 401 |

In 2007, warrants to purchase 502,000 shares of common stock were exercised with total proceeds of approximately $1.8 million paid to the Company.

**Stock Options**

The Company's 2007 Equity Incentive Plan (the 2007 Plan) allows the Company to award stock option grants and restricted stock to employees, officers, directors and consultants of the Company. The exercise price of incentive stock options granted under the Plan may not be less than 100% of the fair market value of the Company's common stock on the date of the grant. The exercise price of nonqualified stock options cannot be less than 100% of the market value on the date of grant. Options granted under the Plan are generally exercisable over a four-year period with 25% of the options vesting after twelve months and the remaining options vesting ratably over the 36 month period thereafter. Options granted under the plan have a maximum term of ten years from the date of grant.

73

Source: BigBand Networks, In, 10-K, March 12, 2008

Table of Contents

Data pertaining to stock option activity under the Plan is as follows (in thousands, except per share and year data):

| | Number of Options | Weighted Average Exercise Price | Weighed Average Remaining Contractual Life | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at December 31, 2004 | 10,527 | $0.88 | 8.80 | $    8,716 |
| Granted | 1,884 | $1.72 | | |
| Exercised | (644) | $0.80 | | |
| Canceled | (674) | $0.88 | | |
| Outstanding at December 31, 2005 | 11,093 | $1.02 | 8.14 | $  13,141 |
| Granted | 6,284 | $4.39 | | |
| Exercised | (708) | $1.08 | | |
| Canceled | (649) | $1.64 | | |
| Outstanding at December 31, 2006 | 16,020 | $2.31 | 8.09 | $  55,194 |
| Granted | 3,846 | $7.58 | | |
| Exercised | (4,055) | $1.15 | | |
| Canceled | (1,960) | $4.14 | | |
| Outstanding at December 31, 2007 | 13,851 | $3.85 | 7.33 | $  26,651 |
| Vested and expected to vest | 13,249 | | 7.26 | $  26,256 |

The following table summarizes the information about stock options outstanding and exercisable as of December 31, 2007 (shares in thousands):

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Exercise Price | Number | Weighted Average Remaining Contractual Life (Years) | Weighted Average Exercise Price | No. Shares Exercisable | Weighted Average Exercise Price |
| $0.20 - 1.00 | 4,570 | 4.98 | $   0.82 | 4,366 | $   0.81 |
| 1.32 - 2.60 | 2,235 | 7.05 | $   2.05 | 1,120 | $   2.00 |
| 5.28 | 3,033 | 8.28 | $   5.28 | 747 | $   5.28 |
| 5.36 - 7.34 | 3,386 | 9.47 | $   6.04 | 196 | $   5.80 |
| 9.33 - 18.95 | 627 | 9.30 | $  13.58 | 41 | $  12.62 |
| | 13,851 | 7.33 | $   3.85 | 6,470 | $   1.76 |

The weighted-average grant-date fair value of options granted for the years ended December 31, 2007 and 2006 on a per-share basis were approximately $6.63 and $3.57, respectively. The total intrinsic value of options exercised during the years ended December 31, 2007, 2006, and 2005, was $28.0 million, $1.4 million, and $0.5 million, respectively. The intrinsic value of options exercised is calculated based on the difference between the exercise price and the closing price of the Company's common stock on the exercise date.

The weighted-average fair value and exercise price of options granted during the year ended December 31, 2007 are as follows:

| | |
|---|---|
| Weighted-average fair value: | |
| Options granted below deemed market value | $8.52 |
| Options granted equal to market value | $5.40 |
| Weighted-average exercise price: | |
| Options granted below deemed market value | $7.51 |
| Options granted equal to market value | $7.62 |

74

Source: BigBand Networks, In, 10-K, March 12, 2008

Table of Contents

### Stock-Based Compensation

Beginning on January 1, 2006, and upon the adoption of SFAS 123R, the fair value of each new option awarded is estimated on the grant date using the Black-Scholes valuation model using the assumptions noted in the following table:

|  | Years ended December 31, | |
|---|---|---|
|  | 2007 | 2006 |
| **Stock Options** | | |
| Expected volatility | 75-91% | 91-98% |
| Expected term | 6 years | 6 years |
| Risk-free interest | 3.89-4.75% | 4.57-4.96% |
| Expected dividends | — | — |
| **Stock Purchase Plan** | | |
| Expected volatility | 55-90% | — |
| Expected term | 0.5-0.6 years | — |
| Risk-free interest | 3.71-5.12% | — |
| Expected dividends | — | — |

The Company's computation of expected volatility is derived from historical volatilities of comparable companies within the communications equipment industry. The risk-free interest factor is based on the U.S. Treasury yield curve in effect at the time of grant for zero coupon U.S. Treasury notes with maturities approximately equal to each grant's expected term. The expected term is calculated using the simplified method provided in the Securities Exchange Commission's Staff Accounting Bulletin No. 107, which takes into consideration the grant's contractual life and the vesting periods. The Company estimates its forfeiture rate based on an analysis of its actual forfeitures and will continue to evaluate the adequacy of the forfeiture rate based on actual forfeiture experience, analysis of employee turnover behavior, and other factors. Estimates are evaluated each reporting period and adjusted, if necessary, by recognizing the cumulative effect of the change in estimate on compensation costs recognized in prior year periods. Forfeiture rate adjustments have not been significant to date. During the years ended December 31, 2007 and 2006, the Company recorded stock-based compensation under the fair value requirements of SFAS 123R of approximately $10.4 million and $1.4 million, respectively.

As of December 31, 2007, pursuant to SFAS 123R, there was $38.2 million of total unrecognized compensation costs related to non-vested share-based compensation arrangements granted under the Plan. That cost is expected to be recognized over a weighted-average period of 2.98 years.

### Restricted Stock Units

The 2007 Plan provides for grants of restricted stock units (RSUs) that generally vest over four years from the date of grant. The RSUs are classified as equity awards because the RSUs are paid only in shares upon vesting. RSU awards are measured at the fair value at the date of grant. In 2007, the Company recorded stock-based compensation expense of $0.8 million.

