Exhibit F

Part 2 of 2

Exhibit 10.6A

**BIGBAND NETWORKS, INC.**
**2007 EQUITY INCENTIVE PLAN**
**NOTICE OF GRANT OF STOCK OPTION**

Unless otherwise defined herein, the terms defined in the 2007 Equity Incentive Plan (the "Plan") will have the same defined meanings in this Notice of Grant of Stock Option (the "Notice of Grant") and Terms and Conditions of Stock Option Grant, attached hereto as Exhibit A (together, the "Agreement").

**Participant:**

**Address:**

Participant has been granted an Option to purchase Common Stock of the Company, subject to the terms and conditions of the Plan and this Agreement, as follows:

Grant Number

Date of Grant

Vesting Commencement Date

Number of Shares Granted

Exercise Price per Share

Total Exercise Price

Type of Option

Term/Expiration Date

Vesting Schedule:

Subject to accelerated vesting as set forth below or in the Plan, this Option will be exercisable, in whole or in part, in accordance with the following schedule:

Termination Period:

This Option will be exercisable for three (3) months after Participant ceases to be a Service Provider, unless such termination is due to Participant's death or Disability, in which case this Option will be exercisable for twelve (12) months after Participant ceases to be a Service Provider.

Notwithstanding the foregoing, in no event may this Option be exercised after the Term/Expiration Date as provided above and may be subject to earlier termination as provided in Section 13(c) of the Plan.

By Participant's signature and the signature of the Company's representative below, Participant and the Company agree that this Option is granted under and governed by the terms and conditions of the Plan and this Agreement. Participant has reviewed the Plan and this Agreement in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Agreement and fully understands all provisions of the Plan and Agreement. Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions relating to the Plan and Agreement. Participant further agrees to notify the Company upon any change in the residence address indicated below.

PARTICIPANT                                                BIGBAND NETWORKS, INC.

_____                          _____
Signature                                                  By

_____                          _____
                                                           Title

-2-

Source: BigBand Networks, In, 10-Q, August 10, 2007

**EXHIBIT A**

**TERMS AND CONDITIONS OF STOCK OPTION GRANT**

1. Grant. The Company hereby grants to the Participant named in the Notice of Grant (the "Participant") an option (the "Option") to purchase the number of Shares, as set forth in the Notice of Grant, at the exercise price per Share set forth in the Notice of Grant (the "Exercise Price"), subject to all of the terms and conditions in this Agreement and the Plan, which is incorporated herein by reference. Subject to Section 18(c) of the Plan, in the event of a conflict between the terms and conditions of the Plan and the terms and conditions of this Agreement, the terms and conditions of the Plan will prevail.

If designated in the Notice of Grant as an Incentive Stock Option ("ISO"), this Option is intended to qualify as an ISO under Section 422 of the Code. However, if this Option is intended to be an ISO, to the extent that it exceeds the $100,000 rule of Code Section 422(d) it will be treated as a Nonstatutory Stock Option ("NSO").

2. Vesting Schedule. Except as provided in Section 3, the Option awarded by this Agreement will vest in accordance with the vesting provisions set forth in the Notice of Grant. Shares scheduled to vest on a certain date or upon the occurrence of a certain condition will not vest in Participant in accordance with any of the provisions of this Agreement, unless Participant will have been continuously a Service Provider from the Date of Grant until the date such vesting occurs.

3. Administrator Discretion. The Administrator, in its discretion, may accelerate the vesting of the balance, or some lesser portion of the balance, of the unvested Option at any time, subject to the terms of the Plan. If so accelerated, such Option will be considered as having vested as of the date specified by the Administrator.

4. Exercise of Option. This Option may be exercised only within the term set out in the Notice of Grant, and may be exercised during such term only in accordance with the Plan and the terms of this Agreement.

This Option is exercisable by delivery of an exercise notice, in the form provided by the Company (the "Exercise Notice") or in a manner and pursuant to such procedures as the Administrator may determine, which will state the election to exercise the Option, the number of Shares in respect of which the Option is being exercised (the "Exercised Shares"), and such other representations and agreements as may be required by the Company pursuant to the provisions of the Plan. The Exercise Notice will be completed by Participant and delivered to the Company. The Exercise Notice will be accompanied by payment of the aggregate Exercise Price as to all Exercised Shares together with any applicable tax withholding. This Option will be deemed to be exercised upon receipt by the Company of such fully executed Exercise Notice accompanied by such aggregate Exercise Price.

5. Method of Payment. Payment of the aggregate Exercise Price will be by any of the following, or a combination thereof, at the election of Participant:

(a) cash;

-3-

Source: BigBand Networks, In, 10-Q, August 10, 2007

(b) check;

(c) consideration received by the Company under a formal cashless exercise program adopted by the Company in connection with the Plan; or

(d) surrender of other Shares, provided Shares acquired directly or indirectly from the Company, (A) have been owned by the Participant and not subject to a substantial risk of forfeiture for more than six (6) months on the date of surrender, and (B) have a Fair Market Value on the date of surrender equal to the aggregate Exercise Price of the Exercised Shares.

6. Tax Obligations.

(a) Withholding of Taxes. Notwithstanding any contrary provision of this Agreement, no certificate representing the Shares will be issued to Participant, unless and until satisfactory arrangements (as determined by the Administrator) will have been made by Participant with respect to the payment of income, employment and other taxes which the Company determines must be withheld with respect to such Shares. To the extent determined appropriate by the Company in its discretion, it shall have the right (but not the obligation) to satisfy any tax withholding obligations by reducing the number of Shares otherwise deliverable to Participant. If Participant fails to make satisfactory arrangements for the payment of any required tax withholding obligations hereunder at the time of the Option exercise, Participant acknowledges and agrees that the Company may refuse to honor the exercise and refuse to deliver Shares if such withholding amounts are not delivered at the time of exercise.

(b) Notice of Disqualifying Disposition of ISO Shares. If the Option granted to Participant herein is an ISO, and if Participant sells or otherwise disposes of any of the Shares acquired pursuant to the ISO on or before the later of (i) the date two (2) years after the Grant Date, or (ii) the date one (1) year after the date of exercise, Participant will immediately notify the Company in writing of such disposition. Participant agrees that Participant may be subject to income tax withholding by the Company on the compensation income recognized by Participant.

(c) Code Section 409A. Under Code Section 409A, an option that vests after December 31, 2004 that was granted with a per Share exercise price that is determined by the Internal Revenue Service (the "IRS") to be less than the Fair Market Value of a Share on the date of grant (a "Discount Option") may be considered "deferred compensation." A Discount Option may result in (i) income recognition by Participant prior to the exercise of the option, (ii) an additional twenty percent (20%) federal income tax, and (iii) potential penalty and interest charges. The Discount Option may also result in additional state income, penalty and interest charges to the Participant. Participant acknowledges that the Company cannot and has not guaranteed that the IRS will agree that the per Share exercise price of this Option equals or exceeds the Fair Market Value of a Share on the Date of Grant in a later examination. Participant agrees that if the IRS determines that the Option was granted with a per Share exercise price that was less than the Fair Market Value of a Share on the date of grant, Participant will be solely responsible for Participant's costs related to such a determination.

-4-

Source: BigBand Networks, In, 10-Q, August 10, 2007

7. <u>Rights as Stockholder</u>. Neither Participant nor any person claiming under or through Participant will have any of the rights or privileges of a stockholder of the Company in respect of any Shares deliverable hereunder unless and until certificates representing such Shares will have been issued, recorded on the records of the Company or its transfer agents or registrars, and delivered to Participant. After such issuance, recordation and delivery, Participant will have all the rights of a stockholder of the Company with respect to voting such Shares and receipt of dividends and distributions on such Shares.

8. <u>No Guarantee of Continued Service</u>. PARTICIPANT ACKNOWLEDGES AND AGREES THAT THE VESTING OF SHARES PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY CONTINUING AS A SERVICE PROVIDER AT THE WILL OF THE COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR RETAINING PARTICIPANT) AND NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THE OPTION OR ACQUIRING SHARES HEREUNDER. PARTICIPANT FURTHER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND WILL NOT INTERFERE IN ANY WAY WITH PARTICIPANT'S RIGHT OR THE RIGHT OF THE COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR RETAINING PARTICIPANT) TO TERMINATE PARTICIPANT'S RELATIONSHIP AS A SERVICE PROVIDER AT ANY TIME, WITH OR WITHOUT CAUSE.

9. <u>Address for Notices</u>. Any notice to be given to the Company under the terms of this Agreement will be addressed to the Company at BigBand Networks, Inc., 475 Broadway Street, Redwood City, CA 94063, or at such other address as the Company may hereafter designate in writing.

10. <u>Grant is Not Transferable</u>. This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Participant only by Participant.

11. <u>Binding Agreement</u>. Subject to the limitation on the transferability of this grant contained herein, this Agreement will be binding upon and inure to the benefit of the heirs, legatees, legal representatives, successors and assigns of the parties hereto.

12. <u>Additional Conditions to Issuance of Stock</u>. If at any time the Company will determine, in its discretion, that the listing, registration or qualification of the Shares upon any securities exchange or under any state or federal law, or the consent or approval of any governmental regulatory authority is necessary or desirable as a condition to the issuance of Shares to Participant (or his or her estate), such issuance will not occur unless and until such listing, registration, qualification, consent or approval will have been effected or obtained free of any conditions not acceptable to the Company. The Company will make all reasonable efforts to meet the requirements of any such state or federal law or securities exchange and to obtain any such consent or approval of any such governmental authority. Assuming such compliance, for income tax purposes the

-5-

Source: BigBand Networks, In, 10-Q, August 10, 2007

Exercised Shares will be considered transferred to Participant on the date the Option is exercised with respect to such Exercised Shares.

13. Plan Governs. This Agreement is subject to all terms and provisions of the Plan. In the event of a conflict between one or more provisions of this Agreement and one or more provisions of the Plan, the provisions of the Plan will govern. Capitalized terms used and not defined in this Agreement will have the meaning set forth in the Plan.

14. Administrator Authority. The Administrator will have the power to interpret the Plan and this Agreement and to adopt such rules for the administration, interpretation and application of the Plan as are consistent therewith and to interpret or revoke any such rules (including, but not limited to, the determination of whether or not any Shares subject to the Option have vested). All actions taken and all interpretations and determinations made by the Administrator in good faith will be final and binding upon Participant, the Company and all other interested persons. No member of the Administrator will be personally liable for any action, determination or interpretation made in good faith with respect to the Plan or this Agreement.

15. Electronic Delivery. The Company may, in its sole discretion, decide to deliver any documents related to Options awarded under the Plan or future Options that may be awarded under the Plan by electronic means or request Participant's consent to participate in the Plan by electronic means. Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through any on-line or electronic system established and maintained by the Company or another third party designated by the Company.

16. Captions. Captions provided herein are for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.

17. Agreement Severable. In the event that any provision in this Agreement will be held invalid or unenforceable, such provision will be severable from, and such invalidity or unenforceability will not be construed to have any effect on, the remaining provisions of this Agreement.

18. Modifications to the Agreement. This Agreement constitutes the entire understanding of the parties on the subjects covered. Participant expressly warrants that he or she is not accepting this Agreement in reliance on any promises, representations, or inducements other than those contained herein. Modifications to this Agreement or the Plan can be made only in an express written contract executed by a duly authorized officer of the Company. Notwithstanding anything to the contrary in the Plan or this Agreement, the Company reserves the right to revise this Agreement as it deems necessary or advisable, in its sole discretion and without the consent of Participant, to comply with Code Section 409A or to otherwise avoid imposition of any additional tax or income recognition under Code Section 409A in connection to this Option.