The following table summarizes the Company's restricted stock unit activity:

|  | Restricted Stock Units | Weighted Average Grant-Date Fair Value | Weighted Average Remaining Contractual Life | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding, December 31, 2006 | — |  | — |  |
| Granted | 406 | $ 15.14 | — | $ — |
| Cancelled | (50) |  |  |  |
| Outstanding, December 31, 2007 | 356 | $ 14.61 | 2.23 | $ 1,832 |
| Vested and expected to vest | 324 |  | 2.20 | $ 1,666 |

75

Source: BigBand Networks, In, 10-K, March 12, 2008

Table of Contents

**Employee Stock Purchase Plan**

On January 31, 2007, the Board of Directors approved the 2007 Employee Stock Purchase Plan (ESPP). A total of 1,000,000 shares of common stock were reserved for future issuance under the ESPP, which became effective on March 15, 2007. Under the ESPP, employees may purchase shares of common stock at a price per share that is 85% of the fair market value of the Company's common stock as of the beginning or the end of each offering period, whichever is lower. The ESPP is compensatory and results in compensation cost accounted for under SFAS 123(R). For the year ended December 31, 2007, the Company recorded stock-based compensation expense associated with its ESPP of $0.7 million.

**Shares Reserved**

Common stock reserved for future issuance is as follows (in thousands):

|  | December 31, | |
|---|---|---|
|  | **2007** | **2006** |
| Conversion of redeemable convertible preferred stock | — | 37,759 |
| Conversion of class B common stock | — | 3,619 |
| Restricted stock units | 356 | |
| Warrants to purchase redeemable convertible preferred and common stock | 428 | 934 |
| ESPP shares reserved for future issuance | 787 | — |
| Reserved for future ESPP issuances | | |
| Stock options: | | |
| Outstanding | 13,851 | 16,020 |
| Reserved for future grants | 5,906 | 2,129 |
| Total: | 21,328 | 60,461 |

**11. Segment Reporting**

FASB Statement No. 131, "*Disclosures about Segments of an Enterprise and Related Information*," establishes standards for reporting information about operating segments. Operating segments are defined as components of an enterprise for which separate financial information is available and is evaluated regularly by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance. The Company's chief operating decision maker is the Chief Executive Officer (CEO). The CEO reviews financial information presented on a consolidated basis for evaluating financial performance and allocating resources. There are no segment managers who are held accountable for operations below the consolidated financial statement level. Accordingly, the Company reports as a single reporting segment.

Net revenues by geographical region are as follows (in thousands):

|  | Years ended December 31, | | |
|---|---|---|---|
|  | **2007** | **2006** | **2005** |
| United States | $ 146,835 | $ 157,466 | $ 81,175 |
| Americas excluding United States | 1,393 | 4,051 | 931 |
| Asia | 13,670 | 3,082 | 4,029 |
| Europe | 14,612 | 12,025 | 11,844 |
|  | $ 176,510 | $ 176,624 | $ 97,979 |

Net revenues are allocated to the geographical region based on the shipping destination of customer orders.

76

Source: BigBand Networks, In, 10-K, March 12, 2008

Table of Contents

Products revenues by product line are as follows (in thousands):

|  | Years ended December 31, | | |
|---|---|---|---|
|  | 2007 | 2006 | 2005 |
| Video | $ 121,046 | $ 121,937 | $ 34,296 |
| Data | 23,669 | 32,076 | 51,670 |
|  | $ 144,715 | $ 154,013 | $ 85,966 |

Long-lived assets by geographical regions are as follows (in thousands):

|  | As of December 31, | |
|---|---|---|
|  | 2007 | 2006 |
| United States | $ 9,358 | $ 8,148 |
| Israel | 7,752 | 4,519 |
| Other | 322 | 121 |
|  | $ 17,432 | $ 12,788 |

## 12. Income Taxes

The Company's net income (loss) before provision for income tax and cumulative effect of change in accounting principle was comprised of the following (in thousands):

|  | Years ended December 31, | | |
|---|---|---|---|
|  | 2007 | 2006 | 2005 |
| Domestic | $ (25,755) | $ 9,868 | $ (25,066) |
| Foreign | 1,613 | 1,534 | 529 |
| Net income (loss) before provision for income tax | $ (24,142) | $ 11,402 | $ (24,537) |

Provision for income tax consisted of the following (in thousands):

|  | Years ended December 31, | | |
|---|---|---|---|
|  | 2007 | 2006 | 2005 |
| Current |  |  |  |
| Federal | $ — | $ 376 | $ — |
| State | (48) | 112 | — |
| Foreign | 1,228 | 2,544 | 259 |
|  | 1,180 | 3,032 | 259 |
| Deferred |  |  |  |
| Federal | 38 | 39 | 58 |
| State | 6 | 6 | 8 |
| Foreign | 1 | (552) | — |
|  | 45 | (507) | 66 |
| Total | $ 1,225 | $ 2,525 | $ 325 |

77

Source: BigBand Networks, In, 10-K, March 12, 2008

**Table of Contents**

Reconciliations of the provisions for income tax at the statutory rate to the Company's provision for income tax are as follows (in thousands):

| | Years ended December 31, | | |
| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Tax provision (benefit) at federal statutory rate | $ (8,450) | $ 3,850 | $ (8,588) |
| U.S. losses not benefited (net operating loss carryforward utilized) | 7,113 | (3,445) | 9,507 |
| Foreign operations | 618 | 1,370 | 259 |
| State taxes | (27) | 77 | — |
| Research and development tax credits | (1,037) | (1,485) | (1,194) |
| Stock-based compensation | 1,127 | 756 | 243 |
| Warrant amortization | 1,741 | 842 | — |
| Permanent items | 140 | 560 | 98 |
| Provision for income taxes | $ 1,225 | $ 2,525 | $ 325 |

Significant components of the Company's net deferred tax assets are as follows (in thousands):

| | As of December 31, | |
| | 2007 | 2006 |
|---|---|---|
| Deferred tax assets: | | |
|     Reserves and accruals | $ 12,818 | $ 6,474 |
|     Stock compensation | 1,266 | 168 |
|     Depreciation and amortization | 2,267 | 2,037 |
|     Net operating loss carryforwards | 30,314 | 33,803 |
|     Tax credit carryforwards | 3,400 | 4,248 |
| Total deferred tax assets | 50,065 | 46,730 |
| Deferred tax liabilities: | | |
|     Goodwill | (154) | (110) |
| Gross deferred taxes | 49,911 | 46,620 |
| Valuation allowance | (49,514) | (46,178) |
| Net deferred tax assets | $ 397 | $ 442 |

Recognition of deferred tax assets is appropriate when realization of such assets is more likely than not. Based upon the weight of available evidence, which includes the Company's historical operating performance and the recorded domestic cumulative net losses in all prior fiscal periods, the Company has provided a full valuation allowance against its U.S. deferred tax assets. The Company's valuation allowance increased by $3.3 million, decreased by $11.5 million and increased by $7.2 million in the years ended December 31, 2007, 2006 and 2005, respectively. As of December 31, 2007, the Company has U.S. federal and state net operating losses of approximately $90.8 million and $45.1 million, respectively. The U.S. federal net operating loss carryforwards will expire at various dates beginning in 2019 through 2027 if not utilized. Most state net operating loss carryforwards will expire at various dates beginning in 2009 through 2027.