19. Amendment, Suspension or Termination of the Plan. By accepting this Award, Participant expressly warrants that he or she has received an Option under the Plan, and has received, read and understood a description of the Plan. Participant understands that the Plan is discretionary in nature and may be amended, suspended or terminated by the Company at any time.

-6-

Source: BigBand Networks, In, 10-Q, August 10, 2007

20. <u>Governing Law</u>. This Agreement will be governed by the laws of the State of California, without giving effect to the conflict of law principles thereof. For purposes of litigating any dispute that arises under this Option or this Agreement, the parties hereby submit to and consent to the jurisdiction of the State of California, and agree that such litigation will be conducted in the courts of San Mateo County, California, or the federal courts for the United States for the Northern District of California, and no other courts, where this Option is made and/or to be performed.

-7-

Source: BigBand Networks, In, 10-Q, August 10, 2007

**EXHIBIT B**

**BIGBAND NETWORKS, INC.**

**2007 EQUITY INCENTIVE PLAN**

**EXERCISE NOTICE**

BigBand Networks, Inc.
475 Broadway Street
Redwood City, CA 94063

Attention: Stock Administration

1. Exercise of Option. Effective as of today, _____, the undersigned ("Purchaser") hereby elects to purchase _____ shares (the "Shares") of the Common Stock of BigBand Networks, Inc. (the "Company") under and pursuant to the 2007 Equity Incentive Plan (the "Plan") and the Stock Option Agreement dated _____ (the "Agreement"). The purchase price for the Shares will be $ _____, as required by the Agreement.

2. Delivery of Payment. Purchaser herewith delivers to the Company the full purchase price of the Shares and any required tax withholding to be paid in connection with the exercise of the Option.

3. Representations of Purchaser. Purchaser acknowledges that Purchaser has received, read and understood the Plan and the Agreement and agrees to abide by and be bound by their terms and conditions.

4. Rights as Stockholder. Until the issuance (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company) of the Shares, no right to vote or receive dividends or any other rights as a stockholder will exist with respect to the Shares subject to the Option, notwithstanding the exercise of the Option. The Shares so acquired will be issued to Participant as soon as practicable after exercise of the Option. No adjustment will be made for a dividend or other right for which the record date is prior to the date of issuance, except as provided in Section 13 of the Plan.

5. Tax Consultation. Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the Shares. Purchaser represents that Purchaser has consulted with any tax consultants Purchaser deems advisable in connection with the purchase or disposition of the Shares and that Purchaser is not relying on the Company for any tax advice.

6. Entire Agreement; Governing Law. The Plan and Agreement are incorporated herein by reference. This Exercise Notice, the Plan and the Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior

-8-

undertakings and agreements of the Company and Purchaser with respect to the subject matter hereof, and may not be modified adversely to the Purchaser's interest except by means of a writing signed by the Company and Purchaser. This agreement is governed by the internal substantive laws, but not the choice of law rules, of the State of California.

Submitted by:                                    Accepted by:

PURCHASER                                    BIGBAND NETWORKS, INC.

_____          _____
Signature                                        By

_____          _____
Print Name                                       Its

Address:

_____

_____

                                                 _____
                                                 Date Received

-9-

Exhibit 10.6B

**BIGBAND NETWORKS, INC.**
**2007 EQUITY INCENTIVE PLAN**
**NOTICE OF GRANT OF STOCK OPTION**
**FOR NON-U.S. EMPLOYEES**

Unless otherwise defined herein, the terms defined in the 2007 Equity Incentive Plan (the "Plan") will have the same defined meanings in this Notice of Grant of Stock Option (the "Notice of Grant"), the Terms and Conditions of Stock Option Grant, attached hereto as <u>Exhibit A</u>, and the <u>Exhibit B</u> for Participant's country of residence (if any) (together, the "Agreement").

**Participant:** _____

**Address:** _____
_____

Participant has been granted an Option to purchase Common Stock of the Company, subject to the terms and conditions of the Plan and this Agreement, as follows:

| | |
|---|---|
| Grant Number | _____ |
| Date of Grant | _____ |
| Vesting Commencement Date | _____ |
| Number of Shares Granted | _____ |
| Exercise Price per Share | $ _____ |
| Total Exercise Price | $ _____ |
| Type of Option | Nonstatutory Stock Option |
| Term/Expiration Date | _____ |
| <u>Vesting Schedule</u>: | _____ |

Subject to accelerated vesting as set forth below or in the Plan, this Option will be exercisable, in whole or in part, in accordance with the following schedule:

Source: BigBand Networks, In, 10-Q, August 10, 2007

<u>Termination Period</u>:

This Option will be exercisable for three (3) months after Participant ceases to be a Service Provider, unless such termination is due to Participant's death or Disability, in which case this Option will be exercisable for twelve (12) months after Participant ceases to be a Service Provider. Notwithstanding the foregoing, in no event may this Option be exercised after the Term/Expiration Date as provided above and may be subject to earlier termination as provided in Section 13(c) of the Plan.

By Participant's signature and the signature of the Company's representative below, Participant and the Company agree that this Option is granted under and governed by the terms and conditions of the Plan and this Agreement. Participant has reviewed the Plan and this Agreement in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Agreement and fully understands all provisions of the Plan and Agreement. Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions relating to the Plan and Agreement. Participant further agrees to notify the Company upon any change in the residence address indicated below.

PARTICIPANT                                              BIGBAND NETWORKS, INC.


_____                         _____
Signature                                                By


_____                         _____
Print Name                                               Title

<u>Address</u>:


_____


_____

-2-

Source: BigBand Networks, In, 10-Q, August 10, 2007

**EXHIBIT A**

**TERMS AND CONDITIONS OF STOCK OPTION GRANT**

**FOR NON U.S. EMPLOYEES**

1. <u>Grant</u>. The Company hereby grants to the Participant named in the Notice of Grant (the "Participant") an option (the "Option") to purchase the number of Shares, as set forth in the Notice of Grant, at the exercise price per Share set forth in the Notice of Grant (the "Exercise Price"), subject to all of the terms and conditions in this Agreement and the Plan, which is incorporated herein by reference. Subject to Section 18(c) of the Plan, in the event of a conflict between the terms and conditions of the Plan and the terms and conditions of this Agreement, the terms and conditions of the Plan will prevail.

2. <u>Vesting Schedule</u>. Except as provided in Section 3, the Option awarded by this Agreement will vest in accordance with the vesting provisions set forth in the Notice of Grant. Shares scheduled to vest on a certain date or upon the occurrence of a certain condition will not vest in Participant in accordance with any of the provisions of this Agreement, unless Participant will have been continuously a Service Provider from the Date of Grant until the date such vesting occurs (in accordance with Section 16(l) below).

3. <u>Administrator Discretion</u>. The Administrator, in its discretion, may accelerate the vesting of the balance, or some lesser portion of the balance, of the unvested Option at any time, subject to the terms of the Plan. If so accelerated, such Option will be considered as having vested as of the date specified by the Administrator.

4. <u>Exercise of Option</u>. This Option may be exercised only within the term set out in the Notice of Grant, and may be exercised during such term only in accordance with the Plan and the terms of this Agreement.

This Option is exercisable by delivery of an exercise notice, in the form attached as <u>Exhibit C</u> (the "Exercise Notice") or in a manner and pursuant to such procedures as the Administrator may determine, which will state the election to exercise the Option, the number of Shares in respect of which the Option is being exercised (the "Exercised Shares"), and such other representations and agreements as may be required by the Company pursuant to the provisions of the Plan. The Exercise Notice will be completed by Participant and delivered to the Company. The Exercise Notice will be accompanied by payment of the aggregate Exercise Price as to all Exercised Shares together with any applicable tax withholding as set forth in Section 6 below. This Option will be deemed to be exercised upon receipt by the Company of such fully executed Exercise Notice accompanied by such aggregate Exercise Price.

5. <u>Method of Payment</u>. Payment of the aggregate Exercise Price will be by any of the following, or a combination thereof, at the election of Participant:

    (a) cash;

    (b) check; or

-3-

Source: BigBand Networks, In, 10-Q, August 10, 2007

(c) consideration received by the Company under a formal cashless exercise program adopted by the Company in connection with the Plan.

6. <u>Tax Obligations/Withholding of Taxes</u>. Regardless of any action the Company or Participant's employer (the "Employer") takes with respect to any or all income tax, social security, payroll tax, or other tax-related withholding ("Tax-Related Items"), Participant acknowledges that the ultimate liability for all Tax-Related Items legally due by Participant is and remains his or her responsibility. Furthermore, Participant acknowledges that the Company and/or the Employer (1) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Option, including the grant of the Option, the exercise of the Option, the subsequent sale of Shares acquired under the Plan and the receipt of any dividends; and (2) do not commit to structure the terms of the grant of the Option or any aspect of Participant's participation in the Plan to reduce or eliminate his or her liability for Tax-Related Items.

Prior to the relevant taxable event, Participant shall pay or make adequate arrangements satisfactory to the Company and/or the Employer to satisfy all withholding obligations of the Company and/or the Employer. In this regard, Participant authorizes the Company and/or the Employer to withhold all applicable Tax-Related Items legally payable by Participant from his or her wages or other cash compensation paid by the Company and/or the Employer or from proceeds of the sale of the Shares acquired under the Plan. Alternatively, or in addition, the Company may (1) sell or arrange for the sale of Shares that Participant acquires under the Plan to meet the withholding obligation for Tax-Related Items, and/or (2) withhold in Shares, provided that the Company only withholds the amount of Shares necessary to satisfy the minimum withholding amount. If the Company satisfies the Tax-Related Item withholding obligation by withholding a number of Shares as described herein, Participant will be deemed to have been issued the full number of Shares due to Participant at exercise, notwithstanding that a number of the Shares is held back solely for the purpose of such Tax-Related Items.

Finally, Participant shall pay to the Company or the Employer any amount of Tax-Related Items that the Company or the Employer may be required to withhold as a result of his or her participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to issue Shares under the Plan and refuse to deliver the Shares if Participant fails to comply with his or her obligations in connection with the Tax-Related Items as described in this section.

7. <u>Code Section 409A</u>. Under Code Section 409A, an option that vests after December 31, 2004 that was granted with a per Share exercise price that is determined by the Internal Revenue Service (the "IRS") to be less than the Fair Market Value of a Share on the date of grant (a "Discount Option") may be considered "deferred compensation." A Discount Option may result in (i) income recognition by Participant prior to the exercise of the option, (ii) an additional twenty percent (20%) federal income tax, and (iii) potential penalty and interest charges. The Discount Option may also result in additional state income, penalty and interest charges to the Participant. Participant acknowledges that the Company cannot and has not guaranteed that the IRS will agree that the per Share exercise price of this Option equals or exceeds the Fair Market Value of a Share on the Date of Grant in a later examination. Participant agrees that if the IRS determines that the Option was granted with a per Share exercise price that was less than the Fair Market Value of a

-4-

Share on the date of grant, Participant will be solely responsible for Participant's costs related to such a determination.

8. <u>Rights as Stockholder</u>. Neither Participant nor any person claiming under or through Participant will have any of the rights or privileges of a stockholder of the Company in respect of any Shares deliverable hereunder unless and until certificates representing such Shares will have been issued, recorded on the records of the Company or its transfer agents or registrars, and delivered to Participant. After such issuance, recordation and delivery, Participant will have all the rights of a stockholder of the Company with respect to voting such Shares and receipt of dividends and distributions on such Shares.