As of December 31, 2007, the Company has U.S. tax credit carryforwards, primarily from research and development credits, of approximately $2.3 million for federal and $1.0 million for state. The federal credit will expire at various dates beginning in 2020 through 2027 if unused. The California state research and development credits can be carried forward indefinitely. Other state incentive tax credits will expire at various dates beginning in 2009 through 2011.

Net operating loss carryforwards and credit carryforwards reflected above are likely to be limited due to ownership changes as provided in Section 382 of the Internal Revenue Code and similar state provisions. The

Source: BigBand Networks, In, 10-K, March 12, 2008

Table of Contents

Company has not provided for U.S. federal income taxes on all of the non-U.S. subsidiaries' undistributed earnings as of December 31, 2007, because such earnings are intended to be indefinitely reinvested. Upon distribution of those earnings in the form of dividends or otherwise, the Company would be subject to applicable U.S. federal and state income taxes.

In connection with the Company's adoption of SFAS No. 123R, the Company uses the 'with-and-without' approach described in EITF Topic No. D-32, *"Intraperiod Tax Allocation of the Tax Effect of Pretax Income from Continuing Operations,"* to determine the recognition and measurement of excess tax benefits. Accordingly, the Company has elected to recognize excess income tax benefits from stock option exercises in additional paid in capital only if an incremental income tax benefit would be realized after considering all other tax attributes presently available to the Company. As of December 31, 2007, the amount of such excess tax benefits from stock options included in net operating losses was $8.8 million. In addition, the Company has elected to account for the indirect effects of stock-based awards on other tax attributes, such as the research and alternative minimum tax credits, through the income statement.

## 13. 401(k) Savings and Retirement Plan

The Company sponsors a 401(k) Savings and Retirement Plan (Plan) for all employees who meet certain eligibility requirements. Participants may contribute, on a pre-tax basis, between 1 percent and 90 percent of their annual compensation, but not to exceed a maximum contribution amount pursuant to Section 401(k) of the Internal Revenue Code. The Company is not required to contribute, nor has it contributed, to the Plan for any of the periods presented.

## 14. Selected Quarterly Financial Data (Unaudited)

The following tables summarize the unaudited quarterly financial data for the last two years (in thousands except per share data):

| | Year Ended December 31, 2007 | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Total net revenues | $ 52,834 | $ 54,463 | $ 38,550 | $ 30,663 |
| Gross profit | 30,396 | 29,091 | 13,697 | 13,652 |
| Net income (loss) | (977) | 1,655 | (12,245) | (13,800) |
| Net income (loss) per share—basic | (0.05) | 0.03 | (0.21) | (0.23) |
| Net income (loss) per share—diluted | (0.05) | 0.02 | (0.21) | (0.23) |

| | Year Ended December 31, 2006 | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Total net revenues | $ 32,550 | $ 38,008 | $ 43,064 | $ 63,002 |
| Gross profit | 16,650 | 18,508 | 22,289 | 35,780 |
| Net income (loss) | (1,063) | (581) | 1,578 | 8,943 |
| Net income (loss) per share—basic | (0.09) | (0.05) | 0.14 | 0.76 |
| Net income (loss) per share—diluted | (0.09) | (0.05) | 0.03 | 0.15 |

## Item 9. Changes In and Disagreements with Accountants on Accounting and Financial Disclosure

None

79

Source: BigBand Networks, In, 10-K, March 12, 2008

Table of Contents

**Item 9A. Controls and Procedures**

### Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures

We maintain disclosure controls and procedures, as such term is defined in SEC Rule 13a-15(e), that are designed to ensure that information required to be disclosed in our reports under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Accounting Officer, as appropriate, to allow for timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As required by SEC Rule 13a-15(b), we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Accounting Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2007. Based on the foregoing, our Chief Executive Officer and Chief Accounting Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level.

### Changes in Internal Control over Financial Reporting

There have been no other changes in our internal controls over financial reporting that occurred during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

**Item 9B. Other Information**

Our annual meeting of stockholders is currently scheduled to be held on June 10, 2008.

Source: BigBand Networks, In, 10-K, March 12, 2008

Table of Contents

PART III

### Item 10. Directors, Executive Officers and Corporate Governance

Information relating to directors and officers of BigBand Networks is set forth under the captions entitled "Election of Directors," "Executive Officers of the Company" and "Section 16(a) Beneficial Ownership Reporting Compliance" in the Company's Proxy Statement for the 2008 Annual Meeting of Stockholders and is incorporated herein by reference.

BigBand Networks' Code of Ethics is available on the Company website at www.bigbandnet.com under Investor Relations, Corporate Governance. The website also will disclose whether there have been any amendments or waivers to the Code of Ethics. BigBand Networks will provide copies of these documents, in electronic or paper form, upon request to Investor Relations, free of charge.

The board of directors of BigBand Networks has identified Ken Goldman, the chairman of the Audit Committee, as our audit committee financial expert, as defined by the SEC.

### Item 11. Executive Compensation

Information regarding compensation of officers and directors of the Company is set forth under the captions entitled "Executive Compensation," "Compensation of Directors," and "Employment Contracts and Termination of Employment and Change-of-Control Arrangements" in the Proxy Statement incorporated herein by reference.

### Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

Information regarding ownership of BigBand Networks common stock is set forth under the captions entitled "Equity Compensation Plan Information," "Security Ownership of Management" and "Security Ownership of Principal Stockholders" in the Proxy Statement and is incorporated herein by reference.

### Item 13. Certain Relationships and Related Transactions

Information regarding certain relationships and related transactions with BigBand Networks is set forth under the captions entitled "Compensation of Directors" and "Certain Relationships and Related Party Transactions" in the Proxy Statement and is incorporated herein by reference.