9. <u>Address for Notices</u>. Any notice to be given to the Company under the terms of this Agreement will be addressed to the Company at BigBand Networks, Inc., 475 Broadway Street, Redwood City, CA 94063, United States of America, or at such other address as the Company may hereafter designate in writing.

10. <u>Grant is Not Transferable</u>. This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Participant only by Participant.

11. <u>Binding Agreement</u>. Subject to the limitation on the transferability of this grant contained herein, this Agreement will be binding upon and inure to the benefit of the heirs, legatees, legal representatives, successors and assigns of the parties hereto.

12. <u>Additional Conditions to Issuance of Stock</u>. If at any time the Company will determine, in its discretion, that the listing, registration or qualification of the Shares upon any securities exchange or under any state or federal law, or the consent or approval of any governmental regulatory authority is necessary or desirable as a condition to the issuance of Shares to Participant (or his or her estate), such issuance will not occur unless and until such listing, registration, qualification, consent or approval will have been effected or obtained free of any conditions not acceptable to the Company. The Company will make all reasonable efforts to meet the requirements of any such state or federal law or securities exchange and to obtain any such consent or approval of any such governmental authority. Assuming such compliance, for income tax purposes the Exercised Shares will be considered transferred to Participant on the date the Option is exercised with respect to such Exercised Shares.

13. <u>Plan Governs</u>. This Agreement is subject to all terms and provisions of the Plan. In the event of a conflict between one or more provisions of this Agreement and one or more provisions of the Plan, the provisions of the Plan will govern. Capitalized terms used and not defined in this Agreement will have the meaning set forth in the Plan.

14. <u>Administrator Authority</u>. The Administrator will have the power to interpret the Plan and this Agreement and to adopt such rules for the administration, interpretation and application of the Plan as are consistent therewith and to interpret or revoke any such rules (including, but not limited to, the determination of whether or not any Shares subject to the Option have vested). All actions taken and all interpretations and determinations made by the Administrator in good faith will

-5-

Source: BigBand Networks, In, 10-Q, August 10, 2007

be final and binding upon Participant, the Company and all other interested persons. No member of the Administrator will be personally liable for any action, determination or interpretation made in good faith with respect to the Plan or this Agreement.

15. Electronic Delivery. The Company may, in its sole discretion, decide to deliver any documents related to Options awarded under the Plan or future Options that may be awarded under the Plan by electronic means or request Participant's consent to participate in the Plan by electronic means. Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through any on-line or electronic system established and maintained by the Company or another third party designated by the Company.

16. Nature of Option. In accepting the Option, Participant acknowledges and agrees that:

(a) the award of the Option is voluntary and occasional, and does not create any contractual or other right to receive future grants of Options, or benefits in lieu of Options, even if Options have been granted repeatedly in the past;

(b) all decisions with respect to future Option grants, if any, will be at the sole discretion of the Company;

(c) Participant's participation in the Plan is voluntary;

(d) Participant's participation in the Plan shall not create a right to further employment with the Employer and shall not interfere with the ability of the Company or the Employer to terminate Participant's employment relationship at any time;

(e) the Option is an extraordinary item that does not constitute compensation of any kind for services of any kind rendered to the Company or any Subsidiary, and which is outside the scope of Participant's employment or service contract, if any;

(f) the Option is not part of normal or expected compensation or salary for any purposes, including, but not limited to, calculating any severance, resignation, termination, redundancy, end of service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments and in no event should be considered as compensation for, or relating in any way to, past services for the Company or any Subsidiary;

(g) in the event that Participant is not an Employee of the Company, the Option and Participant's participation in the Plan will not be interpreted to form an employment or service contract or relationship with the Company; and furthermore, the Option and Participant's participation in the Plan will not be interpreted to form an employment or service contract with any Subsidiary of the Company;

(h) the future value of the Shares is unknown and cannot be predicted with certainty;

(i) if the Shares do not increase in value, the Option will have no value;

-6-

Source: BigBand Networks, In, 10-Q, August 10, 2007

(j) if Participant exercises the Option and obtains Shares, the value of the Shares obtained upon exercise may increase or decrease in value, even below the Exercise Price;

(k) in consideration of the award of the Option, no claim or entitlement to compensation or damages shall arise from termination of the Option or diminution in value of the Option, or Shares purchased through exercise of the Option, resulting from termination of Participant's employment by the Company or any Subsidiary (for any reason whatsoever and whether or not in breach of local labor laws) and in consideration of the grant of the Option, Participant irrevocably releases the Company and any Subsidiary from any such claim that may arise; if, notwithstanding the foregoing, any such claim is found by a court of competent jurisdiction to have arisen, then, by signing the Notice of Grant, Participant shall be deemed irrevocably to have waived his or her right to pursue or seek remedy for any such claim or entitlement;

(l) in the event of termination of Participant's employment (whether or not in breach of local labor laws), Participant's right to receive Options under the Plan and to vest in such Options, if any, will terminate effective as of the date that Participant is no longer actively employed and will not be extended by any notice period mandated under local law (*e.g.*, active employment would not include a period of "garden leave" or similar period pursuant to local law); furthermore, in the event of termination of Participant's employment (whether or not in breach of local labor laws); Participant's right to exercise the Option after termination of employment, if any, will be measured by the date of termination of active employment and will not be extended by any notice period mandated under local law; the Administrator shall have the exclusive discretion to determine when Participant is no longer actively employed for purposes of this Option;

(m) the Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding Participant's participation in the Plan or Participant's acquisition or sale of the underlying Shares; and

(n) Participant is hereby advised to consult with Participant's own personal tax, legal and financial advisors regarding Participant's participation in the Plan before taking any action related to the Plan.

*17. __Data Privacy__. Participant hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of his or her personal data as described in this Agreement by and among, as necessary and applicable, the Employer, the Company and its Subsidiaries for the exclusive purpose of implementing, administering and managing Participant's participation in the Plan.*

*Participant understands that the Company and the Employer may hold certain personal information about him or her, including, but not limited to, Participant's name, home address and telephone number, date of birth, social security or insurance number or other identification number, salary, nationality, and job title, any Common Stock or directorships held in the Company, and details of the Option or any other entitlement to Shares, canceled, exercised, vested, unvested or outstanding in Participant's favor, for the purpose of implementing, administering and managing the Plan ("Data"). Participant understands that Data may be*

-7-

Source: BigBand Networks, In, 10-Q, August 10, 2007

*transferred to any third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in Participant's country or elsewhere, and that the recipients' country may have different data privacy laws and protections than Participant's country. Participant authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing Participant's participation in the Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom Participant may elect to deposit any Shares acquired upon exercise of the Option.*

*Participant understands that he or she may request a list with the names and addresses of any potential recipients of the Data by contacting his or her local human resources representative. Participant understands that Data will be held as long as is reasonably necessary to implement, administer and manage his or her participation in the Plan, and he or she may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing his or her local human resources representative. Such Participants understand, however, that refusing or withdrawing their consent may affect their ability to participate in the Plan. For more information on the consequences of refusal to consent or withdrawal of consent, Participant understands that he or she may contact his or her local human resources representative.*

18. <u>Language</u>. If Participant has received this Agreement or any other document related to the Plan translated into a language other than English and if the translated version is different than the English version, the English version will control, unless otherwise prescribed by local law.

19. <u>Captions</u>. Captions provided herein are for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.

20. <u>Agreement Severable</u>. In the event that any provision in this Agreement will be held invalid or unenforceable, such provision will be severable from, and such invalidity or unenforceability will not be construed to have any effect on, the remaining provisions of this Agreement.

21. <u>Modifications to the Agreement</u>. This Agreement constitutes the entire understanding of the parties on the subjects covered. Participant expressly warrants that he or she is not accepting this Agreement in reliance on any promises, representations, or inducements other than those contained herein. Modifications to this Agreement or the Plan can be made only in an express written contract executed by a duly authorized officer of the Company. Notwithstanding anything to the contrary in the Plan or this Agreement, the Company reserves the right to revise this Agreement as it deems necessary or advisable, in its sole discretion and without the consent of Participant, to comply with Code Section 409A or to otherwise avoid imposition of any additional tax or income recognition under Code Section 409A in connection to this award of Options.

22. <u>Amendment, Suspension or Termination of the Plan</u>. By accepting this Award, Participant expressly warrants that he or she has received an Option under the Plan, and has received, read and understood a description of the Plan. Participant understands that the Plan is

-8-

Source: BigBand Networks, In, 10-Q, August 10, 2007

established voluntarily by the Company, is discretionary in nature and may be amended, suspended or terminated by the Company at any time.

23. Exhibit B. Notwithstanding any provision herein or in the Notice of Grant, the award of the Option shall be subject to any additional terms and conditions as set forth in the Exhibit B for Participant's country of residence, if any.

24. Governing Law. This Agreement will be governed by the laws of the State of California, without giving effect to the conflict of law principles thereof. For purposes of litigating any dispute that arises under this Option or this Agreement, the parties hereby submit to and consent to the jurisdiction of the State of California, and agree that such litigation will be conducted in the courts of San Mateo County, California, or the federal courts for the United States for the Northern District of California, and no other courts, where this Option is made and/or to be performed.

-9-

Source: BigBand Networks, In, 10-Q, August 10, 2007

**EXHIBIT B**

**BIGBAND NETWORKS, INC.**

**2007 EQUITY INCENTIVE PLAN**

**ADDITIONAL TERMS AND CONDITIONS OF STOCK OPTION GRANT**

This Exhibit B has been prepared to provide Participant with a summary of certain important information regarding participation in the Plan in Participant's country of residence.

This Exhibit B is based on the tax and other laws concerning Options in effect as of June 2007. Such laws are often complex and change frequently. As a result, the information contained in this Exhibit B may be out of date at the time Participant exercises Options or sells Shares he or she acquires under the Plan.

In addition, this Exhibit B is general in nature. It is not intended to serve as specific tax or investment advice and does not discuss all of the various laws, rules and regulations that may apply. It may not apply to Participant's particular tax or financial situation, and the Company is not in a position to assure Participant of any particular tax result. **Accordingly, Participant is strongly advised to seek appropriate professional advice as to how the tax or other laws in Participant's country apply to Participant's specific situation.**

*If Participant is a citizen or resident of another country, or is considered a resident of another country for local law purposes, the information contained in this Exhibit B may not be applicable to Participant.*

-10-

**<u>EXHIBIT B</u>**

**BIGBAND NETWORKS, INC.**

**2007 EQUITY INCENTIVE PLAN**

**ADDITIONAL TERMS AND CONDITIONS OF STOCK OPTION GRANT**

**[Local Tax Information]**

-11-

Exhibit 10.6C

**BIGBAND NETWORKS, INC.**

**2007 EQUITY INCENTIVE PLAN**

**NOTICE OF GRANT OF RESTRICTED STOCK UNITS**

Unless otherwise defined herein, the terms defined in the 2007 Equity Incentive Plan (the "Plan") will have the same defined meanings in this Notice of Grant of Restricted Stock Units (the "Notice of Grant") and Terms and Conditions of Restricted Stock Grant, attached hereto as <u>Exhibit A</u> (together, the "Agreement").

**Participant:** _____

**Address:** _____

Participant has been granted the right to receive an Award of Restricted Stock Units, subject to the terms and conditions of the Plan and this Agreement, as follows:

Grant Number                              _____

Date of Grant                             _____

Vesting Commencement Date                 _____

Number of Restricted Stock Units          _____

<u>Vesting Schedule</u>:                          _____

Subject to any acceleration provisions contained in the Plan or set forth below, the Restricted Stock Unit will vest in accordance with the following schedule:

[VESTING SCHEDULE.]

In the event Participant ceases to be a Service Provider for any or no reason before Participant vests in the Restricted Stock Units, the Restricted Stock Units and Participant's right to acquire any Shares hereunder will immediately terminate.