### Item 14. Principal Accountant Fees and Services

Information regarding principal accountant fees and services is set forth under the caption "Relationship with Independent Registered Public Accounting Firm" in the Proxy Statement and is incorporated herein by reference.

81

Source: BigBand Networks, In, 10-K, March 12, 2008

Table of Contents

**PART IV**

**Item 15. Exhibits and Financial Statement Schedules**

| Exhibit Number | Description | Form | File Number | Exhibit Number | Filing Date | Filed with this 10-K |
|---|---|---|---|---|---|---|
| | | | Incorporated by Reference | | | |
| 3.1 | Form of Amended and Restated Certificate of Incorporation of the Registrant | S-1 | 333-139652 | 3.1B | December 22, 2006 | |
| 3.2 | Form of Amended and Restated Bylaws of the Registrant | S-1 | 333-139652 | 3.2B | December 22, 2006 | |
| 10.6 | 2007 Equity Incentive Plan | S-1/A | 333-139652 | 10.6 | March 8, 2007 | |
| 10.6A | Form of Option Agreement (U.S.) | 10-Q | 001-33355 | 10.6A | August 8, 2007 | |
| 10.6B | Form of Option Agreement (Non-U.S.) | 10-Q | 001-33355 | 10.6B | August 8, 2007 | |
| 10.6C | Form of Restricted Stock Unit Agreement (U.S.) | 10-Q | 001-33355 | 10.6C | August 8, 2007 | |
| 10.6D | Form of Restricted Stock Unit Agreement (Non-U.S.) | 10-Q | 001-33355 | 10.6D | August 8, 2007 | |
| 10.6E | 2007 Equity Incentive Plan Sub-Plan for Israeli Employees | 10-Q | 001-33355 | 10.6E | August 8, 2007 | |
| 10.6F | Form of Israeli Sub-Plan Option Agreement | 10-Q | 001-33355 | 10.6F | August 8, 2007 | |
| 10.9A | Amendment to Offer Letter Agreement—Ran Oz | | | | | X |
| 10.10 | Offer Letter Agreement—Maurice Castonguay | | | | | X |
| 10.11 | Offer Letter Agreement—David Heard | S-1/A | 333-139652 | 10.23 | February 26, 2007 | |
| 10.11A | Amendment to Offer Letter Agreement—David Heard | | | | | X |
| 10.12A | Amendment to Offer Letter Agreement—Robert Horton | | | | | X |
| 10.13A | Amendment to Offer Letter Agreement—Jeffrey Lindholm | | | | | X |
| 10.21 | Lease Agreement (Tel Aviv, Israel) | S-1 | 333-139652 | 3.2B | December 22, 2006 | |
| 10.21A | Addendum to Lease Agreement | 10-Q | 001-33355 | 10.21B | May 9, 2007 | |
| 10.23 | Transition Services Agreement—Fred Ball | 8-K | 001-33355 | 10.23 | October 18, 2007 | |
| 10.24 | Lease Agreement (Tel Aviv, Israel) | 8-K | 001-33355 | 99.1 | July 30, 2007 | |
| 10.24A | Amendment to Lease Agreement (Tel Aviv, Israel) | | | | | X |
| 21.1 | Subsidiaries of the Registrant | | | | | X |
| 23.1 | Consent of Independent Registered Public Accounting Firm | | | | | X |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | | | | X |
| 31.2 | Certification of Chief Accounting Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | | | | X |
| 32.1 | Certification of Chief Executive Officer and Chief Accounting Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | | X |

82

Source: BigBand Networks, In, 10-K, March 12, 2008

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on our behalf by the undersigned, thereunto duly authorized on the 11th day of March, 2008.

BIGBAND NETWORKS, INC.

By:          /s/   AMIR BASSAN-ESKENAZI
                **Amir Bassan-Eskenazi**
        **President, Chief Executive Officer and**
             **Chairman of the Board**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this report has been signed below on March 11, 2008 by the following persons on behalf of the Registrant and in the capacities indicated.

| Signature | Title | Date |
|---|---|---|
| /s/   AMIR BASSAN-ESKENAZI<br>**Amir Bassan-Eskenazi** | President, Chief Executive Officer and Chairman of the Board (Principal Executive Officer) | March 11, 2008 |
| /s/   RAVI NARULA<br>**Ravi Narula** | Chief Accounting Officer (Principal Accounting Officer) | March 11, 2008 |
| /s/   LLOYD CARNEY<br>**Lloyd Carney** | Director | March 11, 2008 |
| /s/   DEAN GILBERT<br>**Dean Gilbert** | Director | March 11, 2008 |
| /s/   KEN GOLDMAN<br>**Ken Goldman** | Director | March 11, 2008 |
| /s/   GAL ISRAELY<br>**Gal Israely** | Director | March 11, 2008 |
| /s/   RAN OZ<br>**Ran Oz** | Director | March 11, 2008 |
| /s/   BRUCE SACHS<br>**Bruce Sachs** | Director | March 11, 2008 |
| /s/   GEOFFREY YANG<br>**Geoffrey Yang** | Director | March 11, 2008 |
| /s/   ROBERT SACHS<br>**Robert Sachs** | Director | March 11, 2008 |