By Participant's signature and the signature of the Company's representative below, Participant and the Company agree that this Award of Restricted Stock Units is granted under and governed by the terms and conditions of the Plan and this Agreement. Participant has reviewed the Plan and this Agreement in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Agreement and fully understands all provisions of the Plan and Agreement. Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions relating to the Plan and Agreement. Participant further agrees to notify the Company upon any change in the residence address indicated below.

-1-

PARTICIPANT                                        BIGBAND NETWORKS, INC.

_____                 _____
Signature                                          By

_____                 _____
Print Name                                         Title

<u>Address</u>:

_____

_____

-2-

Source: BigBand Networks, In, 10-Q, August 10, 2007

## EXHIBIT A

### TERMS AND CONDITIONS OF RESTRICTED STOCK UNIT GRANT

1. <u>Grant</u>. The Company hereby grants to the Participant named in the Notice of Grant (the "Participant") under the Plan an Award of Restricted Stock Units, subject to all of the terms and conditions in this Agreement and the Plan, which is incorporated herein by reference. Subject to Section 18(c) of the Plan, in the event of a conflict between the terms and conditions of the Plan and the terms and conditions of this Agreement, the terms and conditions of the Plan will prevail.

2. <u>Company's Obligation to Pay</u>. Each Restricted Stock Unit represents the right to receive a Share on the date it vests. Unless and until the Restricted Stock Units will have vested in the manner set forth in Section 3, Participant will have no right to payment of any such Restricted Stock Units. Prior to actual payment of any vested Restricted Stock Units, such Restricted Stock Unit will represent an unsecured obligation of the Company, payable (if at all) only from the general assets of the Company. Any Restricted Stock Units that vest in accordance with Sections 3 or 4 will be paid to Participant (or in the event of Participant's death, to his or her estate) in whole Shares, subject to Participant satisfying any applicable tax withholding obligations as set forth in Section 6.

3. <u>Vesting Schedule</u>. Except as provided in Section 4, and subject to Section 5, the Restricted Stock Units awarded by this Agreement will vest in accordance with the vesting provisions set forth in the Notice of Grant. Restricted Stock Units scheduled to vest on a certain date or upon the occurrence of a certain condition will not vest in Participant in accordance with any of the provisions of this Agreement, unless Participant will have been continuously a Service Provider from the Date of Grant until the date such vesting occurs.

4. <u>Administrator Discretion</u>. The Administrator, in its discretion, may accelerate the vesting of the balance, or some lesser portion of the balance, of the unvested Restricted Stock Units at any time, subject to the terms of the Plan. If so accelerated, such Restricted Stock Units will be considered as having vested as of the date specified by the Administrator.

5. <u>Forfeiture upon Termination of Status as a Service Provider</u>. Notwithstanding any contrary provision of this Agreement, the balance of the Restricted Stock Units that have not vested as of the time of Participant's termination as a Service Provider for any or no reason and Participant's right to acquire any Shares hereunder will immediately terminate.

6. <u>Death of Participant</u>. Any distribution or delivery to be made to Participant under this Agreement will, if Participant is then deceased, be made to Participant's designated beneficiary, or if no beneficiary survives Participant, the administrator or executor of Participant's estate. Any such transferee must furnish the Company with (a) written notice of his or her status as transferee, and (b) evidence satisfactory to the Company to establish the validity of the transfer and compliance with any laws or regulations pertaining to said transfer.

7. <u>Withholding of Taxes</u>. Notwithstanding any contrary provision of this Agreement, no certificate representing the Shares will be issued to Participant, unless and until satisfactory arrangements (as determined by the Administrator) will have been made by

-3-

Source: BigBand Networks, In, 10-Q, August 10, 2007

Participant with respect to the payment of income, employment and other taxes which the Company determines must be withheld with respect to such Shares. To the extent determined appropriate by the Company in its discretion, it shall have the right (but not the obligation) to satisfy any tax withholding obligations by reducing the number of Shares otherwise deliverable to Participant. If Participant fails to make satisfactory arrangements for the payment of any required tax withholding obligations hereunder at the time any applicable Restricted Stock Units otherwise are scheduled to vest pursuant to Sections 3 or 4, Participant will permanently forfeit such Restricted Stock Units and any right to receive Shares thereunder and the Restricted Stock Units will be returned to the Company at no cost to the Company.

     8. Rights as Stockholder. Neither Participant nor any person claiming under or through Participant will have any of the rights or privileges of a stockholder of the Company in respect of any Shares deliverable hereunder unless and until certificates representing such Shares will have been issued, recorded on the records of the Company or its transfer agents or registrars, and delivered to Participant. After such issuance, recordation and delivery, Participant will have all the rights of a stockholder of the Company with respect to voting such Shares and receipt of dividends and distributions on such Shares.

     **9. No Guarantee of Continued Service. PARTICIPANT ACKNOWLEDGES AND AGREES THAT THE VESTING OF THE RESTRICTED STOCK UNITS PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY CONTINUING AS A SERVICE PROVIDER AT THE WILL OF THE COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR RETAINING PARTICIPANT) AND NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THIS AWARD OF RESTRICTED STOCK UNITS OR ACQUIRING SHARES HEREUNDER. PARTICIPANT FURTHER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND WILL NOT INTERFERE IN ANY WAY WITH PARTICIPANT'S RIGHT OR THE RIGHT OF THE COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR RETAINING PARTICIPANT) TO TERMINATE PARTICIPANT'S RELATIONSHIP AS A SERVICE PROVIDER AT ANY TIME, WITH OR WITHOUT CAUSE.**

     10. Address for Notices. Any notice to be given to the Company under the terms of this Agreement will be addressed to the Company at BigBand Networks, Inc., 475 Broadway Street, Redwood City, CA 94063, or at such other address as the Company may hereafter designate in writing.

     11. Grant is Not Transferable. Except to the limited extent provided in Section 6, this grant and the rights and privileges conferred hereby will not be transferred, assigned, pledged or hypothecated in any way (whether by operation of law or otherwise) and will not be subject to sale under execution, attachment or similar process. Upon any attempt to transfer, assign, pledge, hypothecate or otherwise dispose of this grant, or any right or privilege conferred hereby, or upon any attempted sale under any execution, attachment or similar process, this grant and the rights and privileges conferred hereby immediately will become null and void.

-4-

12. <u>Binding Agreement</u>. Subject to the limitation on the transferability of this grant contained herein, this Agreement will be binding upon and inure to the benefit of the heirs, legatees, legal representatives, successors and assigns of the parties hereto.

13. <u>Additional Conditions to Issuance of Stock</u>. If at any time the Company will determine, in its discretion, that the listing, registration or qualification of the Shares upon any securities exchange or under any state or federal law, or the consent or approval of any governmental regulatory authority is necessary or desirable as a condition to the issuance of Shares to Participant (or his or her estate), such issuance will not occur unless and until such listing, registration, qualification, consent or approval will have been effected or obtained free of any conditions not acceptable to the Company. Where the Company determines that the delivery of the payment of any Shares will violate federal securities laws or other applicable laws, the Company will defer delivery until the earliest date at which the Company reasonably anticipates that the delivery of Shares will no longer cause such violation. The Company will make all reasonable efforts to meet the requirements of any such state or federal law or securities exchange and to obtain any such consent or approval of any such governmental authority.

14. <u>Plan Governs</u>. This Agreement is subject to all terms and provisions of the Plan. In the event of a conflict between one or more provisions of this Agreement and one or more provisions of the Plan, the provisions of the Plan will govern. Capitalized terms used and not defined in this Agreement will have the meaning set forth in the Plan.

15. <u>Administrator Authority</u>. The Administrator will have the power to interpret the Plan and this Agreement and to adopt such rules for the administration, interpretation and application of the Plan as are consistent therewith and to interpret or revoke any such rules (including, but not limited to, the determination of whether or not any Restricted Stock Units have vested). All actions taken and all interpretations and determinations made by the Administrator in good faith will be final and binding upon Participant, the Company and all other interested persons. No member of the Administrator will be personally liable for any action, determination or interpretation made in good faith with respect to the Plan or this Agreement.

16. <u>Electronic Delivery</u>. The Company may, in its sole discretion, decide to deliver any documents related to Restricted Stock Units awarded under the Plan or future Restricted Stock Units that may be awarded under the Plan by electronic means or request Participant's consent to participate in the Plan by electronic means. Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through any on-line or electronic system established and maintained by the Company or another third party designated by the Company.

17. <u>Captions</u>. Captions provided herein are for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.

18. <u>Agreement Severable</u>. In the event that any provision in this Agreement will be held invalid or unenforceable, such provision will be severable from, and such invalidity or unenforceability will not be construed to have any effect on, the remaining provisions of this Agreement.

-5-

19. <u>Modifications to the Agreement</u>. This Agreement constitutes the entire understanding of the parties on the subjects covered. Participant expressly warrants that he or she is not accepting this Agreement in reliance on any promises, representations, or inducements other than those contained herein. Modifications to this Agreement or the Plan can be made only in an express written contract executed by a duly authorized officer of the Company. Notwithstanding anything to the contrary in the Plan or this Agreement, the Company reserves the right to revise this Agreement as it deems necessary or advisable, in its sole discretion and without the consent of Participant, to comply with Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") or to otherwise avoid imposition of any additional tax or income recognition under Section 409A of the Code in connection to this Award of Restricted Stock Units.

20. <u>Amendment, Suspension or Termination of the Plan</u>. By accepting this Award, Participant expressly warrants that he or she has received an Award of Restricted Stock Units under the Plan, and has received, read and understood a description of the Plan. Participant understands that the Plan is discretionary in nature and may be amended, suspended or terminated by the Company at any time.

21. <u>Governing Law</u>. This Agreement shall be governed by the laws of the State of California, without giving effect to the conflict of law principles thereof. For purposes of litigating any dispute that arises under this Award of Restricted Stock Units or this Agreement, the parties hereby submit to and consent to the jurisdiction of the State of California, and agree that such litigation shall be conducted in the courts of San Mateo County, California, or the federal courts for the United States for the Northern District of California, and no other courts, where this Award of Restricted Stock Units is made and/or to be performed.

-6-

Source: BigBand Networks, In, 10-Q, August 10, 2007

Exhibit 10.6D

**BIGBAND NETWORKS, INC.**

**2007 EQUITY INCENTIVE PLAN**

**NOTICE OF GRANT OF RESTRICTED STOCK UNITS**

**FOR NON-U.S. EMPLOYEES**

Unless otherwise defined herein, the terms defined in the 2007 Equity Incentive Plan (the "Plan") will have the same defined meanings in this Notice of Grant of Restricted Stock Units (the "Notice of Grant"), the Terms and Conditions of Restricted Stock Unit Grant, attached hereto as <u>Exhibit A</u>, and the Exhibit B for Participant's country of residence (if any) (together, the "Agreement").

**Participant:** _____

**Address:** _____

_____

Participant has been granted the right to receive an Award of Restricted Stock Units, subject to the terms and conditions of the Plan and this Agreement, as follows:

Grant Number _____

Date of Grant _____

Vesting Commencement Date _____

Number of Restricted Stock Units _____

<u>Vesting Schedule</u>:

Subject to any acceleration provisions contained in the Plan or set forth below, the Restricted Stock Unit will vest in accordance with the following schedule:

[VESTING SCHEDULE.]

In the event Participant ceases to be a Service Provider for any or no reason before Participant vests in the Restricted Stock Units, the Restricted Stock Units and Participant's right to acquire any Shares hereunder will immediately terminate.