83

Source: BigBand Networks, In, 10-K, March 12, 2008

Table of Contents

## EXHIBIT INDEX

| Exhibit Number | Description | Incorporated by Reference | | | | Filed with this 10-K |
|---|---|---|---|---|---|---|
| | | Form | File Number | Exhibit Number | Filing Date | |
| 3.1 | Form of Amended and Restated Certificate of Incorporation of the Registrant | S-1 | 333-139652 | 3.1B | December 22, 2006 | |
| 3.2 | Form of Amended and Restated Bylaws of the Registrant | S-1 | 333-139652 | 3.2B | December 22, 2006 | |
| 10.6 | 2007 Equity Incentive Plan | S-1/A | 333-139652 | 10.6 | March 8, 2007 | |
| 10.6A | Form of Option Agreement (U.S.) | 10-Q | 001-33355 | 10.6A | August 8, 2007 | |
| 10.6B | Form of Option Agreement (Non-U.S.) | 10-Q | 001-33355 | 10.6B | August 8, 2007 | |
| 10.6C | Form of Restricted Stock Unit Agreement (U.S.) | 10-Q | 001-33355 | 10.6C | August 8, 2007 | |
| 10.6D | Form of Restricted Stock Unit Agreement (Non-U.S.) | 10-Q | 001-33355 | 10.6D | August 8, 2007 | |
| 10.6E | 2007 Equity Incentive Plan Sub-Plan for Israeli Employees | 10-Q | 001-33355 | 10.6E | August 8, 2007 | |
| 10.6F | Form of Israeli Sub-Plan Option Agreement | 10-Q | 001-33355 | 10.6F | August 8, 2007 | |
| 10.9A | Amendment to Offer Letter Agreement—Ran Oz | | | | | X |
| 10.10 | Offer Letter Agreement—Maurice Castonguay | | | | | X |
| 10.11 | Offer Letter Agreement—David Heard | S-1/A | 333-139652 | 10.23 | February 26, 2007 | |
| 10.11A | Amendment to Offer Letter Agreement—David Heard | | | | | X |
| 10.12A | Amendment to Offer Letter Agreement—Robert Horton | | | | | X |
| 10.13A | Amendment to Offer Letter Agreement —Jeffrey Lindholm | | | | | X |
| 10.21 | Lease Agreement (Tel Aviv, Israel) | S-1 | 333-139652 | 3.2B | December 22, 2006 | |
| 10.21A | Addendum to Lease Agreement | 10-Q | 001-33355 | 10.21B | May 9, 2007 | |
| 10.23 | Transition Services Agreement—Fred Ball | 8-K | 001-33355 | 10.23 | October 18, 2007 | |
| 10.24 | Lease Agreement (Tel Aviv, Israel) | 8-K | 001-33355 | 99.1 | July 30, 2007 | |
| 10.24A | Amendment to Lease Agreement (Tel Aviv, Israel) | | | | | X |
| 21.1 | Subsidiaries of the Registrant | | | | | X |
| 23.1 | Consent of Independent Registered Public Accounting Firm | | | | | X |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | | | | X |
| 31.2 | Certification of Chief Accounting Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | | | | X |
| 32.1 | Certification of Chief Executive Officer and Chief Accounting Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | | X |

84

Source: BigBand Networks, In, 10-K, March 12, 2008

Exhibit 10.9A

Dear Ran,

As approved by the Compensation Committee of the Board of Directors of BigBand Networks, Inc. (the "Company") on December 9, 2007, I provide you with the following amendment to your employment agreement dated January 2, 2000, as amended (the "Employment Agreement").

Bonus:

You shall have the opportunity to earn a performance bonus up to 50% of your annual base salary ($100,000).

In all other respects, the terms of your employment shall remain as outlined in the Employment Agreement.

Sincerely,

/s/ Amir Bassan-Eskenazi
_____
Amir Bassan-Eskenazi
President & Chief Executive Officer

Exhibit 10.10

[BigBand Networks, Inc. Letterhead]

March 10, 2008

Mr. Maurice Castonguay
[Address redacted]

**Re:  Employment Offer**

Dear Moe:

On behalf of BigBand Networks, Inc. ("BigBand"), I am pleased to extend an offer of employment to you for the position of Senior Vice President and Chief Financial Officer, reporting to Amir Bassan-Eskenazi or his designee. This letter sets out the terms of your employment with BigBand, which will start on March 12, 2008 ("Start Date"). This offer and your Start Date are contingent upon successful completion of a background check. Your primary office in 2008 shall be Redwood City, California with travel to other locations as needed. The Company will reimburse you for all reasonable business expenses related to such travel.

Subject to the approval of the Board of Directors of BigBand, in consideration for your service to BigBand, you will be paid a base salary of $23,333.34 per month (which equals $280,000 on an annualized basis), less applicable taxes and other withholdings in accordance with BigBand's standard payroll practices. You will be eligible for $140,000 in variable compensation (50% of your base salary) based on participation in BigBand's performance bonus program on the same basis as other members of BigBand's senior management. In addition, you will be eligible to participate in various BigBand fringe benefit plans, including: Group Health Insurance, Flexible Spending Accounts, 401(k) Savings Plan, and the vacation program. BigBand reserves the right to modify employee benefit plans and policies, as it deems necessary. These benefits will be explained to you during your employee orientation.

During a period beginning on the Start Date and ending on April 30, 2008 (the "Transition Period"), BigBand shall reimburse you for all reasonable costs associated with your relocation to Redwood City, California including the costs of flight for both you and your spouse, the costs of hotels, and the costs of rental cars.

Subject to the approval of the Board of Directors of BigBand, you will be granted an option to purchase 400,000 shares of BigBand common stock under BigBand's Stock Option Plan at an exercise price equal to the fair market value of that stock on your option grant date (the "Initial Option"). Your Initial Option will vest 25% at the one year anniversary of your start date, with monthly vesting of the balance over the subsequent 36 months, in 36 equal monthly amounts, except if there is a Termination or Constructive Termination following a Change of Control, as delineated below. These options will be subject to the terms and conditions of the related BigBand Stock Option Plan and related standard form of stock option agreement, as modified by this letter agreement, which you will be required to sign as a condition of receiving the option.

Source: BigBand Networks, In, 10-K, March 12, 2008

Mr. Maurice Castonguay
March 10, 2008
Page 2

Your employment with BigBand is "at will"; it is for no specified term, and may be terminated by you or BigBand at any time, with or without cause or advance notice. Any contrary representations that may have been made to you are superceded by this offer. This is the full and complete agreement between you and BigBand on this term. Although your job duties, title, compensation and benefits, as well as BigBand's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and BigBand's Chief Executive Officer.

In the event that BigBand should experience a Change in Control (as that term is defined in the stock option agreement) and you are terminated for a reason other than for Cause or you are Constructively Terminated within six months (6) months after such Change in Control, (i) contingent upon your signing of a general release acceptable to BigBand, which is not inconsistent with the terms and intent of this letter agreement, or its successor in interest, you will receive a severance payment equal to twelve (12) months of your then-current base salary, less applicable taxes and other withholdings as determined by BigBand's payroll department, and (ii) will receive thirty-six (36) months accelerated vesting on the Initial Option ("Acceleration"). Provided however, in the event that your benefits provided for in this letter agreement, when aggregated with any other payments or benefits received by you would constitute "parachute payments" within the meaning of Section 280G of the Internal Revenue Code, and would be subject to the excise tax imposed by Section 4999 of the Code, then you shall have the unilateral right to reduce, in order of priority: such severance payments by an amount required to eliminate the excise tax imposed under Section 4999 . If after reduction of the severance payments, you are still subject to the excise tax imposed under Section 4999, you will have the unilateral right to reduce the number of months acceleration of your then outstanding unvested options to eliminate the excise tax imposed under Section 4999

In the event that your employment with BigBand is terminated or Constructively Terminated for a reason other than for Cause and such termination or Constructive Termination is *not* within (6) months after a Change of Control, then contingent upon your signing of a general release acceptable to BigBand or its successor in interest, you will receive a severance payment equal to six (6) months of your then-current base salary, less applicable taxes and other withholdings as determined by BigBand's payroll department.