By Participant's signature and the signature of the Company's representative below, Participant and the Company agree that this Award of Restricted Stock Units is granted under and governed by the terms and conditions of the Plan and this Agreement. Participant has reviewed the Plan and this Agreement in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Agreement and fully understands all provisions of the Plan and Agreement. Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions relating to the Plan and Agreement. Participant further agrees to notify the Company upon any change in the residence

-1-

Source: BigBand Networks, In, 10-Q, August 10, 2007

address indicated below.

PARTICIPANT                                          BIGBAND NETWORKS, INC.

_____                          _____
Signature                                            By

_____                          _____
Print Name                                           Title

Address:

_____

_____

-2-

Source: BigBand Networks, In, 10-Q, August 10, 2007

**EXHIBIT A**

**TERMS AND CONDITIONS OF RESTRICTED STOCK UNIT GRANT**

**FOR NON U.S. EMPLOYEES**

1. <u>Grant</u>. The Company hereby grants to the Participant named in the Notice of Grant (the "Participant") under the Plan an Award of Restricted Stock Units, subject to all of the terms and conditions in this Agreement and the Plan, which is incorporated herein by reference. Subject to Section 18(c) of the Plan, in the event of a conflict between the terms and conditions of the Plan and the terms and conditions of this Agreement, the terms and conditions of the Plan will prevail.

2. <u>Company's Obligation to Pay</u>. Each Restricted Stock Unit represents the right to receive a Share on the date it vests. Unless and until the Restricted Stock Units will have vested in the manner set forth in Section 3, Participant will have no right to payment of any such Restricted Stock Units. Prior to actual payment of any vested Restricted Stock Units, such Restricted Stock Unit will represent an unsecured obligation of the Company, payable (if at all) only from the general assets of the Company. Any Restricted Stock Units that vest in accordance with Sections 3 or 4 will be paid to Participant (or in the event of Participant's death, to his or her estate) in whole Shares, subject to Participant satisfying any applicable tax withholding obligations as set forth in Section 7.

3. <u>Vesting Schedule</u>. Except as provided in Section 4, and subject to Section 5, the Restricted Stock Units awarded by this Agreement will vest in accordance with the vesting provisions set forth in the Notice of Grant. Restricted Stock Units scheduled to vest on a certain date or upon the occurrence of a certain condition will not vest in Participant in accordance with any of the provisions of this Agreement, unless Participant will have been continuously a Service Provider from the Date of Grant until the date such vesting occurs.

4. <u>Administrator Discretion</u>. The Administrator, in its discretion, may accelerate the vesting of the balance, or some lesser portion of the balance, of the unvested Restricted Stock Units at any time, subject to the terms of the Plan. If so accelerated, such Restricted Stock Units will be considered as having vested as of the date specified by the Administrator.

5. <u>Forfeiture upon Termination of Status as a Service Provider</u>. Notwithstanding any contrary provision of this Agreement, the balance of the Restricted Stock Units that have not vested as of the time of Participant's termination as a Service Provider for any or no reason and Participant's right to acquire any Shares hereunder will immediately terminate in accordance with Section 15 (j).

6. <u>Death of Participant</u>. Any distribution or delivery to be made to Participant under this Agreement will, if Participant is then deceased, be made to the administrator or executor of Participant's estate. Any such transferee must furnish the Company with (a) written notice of his or her status as transferee, and (b) evidence satisfactory to the Company to establish the validity of the transfer and compliance with any laws or regulations pertaining to said transfer.

-3-

Source: BigBand Networks, In, 10-Q, August 10, 2007

7. <u>Withholding of Taxes</u>. Regardless of any action the Company or Participant's employer (the "Employer") takes with respect to any or all income tax, social security, payroll tax, or other tax-related withholding ("Tax-Related Items"), Participant acknowledges that the ultimate liability for all Tax-Related Items legally due by Participant is and remains his or her responsibility. Furthermore, Participant acknowledges that the Company and/or the Employer (1) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Restricted Stock Units, including the grant of the Restricted Stock Units, the vesting of the Restricted Stock Units, the delivery of Shares, the subsequent sale of Shares acquired under the Plan and the receipt of any dividends; and (2) do not commit to structure the terms of the grant of the Restricted Stock Units or any aspect of his or her participation in the Plan to reduce or eliminate his or her liability for Tax-Related Items.

Prior to the relevant taxable event, Participant shall pay or make adequate arrangements satisfactory to the Company and/or the Employer to satisfy all withholding obligations of the Company and/or the Employer. In this regard, Participant authorizes the Company and/or the Employer to withhold all applicable Tax-Related Items legally payable by Participant from his or her wages or other cash compensation paid by the Company and/or the Employer or from proceeds of the sale of the Shares acquired under the Plan. Alternatively, or in addition, if permissible under local law, the Company may (1) sell or arrange for the sale of Shares that Participant acquires under the Plan to meet the withholding obligation for Tax-Related Items, and/or (2) withhold in Shares, provided that the Company only withholds the amount of Shares necessary to satisfy the minimum withholding amount. If the Company satisfies the Tax-Related Item withholding obligation by withholding a number of Shares as described herein, Participant will be deemed to have been issued the full number of Shares due to Participant at vesting, notwithstanding that a number of the Shares is held back solely for the purpose of such Tax-Related Items.

Finally, Participant shall pay to the Company or the Employer any amount of Tax-Related Items that the Company or the Employer may be required to withhold as a result of his or her participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to issue Shares and refuse to deliver the Shares if Participant fails to comply with his or her obligations in connection with the Tax-Related Items as described in this section.

8. <u>Rights as Stockholder</u>. Neither Participant nor any person claiming under or through Participant will have any of the rights or privileges of a stockholder of the Company in respect of any Shares deliverable hereunder unless and until certificates representing such Shares will have been issued, recorded on the records of the Company or its transfer agents or registrars, and delivered to Participant. After such issuance, recordation and delivery, Participant will have all the rights of a stockholder of the Company with respect to voting such Shares and receipt of dividends and distributions on such Shares.

9. <u>Address for Notices</u>. Any notice to be given to the Company under the terms of this Agreement will be addressed to the Company at BigBand Networks, Inc., 475 Broadway Street, Redwood City, CA 94063 or at such other address as the Company may hereafter designate in writing.

-4-

Source: BigBand Networks, In, 10-Q, August 10, 2007

10. <u>Grant is Not Transferable</u>. Except to the limited extent provided in Section 6, this grant and the rights and privileges conferred hereby will not be transferred, assigned, pledged or hypothecated in any way (whether by operation of law or otherwise) and will not be subject to sale under execution, attachment or similar process. Upon any attempt to transfer, assign, pledge, hypothecate or otherwise dispose of this grant, or any right or privilege conferred hereby, or upon any attempted sale under any execution, attachment or similar process, this grant and the rights and privileges conferred hereby immediately will become null and void.

11. <u>Binding Agreement</u>. Subject to the limitation on the transferability of this grant contained herein, this Agreement will be binding upon and inure to the benefit of the heirs, legatees, legal representatives, successors and assigns of the parties hereto.

12. <u>Additional Conditions to Issuance of Stock</u>. If at any time the Company will determine, in its discretion, that the listing, registration or qualification of the Shares upon any securities exchange or under any state or federal law, or the consent or approval of any governmental regulatory authority is necessary or desirable as a condition to the issuance of Shares to Participant (or his or her estate), such issuance will not occur unless and until such listing, registration, qualification, consent or approval will have been effected or obtained free of any conditions not acceptable to the Company. Where the Company determines that the delivery of the payment of any Shares will violate federal securities laws or other applicable laws, the Company will defer delivery until the earliest date at which the Company reasonably anticipates that the delivery of Shares will no longer cause such violation. The Company will make all reasonable efforts to meet the requirements of any such state or federal law or securities exchange and to obtain any such consent or approval of any such governmental authority.

13. <u>Plan Governs</u>. This Agreement is subject to all terms and provisions of the Plan. In the event of a conflict between one or more provisions of this Agreement and one or more provisions of the Plan, the provisions of the Plan will govern. Capitalized terms used and not defined in this Agreement will have the meaning set forth in the Plan.

14. <u>Administrator Authority</u>. The Administrator will have the power to interpret the Plan and this Agreement and to adopt such rules for the administration, interpretation and application of the Plan as are consistent therewith and to interpret or revoke any such rules (including, but not limited to, the determination of whether or not any Restricted Stock Units have vested). All actions taken and all interpretations and determinations made by the Administrator in good faith will be final and binding upon Participant, the Company and all other interested persons. No member of the Administrator will be personally liable for any action, determination or interpretation made in good faith with respect to the Plan or this Agreement.

15. <u>Nature of Restricted Stock Units</u>. In accepting the Restricted Stock Units, Participant acknowledges that:

(a) the Award of Restricted Stock Units is voluntary and occasional and does not create any contractual or other right to receive future awards of Restricted Stock Units, or benefits in lieu of Restricted Stock Units, even if Restricted Stock Units have been awarded repeatedly in the past;

-5-

Source: BigBand Networks, In, 10-Q, August 10, 2007

(b) all decisions with respect to future awards, if any, will be at the sole discretion of the Company;

(c) Participant's participation in the Plan is voluntary;

(d) Participant's participation in the Plan shall not create a right to further employment with the Employer and shall not interfere with the ability of the Employer to terminate Participant's employment or service relationship (if any) at any time;

(e) the Award of Restricted Stock Units is an extraordinary item that does not constitute compensation of any kind for services of any kind rendered to the Company or any Subsidiary, and which is outside the scope of Participant's employment or service contract, if any;

(f) the Award of Restricted Stock Units is not part of normal or expected compensation or salary for any purposes, including, but not limited to, calculation of any severance, resignation, termination, redundancy, end of service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments and in no event should be considered as compensation for, or relating in any way to, past services for the Company or any Subsidiary;

(g) in the event that Participant is not an Employee of the Company, the Award of Restricted Stock Units and Participant's participation in the Plan will not be interpreted to form an employment or service contract or relationship with the Company; and, furthermore, the Award of Restricted Stock Units and Participant's participation in the Plan will not be interpreted to form an employment or service contract with any Subsidiary of the Company;

(h) the future value of the underlying Shares is unknown and cannot be predicted with certainty;

(i) in consideration of the Award of Restricted Stock Units, no claim or entitlement to compensation or damages shall arise from termination of the Award or from any diminution in value of the Award or Shares upon vesting of the Award resulting from termination of Participant's continuous service by the Company or any Subsidiary (for any reason whatsoever and whether or not in breach of local labor laws) and Participant irrevocably releases the Company and any Subsidiary from any such claim that may arise; if, notwithstanding the foregoing, any such claim is found by a court of competent jurisdiction to have arisen, then, by signing the Notice of Grant, Participant shall be deemed irrevocably to have waived Participant's entitlement to pursue such claim;

(j) in the event of termination of Participant's employment (whether or not in breach of local labor laws), Participant's right to receive Restricted Stock Units under the Plan and the vesting of such Restricted Stock Units, if any, will terminate effective as of the date that Participant is no longer actively employed and will not be extended by any notice period mandated under local law (e.g., active employment would not include a period of "garden leave" or similar period pursuant to local law); the Administrator shall have the exclusive discretion to determine when Participant is no longer actively employed for purposes of Participant's Restricted Stock Units;

-6-

Source: BigBand Networks, In, 10-Q, August 10, 2007

(k) the Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding Participant's participation in the Plan or Participant's acquisition or sale of the underlying Shares; and

(l) Participant is hereby advised to consult with Participant's own personal tax, legal and financial advisors regarding Participant's participation in the Plan before taking any action related to the Plan.