Application of Internal Revenue Code Section 409A: Notwithstanding anything to the contrary in this offer letter, if you are a "specified employee" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") and the final regulations and any guidance promulgated thereunder ("Section 409A") at the time of your termination (other than due to death), and the severance payable to you, if any, pursuant to this offer letter, when considered together with any other severance payments or separation benefits that are considered deferred compensation under Section 409A (together, the "Deferred Compensation Separation Benefits") that are payable within the first six (6) months following your termination of employment, will become payable on the first payroll date that occurs on or after the date six (6) months and one (1) day following the date of your termination of employment. All subsequent Deferred Compensation Separation Benefits, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit. Notwithstanding anything herein to the contrary, if you die following your termination but prior to the six (6) month anniversary of your termination, then any payments delayed in accordance with this paragraph will be payable in a lump sum as soon as administratively practicable after the date of your death and all other Deferred Compensation Separation Benefits will be payable in accordance with the payment schedule applicable to each payment or benefit. Each payment and benefit payable under this offer letter is intended to constitute separate payments for purposes of Section 1.409A-2(b)(2) of

Source: BigBand Networks, In, 10-K, March 12, 2008

Mr. Maurice Castonguay
March 10, 2008
Page 3

the Treasury Regulations. For purposes of this paragraph, any amount paid under this offer letter that satisfies the requirements of the "short-term deferral" rule set forth in Section 1.409A-1(b)(4) of the Treasury Regulations will not constitute Deferred Compensation Separation Benefits, and any amount paid under this offer letter that qualifies as a payment made as a result of an involuntary separation from service pursuant to Section 1.409A-1(b)(9)(iii) of the Treasury Regulations that does not exceed the Section 409A Limit will not constitute Deferred Compensation Separation Benefits. For these purposes, "Section 409A Limit" will mean the lesser of two (2) times: (i) your annualized compensation based upon the annual rate of pay paid to you during the Company's taxable year preceding the Company's taxable year of your termination of employment as determined under Treasury Regulation 1.409A-1(b)(9)(iii)(A)(1) and any Internal Revenue Service guidance issued with respect thereto; or (ii) the maximum amount that may be taken into account under a qualified plan pursuant to Section 401(a)(17) of the Code for the year in which your employment is terminated.

The provisions of the foregoing paragraph are intended to comply with the requirements of Section 409A so that none of the severance payments and benefits to be provided hereunder will be subject to the additional tax imposed under Section 409A, and any ambiguities herein will be interpreted to so comply. You and the Company agree to work together in good faith to consider amendments to this offer letter which are necessary, appropriate or desirable to avoid imposition of any additional tax or income recognition prior to actual payment to you under Section 409A.

The Company acknowledges that you currently serve on the board of directors of Cedar Point Communication, Inc. as chairperson of the Audit Committee. The Company also acknowledges that the provision of those services to Cedar Point Communications and your compensation for such services, are not in conflict with the provision of your services to the Company.

For purposes of this Agreement, "Cause" shall mean (i) the commission of any act of fraud, embezzlement or dishonesty by you, (ii) any unauthorized use or disclosure by you of confidential information or trade secrets of BigBand's (or any parent or subsidiary), (iii) any other intentional misconduct by you adversely affecting the business or affairs of BigBand (or any parent or subsidiary) in a material manner, or (iv) your failure to maintain Redwood City, California as your primary office location for at least three weeks per month in 2008 (other than June, July and August of 2008) and at least two weeks per month thereafter.

For purposes of this Agreement, "Constructive Termination" shall mean your resignation within two (2) years following the initial existence of any one or more of the following without your express written consent: (i) the relocation of the principal place of your employment to a location that is more than (50) miles from Redwood City, California or Westborough, Massachusetts; (ii) any failure by BigBand to pay, or any material reduction by BigBand of, your base salary or benefits (unless reductions comparable in amount and duration are concurrently made for all other employees of BigBand with responsibilities, organizational level and title comparable to yours); (iii) without your express written consent, a significant reduction of your duties, position or responsibilities (for purposes of clarity, following a change of control, you are not the Senior Vice President and Chief Financial Officer of the combined company); or (iv) failure of the Company to obtain an agreement from any such successor company to assume and agree to perform the Company's obligations under this letter agreement. You will not resign as a result of a Constructive Termination without first providing BigBand with written notice of the acts or omissions constituting the grounds for a "Constructive Termination" within ninety (90)

Source: BigBand Networks, In, 10-K, March 12, 2008

Mr. Maurice Castonguay
March 10, 2008
Page 4

days of the initial existence of the grounds for a "Constructive Termination" and a reasonable cure period of not less than thirty (30) days following the date of such notice.

By accepting employment with BigBand, you represent that you will not be acting in breach of any agreement with any of your previous employers. BigBand is very impressed with the skills and experience that you will bring to us and we hope that you will consider this offer carefully. Should you accept this offer, I would like to remind you that it is BigBand's policy to avoid situations where information or materials might come into our hands that are considered proprietary by individuals or companies other than BigBand. Other than in your capacity as member of the board of directors of Cedar Point Communications or any such other boards in which you serve. We are interested in employing you because of your skills and abilities, not because of any trade secrets you have learned elsewhere. It is important that you take care not to bring, even inadvertently, any books, drawings, notes, materials, etc., except your personal effects as you leave your current employer. Thus, you represent and warrant that you are not acting in breach of any non-competition, employment or other agreements with your current employer or any of your previous employers.

Like all BigBand employees, you will be required, as a condition to your employment with BigBand, to sign BigBand's standard At Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement, a copy of which is included with this letter. Also, you will be required to provide BigBand with documents establishing your identity and right to work in the U.S. within three (3) business days after your Start Date.