16 _Data Privacy_. *Participant hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of his or her personal data as described in this Agreement by and among, as necessary and applicable, the Employer, the Company and its Subsidiaries for the exclusive purpose of implementing, administering and managing Participant's participation in the Plan.*

*Participant understands that the Company and the Employer may hold certain personal information about him or her, including, but not limited to, Participant's name, home address and telephone number, date of birth, social security or insurance number or other identification number, salary, nationality, and job title, any Shares of stock or directorships held in the Company, and details of the Restricted Stock Units or any other entitlement to Shares, canceled, exercised, vested, unvested or outstanding in Participant's favor, for the purpose of implementing, administering and managing the Plan ("Data"). Participant understands that Data may be transferred to any third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in Participant's country or elsewhere, and that the recipients' country may have different data privacy laws and protections than Participant's country. Participant authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing Participant's participation in the Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom Participant may elect to deposit any Shares acquired upon vesting of the Restricted Stock Units.*

*Participant understands that he or she may request a list with the names and addresses of any potential recipients of the Data by contacting his or her local human resources representative. Participant understands that Data will be held as long as is reasonably necessary to implement, administer and manage his or her participation in the Plan, and he or she may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing his or her local human resources representative. Such Participants understand, however, that refusing or withdrawing their consent may affect their ability to participate in the Plan. For more information on the consequences of refusal to consent or withdrawal of consent, Participant understands that he or she may contact his or her local human resources representative.*

17. _Electronic Delivery_. The Company may, in its sole discretion, decide to deliver any documents related to Restricted Stock Units awarded under the Plan or future Restricted Stock Units that may be awarded under the Plan by electronic means or request Participant's

-7-

Source: BigBand Networks, In, 10-Q, August 10, 2007

consent to participate in the Plan by electronic means. Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through any on-line or electronic system established and maintained by the Company or another third party designated by the Company.

18. <u>Language</u>. If Participant has received this Agreement or any other document related to the Plan translated into a language other than English and if the translated version is different than the English version, the English version will control, unless otherwise prescribed by local law.

19. <u>Captions</u>. Captions provided herein are for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.

20. <u>Agreement Severable</u>. In the event that any provision in this Agreement will be held invalid or unenforceable, such provision will be severable from, and such invalidity or unenforceability will not be construed to have any effect on, the remaining provisions of this Agreement.

21. <u>Modifications to the Agreement</u>. This Agreement constitutes the entire understanding of the parties on the subjects covered. Participant expressly warrants that he or she is not accepting this Agreement in reliance on any promises, representations, or inducements other than those contained herein. Modifications to this Agreement or the Plan can be made only in an express written contract executed by a duly authorized officer of the Company. Notwithstanding anything to the contrary in the Plan or this Agreement, the Company reserves the right to revise this Agreement as it deems necessary or advisable, in its sole discretion and without the consent of Participant, to comply with Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") or to otherwise avoid imposition of any additional tax or income recognition under Section 409A of the Code in connection to this Award of Restricted Stock Units.

22. <u>Amendment, Suspension or Termination of the Plan</u>. By accepting this Award, Participant expressly warrants that he or she has received an Award of Restricted Stock Units under the Plan, and has received, read and understood a description of the Plan. Participant understands that the Plan is established voluntarily by the Company, is discretionary in nature and may be amended, suspended or terminated by the Company at any time.

23. <u>Exhibit B</u>. Notwithstanding any provision herein or in the Notice of Grant, the Award of Restricted Stock Units shall be subject to any additional terms and conditions as set forth in the Exhibit B for Participant's country of residence, if any.

24. <u>Governing Law</u>. This Agreement shall be governed by the laws of the State of California, without giving effect to the conflict of law principles thereof. For purposes of litigating any dispute that arises under this Award of Restricted Stock Units or this Agreement, the parties hereby submit to and consent to the jurisdiction of the State of California, and agree that such litigation shall be conducted in the courts of San Mateo County, California, or the federal courts for the United States for the Northern District of California, and no other courts, where this Award of Restricted Stock Units is made and/or to be performed.

-8-

Source: BigBand Networks, In, 10-Q, August 10, 2007

## EXHIBIT B
## ADDITIONAL TERMS AND CONDITIONS OF
## RESTRICTED STOCK UNIT GRANT

This Exhibit B has been prepared to provide Participant with a summary of certain important information regarding participation in the Plan in Participant's country of residence.

This Exhibit B is based on the tax and other laws concerning Restricted Stock Units in effect as of June 2007. Such laws are often complex and change frequently. As a result, the information contained in this Exhibit B may be out of date at the time Participant acquires Shares or sells Shares he or she acquires under the Plan.

In addition, this Exhibit B is general in nature. It is not intended to serve as specific tax or investment advice and does not discuss all of the various laws, rules and regulations that may apply. It may not apply to Participant's particular tax or financial situation, and the Company is not in a position to assure Participant of any particular tax result. **Accordingly, Participant is strongly advised to seek appropriate professional advice as to how the tax or other laws in Participant's country apply to Participant's specific situation.**

*If Participant is a citizen or resident of another country, or is considered a resident of another country for local law purposes, the information contained in this Exhibit B may not be applicable to Participant.*

-9-

Source: BigBand Networks, In, 10-Q, August 10, 2007

**EXHIBIT B**

**ADDITIONAL TERMS AND CONDITIONS OF**

**RESTRICTED STOCK UNIT GRANT**

**[Local Tax Information]**

-10-

Exhibit 10.6E

**BIGBAND NETWORKS, INC.**

**2007 EQUITY INCENTIVE PLAN**

**ISRAELI SUB-PLAN**
*(For Israeli Residents Only)*

1.  **Special Provisions for Israeli Tax Payers**

   This Israeli Sub-Plan (the "**Sub-Plan**") to the BigBand Networks, Inc. 2007 Equity Incentive Plan (the "**Plan**") shall apply only to participants who are residents of Israel. Capitalized terms contained herein shall have the same meanings given to them in the Plan, unless otherwise provided by this Sub-Plan. Notwithstanding any provisions contained in the Plan to the contrary and to the extent required by Applicable Laws, the following terms shall apply to all Awards granted to residents of Israel, until such time as the Administrator amends this Sub-Plan or the Administrator otherwise provides.

   This Sub Plan applies with respect to grants of Options, Stock Appreciation Rights, Restricted Stock, Restricted Stock Units, Performance Units or Performance Shares under the Plan (individually or collectively be referred to as "**Awards**"). The purpose of this Sub Plan is to establish certain rules and limitations applicable to Awards and Shares that may be granted or issued under the Plan from time to time, in compliance with the securities and other applicable laws currently in force in the State of Israel. Except as otherwise provided by this Sub Plan, all grants made pursuant to this Sub Plan shall be governed by the terms of the Plan.

2.  **Definitions**

   Capitalized terms not otherwise defined herein shall have the meaning assigned to them in the Plan. The following additional definitions will apply to grants made pursuant to this Sub Plan:

   "**3(i) Option**" means an Option which is subject to taxation pursuant to Section 3(i) of the ITO which has been granted to any person who is not an Eligible 102 Optionee.

   "**102 Capital Gains Track**" means the tax alternative set forth in Section 102(b)(2) of the ITO pursuant to which the income is taxed as a capital gain.

   "**102 Capital Gains Track Grant**" means a 102 Trustee Grant qualifying for the special tax treatment under the 102 Capital Gains Track.

   "**102 Ordinary Income Track**" means the tax alternative set forth in Section 102(b)(1) of the ITO pursuant to which income resulting from the sale of Stock derived from Awards is taxed as ordinary income.

   "**102 Ordinary Income Track Grant**" means a 102 Trustee Grant qualifying for the ordinary income tax treatment under the 102 Ordinary Income Track.

"**102 Trustee Grant**" means an Award granted pursuant to Section 102(b) of the ITO and held in trust by a Trustee for the benefit of the Optionee, and includes both 102 Capital Gains Track Grants and 102 Ordinary Income Track Grants.

"**Affiliate**" means any "employing company" within the meaning of Section 102(a) of the ITO.

"**Controlling Shareholder**" as defined under Section 32(9) of the Ordinance, means an employee who prior to the grant or as a result of the exercise of any Award, holds or would hold, directly or indirectly, in his name or with a relative (as defined in the Ordinance) (i) 10% of the outstanding shares of the Company, (ii) 10% of the voting power of the Company, (iii) the right to hold or purchase 10% of the outstanding equity or voting power, (iv) the right to obtain 10% of the "profit" of the Company (as defined in the Ordinance), or (v) the right to appoint a director of the Company.

"**Election**" means the Company's choice of the type (as between capital gains track or ordinary income track) of 102 Trustee Grants it will make under the Plan, as filed with the ITA.

"**Eligible 102 Optionee**" means an Employee a Director or an officer, who is not a Controlling Shareholder.

"**ITA**" means the Israeli Tax Authority.

"**ITO**" means the Israeli Income Tax Ordinance (New Version) 1961 and the rules, regulations, orders or procedures promulgated thereunder and any amendments thereto, including specifically the Rules, all as may be amended from time to time.

"**Non-Trustee Grant**" means an Award granted to an Eligible 102 Optionee pursuant to Section 102(c) of the ITO and not held in trust by a Trustee.

"**Option**" means an Option granted pursuant to the terms and conditions of the Plan and the Sub-Plan .

"**Required Minimum Trust Period**" means the requisite period prescribed by the ITO and the Rules, or such other period as may be required by the ITA, with respect to 102 Trustee Grants, during which Awards or Shares issued thereunder must be held by the Trustee for the benefit of the person to whom it was granted in order for such grant to enjoy the tax benefits afforded to a 102 Trustee Grant.

"**Rules**" means the Income Tax Rules (Tax benefits in Shares Issuance to Employees) 5763-2003.

"**Section 102**" means Section 102 of the ITO as amended from time to time and any regulations, rules and orders of procedures promulgated thereunder as now in effect or as hereafter amended, including the Rules.

2

Source: BigBand Networks, In, 10-Q, August 10, 2007

"**Trustee**" means a person or entity designated by the Board to serve as a trustee and approved by the ITA in accordance with the provisions of Section 102(a) of the ITO.

### 3.    Types of Awards and Section 102 Election

3.1 102 Trustee Grants whether made as grants of Options, Stock Appreciation Rights, Restricted Stock, Restricted Stock Units, Performance Units or Performance Shares, shall be made pursuant to either (a) Section 102(b)(2) of the ITO as 102 Capial Gains Track Grants or (b) Section 102(b)(1) of the ITO as 102 Ordinary Income Track Grants. The Company's Election regarding the type of 102 Trustee Grant it chooses to make shall be filed with the ITA. Once the Company has filed such Election, it may change the type of 102 Trustee Grant that it chooses to make only after the lapse of at least 12 months from the end of the calendar year in which the first grant was made in accordance with the previous Election, in accordance with Section 102. For the avoidance of doubt, such Election shall not prevent the Company from granting Non-Trustee Grants to Eligible 102 Optionees at any time.

3.2 Eligible 102 Optionees may receive only 102 Trustee Grants or Non-Trustee Grants under this Sub-Plan . Optionees who are not Eligible 102 Optionees may be granted only 3(i) Options under this Sub-Plan .

3.3 No 102 Trustee Grants may be made effective pursuant to this Sub-Plan until 30 days after the requisite filings required by the ITO and the Rules have been made with the ITA.

3.4 The Award Agreement shall indicate whether the grant is a 102 Trustee Grant, a Non-Trustee Grant or a 3(i) Option; and, if the grant is a 102 Trustee Grant, whether it is a 102 Capital Gains Track Grant or a 102 Ordinary Income Track Grant.