To ensure the timely and economical resolution of disputes that arise in connection with your employment with BigBand, you and BigBand agree that any and all disputes, claims (including, but not limited to, any claims for compensation, benefits, stock or stock options, fraud or age, sex, race, disability or other discrimination or harassment), or causes of action arising from or relating to the enforcement, breach, performance or interpretation of this Agreement, your employment, or the termination of your employment, shall be resolved to the fullest extent permitted by law by final, binding and confidential arbitration, by a single arbitrator, in San Mateo County, California, conducted in accordance with the rules of the American Arbitration Association ("AAA") under the applicable AAA employment rules. By agreeing to this arbitration procedure, both you and BigBand waive the right to resolve any such dispute through a trial by jury or judge or administrative proceeding. The arbitrator shall: (a) have the authority to compel adequate discovery for the resolution of the dispute and to award such relief as would otherwise be permitted by law; and (b) issue a written arbitration decision, to include the arbitrator's essential findings and conclusions and a statement of the award. The arbitrator shall be authorized to award any or all remedies that you or BigBand would be entitled to seek in a court of law. BigBand shall pay all AAA's arbitration fees in excess of the amount of court fees that would be required if the dispute were decided in a court of law. Nothing in this Agreement is intended to prevent either you or BigBand from obtaining injunctive relief in court to prevent irreparable harm pending the conclusion of any such arbitration. Notwithstanding the foregoing, you and BigBand each have the right to resolve any issue or dispute arising under your Employee Proprietary Information and Inventions Assignment Agreement by court action.

This agreement and the other agreements referred to above constitute the entire agreement between you and BigBand regarding the terms and conditions of your employment, and they supersede all prior negotiations, representations or agreements, whether oral or written, between you and BigBand. This agreement may only be modified by a document signed by you and the Chief Executive Officer of BigBand.

Source: BigBand Networks, In, 10-K, March 12, 2008

Mr. Maurice Castonguay
March 10, 2008
Page 5

    We look forward to working with you at BigBand. Please sign and date this letter on the spaces provided below to acknowledge your acceptance of the terms of this offer. If you have any questions, please call me at 650-995-5000.

    Sincerely,

    BigBand Networks, Inc.

By:  /s/ Amir Bassan-Eskenazi
     Amir Bassan-Eskenazi
     President and Chief Executive Officer

    I have read the above employment offer and accept employment with BigBand on the terms and conditions set forth in this agreement.

        Date: March 10, 2008              /s/ Maurice Castonguay
                                       Maurice Castonguay

            My anticipated start date is March 12, 2008.

Exhibit 10.11A

Dear David,

As approved by the Compensation Committee of the Board of Directors of BigBand Networks, Inc. (the "Company") on December 9, 2007, I provide you with the following amendment to your offer letter dated February 22. 2007 (the "Offer Letter"), as amended.

Salary:

Effective December 15, 2007, you will be paid a base salary of $27,083 per month ($325,000 on an annualized basis), in accordance with the customary practices of the Company as established and modified from time to time.

Bonus:

You shall have the opportunity to earn a performance bonus up to 70% of your annual base salary ($227,500).

Severance:

If your employment is terminated for any reason other than Misconduct, within six (6) months following a Change of Control, as both capitalized terms are defined in the Offer Letter, you will be eligible to receive a severance benefit in an amount equal to twelve (12) months of your annual base salary and twelve (12) months of health benefits under COBRA.

In all other respects, the terms of your employment shall remain as outlined in the Offer Letter.

Sincerely,

/s/ Amir Bassan-Eskenazi
Amir Bassan-Eskenazi
President & Chief Executive Officer

**Exhibit 10.12A**

Dear Rob,

      As approved by the Compensation Committee of the Board of Directors of BigBand Networks, Inc. (the "Company") on December 9, 2007, I provide you with the following amendment to your offer letter dated January 4, 2004 (the "Offer Letter"), as amended.

Salary:

Effective December 15, 2007, you will be paid a base salary of $18,750 per month ($225,000 on an annualized basis), in accordance with the customary practices of the Company as established and modified from time to time.

Bonus:

You shall have the opportunity to earn a performance bonus up to 50% of your annual base salary ($112,500).

Severance:

If you experience a Termination Event other than "for cause" (as such terms are defined in your stock option agreement and Offer Letter, respectively), or the principal place of your employment is relocated to a location more than fifty (50) miles from Redwood City, California without your express written consent, you will be eligible to receive a severance benefit in an amount equal to six (6) months of your annual base salary and six (6) months of health benefits under COBRA. Additionally, if you experience a Termination Event other than "for cause," or the principal place of your employment is relocated to a location more than fifty (50) miles from Redwood City, California without your express written consent, within six (6) months following a Change of Control (as such term is defined in your stock option agreement) you will be eligible to receive a severance benefit in an amount equal to twelve (12) months of your annual base salary and twelve (12) months of health benefits under COBRA.

In all other respects, the terms of your employment shall remain as outlined in the Offer Letter.

Sincerely,

/s/ Amir Bassan-Eskenazi
_____
Amir Bassan-Eskenazi
President & Chief Executive Officer

**Exhibit 10.13A**

Dear Jeff,

As approved by the Compensation Committee of the Board of Directors of BigBand Networks, Inc. (the "Company") on December 9, 2007, I provide you with the following amendment to your offer letter dated October 30, 2006 (the "Offer Letter").

Bonus:

You shall have the opportunity to earn a performance bonus up to 84% of your annual base salary ($210,000).

Severance:

If your employment is terminated for any reason other than Misconduct, within six (6) months following a Change of Control, as both capitalized terms are defined in the Offer Letter, you will be eligible to receive a severance benefit in an amount equal to twelve (12) months of your annual base salary and twelve (12) months of health benefits under COBRA.

In all other respects, the terms of your employment shall remain as outlined in the Offer Letter.

Sincerely,

/s/ Amir Bassan-Eskenazi
Amir Bassan-Eskenazi
President & Chief Executive Officer

Exhibit 10.24A

### Addendum to an Agreement from 25.7.07

Prepared and signed in Herzliyah on February 12, 2007

**Between:**       A. Dori Engineering Works Ltd.
(referred to below as the "**Company**" or the "**Landlord**")


**And:**       Big Band Networks Ltd.
(the "**Tenant**")


**WHEREAS:**       On 25.7.07, the Company and the Tenant signed a Agreement in accordance with which the Company let to the Tenant Premises in the building known as Beit Arazim at 28 HaBarzel Street in Tel Aviv (hereinafter: the "**Agreement**"). The Agreement is attached to this addendum as Appendix A and is an integral part of it (even if it is not attached thereof);


**AND WHEREAS:**       The Premises, as defined in the Agreement, contains 4 floors at the shell form, warehouses on floors -2 and -3 and 175 parking spaces in basements levels -2 and -3, within finishing according to specifications attached to the Agreement as Appendix C;


**AND WHEREAS:**       the Tenant has is interested in renting additional parking spaces and warehouses from the Company, and the Company is interested in leasing to the Tenant the aforementioned facilities, all in the manner and on the terms stipulated in this Addendum as follows:


### It is, therefore, agreed, stipulated and declared that:


1.   The preamble to this Addendum constitutes an integral part of it.


2.   The appendixes attached to this Addendum constitute an integral part of it.


3.   This Addendum comprises an inseparable part of the Agreement, and all its terminology will be interpreted as per their meaning in the Agreement unless other noted explicitly in this Addendum.