3.5 Each Awards granted pursuant to this Sub-Plan shall be evidenced by an Award Agreement.

### 4.    Terms And Conditions of 102 Trustee Awards

4.1 Each 102 Trustee Grant shall be held by the Trustee and each certificate for Shares acquired pursuant to the exercise of an Option, issued directly as Shares shall be issued to and registered in the name of the Trustee and shall be held in trust for the benefit of the Optionee for the Required Minimum Trust Period. After the elapse of the Required Minimum Trust Period, the Trustee may release such Award and any such Shares, provided that (i) the Trustee has received an acknowledgment from the ITA that the Eligible 102 Optionee has paid any applicable tax due pursuant to the ITO or (ii) the Trustee and/or the Company or its Affiliate withholds any applicable tax due pursuant to the ITO. The Trustee shall not release any 102 Trustee Awards or Shares issued thereunder prior to the full payment of the Eligible 102 Optionee's tax liabilities arising from the grant of the Award or the issuance or vesting of the Shares.

4.2 Each 102 Trustee Grant (whether a 102 Capital Gains Track Grant or a 102 Ordinary Income Track Grant, as applicable) shall be subject to the relevant terms of Section 102 and the ITO, which shall be deemed an integral part of the 102 Trustee Grant and shall prevail

3

Source: BigBand Networks, In, 10-Q, August 10, 2007

over any term contained in the Plan, this Sub-Plan or any agreement that is not consistent therewith. Any provision of the ITO and any additional terms required by the ITA not expressly specified in this Sub-Plan or the Award Agreement, as applicable, which are necessary to receive or maintain any tax benefit pursuant to the Section 102 shall be binding on the Eligible 102 Optionee. The Trustee and the Eligible 102 Optionee granted a 102 Trustee Grant shall comply with the ITO, and the terms and conditions of the Trust Agreement entered into between the Company and the Trustee and any tax ruling obtained from the ITA. For avoidance of doubt, it is reiterated that compliance with the ITO specifically includes compliance with the Rules. Further, the Eligible 102 Optionee agrees to execute any and all documents which the Company or the Trustee may reasonably determine to be necessary in order to comply with the provision of any applicable law, and, particularly, Section 102.

**4.3** During the Required Minimum Trust Period, the Eligible 102 Optionee shall not require the Trustee to release or sell the Awards or Shares issued thereunder and other shares received subsequently following any realization of rights derived from Awards or Shares (including stock dividends) to the Eligible 102 Optionee or to a third party, unless permitted to do so by applicable law. Notwithstanding the foregoing, the Trustee may, pursuant to a written request and subject to applicable law, release and transfer such Shares to a designated third party, provided that both of the following conditions have been fulfilled prior to such transfer: (i) all taxes required to be paid upon the release and transfer of the Shares have been withheld for transfer to the tax authorities and (ii) the Trustee has received written confirmation from the Company that all requirements for such release and transfer have been fulfilled according to the terms of the Company's corporate documents, the Plan, any applicable agreement and any applicable law. To avoid doubt such sale or release during the Required Minimum Trust Period will result in different tax ramifications to the Eligible 102 Optionee under Section 102 of the ITO and the Rules and/or any other regulations or orders or procedures promulgated thereunder, which shall apply to and shall be borne solely by such Eligible 102 Optionee.

**4.4** In the event a stock dividend is declared and/or additional rights are granted with respect to Shares which derive from 102 Trustee Grants, such dividend and/or rights shall also be subject to the provisions of this Section 4 and the Required Minimum Trust Period for such shares and/or rights shall be measured from the commencement of the Required Minimum Trust Period for the Awards with respect to which the dividend was declared and/or rights granted. In the event of a cash dividend on Shares, the Trustee shall transfer the dividend proceeds to the Eligible 102 Optionee after deduction of taxes and mandatory payments in compliance with applicable withholding requirements.

**5.    Assignability**

As long as Awards or Shares are held by the Trustee on behalf of the Eligible 102 Optionee, all rights of the Eligible 102 Optionee over the Award and Shares are personal, can not be transferred, assigned, pledged or mortgaged, other than by will or laws of descent and distribution.

4

Source: BigBand Networks, In, 10-Q, August 10, 2007

6. **Tax Consequences**

     6.1 Any tax consequences arising from the grant, vesting or exercise of any Awards, from the payment for Shares covered thereby, or from any other event or act (of the Company and/or its affiliates and/or the Trustee and/or the Optionee), hereunder, shall be borne solely by the Optionee. The Company and/or its affiliates and/or the Trustee shall withhold taxes according to the requirements under the applicable laws, rules, and regulations, including withholding taxes at source. Furthermore, the Optionee shall agree to indemnify the Company and/or its Affiliates and/or the Trustee and hold them harmless against and from any and all liability for any such tax or interest or penalty thereon, including without limitation, liabilities relating to the necessity to withhold, or to have withheld, any such tax from any payment made to the Optionee. The Company and/or any of its Affiliates and/or the Trustee may make such provisions and take such steps as they may deem necessary or appropriate for the withholding of all taxes required by law to be withheld with respect to wards under the Plan and the exercise, vesting and/or sale or other disposition thereof, including, but not limited, to (i) deducting the amount so required to be withheld from any other amount (or Shares issuable) then or thereafter to be provided to the Optionee, including by deducting any such amount from the Optionee's salary or other amounts payable to the Optionee, to the maximum extent permitted under law and/or (ii) requiring the Optionee to pay to the Company or any of its affiliates the amount so required to be withheld as a condition of the issuance, delivery, distribution or release of any Shares. The Company and/or the Trustee shall not be required to release any Shares to the Optionee until all required withholding taxes have been paid by the Optionee. In addition, the Optionee will be required to pay any amount due in excess of the tax withheld and transferred to the ITA, pursuant to applicable tax laws, regulations and rules.

     For avoidance of doubt, there is no assurance that all of the Awards granted as Section 102 Awards shall be eligible for the tax benefits pursuant to Section 102 and therefore any tax consequences arising from the grant, vesting or exercise of any Awards, from the payment for Shares covered thereby, or from any other event or act (of the Company and/or its affiliates and/or the Trustee and/or the Optionee), hereunder, shall be borne solely by the Optionee. The grant of the Awards shall be subject to any tax ruling (if granted) by the Company.

     6.2 With respect to Non-Trustee Grants, if the Optionee ceases to be employed by the Company or any Affiliate, the Eligible 102 Optionee shall extend to the Company and/or its Affiliate a security or guarantee for the payment of tax due at the time of sale of Shares. to the satisfaction of the Company, all in accordance with the provisions of Section 102 of the ITO and the Rules.

     6.3 Following the grant of Options under this Sub-Plan and in any case in which the participant shall stop being considered as an "Israeli Resident," as defined in the Ordinance, the Company may, if and to the extent the Ordinance and/or the rules promulgated thereunder shall impose such obligation on the Company, to withhold all applicable taxes from the participant, to remit the amount withheld to the appropriate Israeli tax authorities and to report to such participant the amount so withheld and paid to said tax authorities.

5

6.4 Notwithstanding anything herein to the contrary, this Sub-Plan shall be governed by the provisions of the Ordinance, the rules promulgated thereunder, and any other applicable Israeli laws with respect to Service Providers or Employees who are Israeli residents.

6.6 This Sub-Plan shall be deemed to be part of the Plan and the Administrator shall have the authority to amend this Sub-Plan in accordance with Section 19 of the Plan.

6

Source: BigBand Networks, In, 10-Q, August 10, 2007

Exhibit 10.6F

**BIGBAND NETWORKS, INC.**

**2007 EQUITY INCENTIVE PLAN**

**ISRAELI SUB-PLAN**

**NOTICE OF GRANT OF STOCK OPTION**

Unless otherwise defined herein, the terms defined in the 2007 Equity Incentive Plan (the "Plan") and the Israeli Sub-Plan thereto (the "Sub-Plan") will have the same defined meanings in this Notice of Grant of Stock Option (the "Notice of Grant") and Terms and Conditions of Stock Option Grant, attached hereto as Exhibit A (together, the "Agreement").

**Participant:** _____

**Address:** _____

Participant has been granted an Option to purchase Common Stock of the Company, subject to the terms and conditions of the Plan and this Agreement, as follows:

Grant Number _____

Date of Grant _____

Vesting Commencement Date _____

Number of Shares Granted _____

Exercise Price per Share $_____

Total Exercise Price $_____

Designation of Option _____

Term/Expiration Date _____

Vesting Schedule: _____

Subject to accelerated vesting as set forth below or in the Plan, this Option will be exercisable, in whole or in part, in accordance with the following schedule:

[VESTING SCHEDULE]

Source: BigBand Networks, In, 10-Q, August 10, 2007

Termination Period:

This Option will be exercisable for [three (3) months] after Participant ceases to be a Service Provider, unless such termination is due to Participant's death or Disability, in which case this Option will be exercisable for [twelve (12) months] after Participant ceases to be a Service Provider. Notwithstanding the foregoing, in no event may this Option be exercised after the Term/Expiration Date as provided above and may be subject to earlier termination as provided in Section 13(c) of the Plan.

By Participant's signature and the signature of the Company's representative below, Participant and the Company agree that this Option is granted under and governed by the terms and conditions of the Plan and this Agreement. Participant has reviewed the Plan and this Agreement in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Agreement and fully understands all provisions of the Plan and Agreement. Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions relating to the Plan and Agreement. Participant further agrees to notify the Company upon any change in the residence address indicated below.

PARTICIPANT                                         BIGBAND NETWORKS, INC.


_____                    _____
Signature                                           By


_____                    _____
Print Name                                          Title

Address:


_____


_____

-2-

## EXHIBIT A
### TERMS AND CONDITIONS OF STOCK OPTION GRANT

1. Grant. The Company hereby grants to the Participant named in the Notice of Grant (the "Participant") an option (the "Option") to purchase the number of Shares, as set forth in the Notice of Grant, at the exercise price per Share set forth in the Notice of Grant (the "Exercise Price"), subject to all of the terms and conditions in this Agreement, the Plan and the Sub-Plan, which are incorporated herein by reference. Subject to Section 18(c) of the Plan, in the event of a conflict between the terms and conditions of the Plan and the terms and conditions of this Agreement, the terms and conditions of the Plan will prevail.

2. Vesting Schedule. Except as provided in Section 3, the Option awarded by this Agreement will vest in accordance with the vesting provisions set forth in the Notice of Grant. Shares scheduled to vest on a certain date or upon the occurrence of a certain condition will not vest in Participant in accordance with any of the provisions of this Agreement, unless Participant will have been continuously a Service Provider from the Date of Grant until the date such vesting occurs.

3. Administrator Discretion. The Administrator, in its discretion, may accelerate the vesting of the balance, or some lesser portion of the balance, of the unvested Option at any time, subject to the terms of the Plan and the Sub-Plan. If so accelerated, such Option will be considered as having vested as of the date specified by the Administrator.

4. Exercise of Option. This Option may be exercised only within the term set out in the Notice of Grant, and may be exercised during such term only in accordance with the Plan, the Sub-Plan and the terms of this Agreement.

This Option is exercisable by delivery of an exercise notice, in the form attached as Exhibit B (the "Exercise Notice") or in a manner and pursuant to such procedures as the Administrator may determine, which will state the election to exercise the Option, the number of Shares in respect of which the Option is being exercised (the "Exercised Shares"), and such other representations and agreements as may be required by the Company pursuant to the provisions of the Plan. The Exercise Notice will be completed by Participant and delivered to the Company. The Exercise Notice will be accompanied by payment of the aggregate Exercise Price as to all Exercised Shares together with any applicable tax withholding. This Option will be deemed to be exercised upon receipt by the Company of such fully executed Exercise Notice accompanied by such aggregate Exercise Price.