4.   In this Addendum to the Agreement:


    4.1   "The Additional Parking Spaces" – 57 parking spaces on basement -1 level of the building marked in yellow on the plan attached to this Addendum as Appendix B.


    4.2   "The Additional Warehouses" – warehouses on basement level -1 of the building with a total floor space of 141 sq.m., and that are marked in green on the plan as warehouses 8, 9 and 9a.


Source: BigBand Networks, In, 10-K, March 12, 2008

The Additional Parking Spaces and Additional Warehouses, together, will hereinafter be defined as: "the Additional Areas".

5.   The Landlord undertakes to convert the storage areas on level -1, and marked on the plan, attached as Appendix B to the Addendum, as warehouses 4, 5, 6, 10, 11, to parking spaces. Conversion of the warehouses to parking spaces, as said, will be performed subject to obtaining approval from the relevant authorities, and will commence after the obtainment of a "form 4" for the building and will be completed 60 days after receipt of the said approval from the authorities (the "**Completion Date**").

6.   The Company hereby agrees that, upon the Completion Date, it will lease to the Tenant, and the Tenant hereby agrees that, upon the Completion Date, it will rent from the Company the Additional Areas, in accordance with the conditions detailed in this Addendum.

7.   7.1   In consideration of renting the Additional Parking Spaces, the Tenant shall pay the Company monthly rental fees of NIS 440 plus VAT for each parking space, totaling NIS 25,080 plus VAT.

     7.2   In consideration of renting the Additional Warehouses, the Tenant shall pay the Company monthly rental fees of NIS 30 plus VAT for each square meter of warehouse space, totaling NIS 4,230 plus VAT.

     The above sums shall be linked to the consumer price index in accordance with that said in the Agreement, and will be added to the Rental Fees included in the Agreement.

8.   Subject to this Addendum, the Additional Warehouses will be an integral part of "the Warehouses", as defined in the Agreement and the Additional Parking spaces will constitute an integral part of the "Parking Spaces" as defined in the Agreement, and all the provisions of the Agreement will apply to them, as if they were included in it from the outset.

9.   It is clarified that the Landlord retains the right to install an elevator in the area between Warehouses 9 and Warehouse 9a which will serve the front commercial areas. The Tenant undertakes to allow pedestrian access to this elevator from the parking area outside the Big Band parking compound.

10.  If, in the future, areas within the Big Band parking area are converted into warehouses, the rental fees for them will be calculated in accordance with the warehouse fees determined in the agreement.

**In witness whereof the parties have hereunto set their hands**

| /s/   Shoki Sharon | |
| /s/   Amit Yolevtish | /s/   Robert Horton |
| A. Dori Engineering Works Ltd. | Big Band Networks Ltd. |

Source: BigBand Networks, In, 10-K, March 12, 2008

EXHIBIT 21.1

**BIGBAND NETWORKS, INC.**
Direct Subsidiaries at December 31, 2007

Foreign and Domestic

| Subsidiary | Jurisdiction |
| --- | --- |
| BigBand Networks International, Inc. | Delaware |
| BigBand Networks Ltd. | Israel |
| Bigband Networks (Shenzhen) Co. Ltd. | People's Republic of China |
| BigBand Deutschland GmbH (subsidiary of BigBand Networks International, Inc.) | Germany |
| BigBand Networks UK Limited (subsidiary of BigBand Networks International, Inc.) | United Kingdom |

**EXHIBIT 23.1**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the Registration Statement (Form S-8 No. 333-141401) pertaining to the 1999 Share Option and Incentive Plan , 2001 Share Option and Incentive Plan, 2003 Share Option and Incentive Plan, 2004 Share Option and Incentive Sub-Plan for Israeli Employees, 2007 Equity Incentive Plan, and Employee Stock Purchase Plan of BigBand Networks, Inc. of our report dated March 10, 2008, with respect to the consolidated financial statements of BigBand Networks, Inc. included in this Annual Report (Form 10-K) for the year ended December 31, 2007.

/s/ ERNST & YOUNG LLP

Palo Alto, California
March 10, 2008

Exhibit 31.1

## SARBANES-OXLEY SECTION 302(a) CERTIFICATION

I, Amir Bassan-Eskenazi, certify that:

1. I have reviewed this annual report on Form 10-K of BigBand Networks, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   AMIR BASSAN-ESKENAZI
Amir Bassan-Eskenazi
President, Chief Executive Officer and
Chairman of the Board

March 11, 2008

Exhibit 31.2

## SARBANES-OXLEY SECTION 302(a) CERTIFICATION

I, Ravi Narula certify that:

1. I have reviewed this annual report on Form 10-K of BigBand Networks, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.


/s/   RAVI NARULA
Ravi Narula
Chief Accounting Officer

March 11, 2008

Exhibit 32.1

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER AND CHIEF ACCOUNTING OFFICER**
**PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Amir Bassan-Eskenazi certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report of BigBand Networks, Inc. on Form 10-K for the year ended December 31, 2007 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Form 10-K fairly presents in all material respects the financial condition and results of operations of BigBand Networks, Inc.

By:      /s/   AMIR BASSAN-ESKENAZI
Name:          **Amir Bassan-Eskenazi**
Title:          **President, Chief Executive Officer and**
               **Chairman of the Board**

March 11, 2008

I, Ravi Narula, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report of BigBand Networks, Inc. on Form 10-K for the year ended December 31, 2007 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Form 10-K fairly presents in all material respects the financial condition and results of operations of BigBand Networks, Inc.

By:      /s/   RAVI NARULA
Name:          **Ravi Narula**
Title:          **Chief Accounting Officer**

March 11, 2008

Created by 10KWizard   www.10KWizard.com