5. Method of Payment. Payment of the aggregate Exercise Price will be by any of the following, or a combination thereof, at the election of Participant:

(a) cash;

(b) check;

(c) consideration received by the Company under a formal cashless exercise program adopted by the Company in connection with the Plan; or

-3-

(d) surrender of other Shares, provided Shares acquired directly or indirectly from the Company, (A) have been owned by the Participant and not subject to a substantial risk of forfeiture for more than six (6) months on the date of surrender, and (B) have a Fair Market Value on the date of surrender equal to the aggregate Exercise Price of the Exercised Shares.

    6. Tax Obligations.

    (a) Israeli Taxes. If designated in the Notice of Grant as Section 102(b)(2) Options, the Options are intended to qualify as options for the capital track special tax treatment within the meaning of Section 102 of the Israeli Tax Ordinance (New Version), 5721-1961, as amended (the "Ordinance"), and the Income Tax Rules (Tax Benefits in Share Issuances to Employees) 5763-2003 (the "Rules").

    (b) Withholding of Taxes. Notwithstanding any contrary provision of this Agreement, no certificate representing the Shares will be issued to Participant, unless and until satisfactory arrangements (as determined by the Administrator) will have been made by Participant with respect to the payment of income, employment and other taxes which the Company determines must be withheld with respect to such Shares. To the extent determined appropriate by the Company in its discretion, it shall have the right (but not the obligation) to satisfy any tax withholding obligations by reducing the number of Shares otherwise deliverable to Participant. If Participant fails to make satisfactory arrangements for the payment of any required tax withholding obligations hereunder at the time of the Option exercise, Participant acknowledges and agrees that the Company may refuse to honor the exercise and refuse to deliver Shares if such withholding amounts are not delivered at the time of exercise.

    7. Rights as Stockholder. Neither Participant nor any person claiming under or through Participant will have any of the rights or privileges of a stockholder of the Company in respect of any Shares deliverable hereunder unless and until certificates representing such Shares will have been issued, recorded on the records of the Company or its transfer agents or registrars, and delivered to Participant. After such issuance, recordation and delivery, Participant will have all the rights of a stockholder of the Company with respect to voting such Shares and receipt of dividends and distributions on such Shares.

    8. No Guarantee of Continued Service. PARTICIPANT ACKNOWLEDGES AND AGREES THAT THE VESTING OF SHARES PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY CONTINUING AS A SERVICE PROVIDER AT THE WILL OF THE COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR RETAINING PARTICIPANT) AND NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THE OPTION OR ACQUIRING SHARES HEREUNDER. PARTICIPANT FURTHER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND WILL NOT INTERFERE IN ANY WAY WITH PARTICIPANT'S RIGHT OR THE RIGHT OF THE COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR RETAINING

-4-

Source: BigBand Networks, In, 10-Q, August 10, 2007

PARTICIPANT) TO TERMINATE PARTICIPANT'S RELATIONSHIP AS A SERVICE PROVIDER AT ANY TIME, WITH OR WITHOUT CAUSE.

9. Address for Notices. Any notice to be given to the Company under the terms of this Agreement will be addressed to the Company at BigBand Networks, Inc., [ADDRESS], or at such other address as the Company may hereafter designate in writing.

10. Grant is Not Transferable. This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Participant only by Participant.

11. Binding Agreement. Subject to the limitation on the transferability of this grant contained herein, this Agreement will be binding upon and inure to the benefit of the heirs, legatees, legal representatives, successors and assigns of the parties hereto.

12. Additional Conditions to Issuance of Stock. If at any time the Company will determine, in its discretion, that the listing, registration or qualification of the Shares upon any securities exchange or under any state or federal law, or the consent or approval of any governmental regulatory authority is necessary or desirable as a condition to the issuance of Shares to Participant (or his or her estate), such issuance will not occur unless and until such listing, registration, qualification, consent or approval will have been effected or obtained free of any conditions not acceptable to the Company. The Company will make all reasonable efforts to meet the requirements of any such state or federal law or securities exchange and to obtain any such consent or approval of any such governmental authority. Assuming such compliance, for income tax purposes the Exercised Shares will be considered transferred to Participant on the date the Option is exercised with respect to such Exercised Shares.

13. Plan Governs. This Agreement is subject to all terms and provisions of the Plan and the Sub-Plan. In the event of a conflict between one or more provisions of this Agreement and one or more provisions of the Plan or the Sub-Plan, the provisions of the Plan and the Sub-Plan will govern. Capitalized terms used and not defined in this Agreement will have the meaning set forth in the Plan or the Sub-Plan.

14. Administrator Authority. The Administrator will have the power to interpret the Plan, the Sub-Plan and this Agreement, and to adopt such rules for the administration, interpretation and application of the Plan and the Sub-Plan as are consistent therewith and to interpret or revoke any such rules (including, but not limited to, the determination of whether or not any Shares subject to the Option have vested). All actions taken and all interpretations and determinations made by the Administrator in good faith will be final and binding upon Participant, the Company and all other interested persons. No member of the Administrator will be personally liable for any action, determination or interpretation made in good faith with respect to the Plan, the Sub-Plan or this Agreement.

15. Electronic Delivery. The Company may, in its sole discretion, decide to deliver any documents related to Options awarded under the Plan or the Sub-Plan or future Options that may be awarded under the Plan or the Sub-Plan by electronic means or request Participant's consent to

Source: BigBand Networks, In, 10-Q, August 10, 2007

participate in the Plan and the Sub-Plan by electronic means. Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan and the Sub-Plan through any on-line or electronic system established and maintained by the Company or another third party designated by the Company.

16. Captions. Captions provided herein are for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.

17. Agreement Severable. In the event that any provision in this Agreement will be held invalid or unenforceable, such provision will be severable from, and such invalidity or unenforceability will not be construed to have any effect on, the remaining provisions of this Agreement.

18. Modifications to the Agreement. This Agreement constitutes the entire understanding of the parties on the subjects covered. Participant expressly warrants that he or she is not accepting this Agreement in reliance on any promises, representations, or inducements other than those contained herein. Modifications to this Agreement, the Plan or the Sub-Plan can be made only in an express written contract executed by a duly authorized officer of the Company.

19. Amendment, Suspension or Termination of the Plan. By accepting this Award, Participant expressly warrants that he or she has received an Option under the Plan and the Sub-Plan, and has received, read and understood descriptions of the Plan and the Sub-Plan. Participant understands that the Plan and the Sub-Plan are discretionary in nature and may be amended, suspended or terminated by the Company at any time.

20. Governing Law. This Agreement will be governed by the laws of the State of Israel, without giving effect to the conflict of law principles thereof. For purposes of litigating any dispute that arises under this Option or this Agreement, the parties hereby submit to and consent to the jurisdiction of the State of Israel, and agree that such litigation will be conducted in the courts of the State of Israel, and no other courts, where this Option is made and/or to be performed.

-6-

**EXHIBIT B**

**BIGBAND NETWORKS, INC.**

**2007 EQUITY INCENTIVE PLAN**

**ISRAELI SUB-PLAN**

**EXERCISE NOTICE**

BigBand Networks, Inc.
[ADDRESS]

Attention: _____

1. Exercise of Option. Effective as of today,            ,         , the undersigned ("Purchaser") hereby elects to purchase             shares (the "Shares") of the Common Stock of BigBand Networks, Inc. (the "Company") under and pursuant to the 2007 Equity Incentive Plan (the "Plan"), the Israeli Sub-Plan thereto (the Sub-Plan) and the Stock Option Agreement dated            (the "Agreement"). The purchase price for the Shares will be $         , as required by the Agreement.

2. Delivery of Payment. Purchaser herewith delivers to the Company the full purchase price of the Shares and any required tax withholding to be paid in connection with the exercise of the Option.

3. Representations of Purchaser. Purchaser acknowledges that Purchaser has received, read and understood the Plan, the Sub-Plan and the Agreement and agrees to abide by and be bound by their terms and conditions.

4. Rights as Stockholder. Until the issuance (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company) of the Shares, no right to vote or receive dividends or any other rights as a stockholder will exist with respect to the Shares subject to the Option, notwithstanding the exercise of the Option. The Shares so acquired will be issued to Participant as soon as practicable after exercise of the Option. No adjustment will be made for a dividend or other right for which the record date is prior to the date of issuance, except as provided in Section 13 of the Plan.

5. Tax Consultation. Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the Shares. Purchaser represents that Purchaser has consulted with any tax consultants Purchaser deems advisable in connection with the purchase or disposition of the Shares and that Purchaser is not relying on the Company for any tax advice.

-7-

6. <u>Entire Agreement; Governing Law</u>. The Plan, the Sub-Plan and Agreement are incorporated herein by reference. This Exercise Notice, the Plan, the Sub-Plan and the Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Purchaser with respect to the subject matter hereof, and may not be modified adversely to the Purchaser's interest except by means of a writing signed by the Company and Purchaser. This agreement is governed by the internal substantive laws, but not the choice of law rules, of the State of Israel.

Submitted by:                                              Accepted by:

PARTICIPANT                                         BIGBAND NETWORKS, INC.

_____      _____
Signature                                                  By

_____      _____
Print Name                                                Title
Address:

_____
_____

                                                               _____
                                                               Date Received

                                          -8-

Source: BigBand Networks, In, 10-Q, August 10, 2007

EXHIBIT 31.1

CERTIFICATION

I, Amir Bassan-Eskenazi, certify that:

1. I have reviewed this quarterly report on Form 10-Q of BigBand Networks, Inc. (the "Registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4. The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Registrant and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Date: August 10, 2007

/s/ Amir Bassan-Eskenazi
Amir Bassan-Eskenazi
Chief Executive Officer
(Principal Executive Officer)

EXHIBIT 31.2

## CERTIFICATION

I, Frederick Ball, certify that:

1. I have reviewed this quarterly report on Form 10-Q of BigBand Networks, Inc. (the "Registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4. The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Registrant and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Date: August 10, 2007

/s/ Frederick Ball
Frederick Ball
Chief Financial Officer
*(Principal Financial Officer)*

Source: BigBand Networks, In, 10-Q, August 10, 2007

EXHIBIT 32.1

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**
**Pursuant to**
**18 U.S.C. Section 1350,**
**As Adopted pursuant to**
**Section 906 of the Sarbanes-Oxley Act of 2002**

I, Amir Bassan-Eskenazi, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the quarterly report of BigBand Networks, Inc. on Form 10-Q for the quarterly period ended June 30, 2007, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such quarterly report on Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of BigBand Networks, Inc.

Date: August 10, 2007

/s/ Amir Bassan-Eskenazi
Amir Bassan-Eskenazi
Chief Executive Officer
*(Principal Executive Officer)*

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**
**Pursuant to**
**18 U.S.C. Section 1350,**
**As Adopted pursuant to**
**Section 906 of the Sarbanes-Oxley Act of 2002**

I, Frederick Ball, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the quarterly report of BigBand Networks, Inc. on Form 10-Q for the quarterly period ended June 30, 2007, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such quarterly report on Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of BigBand Networks, Inc.

Date: August 10, 2007

/s/ Frederick Ball
Frederick Ball
Chief Financial Officer
*(Principal Financial Officer)*

*The forgoing certifications are being furnished to the U.S. Securities and Exchange Commission as an exhibit to the quarterly report on Form 10-Q for the quarterly period ended June 30, 2007 and accompany such Form 10-Q, and shall not be considered filed as part of such report.

Created by 10KWizard    www.10KWizard.com